RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY

2015 APR -1  AM 11: 45

**ESTATE OF ARTURO GIRON ALVAREZ**    *
by and through Maria Ana Giron Galindo
as Administrator    *

**AND THE 773 INDIVIDUALS IDENTIFIED ON**    *
**EXHIBIT 1 TO THIS COMPLAINT**

   *

**AND UNKNOWN USE PLAINTIFFS**, et al.

   *

     c/o Escritorio Juridico Rodriguez,    *
     Fajardo y Asociados
     Centro Profesional Cipreses, Nivel 5, Oficina 505
     Caracas, Distrito Federal,    *
     Republica Bolivariana de Venezuela

   *

     and

   *

     Salsbury, Clements, Bekman, Marder
     & Adkins LLC    *
     300 West Pratt Street, Suite 450
     Baltimore, Maryland 21201    *

     **PLAINTIFFS**    *

v.    *

**THE JOHNS HOPKINS UNIVERSITY**    *
3400 North Charles Street
Baltimore, MD 21218    *

and    *

**THE JOHNS HOPKINS UNIVERSITY**    *
**SCHOOL OF MEDICINE**
3400 North Charles Street    *
Baltimore, MD 21218

   *

     <u>Serve On:</u>
     Mark Rotenberg, Esq.    *
     3400 North Charles Street
     Baltimore, MD 21218    *

and    *

**IN THE CIRCUIT**

**COURT FOR** CIVIL DIVISION

**BALTIMORE CITY**

Case No.: _____

1

**THE JOHNS HOPKINS HOSPITAL**                              *
600 North Wolfe Street
Baltimore, MD 21287                                         *

    <u>Serve On:</u>                  *
    Joanne Pollak, Esq.
    Resident Agent                     *
    Administration 414
    600 North Wolfe Street             *
    Baltimore, MD 21287
                                                           *
and
                                                           *
**THE JOHNS HOPKINS BLOOMBERG SCHOOL OF**
**PUBLIC HEALTH, formerly known as THE JOHNS**  *
**HOPKINS SCHOOL OF HYGIENE AND PUBLIC**
**HEALTH**                                                 *
615 North Wolfe Street
Baltimore, MD 21205                                        *

and                                                        *

**THE JOHNS HOPKINS HEALTH SYSTEM**                        *
**CORPORATION**
600 North Wolfe Street                                     *
Baltimore, MD 21287
                                                           *
    <u>Serve On:</u>
    Joanne Pollak, Esq.                *
    Resident Agent
    Administration 414                 *
    600 North Wolfe Street
    Baltimore, MD 21287                *

and                                                        *

**THE ROCKEFELLER FOUNDATION**                             *
420 Fifth Avenue
New York, NY 10018                                         *

    <u>Serve On:</u>                  *
    Gregory L. Diskant
    Patterson Belnap Webb & Tyler      *
    1133 Avenue of the Americas
    New York, NY 10036                 *

2

and

*

**BRISTOL-MYERS SQUIBB COMPANY,**
**formerly known as E.R. SQUIBB & SONS, INC.;**   *
**BRISTOL, MYERS; BRISTOL-MYERS;**
**BRISTOL LABORATORIES;**   *
**and the SQUIBB INSTITUTE FOR**
**MEDICAL RESEARCH**   *
345 Park Avenue
New York, NY 10154   *

    <u>Serve On</u>:   *
    CT Corporation System
    Resident Agent   *
    111 Eighth Avenue
    New York, NY 10011   *

And   *

**BRISTOL-MYERS SQUIBB U.S.**   *
**PHARMACEUTICAL GROUP,**
**formerly known as E.R. SQUIBB & SONS, INC.;**   *
**BRISTOL, MYERS; BRISTOL-MYERS;**
**BRISTOL LABORATORIES;**   *
**and the SQUIBB INSTITUTE FOR**
**MEDICAL RESEARCH**   *
Bristol-Myers Squibb U.S. Pharmaceutical Corporation
Trust Incorporated   *
32 South Street
Baltimore, MD 21202   *

    <u>Serve On</u>:   *
    CSC-Lawyers Incorporating Service Company
    7 St. Paul Street, Suite 820   *
    Baltimore, MD 21202
       *

And   *

       *

**MEAD JOHNSON & COMPANY, LLC,**
**as the owner of**   *
**BRISTOL-MYERS SQUIBB U.S.**
**PHARMACEUTICAL GROUP**   *
2701 Patriot Boulevard, Fourth Floor
Glenview, IL   *

Serve On:                                                    *
CSC-Lawyers Incorporating Service Company
7 St. Paul Street, Suite 820                                 *
Baltimore, MD 21202
                                                             *
**DEFENDANTS**.
                                                             *
*       *       *       *       *       *       *       *       *       *       *       *

## COMPLAINT

Plaintiffs, by and through their attorneys, Paul D. Bekman, E. Dale Adkins, III, Laurence A. Marder, Gregory G. Hopper, Emily C. Malarkey, and James O'C Gentry of Salsbury, Clements, Bekman, Marder & Adkins, LLC; F. R. Jenkins and Matthew R. Caton of Meridian 361 International Law Group, PLLC; and Juan Pablo Rodriguez of Escritorio Juridico Rodriguez, Fajardo y Asociados, hereby sue Defendants, The Johns Hopkins Hospital, The Johns Hopkins University, The Johns Hopkins University School of Medicine, The Johns Hopkins Bloomberg School of Public Health, The Johns Hopkins Health System Corporation, The Rockefeller Foundation, Bristol-Myers Squibb Company, Bristol-Myers Squibb U.S. Pharmaceutical Group, and Mead Johnson & Company, LLC, and state as follows.

### Summary of the Case

1.     From 1945 to 1956, physicians and scientists, and other agents employed by Johns Hopkins and The Rockefeller Foundation, participated in, approved, encouraged, directed, and aided and abetted human subject experiments in Guatemala in which children, soldiers, prison inmates, psychiatric hospital patients, and orphans were intentionally exposed to and infected with syphilis, gonorrhea, chancroid, and other diseases (as further described herein, the "Guatemala Experiments" or the "Experiments").

2.     The Guatemalan subjects were not told that they were being exposed to or

infected with these devastating and potentially fatal diseases, or even that they were being experimented upon. Instead, in an intentional effort to deceive and mislead them, and to keep the true nature of the experiments a secret, the researchers said that they were performing routine medical tests and administering medication for the subjects' own good. This deception continued even after the human experiments ended.

3.      The Guatemalans were not told about the nature of the experiments, warned about the consequences of being exposed to and infected with these sexually transmitted diseases, or given any follow-up care, treatment, or education to minimize their pain and suffering. Nothing was done to prevent them from passing the diseases on to their spouses, children, and other descendants. As a result, many Guatemalans have suffered and died, and will continue to suffer and die, from the venereal diseases with which they were intentionally infected.

4.      The Guatemala Experiments were hidden from view until September of 2011, when the United States Presidential Commission for the Study of Bioethical Issues released a report outlining its investigation into the experiments. That Commission concluded "that the Guatemala experiments involved gross violations of ethics as judged against both the standards of today and the researchers' own understanding of applicable contemporaneous practices." Leaving no room for doubt about the character of the experiments, the Presidential Commission stated that the researchers and those who oversaw them committed "egregious moral wrongs." A Guatemalan Presidential Commission also investigated and concluded the Guatemala Experiments were "an immoral act of great impact and a crime against humanity."

5.      Johns Hopkins[1] and The Rockefeller Foundation[2] helped design, support,

---

[1] As used in this Complaint, "Hopkins" and/or "Johns Hopkins" refers to The Johns

develop, encourage, and finance, and participated in and benefitted from the Guatemala Experiments. As institutions and through their agents, servants, employees, and borrowed servants, and in concert with others, Johns Hopkins and Rockefeller created and designed the Guatemala Experiments; approved and recommended them for funding; oversaw, monitored, encouraged, directed, and aided and abetted them while they were ongoing; and helped conceal their unethical, immoral, and tortious nature.

6.      In the early 1940's, Bristol-Myers Squibb's[3] predecessor companies were involved in the investigation and commercial production of various forms of penicillin. They, as institutions and through their agents, servants, employees, and borrowed servants, were interested in studying the efficacy of different forms of this drug for treating and/or preventing syphilis and other infectious diseases. Their intent was to develop and sell for profit various forms of penicillin.

7.      The predecessors of Bristol-Myers Squibb, because of connections in the medical community, knew of the secret non-consensual studies being performed in Guatemala and decided to use those Experiments with human subjects to test various forms of penicillin they had manufactured and their efficacy. They supplied penicillin in various forms for use in the negligently and unethically designed experiments, and were made aware of the study results in

---

Hopkins University, The Johns Hopkins University School of Medicine, The Johns Hopkins Bloomberg School of Public Health (formerly known as The Johns Hopkins School of Hygiene and Public Health), The Johns Hopkins Health System Corporation, and The Johns Hopkins Hospital.

[2] The Rockefeller Foundation is also referred to as Rockefeller in this Complaint.

[3] As used in this Complaint, Bristol-Myers Squibb refers to the current day Bristol-Myers Squibb Company and Bristol-Myers Squibb U.S. Pharmaceutical Group, both of which were formerly known as E.R. Squibb & Sons, Inc.; Bristol, Myers; Bristol-Myers; Bristol Laboratories; and the Squibb Institute For Medical Research, as well as all other predecessor corporations and entities.

order that they might better manufacture and market for profit various forms of the drug for use in treating and/or preventing syphilis.

### The Plaintiffs

8.     The Plaintiffs in this case, who seek compensatory and punitive damages from the Defendants, include:

a.     Guatemalans who were subjects in the Experiments referred to in this Complaint (the "Subject Plaintiffs"), who were intentionally and negligently exposed to and infected with syphilis, gonorrhea, and/or chancroid, without their actual or informed consent;

b.     Guatemalans who were spouses, children, sexual partners or descendants of the Subject Plaintiffs, and who acquired syphilis, gonorrhea, and/or chancroid through sexual contact or congenitally from the Subject Plaintiffs;

c.     Descendants of the Plaintiffs entitled to prosecute wrongful death claims under Maryland law as a result of the death of their decedents from complications of venereal diseases.

9.     All 774 Plaintiffs are identified by name on the attached Exhibit 1, which is expressly incorporated into this Complaint. Those individuals who were Subject Plaintiffs are highlighted in yellow and marked with the label "VD" (Victima Directa). The spouses and descendants of the Subject Plaintiffs follow underneath each of their names.

### The Defendants

10.     Defendants Johns Hopkins University, The Johns Hopkins Health System Corporation, and The Johns Hopkins Hospital, are corporate entities created and existing under the laws of the State of Maryland with their principal places of business located in Baltimore City. At all times relevant to this case, from their creation until today, these

Defendants have regularly conducted business in Baltimore City.  At all times relevant to this case, these Defendants are the successor and/or predecessor corporations to, The Johns Hopkins University School of Medicine and The Johns Hopkins Bloomberg School of Public Health.

11.    Defendants The Johns Hopkins University School of Medicine and The Johns Hopkins Bloomberg School of Public Health, formerly known as The Johns Hopkins School of Hygiene and Public Health, are predecessor, and/or successor entities to and subsidiaries of Defendants Johns Hopkins University, The Johns Hopkins Health System Corporation, and The Johns Hopkins Hospital, and at all relevant times were and are owned, controlled, and operated by these Defendants.  At all times relevant to this case, from their creation until today, Defendants The Johns Hopkins University School of Medicine and The Johns Hopkins Bloomberg School of Public Health have regularly conducted business in Baltimore City.

12.    The Rockefeller Foundation is a corporation created and existing under the laws of the State of New York. At all times relevant to this case, from its creation until today, The Rockefeller Foundation has regularly conducted business in Baltimore City.

13.    Bristol-Myers Squibb Company is incorporated under the laws of the State of Delaware.  It maintains a principal place of business in the State of New York.  At times relevant to this Complaint, it was known as Bristol, Myers; Bristol-Myers; E.R. Squibb & Sons, Inc.; Bristol Laboratories; and the Squibb Institute For Medical Research, as well as other unknown corporate names.  At all times relevant to this case, from its creation until today, Bristol-Myers Squibb Company has regularly conducted business in Baltimore City.

14.    Bristol-Myers Squibb U.S. Pharmaceutical Group is owned by Mead Johnson & Company, LLC, which is incorporated under the laws of the State of Delaware, with its principal place of business in the State of Indiana.  At times relevant to this Complaint, it was known as

8

Bristol, Myers; Bristol-Myers; E.R. Squibb & Sons, Inc.; Bristol Laboratories; and the Squibb

Institute For Medical Research, as well as other unknown corporate names.  At all times relevant

to this case, from its creation until today, Bristol-Myers Squibb U.S. Pharmaceutical Group and

Mead Johnson & Company, LLC, have regularly conducted business in Baltimore City.

### Jurisdiction and Venue

15.    This Court has jurisdiction over all of the Defendants in this case.

16.    Venue is proper in Baltimore City.

17.    Plaintiffs, individually and collectively, whether considered by count or

individual claim, are claiming damages in an amount exceeding seventy-five thousand dollars

($75,000).

### Facts Common To All Counts

#### *Hopkins' And Rockefeller's Early Role In STD Research*

18.    A part of the business of Johns Hopkins University and its associated

organizations has always been medical research and development.  In furtherance of this activity,

in the first part of the 20th Century, Hopkins established itself as a leading research center in the

area of sexually transmitted diseases (STDs), or venereal diseases.  In the relatively small world

of venereal disease researchers at the time, many preeminent in the field were employed by or

were agents of Hopkins.

19.    The Rockefeller Foundation was established in 1913.  A part of its business is to

investigate and promote research in the area of public health.  It has accomplished this mission

by providing funding for projects and by placing its personnel on assignment to those projects in

order to direct, participate in, control, and oversee the work in question.  In the first part of the

20th Century, The Rockefeller Foundation developed an interest in venereal diseases, and

directed its money, resources, and personnel towards the investigation of such diseases.

20.     In 1914, The Rockefeller Foundation gave Johns Hopkins $15,000 to establish a clinic at its Baltimore campus to study and treat patients with syphilis. The clinic, which became known as "Department L" (for *lues venerea*, the Latin name for the disease), was devoted to the study and treatment of syphilis.

21.     In 1915, The Rockefeller Foundation announced its decision to fund a school of public hygiene in the United States. Hopkins was chosen, and in 1916, the Hopkins School of Hygiene and Public Health, today known as the Hopkins Bloomberg School of Public Health, opened its doors.

22.     From 1921 to 1929, Dr. Alan Chesney of Johns Hopkins served as the Director of Department L. As the Director and later as Dean of the Hopkins School of Medicine, Dr. Chesney worked to involve Hopkins in the study and treatment of STDs. Indeed, Dr. Chesney spent almost twenty years conducting experiments evaluating the basic mechanisms of immunity in syphilis. He published frequently in the field and obtained numerous grants from private and public sources related to his work at Johns Hopkins. During this time, the United States Government was becoming increasingly concerned with the spread of syphilis and other venereal diseases.

23.     In 1929, Dr. J. Earle Moore, a Hopkins Professor, replaced Dr. Chesney as Director of Department L. Dr. Moore had been conducting STD research of his own for some time at Hopkins. While employed by Hopkins and as a part of his duties there, Dr. Moore advised the Surgeon Generals of the U.S. Army, Navy, and Public Health Service (PHS) on STDs.

24.     Upon becoming Director of Department L, Dr. Moore began to aggressively expand the scope of Hopkins' clinical STD program and to position Hopkins to control the

federally funded investigations into the treatment of syphilis and other STDs.   Under his direction, Department L obtained large grants of money from the Federal Government and from private sources, including The Rockefeller Foundation, to perform clinical research into venereal diseases.  In 1937, Hopkins received its first ever grant of federal research funds, and the grant was for the study of syphilis.

25.    In the 1930s and 1940s, there was a significant increase in federally funded research activities and experimentation in the area of STDs, and these activities received more federal funding than any other field of medical research.

26.    At the time, it was the express policy of the Federal Government to fund scientific and medical research, but not to control the research or the individual scientists conducting it.  To accomplish this, the Federal Government established a system wherein panels of non-governmental scientists and physicians proposed, designed, authorized, supervised and approved federal funding of scientific and medical research and experimentation. This system resulted in private sector control of federally funded venereal disease research and experimentation.

27.    By placing its agents and employees on these panels, Hopkins achieved substantial influence over federally funded STD research and experimentation.  The most important of these panels were the Subcommittee on Venereal Diseases and the Penicillin Panel within the National Research Council (NRC),[4] the National Advisory Health Council (NAHC), the Syphilis and Antibiotic Study Sections of the National Institutes of Health (the NIH), and the Pan American Sanitary Bureau (PASB).

---

[4] The National Research Council is a private, non-profit organization that shares in the responsibility for advising the Federal Government on questions of public health, science, and technology.  Its members are not compensated.

28.     By influencing and controlling these entities, Hopkins physicians and scientists proposed, designed, authorized, supervised and approved the most important federally funded human STD research and experimentation of this time. They also used their representation on these committees to ensure that grants supported their own STD research and experimentation, including a component for Hopkins overhead.

29.     Consistent with the express policy of the Federal Government that federally funded research should be controlled by the private sector, these Hopkins agents, servants and employees were not Federal Government employees, were not compensated by the Federal Government, and were not controlled by the Federal Government. Their participation in these panels and committees occurred within the scope of their employment with Johns Hopkins, and Hopkins paid them. Hopkins knew of, supported, and benefited from the participation of its agents, servants and employees in these leadership positions.

30.     In the early 1940s, Dr. Moore, Dr. Chesney and Dr. Harry Eagle, another Hopkins professor, conceived and pursued a joint Hopkins-PHS Venereal Disease Research and Post-Graduate Training Center, and joint Hopkins-PHS Laboratory of Experimental Therapeutics and Venereal Disease Research, all based in Baltimore. The project was sanctioned and authorized by Hopkins President Isaiah Bowman and Rockefeller Trustee and Surgeon General Thomas Parran, M.D. The Government began sending numerous members of the PHS to Hopkins for training.

31.     Dr. J. Earle Moore and other employees of Hopkins also established Johns Hopkins as the national command and control center and information clearinghouse for all federally funded investigations into the treatment of syphilis and other venereal diseases. Clinics around the country examined, treated, and followed syphilis patients according to a uniform plan

developed by Dr. Moore. They recorded their results on Hopkins-designed forms, and mailed these forms to Hopkins in Baltimore. Moore then shared the collected data with colleagues at the Hopkins School of Hygiene and Public Health, including Hopkins Vice President and physician Dr. Lowell J. Reed. Dr. Reed chaired a federally funded Biostatistical Unit, based at Hopkins, which processed data generated in the investigations. Research findings were published in reports distributed by the National Research Council's Penicillin Panel, which Dr. Moore chaired, and which included other Hopkins physicians.

### *Tuskegee and Terre Haute*

32.    Using their positions of influence and power in the area of STD research and prevention, Dr. Moore and other agents, servants, employees and borrowed servants of Hopkins led two now infamous research studies involving human subjects.

33.    The first of these studies began in 1932 and involved 600 impoverished, uneducated African-American sharecroppers who participated unknowingly in a syphilis experiment officially named the "Tuskegee Study of Untreated Syphilis in the Negro Male." The participants in the Tuskegee Study, many of whom had syphilis, were never told they had a debilitating and potentially fatal disease. Rather, they were intentionally deceived as to the nature of their illness, and were led to believe they were receiving effective treatment when, in fact, they only received placebos. Even after penicillin had been discovered to be an effective treatment for syphilis in the mid-1940s, the researchers did not prescribe it and simply watched as men and women died from syphilis, their spouses contracted syphilis, and their children were born with congenital syphilis.

34.    Johns Hopkins' Dr. Moore was an architect of the Tuskegee Study and designed, authorized, supervised, conducted, and supported it while at Hopkins. He specified to

the PHS doctors in the field the experiment's sample size, demographics, and specifics of the examinations and tests, which continued until 1972, when the study became public knowledge and was terminated.

35.     The Terre Haute Experiments began in 1942 while the Tuskegee Study was still underway.  Dr. Moore asked members of the NRC Subcommittee on Venereal Diseases, which he chaired, and which included his Hopkins colleagues Dr. Harry Eagle, Dr. Thomas Turner, Dr. Lewis Weed, and Dr. Nels Nelson, to approve experiments to be conducted on federal prison inmates in Terre Haute, Indiana. The Surgeon General of the Public Health Service, Thomas Parran, M.D., who was a close personal friend of Dr. Moore, a Trustee of The Rockefeller Foundation, and a Scientific Director of Rockefeller's International Health Division, supported the Terre Haute proposal.

36.     Dr. Moore's proposal for experiments on prison inmates at Terre Haute was successful.  Starting in September of 1943, experiments were performed to intentionally infect 241 prisoners with gonorrhea.  The researchers involved reported directly to Dr. Moore's Subcommittee on Venereal Diseases, which retained oversight responsibility for their work.

37.     Two problems developed during the Terre Haute Experiments.  First, members of the NRC became increasingly concerned about the potential for adverse legal action and bad publicity.  One member worried that the details of the Terre Haute Experiments would "fall in the hands of a very unscrupulous lawyer," and that the waivers signed by the prisoners would not constitute sufficient legal protection for the researchers.  Another member was concerned about adverse publicity and public relations.  Secondly, the Terre Haute researchers had difficulty infecting the prisoners, having tried almost every method of transmission except the "natural method" of infection, *i.e.,* sexual contact, which was felt to be impermissible in the

14

United States.

38.     The Terre Haute Experiments were terminated in 1944, although Dr. Moore and the other members of the NRC Subcommittee resisted the cessation.

39.     The inability of the Terre Haute researchers to develop an effective method for infecting subjects with venereal disease left them unable to address their primary research goals. As a result, their work was unfinished.  The researchers needed different subjects in a different setting, where there was less scrutiny.

*The Guatemala Experiments*

40.     In 1946, the NRC Penicillin Panel and its Subcommittee on Venereal Diseases, both chaired by Dr. Moore of Hopkins, were reconstituted into the "Syphilis Study Section," a committee within the National Institutes of Health.  The membership and purpose of the Study Section – to initiate and promote research into syphilis – was the same as its predecessor.

41.     The Syphilis Study Section was composed of non-governmental researchers and liaison officers from the PHS, the Veterans Administration, and the military, but only the non-governmental members of the Section had voting privileges.

42.     Dr. Moore was the Chairman of the Syphilis Study Section. Drs. Harry Eagle, Lowell Reed, and Thomas Turner – all Johns Hopkins Professors – were on the committee. Dr. Reed was the Vice President of both Johns Hopkins University and Johns Hopkins Hospital during the first half of the Guatemala Experiments, and the seventh President of Johns Hopkins University during the second half of the Guatemala Experiments.  At this time, Dr. Reed was also a Scientific Director of The Rockefeller Foundation.   During the Guatemala Experiments, Dr. Turner was a Professor and Chairman of the Department of Bacteriology at the School of Public Health, and later became the Dean of the School of Medicine.  So many of the doctors on

the Syphilis Study Section were senior employees of Johns Hopkins that a number of its meetings were held on the Hopkins campus in Baltimore.

43.    Because of the Syphilis Study Section's authority and voting rules, Hopkins and The Rockefeller Foundation controlled federal funding for all syphilis research at the time.

44.    At the first meeting of the Syphilis Study Section in February of 1946, a proposal was made and approved to conduct the Guatemala Experiments, referred to as the "experimental transmission of syphilis to human volunteers and improved methods of prophylaxis" in Guatemala.

45.    The Guatemala Experiments were funded through a grant to the Pan American Sanitary Bureau (PASB). They were the single largest project funded by the National Institutes of Health in 1946 and 1947.

46.    The Experiments were to be conducted not on U.S. citizens (like the prisoners at Terre Haute) but on Guatemalans. Studying in Guatemala gave the researchers the opportunity to test additional methods of infecting humans with venereal disease in a foreign location more easily hidden from public scrutiny. The individuals who would be the "subjects" in the experiments were to be children, orphans, asylum inmates, prisoners, members of the military, and other vulnerable Guatemalans.

47.    Guatemala was an ideal location for such experiments for multiple reasons. First, relations between the U.S. Government and Guatemala were cooperative. The relationship between the military of both countries was good, ensuring secrecy and access to vulnerable, captive populations, such as prison inmates, psychiatric patients, soldiers, school children, and orphans, many drawn from socio-economically disadvantaged indigenous groups not speaking the prevailing Spanish dialect.

48.     Also, at the time, the PHS had a pre-existing relationship with Guatemala.  Dr. Juan Funes, Guatemala's leading venereal disease public health official, had trained in the United States.  This relationship ensured contact, cooperation, access to, and support by the Guatemalan government.

49.     Prostitution was legal in Guatemala, and sex workers underwent regular inspections at clinics controlled by Dr. Funes.  This situation afforded a "living laboratory," making the transmission of syphilis and other STDs by physical sexual contact possible. Prostitutes could be infected with venereal disease and then infect a study subject through intercourse, a practical impossibility at Terre Haute.

50.     The Guatemala Experiments were undertaken by the same team of doctors and scientists involved in Tuskegee and Terre Haute.  In all three experiments, onsite responsibility was given to a young Public Health Service trained physician, Dr. John Cutler.

51.     Dr. Cutler arrived in Guatemala in August of 1946.  With the support, knowledge, and approval of agents, servants, and employees of Hopkins and The Rockefeller Foundation, Dr. Cutler and other researchers exposed prison inmates in the Penitenciaria Central in Guatemala City; psychiatric patients in the Asilo de Alienados in Guatemala City; orphans in the Hospicio Nacional de Guatemala in Guatemala City; school children in a school in Puerto de San Jose; school children at Casa del Nino in Guatemala City, and others to syphilis, gonorrhea, chancroid, and a strain of syphilis that infects rabbits known as *T. cuniculi*.  They were also exposed to various human and animal fluids and tissues potentially containing other pathogens.

52.     The primary purpose of the Guatemala Experiments was to develop a way to best transmit syphilis, gonorrhea and chancroid to humans so as to study the natural course and development of these diseases, ways to treat and prevent them, and the potential for humans with

17

latent or untreated syphilis to be re-infected.

53.    During the Experiments the following occurred:

a.    Prostitutes were infected with venereal disease and then provided for sex to subjects for intentional transmission of the disease;

b.    Subjects were inoculated by injection of syphilis spirochetes into the spinal fluid that bathes the brain and spinal cord, under the skin, and on mucous membranes;

c.    An emulsion containing syphilis or gonorrhea was spread under the foreskin of the penis in male subjects;

d.    The penis of male subjects was scraped or scarified and then coated with the emulsion containing syphilis or gonorrhea;

e.    A woman from the psychiatric hospital was injected with syphilis, developed skin lesions and wasting, and then had gonorrheal pus from a male subject injected into both of her eyes; and

f.    Children were subjected to blood studies to check for the presence of venereal disease.

54.    Many of the human subjects developed disease.  In addition, researchers subjected the human subjects to repeated blood draws, lumbar punctures and cisternal punctures (of the suboccipital portion of the brain), gynecological examinations, touching and penetration of sexual organs, and forced or coerced sexual contact, all in furtherance of the research goals. These measures were non-therapeutic in nature.

55.    The Guatemala Experiments were negligently designed and executed, lacked a logical progression, and lacked any therapeutic value for the human subjects.

56.    Despite the dangerous, harmful, and invasive nature of the Experiments, the

Guatemalan subjects were not informed of their nature or risks, and did not (and in many cases could not, *e.g.*, children and asylum inmates) give effective informed, voluntary, competent, and understanding consent to be experimented upon.

57.     Many subjects were lied to about the nature of the Experiments, and were falsely informed that they were receiving prophylaxis or treatment.[5]  Researchers hid the truth from the Guatemalan subjects, offering a variety of false explanations about what was being done, saying that they were being treated for non-existent conditions or for their own good.

58.     Hopkins and Rockefeller did not limit their involvement to the design, planning, funding and authorization of the Experiments; instead, they exercised control over, supervised, supported, encouraged, participated in, and directed the course of the Experiments.

59.     For example, to further his research into whether *T. cuniculi* (the rabbit syphilis spirochete) was a potential human syphilis vaccine, Dr. Turner, of Hopkins, requested that Dr. Cutler expose human subjects in Guatemala to the rabbit spirochete he was studying. He supplied *T. cuniculi* from his Hopkins laboratory to the on-site researchers in Guatemala, by sending from Baltimore rabbits carrying the *T. cuniculi* strains that he had isolated in his Hopkins laboratory.  A number of Guatemalans were intentionally exposed to the rabbit syphilis strain.   Mention of Dr. Turner's work was included in the 1946 Annual Report for The Rockefeller Foundation.

60.     Additionally, prior to the initiation of the Guatemala Experiments, Dr. Moore and his NRC Subcommittee on Venereal Diseases (meeting at Hopkins in Baltimore) had been studying the effectiveness of penicillin when applied in a medium of peanut oil and beeswax, and, along with Squibb Institute and Bristol Laboratories, who manufactured the product, were

---

[5] Dr. Cutler, for instance, wrote that he had told the "patients" that they were receiving a new treatment, and that "this double talk keeps me hopping at times."

planning further experimentation in this area. Experimentation to determine if penicillin could effectively treat syphilis if applied in a medium of peanut oil-beeswax was a major part of the Guatemala Experiments.

61.     Dr. Harry Eagle, a Hopkins adjunct professor who was directing the research for the joint Hopkins/PHS laboratories at Hopkins in Baltimore, was also working to determine whether arsenic and bismuth were effective to treat and prevent the development of syphilis. Dr. Eagle suggested that his work would be of interest to the researchers in Guatemala and asked to participate in the experiments. Many subjects in Guatemala were treated with a "schedule" of arsenic and bismuth injections developed by Dr. Eagle.

62.     Dr. Eagle also acted to support the effort in Guatemala by facilitating the cooperation of the Guatemalan Army, which was integral to the success of the Guatemala Experiments. When the wife of Dr. Carlos Tejada, the Chief of the Guatemalan Army Medical Department, fell ill with acute mercury poisoning, Dr. Eagle supplied Dr. Cutler with British anti-lewisite, the antidote for such poisoning, from his lab at Hopkins. British anti-lewisite was not commercially available at the time, so this favor had a strong effect on Dr. Tejada, and ensured his ongoing cooperation for the researchers in Guatemala.

### *The Rockefeller Foundation's Role*

63.     As stated previously, since 1914, The Rockefeller Foundation (Rockefeller) had been involved in supporting research activities at Johns Hopkins, including research in the area of STDs. As early as 1916, the Trustees of The Rockefeller Foundation resolved to cooperate with Hopkins for the advancement of knowledge and the training of workers in the field of public health.

64.     Rockefeller's approach to accomplishing its goals was to work within existing

governmental and private organizations through grants and personnel support. This philosophy was originally articulated by Wickliffe Rose, one of the first Trustees of Rockefeller and the General Director of its International Health Division. Rose believed that Rockefeller should be "a partner, but not a patron." Accordingly, Rockefeller accomplished its goals by becoming an active participant in government and private organizations.

65.    Rockefeller's partnership with the Government consisted of both efforts of its Trustees serving in government positions, and furnishing its employees to direct governmentally funded research.

66.    A part of Rockefeller's involvement with venereal disease research at Hopkins was to assign Dr. Thomas Turner to Hopkins, and to fund his STD work there. Dr. Turner was employed by the International Health Division of Rockefeller from 1932 to 1936. At the request of Hopkins, Rockefeller assigned Dr. Turner to Hopkins with the mission of expanding its venereal disease research and training programs. Dr. Turner was conducting investigations into treponemal infections (including the spirochete that causes syphilis). In particular, Dr. Turner was interested in a spirochete that caused syphilis in rabbits, *T. cuniculi*. It was believed that administration of this spirochete might serve as a vaccine for human syphilis.

67.    In 1936, Thomas Parran Jr., M.D., a cousin of Dr. Turner, who had long been interested in the public health implications of syphilis, was appointed Scientific Director of the International Health Division of The Rockefeller Foundation. Later that same year, he was appointed Surgeon General of the United States.

68.    In his roles as Scientific Director of the International Health Division of Rockefeller, as Surgeon General, and after 1941 as a Trustee of The Rockefeller Foundation, Dr. Parran worked to foster syphilis research. He was personally involved in the Tuskegee Study,

and reported that, "the lifespan of male Negroes with untreated syphilis was about 20 percent shorter than that of a comparable, uninfected group." When the Syphilis Study Section approved the grant of federal funds for the Guatemala Experiments, Dr. Parran executed the approval.

69.     Dr. Parran was aware that the Guatemala Experiments would be conducted in an improper way on improper subjects.  He was quoted as saying in a private conversation, "you know, we couldn't do such an experiment in this country."

70.     Virtually all of the human Guatemala Experiments were scheduled to be underway in Guatemala by mid-1947.  The study needed a "responsible" investigator and a discreet individual to administer the grant.

71.     Dr. Frederick Soper had been an employee of The Rockefeller Foundation since he graduated from Rush University medical school in 1919.  Employed by the International Health Board of Rockefeller, he had worked in South America, Africa and the Middle East.

72.     In January of 1947, The Rockefeller Foundation assigned its employee Dr. Soper to the position of Director of the Pan American Sanitary Bureau (PASB).  Upon his assignment, Dr. Soper was officially designated the "responsible Investigator" for the Guatemala Experiments.

73.     Dr. Soper was given freedom from federal control in developing and conducting the Experiments, and his salary and benefits were paid by The Rockefeller Foundation.  He reported directly to Dr. George Strode, his supervisor at The Rockefeller Foundation, throughout the Guatemala Experiments.  Dr. Soper also regularly briefed Dr. Parran, a Rockefeller Trustee.

74.     In March of 1947, the Syphilis Study Section, still chaired by Dr. Moore of Hopkins, met and voted to continue the Guatemala Experiments, with Dr. Soper as the "responsible" Investigator.

75.     As an employee of Rockefeller, Dr. Soper traveled to Guatemala on at least six occasions to inspect the Experiments.  As responsible Investigator, he was entitled to, and received, the "full confidence" of the local researchers implementing the Experiments.  He was aware of all aspects of the Experiments, including the nature and extent to which human subjects were being intentionally exposed to and infected with STDs, including *T. cuniculi,* without their consent and without treatment.

76.     Dr. Rolla E. Dyer was both the Director of the NIH, and a Scientific Director of the International Health Division of The Rockefeller Foundation during the Guatemala Experiments.  Dr. Dyer supported the Terre Haute Experiments, and was involved in the initial and subsequent annual review and approval of the Guatemala Experiments.

77.     The Guatemala Experiments continued until the 1950s under the supervision of Dr. Soper and Dr. Juan Funes.  Dr. Funes traveled to Baltimore for meetings with agents and employees of Hopkins in 1949, and reported to individuals at Hopkins and Rockefeller about the Experiment's human subjects.

*Bristol-Myers Squibb's Role*

78.     Two pharmaceutical companies, Bristol Laboratories and E.R Squibb & Sons, Inc.'s Squibb Institute For Medical Research, also actively participated in the Guatemala Experiments despite knowing that the research subjects did not, and could not, provide adequate informed consent.

79.     Bristol Laboratories and Squibb Institute used the Guatemala Experiments as a clinical trial for testing the efficacy of their products.  In fact, they supplied penicillin in various forms to be used in the Experiments, later patenting the process that crystallized it.

80.     Dr. Oskar Wintersteiner, who discovered the process by which to create sodium

penicillin G, was the Director of Research at the Squibb Institute in the 1940s. He joined the Antibiotics Study Section in March 1946, immediately following the approval of the Guatemala Experiments by the Syphilis Study Section. The Antibiotics Study Section's function was to promote, develop and correlate research in the antibiotic field. As such, it allocated penicillin to all federally funded experiments requiring penicillin, including Guatemala.

81.    Dr. Geoffrey R. Rake was the Medical Director of the Division of Microbiology of the Squibb Institute in the 1940s. In that capacity, he obtained and used federal grants to investigate the use of penicillin as a prophylaxis for syphilis.

82.    Dr. Rake was a member of a committee appointed by the Subcommittee on Venereal Diseases (chaired by Dr. Eagle) that was concerned with the efficacy of different fractions of penicillin both as treatment of and as prophylaxis for syphilis. In July of 1945, Dr. Rake and Dr. Arthur P. Richardson, Head of the Division of Pharmacology at the Squibb Institute, attended a meeting of the Subcommittee on Venereal Diseases held in Baltimore at Hopkins that focused on the application of penicillin in a medium of peanut oil and beeswax (POB). As a result of the meeting, the Subcommittee recommended further syphilis experimentation using penicillin in POB.

83.    In February of 1945, Dr. Richardson attended a meeting chaired by Dr. Moore of Hopkins. One topic addressed during the meeting was the need to secure a supply of peanut oil and beeswax from pharmaceutical companies for use in penicillin experiments.

84.    The following year, the committee on which Dr. Rake served was reconstituted as the Syphilis Study Section's Subcommittee on Treatment of Experimental Syphilis With Penicillin. Under the direction of Dr. Moore of Hopkins, Dr. Rake actively investigated the efficacy of different fractions of penicillin, including penicillin G, at Squibb Institute. As a result

of his investigations, the Syphilis Study Section resolved that only penicillin G would be used in penicillin-based experiments going forward.

85.    Squibb then manufactured and supplied sodium penicillin G in a suspension of peanut oil and beeswax for use in the Guatemala Experiments. Its penicillin was in fact tested on human subjects in Guatemala, both as a treatment of and as a prophylaxis for syphilis. Its patent application for sodium penicillin G was granted on February 15, 1949, after its penicillin had been tested in Guatemala.

86.    Bristol Laboratories also manufactured penicillin in the 1940s. The Medical Director of Bristol Laboratories was Dr. Delmas K. Kitchen, who was introduced to Dr. Soper, the Responsible Investigator for the Experiments. Dr. Kitchen and Dr. Soper met in 1947 to discuss the Guatemala Experiments.

87.    Bristol Laboratories, like Squibb, supplied penicillin for use in the Guatemala Experiments. It, like Squibb, was aware, or should have been aware, that the human research subjects in Guatemala, on whom its product was being tested, had not and could not give adequate informed consent.

### *Fraud And Concealment*

88.    Correspondence between the researchers involved in the Guatemala Experiments indicate that they were acutely conscious of their wrongdoing, and that they engaged in a campaign to conceal the experiments from public view.

89.    Dr. Cutler wrote: "[I]t is unfortunate that we have to work in such a guarded, even subterranean way, but it seems to be very necessary" and "it is imperative that the least possible be known and said about this project, for a few words to the wrong person here, or even at home, might wreck it or parts of it."

90.     On one occasion, Dr. Cutler's superior expressed concern that they would be exposed to criticism for experimenting on the mentally ill, because if "some goody organization got wind of the work, they would raise a lot of smoke." He instructed Dr. Cutler: "In the report, I see no reason to say where the work was done and the type of volunteer."

91.     As asserted previously, Dr. Parran, a Rockefeller Trustee, privately commented with regard to the Experiments: "You know, we couldn't do such an experiment in this country."

92.     After Dr. Cutler left Guatemala, he came to Hopkins in 1950. Once in Baltimore, he continued to process data obtained during the Guatemala Experiments, and drafted reports on his findings. Those reports were never published, but instead, were labeled "SECRET-CONFIDENTIAL," and identifying details were removed. They remained secret for decades.

93.     After the Experiments concluded, the researchers never revealed what they had done. They never told the Guatemalans subjects who had been exposed or infected about the consequences of their participation, nor did they provide them with any follow-up care, treatment, or education to minimize their pain and suffering, or to prevent them from passing disease to their spouses, children, grandchildren, and great-grandchildren.

94.     None of the final reports or any of the results of the Guatemala Experiments were ever submitted for peer review or published. This lack of publication further evidences the concealment of the project. Under normal circumstances, and especially given the enormous amount of money, time, and effort that went into the Experiments, Hopkins, The Rockefeller Foundation, and other researchers involved in STD research ordinarily would have published prolifically on their projects, work, and results. Dr. Jonathan Zenilman, a Hopkins Professor who served as technical consultant to the Presidential Commission, has concluded: "Somebody

must have told them to stop the work, and put a stop to it, and said don't publish."

95.     As a result of the secrecy that surrounded the Guatemala Experiments, and the non-disclosure of documents and records related to it, the unethical, immoral, and tortious Guatemala Experiments were not revealed in the United States until September of 2011, when the United States Presidential Commission for the Study of Bioethical Issues wrote a letter to President Barack Obama and issued a report outlining its investigation.

96.     In the letter, the Commission explained that it had concluded "that the Guatemala experiments involved gross violations of ethics as judged against both the standards of today and the researchers' own understanding of applicable contemporaneous practices." Leaving no room for doubt about the character of the Experiments, the Commission's report concluded that the researchers committed "egregious moral wrongs."

97.     The Commission's report states: "None of these elements [of informed consent] were satisfied in Guatemala." As its investigation shows, there is no evidence that consent was sought or obtained from the individual subjects of the research. On the contrary, there were examples of "active deceit."

98.     The information in the Commission Report was not widely disseminated in Guatemala, and many of the subjects of the Experiments, and their spouses and descendants, still are unaware of what was done to them or their progenitors during the Experiments.

99.     The Guatemalan people who were intentionally exposed to and infected with syphilis, gonorrhea, and chancroid as part of the Guatemala Experiments, and who were not treated for their disease, suffered significantly as a result. Their diseases, left untreated, were painful, destructive, disfiguring, permanently damaging, and, in some cases, fatal.

100.    Without knowing of their exposure, the Guatemalan research subjects passed

syphilis, gonorrhea, and chancroid on to their sexual partners and spouses through sexual contact, and also passed the diseases congenitally to their descendants. These individuals have suffered, and will continue to suffer, as a direct result of the Guatemala Experiments.

## Count I
## Lack of Consent and Lack of Informed Consent

101.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

102.   Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, owed a duty to the Subject Plaintiffs to exercise reasonable care in obtaining their consent and their informed consent, in properly informing them of the nature and risks inherent in the experiments, and to protect them from harm. The duty owed by Defendants to the Subject Plaintiffs arose out of a special relationship that is the same as the duty a doctor owes his or her patient or that a researcher owes his or her human subjects. The duty owed by Defendants to provide consent and informed consent also arose out of obligations imposed by international laws that were recognized and known to Defendants and their agents, servants, employees, and borrowed servants at the time. Defendants' duty not only existed at the time the Guatemala Experiments were occurring, but continued to exist after the Experiments had concluded.

103.   Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, also owed a duty to protect the Subject Plaintiffs' spouses, children, grandchildren, and great-grandchildren (the non-Subject Plaintiffs) from the risk of being infected with and suffering from STDs as a result of their relationships with the Subject Plaintiffs. Defendants knew or should have known that the Subject Plaintiffs, once exposed, infected and untreated, were likely to spread STDs to their sexual partners, spouses, and descendants. This duty was ongoing

28

after the Guatemala Experiments had concluded.

104. Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, breached their duty to obtain informed, voluntary, competent, and understanding consent, and to otherwise protect the Plaintiffs from harm in the following ways:

a. By failing to inform, or failing to adequately and properly inform, the Subject Plaintiffs that they were human research subjects;

b. By failing to inform, or failing to adequately and properly inform, the Subject Plaintiffs of the true nature of the research being performed on them, including the purpose of the research, the means by which it would be carried out, and the effect it would have on them and on their spouses and descendants;

c. By failing to obtain the Subject Plaintiffs' informed, voluntary, competent, and understanding consent;

d. By failing to inform the Subject Plaintiffs that they were being purposefully exposed to and infected with STDs;

e. By failing to inform the Subject Plaintiffs that they were not being and would not be treated for STDs;

f. By failing to inform the Subject Plaintiffs that their sexual partners were likely to contract diseases through sexual contact;

g. By failing to inform the Subject Plaintiffs that any children they conceived were likely to acquire STDs from them;

h. By failing to warn the non-Subject Plaintiffs that they could acquire an STD

from their family member involved in the Experiments;

i. By failing to disclose the nature of the Guatemala Experiments, failing to warn the Plaintiffs of their risk of having a sexually transmitted disease, and failing to warn the Plaintiffs of the need for treatment for sexually transmitted disease; and

j. In other ways.

105. Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and through their agents, servants, employees and borrowed servants, are also liable for the actions of their agents, servants, employees, and borrowed servants who supervised, monitored, oversaw, authorized, recommended, supported, directed, and otherwise exercised control over the Guatemala Experiments. To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the actions described in this Complaint, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees and borrowed servants, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the perpetrators of the Guatemala Experiments in the following manners:

a. By approving or authorizing, and re-approving or re-authorizing, the Guatemala Experiments;

b. By approving or authorizing, and re-approving or re-authorizing, the funding for the Guatemala Experiments;

c. By conceiving, formulating, and planning the Guatemala Experiments;

d. By funding the Guatemala Experiments or causing them to be funded;

e. By encouraging the Guatemala Experiments;

f. By contributing personnel, equipment, supplies and medication to the Guatemala Experiments;

g. By contributing advice, counsel, and expertise to the Guatemala Experiments;

h. By requesting that specific testing and experimentation be performed in the Guatemala Experiments;

i. By allowing the Guatemala Experiments to occur despite knowing that they involved non-therapeutic human experimentation that was harming or was likely to harm the Plaintiffs;

j. By concealing the Guatemala Experiments while they were occurring and after they had been completed;

k. By using the Guatemala Experiments as a clinical trial to test the efficacy of penicillin in order to manufacture and market it commercially;

l. And in other ways.

106.   Additionally, to the extent the agents, servants, employees, and borrowed servants of Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb did not personally or directly perpetrate the actions described in this Complaint, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, entered into an agreement and understanding and conspiracy with each other and with non-parties to this lawsuit, and acted in concert with each other and with non-parties to this lawsuit, to intentionally expose and infect the Subject Plaintiffs with venereal disease without their informed, voluntary,

competent and understanding consent. Specifically, Defendants, as institutions and through their agents, servants, employees, and borrowed servants engaged in the following understanding, agreement and conspiracy:

a. Hopkins and The Rockefeller Foundation, with each other and with non-parties to this lawsuit, formulated and planned the Guatemala Experiments as a natural extension of the Tuskegee Study and Terre Haute Experiments.

b. Hopkins and The Rockefeller Foundation entered into an agreement or understanding with each other and with non-parties to this lawsuit as part of their ongoing efforts to maintain their positions of influence and power in the study and treatment of STDs, expand their reputations and influence in the medical and international health communities, obtain grant money, and otherwise control medical science in the area of venereal disease.

c. Hopkins and The Rockefeller Foundation knew from their involvement in Tuskegee and Terre Haute that they could not and should not perform the types of human experiments that were performed in the Guatemala Experiments in the United States.

d. All of the Defendants knew that law, regulations and moral and ethical standards applicable at the time required research subjects to be informed, and to give voluntary, competent, and understanding consent, and public pressure and the potential for litigation made such experiments impossible in this country.

e. All of the Defendants also knew that they needed to perform additional work to identify infection techniques to overcome the limitations of the

Terre Haute experiments. Choosing Guatemala allowed them to conduct their experiments using prostitutes and infection by sexual contact and to perform more coercive and invasive methods in a location where they could hide their actions, and prevent their subjects from learning the true nature of their participation.

f.  The similarities between the goals, designs, and methods of the Guatemala Experiments and Tuskegee and Terre Haute, and the rapidity with which the Guatemala Experiments were formulated, recommended and adopted, demonstrates that Hopkins and The Rockefeller Foundation formulated and planned the Guatemala Experiments before they were ever approved by the NIH Syphilis Study Section. Indeed, the Guatemala Experiments were undertaken by the same team of doctors and scientists involved in Tuskegee and Terre Haute.

g.  Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb contributed advice, counsel, expertise, knowledge, research, equipment, personnel, supplies, and medication to the Guatemala Experiments.

h.  Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb requested that specific testing and experimentation be performed in the Guatemala Experiments. Not only were they and their agents actively involved in the Experiments, but they also provided encouragement, incited, and aided and abetted the direct perpetrators.

i.  Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb also kept secret the fact that the Guatemala Experiments occurred, as well as the

nature and extent of the Experiments, during their course, and for decades after they had concluded. Despite the fact that Defendants' agents regularly published on their research efforts, in a continuing effort to keep them secret, they deliberately never published any of the data obtained from the Guatemala Experiments, or the results of the study.

107.    As a result of Defendants' (a) breach of their duty to Plaintiffs to obtain informed, voluntary, competent, and understanding consent, and to otherwise protect them from harm, (b) aiding and abetting the breach of said duty, and/or (c) involvement in a conspiracy to breach said duty, Defendants caused the Plaintiffs to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

## Count II
### Negligence

108.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

109.    Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, owed a duty to the Subject Plaintiffs to exercise reasonable care to protect them from harm. The duty owed by Defendants to the Subject Plaintiffs arose out of a special relationship that is the same as, or akin to, the duty a doctor owes his patient or that a researcher owes his human subjects.

34

Defendants' duty not only existed at the time the Guatemala Experiments were occurring, but continued to exist after the Experiments had concluded.

110.    Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, also owed a duty to the Subject Plaintiffs' spouses, children, grandchildren and great-grandchildren (the non-Subject Plaintiffs) to exercise reasonable care to protect them from harm because Defendants knew, or should have known, that the Subject Plaintiffs, once exposed, infected and untreated, were likely to spread STDs to their sexual partners, spouses, children, grandchildren, and great-grandchildren. This duty continued to exist after the Guatemala Experiments had concluded.

111.    Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and through their agents, servants, employees and borrowed servants, knew or should have known that the personnel that were selected, hired, employed, placed, or caused to be placed in Guatemala to carry out the Guatemala Experiments were exposing the Plaintiffs to an unreasonable risk of harm, and were engaging in unethical, tortious, intentional and negligent conduct that was causing actual harm to the Subject Plaintiffs, and that was likely to cause harm to the non-Subject Plaintiffs.

112.    Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, breached their duty of care to the Plaintiffs and were negligent in the following ways:

a. By designing and implementing research experiments that exposed the Plaintiffs to an unreasonable risk of bodily harm;

b. By designing and implementing research experiments that in fact caused

the Plaintiffs to suffer bodily harm;

c.  By failing to provide penicillin or other reasonable treatment to the Plaintiffs after they had been infected with STDs;

d.  By failing to provide penicillin, reasonable treatment, education, or warnings to the Plaintiffs so that their STDs would not be passed on to their sexual partners and children;

e.  By failing to inform the Plaintiffs that they had been exposed to STDs, and that they were likely to be suffering from a disease that required treatment;

f.  By failing to inform the Subject Plaintiffs that their sexual partners were likely to contract disease through sexual relations, and that any children they conceived were likely to acquire their disease;

g.  By failing to inform the non-Subject Plaintiffs that their sexual partners, spouses, parents, grandparents, and great-grandparents had been participants in the Guatemala Experiments, and that they therefore may have, or were likely to have, acquired a disease that required treatment;

h.  By continuing to employ, place, retain, and otherwise permit or allow the personnel in Guatemala to continue to perform the Guatemala Experiments when they knew that said personnel were exposing the Plaintiffs to an unreasonable risk of harm, and were engaging in unethical, tortious, intentional and negligent conduct that was causing actual harm to Subject Plaintiffs, and that was likely to cause harm to their sexual partners and descendants;

i.  And in other ways.

113.    To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the negligence described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Experiments in the manners described in detail above.

114.    Additionally, to the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the negligence described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, entered into an agreement and understanding and conspiracy with each other and with non-parties to this lawsuit, and acted in concert with each other and with non-parties to this lawsuit, to negligently and intentionally expose and infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments, and to perpetrate the negligence described above.

115.    As a result of Defendants' (a) breach of duty to Plaintiffs, (b) aiding and abetting the breach of said duty, and/or (c) commission of a conspiracy to breach said duty, Defendants caused the Plaintiffs to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller

Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

## Count III
## Corporate Negligence

116.     Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as corporate entities who were performing experiments on human research subjects, owed a duty of care to the Subject Plaintiffs to provide them with adequate informed consent, to inform them of the nature of the experiments in which they were participating, the risks of participation, the alternatives to participation, and the consequences of participation, as well as to protect them from harm. This duty of care is akin to the duty a hospital owes its patient, that a physician owes his or her patient, or that a research institution owes its research subjects. This duty was ongoing even after the Experiments had officially concluded.

117.     Defendants also owed a duty to protect the Subject Plaintiffs' spouses, children, grandchildren and great-grandchildren (the non-Subject Plaintiffs) from the risk of being infected with and suffering from STDs as a result of their relationships with the Subject Plaintiffs, and to protect them from harm. This duty too was ongoing even after the Experiments had concluded.

118.     Defendants, as institutions, violated their duty of care to the Plaintiffs in the manners set forth in detail in Counts I and II above, which are expressly incorporated herein by reference.

119.     Defendants, as institutions, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Experiments in the manners described in detail above.

120.     Defendants, as institutions, entered into an agreement and understanding and conspiracy with each other and with non- parties to this lawsuit, and acted in concert with each

other and with non-parties to this lawsuit, to negligently and intentionally expose and infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments, and to perpetrate the negligence described above.

121.    As a result of Defendants' (a) breach of a corporate duty to the Plaintiffs, (b) aiding and abetting the breach of said duty, and/or (c) commission of a conspiracy to breach said duty, Plaintiffs were caused to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses.  All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

### Count IV
### Battery

122.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

123.    Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, by and through their agents, servants, employees, and borrowed servants, violated the bodily integrity of the Subject Plaintiffs and intentionally touched them without their consent in the following ways:

   a.  By purposefully exposing them to and inoculating them with sexually transmitted disease;

   b.  By purposefully exposing them to and inoculating them with material known to be infectious to rabbits;

39

c.  By subjecting them to non-therapeutic medical testing and procedures, including, but not limited to: blood draws, needle sticks, lumbar and cisternal punctures, gynecologic examinations, and touching and penetration of their sexual organs;

d.  By forcing and/or coercing them into having sexual relations;

e.  And in other ways.

124.   Any alleged consent that was given by the Subject Plaintiffs to the Defendants or their agents, servants, employees and borrowed servants was not freely and intelligently given, but rather, was the result of fraud, coercion, misrepresentation, and failure to inform the Plaintiffs that the touchings were related to non-therapeutic human experimentation and medical research. As a result, any alleged consent was not legally valid.

125.   The intentional and inappropriate touching of the Subject Plaintiffs by the Defendants was harmful and offensive.

126.   The intentional and inappropriate touching of the Subject Plaintiffs by the Defendants offended the Plaintiffs' reasonable sense of personal dignity.

127.   The intentional and inappropriate touching of the Subject Plaintiffs by the Defendants caused physical pain, injury, and illness.

128.   To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the batteries described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, and through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Experiments in the manners described in detail above.

129.   Additionally, to the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the batteries described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, entered into an agreement and understanding and conspiracy with each other and non-parties to this lawsuit, and acted in concert with each other and non-parties to this lawsuit, to intentionally infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments, and to commit the batteries described above.

130.   As a result of Defendants' (a) batteries of the Plaintiffs, (b) aiding and abetting said batteries, and (c) commission of a conspiracy to commit said batteries, Defendants caused the Plaintiffs to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses.   All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

### Count V
### Fraud or Deceit By Misrepresentation

131.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

132.   In an effort to coerce and secure the participation of the Guatemalan test subjects in the Guatemala Experiments, Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and through their agents, servants, employees, and borrowed servants, made numerous false representations of material fact to the Subject Plaintiffs that were

41

designed to intentionally mislead them, including but not limited to, informing the Subject Plaintiffs that they were receiving necessary medical treatment.

133.    Defendants, as institutions and through their agents, servants, employees, and borrowed servants, knew at the time they made these representations that they were false, or, at the very least, made these representations with such reckless indifference to their truth that it would be reasonable to charge the Defendants with knowledge of their falsity.

134.    Defendants, as institutions and through their agents, servants, employees, and borrowed servants, knew at the time they made these representations that a reasonable person would rely on them.   These persons intended the Subject Plaintiffs to act in reliance on their false representations of material fact, and knew that the Subject Plaintiffs were likely to rely on them.

135.    The Subject Plaintiffs did in fact justifiably rely on Defendants' false representations of material fact.

136.    To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the fraud described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and and by and through their agents, servants, employees and borrowed servants, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Experiments in the manners described in detail above.

137.    Additionally, to the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the fraud described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants,

entered into an agreement and understanding and conspiracy with each other and non-parties to this lawsuit, and acted in concert with each other and non-parties to this lawsuit, to intentionally infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments, and to commit the fraud described above.

138.    As a result of the Defendants' (a) fraud and deceit, (b) aiding and abetting the fraud or deceit, and/or (c) commission of a conspiracy to commit fraud and deceit, Defendants caused the Plaintiffs to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

## Count VI
## Fraudulent Concealment

139.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

140.    Johns Hopkins, The  Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, actively worked to conceal the actions of the researchers who participated in the Guatemala Experiments, as well as the actions of those who supervised, monitored, oversaw, authorized, recommended, supported, directed, and otherwise exercised control over the Experiments. They intentionally concealed from the Subject Plaintiffs and their sexual partners and descendants material facts that they had a duty to disclose, including but not limited to: failing to inform the Plaintiffs that they were human research subjects, failing to inform the Plaintiffs of the true

43

nature of the research being performed on them, failing to inform Plaintiffs that they were being exposed to and inoculated with sexually transmitted disease, failing to inform the Plaintiffs that they were or likely were infected with sexually transmitted disease, failing to inform the Plaintiffs that they were not being treated for sexually transmitted disease, failing to inform the Plaintiffs that their sexual partners were likely to contract or were likely to have contracted disease through sexual relations with them, and failing to inform the Plaintiffs that any children they would conceive or had conceived were likely to acquire their disease.

141.   Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, actively and intentionally concealed material facts from the non-Subject Plaintiffs, namely, that their sexual partners, spouses, parents, grandparents, and great-grandparents had been subjects in the Guatemala Experiments, and that they therefore may have, or were likely to have, acquired a disease that required treatment.

142.   By intentionally concealing these material facts, and others, from the Plaintiffs, Defendants, as institutions and through their agents, servants, employees and borrowed servants, intended to defraud or deceive the Plaintiffs. In fact, because of Defendants' concealment of material facts, the Plaintiffs actually did justifiably rely on Defendants and acted in a manner different than how they would have acted had they known the true facts, including but not limited to, participating in the Guatemala Experiments, failing to obtain treatment for disease, and failing to warn their sexual partners and children that they may be infected with a sexually-transmitted disease.

143.   To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the fraudulent concealment described above, Defendants are

nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and through their agents, servants, employees, and borrowed servants, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Experiments in the manners described in detail above.

144.    Additionally, to the extent the Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the fraudulent concealment described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, entered into an agreement and understanding and conspiracy with each other and non-parties to this lawsuit, and acted in concert with each other and non-parties to this lawsuit, to intentionally infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments and to commit the fraudulent concealment that is described above.

145.    As a result of the Defendants' (a) fraudulent concealment, (b) aiding and abetting the fraudulent concealment, and/or (c) commission of a conspiracy to commit fraudulent concealment, Defendants caused the Plaintiffs to suffer severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur medical expenses, loss of earnings and loss of earning capacity, and have incurred and likely will in the future incur additional damages and economic losses.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockfeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

**Count VII**
**Intentional Infliction of Emotional Distress**

146.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

147.    The conduct of Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, in organizing, approving, funding, implementing, cooperating in, participating in, perpetrating, and concealing the Guatemala Experiments, was intentional and reckless.

148.    The conduct of the Defendants, as institutions and through their agents, servants, employees, and borrowed servants, in organizing, approving, funding, implementing, cooperating in, participating in, perpetrating, and concealing the Guatemala Experiments, was extreme and outrageous.

149.    To the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the intentional inflection of emotional distress described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and through their agents, servants, employees and borrowed servants, through their words, actions, conduct, and behavior, planned, encouraged, incited, aided and abetted the acts of the direct perpetrators of the Guatemala Experiments in the manners described in detail above.

150.    Additionally, to the extent Defendants' agents, servants, employees, and borrowed servants did not personally or directly perpetrate the intentional infliction of emotional distress described above, Defendants are nevertheless jointly and severally liable in tort to the Plaintiffs inasmuch as they, as institutions and by and through their agents, servants, employees, and borrowed servants, entered into an agreement and understanding and conspiracy with each other and non-parties to this lawsuit, and acted in concert with each other and non-parties to this

lawsuit, to intentionally infect the Subject Plaintiffs with syphilis and other STDs in furtherance of the Guatemala Experiments and to commit the intentional infliction of emotional distress that is described above.

151.    The conduct of the Defendants, as institutions and through their agents, servants, employees, apparent agents and borrowed servants, in (a) organizing, approving, funding, implementing, cooperating in, participating in, perpetrating, concealing, (b) aiding and abetting, and/or (c) commission of a civil conspiracy to perpetrate the Guatemala Experiments and the actions described at length in this Complaint, caused severe emotional distress to the Plaintiffs.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

### Count VIII
### Unjust Enrichment

152.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

153.    Many benefits were conferred upon the Defendants and the Defendants' agents, servants, employees, and borrowed servants through the Subject Plaintiffs' participation in the Guatemala Experiments.   Through their research and experimentation on these Plaintiffs, Hopkins, Rockefeller, and Bristol-Myers Squibb gained recognition for their institutions, furthered their reputations and the reputations of their agents and employees in the area of venereal disease research, attracted leading scholars, gained positions of power on government committees, obtained grant monies, furthered their work towards patent applications, developed and sold their pharmaceutical products, and benefitted financially in other ways.

154.    The Defendants, as institutions and through their agents, servants, employees and borrowed servants, appreciated and were aware of the benefits conferred upon them by the

Plaintiffs, and in fact intentionally exploited Plaintiffs' vulnerability to achieve these benefits, recognizing that the Experiments could not be conducted on subjects in the United States.

155.    The circumstances under which Defendants received these benefits from the Plaintiffs render it inequitable for Defendants to retain the benefits without payment to Plaintiffs. In essence, Defendants have been unjustly enriched by the Subject Plaintiffs' unwitting and nonconsensual participation in the Experiments, and are liable to all of the Plaintiffs for the value of the benefit they received at Plaintiffs' expense.

WHEREFORE, Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

### Count IX
### Wrongful Death

156.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

157.    Plaintiffs No. 1, 2, 5, 9, 10, 12, 13, 19, 35, 49, 52, 59, 69, 77, 78, 79, 80, 87, 88, 99, 100, 109, 110, 130, 131, 143, 145, 146, 147, 150, 154, 159, 169, 171, 173, 187, 194, 215, 217, 221, 241, 255, 267, 269, 275, 291, 294, 302, 307, 308, 313, 314, 316, 328,, 337, 342, 350, 355, 357, 361, 362, 366, 370, 374, 376, 377, 382, 383, 384, 388, 396, 403, 406, 407, 408, 411, 412, 419, 437, 438, 453, 454, 467, 468, 469, 486, 487, 499, 507, 510, 522, 523, 540, 548, 548, 557, 558, 564, 567, 577, 582, 583, 598, 599, 600, 601, 616, 630, 653, 656, 662, 663, 664, 685, and 686 died from complications caused by the diseases they contracted as a result of the Guatemala Experiments. Their surviving spouses, children, and parents, including but not limited to the remaining Plaintiffs and other unknown Use Plaintiffs (collectively, the Wrongful Death Plaintiffs) have a cause of action under the Maryland Wrongful Death Act, Courts and Judicial Proceedings Article § 3-

901 *et seq.*, to recover for pecuniary loss and for the mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, and education occasioned by the loss of their loved ones.

WHEREFORE, the Wrongful Death Plaintiffs claim actual damages against Johns Hopkins, The Rockefeller Foundation, and Bristol Myers-Squibb in an amount exceeding seventy-five thousand dollars and to be determined by a jury, and punitive damages as described below.

### Count X
### Punitive Damages

158.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference.

159.    In perpetrating the acts described in Counts I through IX above, Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, as institutions and by and through their agents, servants, employees, and borrowed servants, acted with actual malice, acted unlawfully, deliberately, knowingly, intentionally, and/or wantonly, and in an extraordinary and outrageous manner characterized by wanton and reckless disregard for the rights of the Plaintiffs. The actions of the Defendants and their agents, servants, employees, and borrowed servants described in this Complaint were undertaken without legal justification or excuse, but instead, with an evil or rancorous motive, the purpose being to deliberately and willfully injure the Plaintiffs and to act with reckless disregard for their safety and their lives.

160.    As a result of the malicious, unlawful, deliberate, knowing, intentional, wanton, extraordinary and outrageous conduct associated with experimenting on the Subject Plaintiffs without their consent; negligence; battery; intentional misrepresentation; fraud; deceit; concealment; intentional infliction of emotional distress; unjust enrichment; and other actions

described in Counts I through IX above, the allegations of which are expressly incorporated herein by reference, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs claim punitive damages against Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb in the amount of $1,000,000,000 (one billion dollars).

PAUL D. BEKMAN
E. DALE ADKINS III
LAURENCE A. MARDER
GREGORY G. HOPPER
EMILY C. MALARKEY
JAMES O'C GENTRY
SALSBURY, CLEMENTS, BEKMAN,
    MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Plaintiffs*

Pending Admission Pro Hac Vice:

F. R. JENKINS
MATTHEW R. CATON
MERIDIAN 361 INTERNATIONAL LAW GROUP PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
(866) 338-7087

JUAN PABLO RODRIGUEZ
ESCRITORIO JURIDICO RODRIGUEZ FAJARDO Y
   ASOCIADOS
Centro Profesional Cipreses, Nivel 5, Oficina 505
Caracas, Distrito Federal,
Republica Bolivariana de Venezuela

50