**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **ESTATE OF ARTURO GIRON ALVAREZ, et al.**<br><br>        **Plaintiffs**<br><br>**v.**<br><br>**THE JOHNS HOPKINS UNIVERSITY, et al.**<br><br>        **Defendants** | **Civil Action No. 1:15-cv-0950 MJG** |

## THIRD AMENDED COMPLAINT
## TABLE OF CONTENTS

Summary of the Case ................................................................................................4

Jurisdiction and Venue ............................................................................................8

Statute of Limitations – Alien Tort Statute ...........................................................9

    A.  Equitable tolling ............................................................................................9
    B.  Discovery rule ............................................................................................12

Statute of Limitations – Guatemalan Law Counts ...............................................15

The Plaintiffs............................................................................................................17

    A.  Category 1 Plaintiffs....................................................................................20
    B.  Category 2 Plaintiffs....................................................................................28
    C.  Category 3 Plaintiffs....................................................................................34
    D.  Category 4 Plaintiffs....................................................................................44
    E.  Category 5 Plaintiffs....................................................................................56
    F.  Category 6 Plaintiffs....................................................................................57

The Defendants ........................................................................................................58

    A.  The Johns Hopkins Defendants....................................................................58

Johns Hopkins' Decentralized Organizational Structure ....................................59
Dr. J. Earle Moore ...........................................................................................61
Dr. Lowell Reed ...............................................................................................65
Dr. Thomas Turner ...........................................................................................68
Dr. Harry Eagle ................................................................................................71

B. The Rockefeller Foundation .....................................................................75

The Rockefeller Foundation, Syphilis, and Sexually Transmitted Diseases.....77
Dr. Thomas Parran ..........................................................................................77
Dr. Frederick Soper .........................................................................................80
Dr. George Strode ...........................................................................................83

C. Bristol-Myers Squibb ................................................................................85

Bristol-Myers and the Guatemala Experiments ...............................................86

Statement of Facts...............................................................................................88

A. 1910 to 1930 ...............................................................................................89
B. 1930 to 1940 ...............................................................................................91
C. The Tuskegee Study of Untreated Syphilis in the Negro Male........................93
D. Early 1940s..................................................................................................101
E. The Terre Haute Prison Experiment ...........................................................106
F. Mid 1940s....................................................................................................113
G. The Guatemala Experiments ......................................................................115
H. 1950s to 2010 .............................................................................................139
I. Fraudulent Concealment and Conspiracy ....................................................140
J. The United States' Investigation .................................................................143
K. The Guatemalan Investigation ....................................................................145
L. Plaintiffs' Counsel's Investigation ..............................................................147

Count I: Tortious Violation of Well-Established and Customary Norms of International Law ...........................................................................................................147

Count II: Claim for Damages under the Guatemalan Civil Code....................177

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ESTATE OF ARTURO GIRON ALVAREZ, et al.**<br><br>　　　　**Plaintiffs**<br><br>**v.**<br><br>**THE JOHNS HOPKINS UNIVERSITY, et al.**<br><br>　　　　**Defendants** | **Civil Action Nos.**<br>**1:15-cv-0950 MJG** |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiffs, by and through their attorneys, Paul D. Bekman, E. Dale Adkins, III, Laurence A. Marder, Gregory G. Hopper, Emily C. Malarkey, and Ryan S. Perlin of Bekman, Marder & Adkins, L.L.C.; F. R. Jenkins and Matthew R. Caton of Meridian 361 International Law Group, PLLC; and Juan Pablo Rodriguez of Escritorio Juridico Rodriguez, Fajardo y Asociados, hereby file this Third Amended Complaint and sue Defendants, The Johns Hopkins Hospital, The Johns Hopkins University, The Johns Hopkins University School of Medicine, The Johns Hopkins Bloomberg School of Public Health, The Johns Hopkins Health System Corporation[1], The Rockefeller Foundation, and Bristol-Myers Squibb Company, and state as follows:

---

[1]　　The various Johns Hopkins entities are collectively referred to as "Johns Hopkins" or "Hopkins" throughout this Third Amended Complaint.

## Summary of the Case

1.      From 1945 to 1956, physicians, researchers, and other employees and agents of Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb designed, developed, approved, encouraged, directed, oversaw, and aided and abetted nonconsensual, nontherapeutic, human subject experiments in Guatemala in which mentally ill patients confined to asylums, soldiers, prison inmates, orphans, and school children were intentionally exposed to and infected with syphilis and other diseases.[2]

2.      The Guatemala Experiments did not happen in a vacuum. A small group of powerful and highly influential men at Johns Hopkins and The Rockefeller Foundation spent their careers researching and studying syphilis. These men, high level decision makers and policymakers at their respective institutions, were so driven for answers that they had already been the architects and overseers of two of the most infamous human experiments in history: the Tuskegee Study of Untreated Syphilis in the Negro Male[3] and the Terre Haute Experiment.

3.      With the end of World War II, changing political fortunes, and the arrival of penicillin as a treatment for syphilis, the men saw the window of opportunity closing and the Guatemala Experiments as their last best chance for an experiment to advance their research interests.  While they could have conducted consensual experiments, doing

---

[2]      The nonconsensual experiments conducted in Guatemala are collectively referred to as "the Guatemala Experiments" or "the Experiments" throughout this Third Amended Complaint.

[3]      The Tuskegee Study of Untreated Syphilis in the Negro Male is referred to as "the Tuskegee Study" or "Tuskegee" throughout this Third Amended Complaint.

so would have been slower and potentially subjected them to scrutiny. They intentionally chose to conduct nontherapeutic, nonconsensual experiments because doing so allowed them to quickly identify a large pool of uninfected people, infect them with syphilis strains that they had isolated and examined for decades, and then use the newly infected men and women as a resource to be consumed as a means to their ends.

4.     The predecessors of Bristol-Myers Squibb had similar motivations. The lead researchers in these institutions had developed a new form of penicillin – penicillin G – that could make them tens or hundreds of millions of dollars if they could quickly demonstrate its efficacy. While lab studies on animals had been promising, they recognized that it would take them a long time to prove the efficacy of the drug through laboratory trials and they wanted to be one of the first drugs on the market. Like their co-conspirators from Hopkins and Rockefeller, these men chose to conduct nontherapeutic, nonconsensual experiments because doing so allowed them to quickly test their drug on a large pool of newly infected people using a variety of schedules and different dosages.

5.     The high level decision makers and policymakers from Johns Hopkins, The Rockefeller Foundation, and the predecessors of the Bristol-Myers Squibb entered into a conspiracy with each other and with a small handful of like-minded doctors in academia and the government to design, develop, approve, direct, and oversee the nonconsensual experiments to serve their ends and the ends of their institutions. They used their influence and connections to obtain approval for the Guatemala Experiments, convince the government to provide the resources they needed (researchers, facilities, and government-to-government connections), and implement the Guatemala Experiments.

6.     The control group followed the playbook developed in Tuskegee and Terra Haute, designing the Guatemala Experiments so that the test subjects would not be told that they were being infected with a devastating and potentially fatal disease, or even that they were being experimented upon. Instead, as part of a concerted and intentional effort to deceive and mislead the test subjects, and to keep the true nature of the experiments a secret, the control group had the Guatemala researchers tell the test subjects that they were receiving routine medical tests, that they had medical conditions (sometimes real and sometimes not) that needed to be treated, or that the medication was for their own good. This deception was very successful and continued long after the human experiments ended.

7.     Hundreds of Guatemalans were unknowingly infected with syphilis. They were not told about the nature of the Experiments, warned about the consequences of being exposed to and infected with these sexually transmitted diseases, or given any follow-up care, treatment, or education to minimize their pain and suffering. Despite the fact that Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb knew that the test subjects would pass syphilis and other diseases to their sexual partners, wives, and children if they were not treated, very few of them received sufficient treatment to cure them, and none of them were given information about how to prevent syphilis from being transmitted. As a result, the test subjects, their spouses, third children, and their grandchildren suffered and died in ignorance.

8.     When the Experiments were abruptly terminated, the control group – decision makers and policymakers from Johns Hopkins, The Rockefeller Foundation, and

Bristol-Myers Squibb – took great care to protect themselves and their institutions from negative publicity or lawsuits. They concealed their involvement, instructed those involved to never publish their work, concealed and destroyed records and files relevant to the Experiments, and never admitted their roles in the Experiments.

9.     The Guatemala Experiments were kept secret until they were inadvertently discovered by a historian, Susan Reverby, conducting research on the Tuskegee Study. Dr. Reverby provided the information she had discovered to the United States Government, which assigned the responsibility of investigating the Experiments to a Presidential Commission for the Study of Bioethical Issues.

10.     In September 2011, the U.S. Commission released a report of its findings about the Guatemala Experiments. The Commission concluded that the Guatemala experiments involved gross violations of ethics as judged against both the standards of today and the researchers' own understanding of applicable contemporaneous practices. Leaving no room for doubt about the character of the experiments, the Commission emphasized that the researchers and those who oversaw them committed egregious moral wrongs.

11.     The Plaintiffs in this case are the primary and secondary victims of the Guatemala Experiments. They, and their loved ones, have endured, and will continue to endure, pain and suffering as a direct, immediate, and proximate result of the Experiments. By filing this lawsuit, they seek compensatory and punitive damages from Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb, and public recognition of what they did in Guatemala from 1945 to 1956.

**Jurisdiction and Venue**

12.     This Court has jurisdiction to consider claims and impose damages against all of the Defendants in this case under 28 U.S.C. §§ 1331, 1332, and 1350 and the principles of pendent and ancillary jurisdiction.

13.     The Alien Tort Statute, codified as 28 U.S.C. § 1350, provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." It has been interpreted to grant federal courts jurisdiction to hear tort claims filed by foreign nationals for acts committed in violation of well-established and customary international legal norms.

14.     ATS claims are, by definition, hybrid claims, combining international law with federal common law. International law defines the legal norms at issue -- in this case, the prohibitions against nonconsensual, nontherapeutic human experimentation and crimes against humanity -- and federal common law provides remedies to the foreign nationals injured as a result of the violation of those norms.

15.     Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391 given that the Johns Hopkins Defendants reside in this judicial district and a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.

16.     The Plaintiffs, individually and collectively, meet the amount in controversy requirement. Whether considered by count or individual claim, the Plaintiffs

are claiming damages in an amount much greater than seventy-five thousand dollars ($75,000).

## Statute of Limitations – Alien Tort Statute

17.     The Alien Tort Statute does not have an express statute of limitations. Instead, it borrows the ten-year statute of limitations from the federal Torture Victims Prevention Act of 1991.

A.     Equitable tolling

18.     Limitations under the ATS is subject to equitable tolling when a plaintiff remains in ignorance of the facts of a claim through defendant's fraudulent concealment of those facts, without any fault or lack of diligence on his or her part. Equitable tolling also applies in the absence of fraud where a defendant conceals himself by fleeing to avoid liability. Limitations is tolled in these circumstances until the time the defendant's fraud is discovered or the defendant is located because it would be unconscionable to enforce the limitations period against the plaintiff under these circumstances, and doing so would result in gross injustice.

19.     In this case, limitations were tolled because of the Defendants' fraudulent concealment. As outlined in more detail in the Statement of Facts section, the Defendants, directly and in concert with each other, chose Guatemala as the site of the Experiments -- an isolated location where their experiments could be conducted in secret -- and chose test subjects -- people in mental institutions, prison inmates, and children in orphanages and state-run schools -- who were isolated, poor, uneducated, vulnerable, and unlikely to understand what was being done to them. The Defendants then intentionally

selected a team of individuals to conduct the Experiments in Guatemala that they knew had previously conducted unethical, nonconsensual experiments before – men who had already shown a willingness to deceive test subjects as to what they were doing and why, and hide details of prior experiments from test subjects and the public at large.

20.     Because of their prior experiences in Tuskegee and Terre Haute, the Defendants, directly and in concert with one another, were very concerned about the American public discovering what they were doing and about "unscrupulous lawyers" or "goody organizations" becoming involved. In addition to fraudulently concealing their actions from the test subjects, they also acted to conceal the Experiments so that no one would intervene to stop the nonconsensual infection of the test subjects.

21.     Although the Defendants may not have directly employed the researchers in Guatemala who actually injected syphilis into the Direct Plaintiffs and then lied to and deceived them, the Defendants were the researchers' principals, masters, and co-conspirators, and they directed and had prior and concurrent knowledge that the researchers would lie and be deceitful; it was why those researchers were chosen in the first place.

22.     As planned, the researchers in Guatemala made no attempt to obtain the test subjects' informed consent. They did not give the test subjects any information about the Experiments, what was being done to the subjects, or the dangers to which the subjects were being exposed. In fact, they did not tell the test subjects that they were being experimented upon or being exposed to or infected with syphilis or any disease. Instead, following the Defendants' model, they infected the test subjects and lied to and deceived

them. The Researchers told the test subjects they were performing routine medical tests, giving them medications to help them, treating them for unrelated or fictional conditions, or else they gave other false but reassuring answers.

23.    The Defendants, directly and in concert with one another, also acted to conceal the Experiments after they were abruptly discontinued. They instructed the researchers on the ground to close their facilities and not tell the test subjects anything. The researchers followed these instructions and did not tell the test subjects they had been experimented upon, they had been exposed to or infected with syphilis or a disease, and they did not give them health information or education so they could minimize their pain and suffering or prevent the passage of the disease to their sexual partners, spouses, children, and grandchildren. They researchers closed the facilities and left Guatemala, removing any connection to the Defendants.

24.    The Defendants' concealment continued for decades. The control group instructed all of the doctors and researchers involved -- who otherwise devoted their professional lives to contributing their knowledge and experimental experience to the medical literature -- not to publish anything about the Experiments. They instructed that all notes and other paperwork were to be destroyed and that no one should mention what had occurred in Guatemala. That the truth about the Guatemala Experiments was not publicized until September 2011 -- more than 60 years later -- shows how successful the Defendants' concealment efforts were.

25.    Even today, the Defendants continue to fraudulently conceal their involvement in the Guatemala Experiments. Since the Experiments were discovered and

publicized in September 2011, each of the Defendants has publicly made statements denying any role or involvement in them.

B.    Discovery rule

26.    Limitations under the ATS is also subject to the discovery rule. Federal law is clear that limitations does not begin to run or accrue until a plaintiff discovers, or in the exercise of reasonable diligence could discover, both his or her injury and its probable cause. If a plaintiff experiences the signs and symptoms of an injury but did not discover the probable cause of those signs and symptoms until later, limitations does not begin to run until the probable cause is discovered.

27.    In this case, the Plaintiffs did not discover that they had syphilis, or that it was probably caused by the Guatemala Experiments, until sometime after September 2011, with the individual discovery dates ranging from a few months after September 2011, to more than two years after that date.

28.    The limitations period for each Plaintiff is different based on his or her unique circumstances and the details related to the Representative Plaintiffs are set forth below. A number of facts apply to all Plaintiffs, however.

29.    The "Direct Plaintiffs" were adults in mental institutions, prisons, and the military and children in orphanages and state-run schools for the poor that were intentionally infected with syphilis. These people were targeted because they were socio-economically disadvantaged and not likely to understand what was being done to them. They lived in or moved to rural communities hours from towns or cities with doctors or medical facilities. With only a few exceptions, they did not have access to or receive

medical care, and they lacked any real understanding or knowledge of even basic concepts of health and disease.

30.     As the Defendants intended and instructed, none of the Direct Plaintiffs were told that they were involved in an experiment, were being infected with syphilis or any disease, or that they would be harmed in any way. They were lied to and deceived in a variety of ways, and they believed what the doctors told them: the doctors were only performing routine medical tests, the doctors were giving them medicine to help them, they were being treated for unrelated conditions, or they were being treated for nonexistent conditions, or conditions they did not have.

31.     When the experiments abruptly ended, none of the Plaintiffs were told what had been done to them. They were not told that they had been part of an experiment, exposed to or infected with syphilis or another disease, were contagious and could make others sick, or should seek medical care. They were not told that the doctors had lied to or deceived them. They were not given any health information or education. And they were not given any information to minimize their pain and suffering, or avoid infecting their sexual partners, spouses, children, and grandchildren.

32.     As a result, the Direct Plaintiffs did not know and had no reason to suspect that they were part of an experiment, or they had been infected with syphilis. If lesions or other signs and symptoms appeared, the Direct Plaintiffs either did not notice them or they did not understand what they meant or what was causing them. In almost all cases, the Defendants had, and continue to have, very poor living conditions and little access to

modern conveniences, making the appearance of cuts, abrasions, lesions, or rashes unremarkable and not worthy of medical attention.

33. The Direct Plaintiffs had no reason to know they were involved in an experiment until after 2011 when the Guatemala Experiments were made public. In a handful of cases, the Direct Plaintiffs saw media coverage or had conversations about the Experiments and then had their suspicions confirmed by Guatemalan health officials and investigators who tracked them down from government records and tested them. In the rest of the cases, the vast majority, neither the Direct Plaintiffs nor their "Spouses", "Children", or "Grandchildren" were aware of the Guatemala Experiments, that they had syphilis, or that their syphilis was because of the Experiments until the health officials, investigators, or Plaintiffs' consultants located and tested them.  As the Defendants knew, expected, and relied upon, the Plaintiffs' poverty, lack of education, lack of knowledge about health care and disease, and lack of access to health care all prevented them from discovering what had happened.

34. While there was news coverage of the Experiments in Guatemala after September 2011, very few Plaintiffs saw, heard, or read about them. Many of the Plaintiffs cannot read. Many only speak native spoken dialects. Very few have televisions or telephones or read newspapers. The vast majority only learned about the Experiments from the health officials and investigators who located and tested them. None of the Plaintiffs knew about their own connection to the Experiments, or that it was the probable cause of their health issues, until after September 2011 when they were tested.

14

35.     Even if at some point the Plaintiffs had reason to suspect that their health issues were somehow related to the injections the Direct Plaintiffs received in the late 1940s, a premise that each Plaintiff denies, a reasonably diligent inquiry still would not have been able to reveal that they had a cause of action. The Defendants closed the facilities and the researchers moved back to the United States. The documents were taken back to the United States or destroyed. The doctors and researchers did not reveal what they had done or their role in the Experiments, nor did they publish about the Experiments. As the Defendants knew, expected, and relied upon, the lack of information caused by their actions meant that any reasonable inquiry would have failed until previously unavailable documents were discovered in the United States and publicized after September 2011.

### Statute of Limitations – Guatemalan Law Counts

36.     Plaintiffs' claims are also timely under Guatemalan law.  The Court is obligated to apply the procedural law of the forum – Maryland – including Maryland's choice of law principles and its three-year procedural statute of limitations, which may be tolled for discovery, age, and fraud.

37.     The three-year applicable statute of limitations was tolled until the time that the Plaintiffs discovered, or reasonably should have discovered, that they had a cause of action against Defendants.   The three-year statute of limitations was similarly tolled pursuant to Article 57, § 14 of the Maryland Code, which provided that

> In all actions where a party has a cause of action of
> which he has been kept in ignorance by the fraud of
> the adverse party, the right to bring suit shall be

15

> deemed to have first accrued at the time at which such
> fraud shall or with usual or ordinary diligence might
> have been known or discovered.

The modern, re-codified version of Article 57, § 14 is Md. Code, Cts. & Jud. Proc., § 5-203.

38.     As set forth above, the Plaintiffs were unaware that they had syphilis, were unaware of the Guatemala Experiments, were unaware that their health condition was the result of the Guatemala Experiments, were unaware of Defendants' involvement in the Guatemala Experiments, and had not otherwise discovered, nor could they have reasonably discovered, that they had a cause of action against Defendants until less than three years prior to the date on which Plaintiffs' initial Complaint was filed.  Their lack of awareness was a result of Defendants' fraudulent conduct, which concealed from the Plaintiffs the existence and nature of their claim.

39.     Even if the Court were to conclude that Guatemala's one-year prescription period was applicable to Plaintiffs' claims, Plaintiffs' claims would nevertheless be timely.  Under Guatemalan law, the prescription period applicable to Plaintiffs' claims would be equitably tolled pursuant to Article 15 of the Judiciary Law of Guatemala and Article 2296 of the 1933 Civil Code (known as the "abuse of rights" doctrine) until such time as the Plaintiffs knew they had a cause of action and knew the identity of the harmful actor.  The Guatemalan law prescription period would similarly be inapplicable because actions which are gross violations of human rights, such as the actions of the Defendants in this case, are imprescriptible under Guatemalan law.  Finally, for all individuals who contracted syphilis after 1964, the 1964 Guatemalan Civil Code applies

16

and the prescription period does not begin to run until the Plaintiff knows of their injury and who caused it.  As set forth above, the Plaintiffs born after 1964 did not learn of their injury and who caused it until shortly before this lawsuit was filed.

## The Plaintiffs

40.     This case is being brought by 842 Plaintiffs. For organizational purposes, they are divided into the following six categories.

41.     "Category 1 Plaintiffs," also described as "Direct Plaintiffs," are Guatemalans who were nonconsensually and unknowingly infected with syphilis as part of the Guatemala Experiments. This is referred to in the Third Amended Complaint as "direct exposure" or "primary exposure."

42.     "Category 2 Plaintiffs," also described as "Spouses," are Guatemalans who did not have syphilis before they married or had sexual contact with a Direct Plaintiff (Cat. 1), and were infected with the disease through sexual contact with the Direct Plaintiff after the Direct Plaintiff was infected as part of the Guatemala Experiments. This is one form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

43.     "Category 3 Plaintiffs," also described as "Children," are Guatemalans who are the sons and daughters (first generation descendants) of a Direct Plaintiff (Cat. 1) and a Spouse (Cat. 2) or the spouse of the son or daughter of a Direct Plaintiff and Spouse. If the Child's mother is a Direct Plaintiff, she passed syphilis to the Child in utero (the disease was passed to the child through the placenta) or at birth (the disease was passed to the child as he or she was being delivered vaginally) after being infected as part of the

17

Guatemala Experiments. If the Child's father is a Direct Plaintiff, he passed syphilis to the Child's mother through sexual contact after being infected as part of the Guatemala Experiments, and the Child's mother passed the disease she received from the Direct Plaintiff to the Child in utero or at birth. If the Plaintiff is the spouse of a Child, he or she contracted syphilis from their spouse, who is the child of a Direct Plaintiff.   This is a second form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

44.    "Category 4 Plaintiffs," also described as "Grandchildren," are Guatemalans who are the grandchildren or great-grandchildren (second or third generation descendants) of a Direct Plaintiff and the sons and daughters of Children (Cat. 3). If the Grandchild's mother was a Child (second generation) or a Grandchild (third generation), she passed syphilis she had been infected with because of the Guatemala Experiments to the Grandchild in utero or at birth. If the Grandchild's father was a Child (second generation) or a Grandchild (third generation), he passed syphilis he had been indirectly infected with because of the Guatemala Experiments to the Grandchild's mother, and the Grandchild's mother passed the disease she received from the Child (second generation) or Grandchild (third generation) to the Grandchild in utero or at birth. This is a third form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

45.    "Category 5 Plaintiffs," also described as "Wrongful Death Plaintiffs (Cat. 5)," are Guatemalans who are the Parent, Spouse or Child of a Deceased Plaintiff who

died as a result of syphilis acquired as a result of the Guatemala Experiments. All of the Wrongful Death Plaintiffs are also members of Categories 1, 2, 3, 4, and/or 6.

46.    Finally, "Category 6 Plaintiffs," also described as "Estate Plaintiffs," are the Estates and designated beneficiaries of Guatemalans who died as a result of syphilis acquired as a result of the Guatemala Experiments. All of the Estate Plaintiffs are also members of Categories 1, 2, 3, 4, and/or 5.

47.    There is one Plaintiff who maintains dual Guatemalan-United States citizenship and that is Ramiro Anibal Galvez Ortiz (Plaintiff No. 76).  All other Plaintiffs are citizens of Guatemala, and not the United States.

48.    Plaintiffs' Original Complaint identified 774 Plaintiffs by name.  An additional 68 Plaintiffs were named in the Amended Complaint.  All Plaintiffs are identified by name in **Exhibit 1** to this Third Amended Complaint.  Category 1 Plaintiffs / Direct Plaintiffs are highlighted in yellow and marked with the label "VD" (*Victima Directa*).    The Category 2 (spouses), Category 3 (children), and Category 4 (grandchildren and great-grandchildren) Plaintiffs are listed below each of the Category 1 Plaintiffs' names.

49.    As a direct, immediate, and proximate result of the negligence and/or intentional actions of the Defendants, all of the Plaintiffs were caused to suffer painful and permanent injuries to their body, were caused to sustain severe mental anguish, emotional pain and suffering, and, in some cases, death, and moral injury and damage, and were caused to incur hospital expenses, medical expenses, and other financial loss.

50.     All of the injuries and damages experienced by the Plaintiffs were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  The Plaintiffs were not infected with syphilis through any means other than the Guatemala Experiments.

51.     Per the Court's Order, below are identified representatives of each of the six categories of Plaintiffs.

A.     Category 1 Plaintiffs

52.     "Category 1 Plaintiffs," also described as "Direct Plaintiffs," are Guatemalans who were unknowingly, and without their consent, infected with syphilis as part of the Guatemala Experiments. This is referred to in the Third Amended Complaint as "direct exposure" or "primary exposure."

53.     Per the Court's Order, Plaintiffs have identified four Direct Plaintiffs as representatives of Category 1 Plaintiffs.

*Francisco Garcia Alvarez – Plaintiff No. 349*

54.     Francisco Garcia Alvarez is identified in Exhibit 1 as Plaintiff No. 349.  He is a Direct Victim of the Guatemala Experiments, and he is identified in the papers of Dr. John Cutler as a participant in the human experimentation conducted in the Central Penitentiary (*Penitenciaria Central*).  Mr. Alvarez has submitted to serological testing that confirms he is positive for syphilis infection.  He has tested positive for the Nichols Strain of syphilis.  The Estate of his wife, Adelina Mollinedo de Garcia (Plaintiff No. 350), as well as several of his children and grandchildren are Plaintiffs in this lawsuit including, but not limited to, Plaintiff Nos. 351 through 369 on Exhibit 1.  Adelina

Mollinedo de Garcia (Plaintiff No. 350) died as a result of syphilis contracted from her husband, who contracted syphilis as a result of the Guatemala Experiments, and her death forms the basis of a Wrongful Death claim.

55.     Mr. Alvarez's date of birth is June 16, 1927.  He was imprisoned in a men's Penitentiary in Guatemala City for several months in 1947 when he was approximately 20 years old.  During his incarceration, two men in white lab coats entered the cell he shared with approximately five other prisoners.  One of the men spoke Spanish and the other only spoke English, although the two men spoke English to each other.  The men told the prisoners that they were going to give the prisoners injections of "vitamins." Over the course of three days, Mr. Alvarez was injected at least three times – once in the left arm, once in the left hip, and once in the right hip.

56.     Mr. Alvarez first noticed unusual symptoms about two weeks after the injections, though he did not discover that the symptoms were related to the injections until 2013.  Over the course of his lifetime, he has suffered from severe headaches, pain in his joints, joint swelling in his hands and knees, loss of vision, and lethargy.   He visited a doctor for these problems, but the doctor only treated the symptoms, and Mr. Alvarez never was given a diagnosis of syphilis.  Mr. Alvarez remained unaware that he was suffering from syphilis until approximately two years ago, when Dr. Pablo Werner Ramirez Rivas, a physician consultant for the Plaintiffs and a former Guatemalan Health Minister, examined him and tested him for syphilis.  Mr. Alvarez was similarly unaware of the Guatemala Experiments until learning of them from Dr. Werner approximately two

21

years ago.  He had not previously heard or learned about the Guatemala Experiments from any other source.

57.     As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Alvarez was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect his spouse and heirs with syphilis.

58.     All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Alvarez was not infected with syphilis through any means other than the Guatemala Experiments.

*Ramiro Galvez Villalobos – Plaintiff No. 63*

59.     Ramiro Galvez Villalobos is identified in Exhibit 1 as Plaintiff No. 63.  He is a Direct Victim of the Guatemala Experiments.  He has submitted to serological testing that confirms he is positive for syphilis infection.  He has tested positive for the Nichols Strain of syphilis.  Several of his children and grandchildren are Plaintiffs in this lawsuit, including but not limited to, his daughter Ebelin Galvez Ortiz (Plaintiff No. 67, described further below), who has tested positive for the Nichols Strain of syphilis, and his grandchildren Ronald Roberto Benavente Galvez and Katarin Elisabet Benavente Galvez (Plaintiffs Nos. 68 and 70, described further below), both of whom have also tested positive for the Nichols Strain of syphilis.

60.     Mr. Galvez Villalobos was born on February 21, 1940.  When he was a small child, he was cared for in a school in the city where he lived, Puerto de San Jose. In 1947, when he was seven years old, two tall white men in white coats came to the school and placed the students in a single file line.  The men injected the students and told them that the purpose of the injection was to protect the children against diseases. Mr. Galvez received an injection in the right shoulder and the right hip.  Mr. Galvez was examined on multiple occasions, during which examinations the tip of his penis was scraped at least once.

61.     The white men returned several months later and injected Mr. Galvez Villalobos and other students on a second occasion.  This time Mr. Galvez was injected on his right thigh.  The men again told Mr. Galvez and the other students that they were being injected to protect them from disease.

62.     Approximately two years later, when he was approximately nine years old, Mr. Galvez Villalobos came down with a fever accompanied by pain all over his body and pus and fluid discharging from his penis.  Mr. Galvez Villalobos told his father and was taken for treatment at the local hospital.  Mr. Galvez Villalobos was given a shot and told that his "blood was contaminated."  He was never told that he had syphilis.

63.     Mr. Galvez Villalobos continued to experience symptoms of syphilis throughout his lifetime, though he did not know that is what they were at the time.  Mr. Galvez Villalobos recalls that when he was 14 or 15 years old, his entire body broke out into a rash and he had severe pain in his legs.  He continues to experience symptoms to this day, including periods where his body erupts in rashes, joint pain, joint swelling

(especially in his knees), and headaches.  His joint pain is so severe that at times he cannot put his clothing on without assistance.

64.    Mr. Galvez Villalobos first learned of the Guatemala Experiments on television when he heard reports that President Obama issued a public apology in approximately 2012.  Mr. Galvez Villalobos did not hear reports, though, indicating that the Guatemala Experiments involved schoolchildren and, therefore, he did not know, understand, or even suspect that he was, or could have been, a victim of the Guatemala Experiments.  Mr. Galvez remained unaware that he was suffering from syphilis or was a victim of the Guatemala Experiments until approximately September 2013, when Dr. Pablo Werner Ramirez Rivas examined him, tested him for syphilis, and advised him that his name was on a list from the school in Puerto de San Jose.  Mr. Galvez Villalobos had not previously heard or learned about his involvement in the Guatemala Experiments from any other source.

65.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Galvez Villalobos was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect his spouse and heirs with syphilis.

66.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Galvez

Villalobos was not infected with syphilis through any means other than the Guatemala Experiments.

*Margarita Mendoza Gonzalez – Plaintiff No. 54*

67.    Margarita Mendoza Gonzalez is identified in Exhibit 1 as Plaintiff No. 54. She is a Direct Victim of the Guatemala Experiments.  She has submitted to serological testing that confirms she is positive for syphilis infection.  She tested positive for the Nichols Strain of syphilis.  Her brother Carlos Alberto Mendoza is also a Plaintiff in this lawsuit (Plaintiff No. 55), as described below.

68.    Ms. Mendoza Gonzalez was born on August 16, 1940.  When she was a small child, she was cared for in a school known as the Casa del Niño in the city where she lived, Puerto de San Jose.  When she was a student at this school, two tall, Caucasian doctors, who spoke English and some broken Spanish, entered a room and told her and the other students to lay down on their stomachs.  Ms. Mendoza recalls being very afraid. The doctors then took students, one by one, to a bed where they examined the children and gave them shots.  Ms. Mendoza Gonzalez received a total of 4 or 5 injections, on both sides of her shoulders.   Ms. Mendoza Gonzalez still has visible marks on her shoulders from the injections.

69.    Ms. Mendoza Gonzalez experienced fevers, coughing, headaches and pain shortly after the injections, though she did not appreciate what happened given her age. She continues to experience symptoms of syphilis today.  Ms. Mendoza Gonzalez suffers from headaches and severe pain in her right knee and right arm.  She can barely move her right arm because of the pain.  She has lost all vision in her right eye, and the vision in

her left eye is very poor.  She has suffered throughout her life from forgetfulness and dementia.

70.    Ms. Mendoza Gonzalez first learned of the Guatemala Experiments on television, though she does not remember exactly when.  Ms. Mendoza Gonzalez did not hear reports indicating that the Guatemala Experiments involved young children and she did not know, understand, or even suspect at the time that she was or could have been a victim of the Guatemala Experiments.  Ms. Mendoza remained unaware that she suffered from syphilis or that she was a victim of the Guatemala Experiments until October 2013, when Dr. Pablo Werner Ramirez Rivas examined her, tested her for syphilis, and advised her that her name was on a list from the Casa del Niño.  Ms. Mendoza Gonzales had not previously heard or learned about her involvement in the Guatemala Experiments from any other source.

71.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Ms. Mendoza Gonzalez was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her spouse and heirs with syphilis.

72.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Ms. Mendoza Gonzalez was not infected with syphilis through any means other than the Guatemala Experiments.

*Carlos Alberto Mendoza – Plaintiff No. 55*

73.     Carlos Alberto Mendoza is identified in Exhibit 1 as Plaintiff No. 55.  He is the brother of Margarita Mendoza Gonzalez (Plaintiff No. 54, described above) and a Direct Victim of the Guatemala Experiments.  He has submitted to serological testing that confirms he is positive for syphilis infection.  He has tested positive for the Nichols Strain of syphilis.  His wife and son, Berta Villatoro de Mendoza (described further below), and Luis Hernando Mendoza Villatoro, are Plaintiffs in this lawsuit (Plaintiff Nos. 56 and 57, respectively).

74.     Mr. Mendoza was born on August 12, 1942.  He received injections when he was a child and student with his sister at the Casa del Niño school in Puerto de San Jose.  Two young men put the children in groups of approximately 15 students and took them into a dark room.  The children were lined up in a single file line and called over to the two men, who gave them shots.  The men did not tell the children the purpose of the shots.  The men returned on multiple occasions to examine the children and administer additional shots.  Mr. Mendoza received shots on both of his shoulders.  For the examination, he was told to remove his clothes and the men listened to his heart with a stethoscope, examined his body, and pressed on his penis.  Several times, the men drew Mr. Mendoza's blood.

75.     After one series of injections, Mr. Mendoza became ill and spent several days confined to a bed, though he did not appreciate the relationship between this illness and the injections at the time.  He also had a rash all over his body.  Since then and over the course of his lifetime, Mr. Mendoza has experienced many symptoms caused by his

syphilis infection including headaches, severe joint pain in his knees, arms, and hands, pain in his gums, light sensitivity, impaired vision, and seizure or convulsive-like activity that has caused him to pass out, and which began when he was in his mid-50s.

76.    Mr. Mendoza remained unaware of the Guatemala Experiments and unaware that he was suffering from syphilis until approximately three years ago, when a Dr. Pablo Werner Ramirez Rivas examined him, tested him for syphilis, and advised him that his name was on a list from the Casa del Niño school in Puerto de San Jose.  Mr. Mendoza had not previously heard or learned about his involvement in the Guatemala Experiments from any other source.

77.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Mendoza was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect his spouse and heirs with syphilis.

78.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Mendoza was not infected with syphilis through any means other than the Guatemala Experiments.

B.    Category 2 Plaintiffs

79.    "Category 2 Plaintiffs," also described as "Spouses," are Guatemalans who did not have syphilis before he or she married or had sexual contact with a Direct Plaintiff (Category 1), and who was infected with the disease through sexual contact with

the Direct Plaintiff after the Direct Plaintiff was infected as part of the Guatemala Experiments. This is one form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

80.     Per the Court's Order, Plaintiffs have identified three Spouses as representatives of Category 2 Plaintiffs.

*Graciela Ortiz de Galvez – Plaintiff No. 64*

81.     Graciela Ortiz de Galvez is identified on Exhibit 1 as Plaintiff No. 64.  She is the wife of Ramiro Galvez Villalobos (Plaintiff No. 63, described above), a Direct Victim of the Guatemala Experiments.  She has submitted to serological testing that confirms she is positive for syphilis infection.  Her six children with Ramiro Galvez have all tested positive for syphilis.  Her daughter, Ebelin Galvez Ortiz (Plaintiff No. 67), as well as her grandchildren, Ronald Roberto Benavente Galvez (Plaintiff No. 70) and Katarin Elisabet Benavente Galvez (Plaintiff No. 68) have also tested positive for the Nichols strain of syphilis.  Mrs. Ortiz de Galvez was previously married to a different man prior to her marriage to Ramiro Galvez Villalobos.  Mrs. Ortiz de Galvez had two children from that marriage and neither of those children have syphilis.

82.     Since her second marriage to Mr. Galvez Villalobos in approximately 1958, Mrs. Ortiz de Galvez has experienced numerous signs and symptoms of syphilis.  The disease was transmitted to her by her husband, Ramiro Galvez Villalobos, a Direct Victim of the Guatemala Experiments.  Her symptoms include the loss of vision during her pregnancy with her first child by Mr. Galvez Villalobos, chronic joint pain, especially in her left knee and right arm, and sores and rashes between her fingers.  At times she is

unable to lift her right arm because the pain is so severe.  She also suffers from Saddle
Nose Deformity, a sign of prolonged exposure to syphilis, and severely deformed joints,
primarily her knees, as shown in the photographs below.  Mrs. Ortiz de Galvez also
experienced a miscarriage with her third pregnancy.




83.    Mrs. Ortiz de Galvez is illiterate.  She remained unaware that she was
suffering from syphilis until approximately three years ago, when Dr. Pablo Werner
Ramirez Rivas contacted her, examined her, and tested her for syphilis.  Mrs. Ortiz was
similarly unaware of the Guatemala Experiments until Dr. Werner told her about the
Experiments.

84.    As a direct, immediate, and proximate result of the negligence and
intentional actions of the Defendants, Mrs. Ortiz de Galvez was caused to suffer painful

and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her heirs with syphilis.

85.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mrs. Ortiz de Galvez was not infected with syphilis through any means other than the Guatemala Experiments.

*Alba Violeta Echevarria – Plaintiff No. 81*

86.    Alba Violeta Echevarria is identified on Exhibit 1 as Plaintiff No. 81.  She was born on September 3, 1943 and is the wife of Direct Victim Plaintiff, Mariano Humberto Guzman (Plaintiff No. 80), who was a participant in the human experimentation conducted in the Central Penitentiary (*Penitenciaria Central*).  Mr. Guzman was born in 1910 and died in 1987.  Prior to his death, he frequently complained of pain in his knees, hands and fingers, as well as headaches and pain in his genital region.  Upon information and belief, Mr. Guzman's symptoms are the result of syphilis acquired while an inmate at the Central Penitentiary.  Mrs. Echevarria has submitted to serological testing that confirms she is positive for syphilis infection.

87.    Shortly after marrying Mr. Guzman in 1962, Mrs. Echevarria began suffering from signs and symptoms of syphilis, though she did not recognize them as such at that time. The disease was transmitted to her by her husband, Mariano Humberto Guzman, a Direct Victim of the Guatemala Experiments, who died as a result of syphilis

and whose death forms the basis of a Wrongful Death Claim.   Mrs. Echevarria's symptoms include pain in her joints, primarily her elbows and knees, significant loss of vision to the point of being almost blind, nervousness, anxiety, and other nervous system impairment, sleep disorders, and inflammation of her lymph nodes.  Approximately eight years ago, she began developing sores on her genitals.  Mrs. Echevarria experienced three miscarriages and experienced significant pain and inflammation in her genitals during each of her pregnancies.

88.    Mrs. Echevarria lives in a town called La Tinta that is approximately a 13-hour bus ride from Guatemala City.  Access to medical treatment is sparse and Mrs. Echevarria does not recall ever visiting a doctor because of her symptoms throughout her life.  Although she can read and write Spanish, she does not have access to a television or telephone.

89.    Mrs. Echevarria remained unaware that she was suffering from syphilis until October 2013, when Dr. Pablo Werner Ramirez Rivas contacted her, examined her, and tested her for syphilis.  Mrs. Echevarria was similarly unaware of the Guatemala Experiments until Dr. Werner advised her of them.

90.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mrs. Echevarria was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her heirs with syphilis.

91.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.    Mrs. Echevarria was not infected with syphilis through any means other than the Guatemala Experiments.

*Berta Villatoro de Mendoza – Plaintiff No. 56*

92.    Berta Villatoro de Mendoza is identified on Exhibit 1 as Plaintiff No. 56. She was born on July 20, 1944.    She is the spouse of Direct Victim, Carlos Alberto Mendoza (Plaintiff No. 55).    She has submitted to serological testing that confirms she is positive for syphilis infection.    Mr. and Mrs. Mendoza have one son together, Luis Hernando Mendoza Villatoro (Plaintiff No. 57), who has also submitted to serological testing confirming that he is positive for syphilis infection.    Mrs. Mendoza had three children from a prior marriage.    None of those children suffer from syphilis.

93.    Shortly after marrying Mr. Mendoza, Mrs. Villatoro de Mendoza began suffering from numerous signs and symptoms of syphilis, though she did not identify them as being caused by syphilis at the time and she did not know she or her husband was infected with syphilis.    The disease was transmitted to her by her husband, Carlos Mendoza, a Direct Victim of the Guatemala Experiments.    Her symptoms included, and continue to include, severe headaches, joint pain in her legs and knees, swelling in her knees, loss of vision, and dermatological rashes and itching.    She has experienced two miscarriages.    The first was with her first pregnancy with Mr. Mendoza and occurred at approximately eight months.    The second was with her third pregnancy (the first after Luis Hernando was born) and occurred at approximately seven months.

94.   Mr. Mendoza had previously told Mrs. Mendoza that he was a sick person, but neither of them knew why or had reason to know he was infected with syphilis.  Mrs. Mendoza remained unaware that she or her husband suffered from syphilis until October 2013, when Dr. Pablo Werner Ramirez Rivas contacted her, examined her, and tested her for syphilis.  Mrs. Mendoza was similarly unaware that the injections her husband described having received as a child were related to the Guatemala Experiments until learning from Dr. Werner.  Mrs. Mendoza had not previously heard or learned about Mr. Mendoza's involvement in the Guatemala Experiments, or her infection with syphilis, from any other source.

95.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mrs. Mendoza was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her heirs with syphilis.

96.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mrs. Mendoza was not infected with syphilis through any means other than the Guatemala Experiments.

C.   Category 3 Plaintiffs

97.   "Category 3 Plaintiffs," also described as "Children," are Guatemalans who are the sons and daughters (first generation descendants) of a Direct Plaintiff (Cat. 1) and

a Spouse (Cat. 2) or the spouse of the son or daughter of a Direct Plaintiff and Spouse. If the Child's mother is a Direct Plaintiff, she passed syphilis to the Child in utero (the disease was passed to the child through the placenta) or at birth (the disease was passed to the child as he or she was being delivered vaginally) after being infected as part of the Guatemala Experiments. If the Child's father is a Direct Plaintiff, he passed syphilis to the Child's mother through sexual contact after being infected as part of the Guatemala Experiments, and the Child's mother passed the disease she received from the Direct Plaintiff to the Child in utero or at birth. If the Plaintiff is the spouse of a Child, he or she contracted syphilis from their spouse, who is the child of a Direct Plaintiff.  This is a second form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

98.

99.    Per the Court's Order, Plaintiffs have identified four Children as representatives of Category 3 Plaintiffs.

*Ebelin Galvez Ortiz – Plaintiff No. 67*

100.    Ebelin Galvez Ortiz is identified on Exhibit 1 as Plaintiff No. 67.  She was born on October 31, 1971.  She is the daughter of Direct Victim Plaintiff Ramiro Galvez Villalobos and his wife Graciela Ortiz de Galvez (Plaintiffs No. 63 and 64, described above).  She is the mother of Second Generation Descendant Plaintiffs, Ronald Roberto Benavente Galvez (Plaintiff No. 70) and Katarin Elisabet Benavente Galvez (Plaintiff No. 68).  She has submitted to serological testing that confirms she is positive for syphilis infection.  She has tested positive for the Nichols Strain of syphilis, just like her mother,

father, son, and daughter.  Mrs. Galvez Ortiz was born with syphilis, having contracted it from her mother, Graciela Ortiz de Galvez, who contracted it from her husband, Ramiro Galvez Villalobos, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.  Mrs. Galvez Ortiz transmitted syphilis to her son, Ronald Roberto Benavente Galvez, and her daughter Katarin Elisabet Benavente Galvez through pregnancy and birth.

101.   Ms. Galvez Ortiz has suffered from the signs and symptoms of congenital syphilis since her birth, though she only recently learned that syphilis was the cause of those signs and symptoms.  In particular, she suffers from waxing and waning bumps and rashes over her entire body.  She has deformities of her joints, including her arms, which cannot be stretched straight.  She experiences constant pain in her joints in her wrists, elbows, and knees, as well as in her back.  She has endured these symptoms for her entire life.

102.   Ms. Galvez Ortiz remained unaware that she was suffering from syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas, a physician consultant for the Plaintiffs, examined her and tested her and her family members for syphilis.  Ms. Galvez Ortiz was similarly unaware of the Guatemala Experiments until her father, Ramiro Galvez, told Ms. Ortiz within the last three years about the injections he received when he was a student at the school in Puerto de San Jose.  Ms. Galvez Ortiz had not previously heard or learned about her father's involvement in the Guatemala Experiments, her father's or mother's infection with syphilis, or her own infection with syphilis, from any other source.

103.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Ms. Galvez Ortiz was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her children with syphilis.

104.    All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Ms. Galvez Ortiz was not infected with syphilis through any means other than the Guatemala Experiments.

*Lesbia Lucila Giron Galindo – Plaintiff No. 3*

105.    Lesbia Lucila Giron Galindo is identified in Exhibit 1 as Plaintiff No. 3. She was born on June 15, 1962.  She is the daughter of Direct Victim Plaintiff Arturo Giron Alvarez (Plaintiff No. 1) and his wife, Basilia Galindo de Giron (Plaintiff No. 2). Her father, Mr. Giron Alvarez, is identified in the papers of Dr. John Cutler as a participant in the human experimentation conducted in the Central Penitentiary (*Penitenciaria Central*).  Ms. Giron Galindo has submitted to serological testing that confirms she is positive for syphilis infection.  She has tested positive for the Nichols Strain of syphilis.  Ms. Giron Galindo was born with syphilis, having contracted it from her mother, who contracted it from her husband, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.  Ms. Giron Galindo's father and mother, Arturo Giron Alvarez (Plaintiff No. 1) and Basilia Galindo

de Giron (Plaintiff No. 2), died as a result of syphilis they contracted because of the Guatemala Experiments, and their deaths form the basis of Wrongful Death claims.  Ms. Giron Galindo's older sister, Maria Ana Giron Galindo, was born in 1940, before their father became imprisoned in the Penitentiary, and is healthy and does not exhibit any signs of congenital syphilis, nor has she ever been diagnosed with syphilis.

106.   When Mr. Giron Alvarez went to jail, he was very active and healthy, according to Maria Ana Giron Galindo.  When he was released from jail, though, his cognitive function was impaired, he had frequent maladies from which he never suffered before, such as stomach aches, bone pain, pus-filled rashes, and loss of vision.  These health changes were caused by the Guatemala Experiments, which infected Mr. Giron Alvarez with syphilis.

107.   Mr. Giron Alvarez transmitted syphilis to his wife, Basilia Galindo de Giron, through marital relations.  Ms. Galindo de Giron transmitted syphilis congenitally to her daughter Lesbia Lucila Giron Galindo, who has suffered from the signs and symptoms of congenital syphilis since her birth, though she only recently learned that syphilis was the cause of those problems.  Ms. Giron Galindo suffers from numbness in her legs that causes difficulty with ambulation, joint pain (especially in the knees), loss of vision, cognitive impairment, loss of memory, small stature, and recurrent fevers.  She also experienced a miscarriage.  She has endured these symptoms for her entire life.

108.   Ms. Giron Galindo was unaware that she suffered from syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas contacted her, examined her, and tested her for syphilis.  Ms. Giron Galindo was similarly unaware of

the Guatemala Experiments, and her father's involvement in them, until Dr. Werner advised her about the Guatemala Experiments approximately three years ago.  Ms. Giron Galindo had not previously heard or learned about her father's involvement in the Guatemala Experiments, her father's or mother's infection with syphilis, or her own infection with syphilis, from any other source.

109.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Ms. Giron Galindo was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect her children with syphilis.

110.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Ms. Giron Galindo was not infected with syphilis through any means other than the Guatemala Experiments.

*Guillermo Caal Pop – Plaintiff No. 60*

111.   Guillermo Caal Pop is identified on Exhibit 1 as Plaintiff No. 60.  He was born on January 2, 1977.  He is the son of Direct Victim Plaintiff Antonio Caal Ramirez (Plaintiff No. 58), and Asuncion Pop (Plaintiff No. 59).  He is the brother of Aurelia Caal Pop (Plaintiff No. 62) and Antonio Caal Pop (Plaintiff No. 61).  Gullermo Caal Pop's father, Mr. Caal Ramirez, was a participant in the Guatemala Experiments conducted on members of the Guatemalan Army.  He was diagnosed with syphilis by a physician in

2012, which was confirmed by serological blood test prior to his death.  He died of complications of syphilis on November 25, 2014 while en route to the closest hospital, which was four hours away.  Mr. Caal Pop has submitted to serological testing that confirms he is positive for syphilis infection, just like his father and his siblings.  Mr. Caal Pop was born with syphilis, having contracted it from his mother, Asuncion Pop, who contracted it from her husband, Antonio Caal Ramirez, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.

112.   Mr. Caal Pop recalls that his father spoke of memories of being injected when he was in the Army, but Mr. Caal Pop did not know what the injections were for, nor did he know that they may be related to his illness, nor did his father ever convey information indicating that he understood the injections to have infected him with syphilis or any other disease.  During his life, Mr. Caal Ramirez complained frequently of significant pain in his groin area and deterioration of his mental health.  Antonio Caal Ramirez's wife, and Guillermo Caal Pop's mother, Asuncion Pop, died in 1991 after suffering from similar signs and symptoms.  These health changes, as well as the deaths of Mr. Caal Ramirez and Ms. Pop, were caused by the Guatemala Experiments, which infected Mr. Caal Ramirez with syphilis.  The deaths of Mr. Caal Ramirez and Ms. Pop form the basis of Wrongful Death claims.

113.   Mr. Caal Ramirez transmitted syphilis to his wife, Asuncion Pop, through marital relations.  Ms. Pop transmitted syphilis congenitally to her son, Guillermo Caal Pop, who has suffered from the signs and symptoms of congenital syphilis since his birth, though he only recently learned that syphilis was the cause of those problems.  Mr. Caal

Pop suffers from several signs and symptoms of syphilis, including back pain, groin pain, pain while urinating, itching skin, sores on his tongue and penis that wax and wane, and progressive memory loss.  He sought treatment by a doctor for these and other problems beginning at around the age of 16 years.  Although the doctor provided treatment for his symptoms, Mr. Caal Pop was never diagnosed with syphilis.  He has endured these symptoms for his entire life.

114.    Mr. Caal Pop cannot read or write and has no education beyond first grade. He speaks K'iche, a native Guatemalan spoken dialect.  He lives in a village of approximately 700-1,000 people located approximately 10 hours by car from Guatemala City.  He first learned of the Guatemala Experiments approximately four years ago from his uncle, though he was not aware of the involvement of any United States entities, corporations, or institutions until learning the details of the Guatemala Experiments from Dr. Pablo Werner Ramirez, Rivas who examined Mr. Caal Pop and tested him for syphilis.  Receiving the results of Dr. Werner's test was the first time Mr. Caal Pop learned that he was infected with syphilis.

115.    Mr. Caal Pop had not previously heard or learned about his father's involvement in the Guatemala Experiments, his father's or mother's infection with syphilis, his own infection with syphilis, or the infection of his siblings, from any other source.

116.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Caal Pop was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional

pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss.

117.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Caal Pop was not infected with syphilis through any means other than the Guatemala Experiments.

*Victor Vicente Catun Coy – Plaintiff No. 413*

118.   Victor Vicente Catun Coy is identified on Exhibit 1 as Plaintiff No. 413. He was born on January 22, 1950.  He is the son of Direct Victim Plaintiff Fidel Catun (Plaintiff No. 411) and his wife, Angela Coy de Catun (Plaintiff No. 412).  He is the father of Second Generation Descendant Plaintiffs Gleidy Esperanza Catun (Plaintiff No. 415) and Erwin Rolando Catun (Plaintiff No. 416).  He is the sibling of Ambrocio Fidel Catun Coy (Plaintiff No. 414).  Mr. Catun Coy has submitted to serological testing that confirms he is positive for syphilis infection.  Mr. Catun Coy was born with syphilis, having contracted it from his mother, who contracted it from her husband, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.  Mr. Catun Coy transmitted syphilis to his wife, who transmitted it congenitally to her children, who have both tested positive for syphilis infection.  The deaths of Mr. Catun Coy's parents, Fidel Catun (Plaintiff No. 411) and Angela Coy de Catun (Plaintiff No.412), were directly caused by the Guatemala Experiments, and their deaths form the basis of Wrongful Death claims.

119.   Mr. Catun Coy has suffered from the signs and symptoms of congenital syphilis since his birth, though he only recently learned that syphilis was the cause of

those maladies.  In particular, Mr. Catun Coy suffers from painful body aches, swelling and pain in his knees and elbows, difficulty ambulating, headaches, vision impairment, and discoloration of the skin on his chest, abdomen, face, and neck.  A photograph of the discoloration of his skin is included below.  Mr. Catun Coy has endured these symptoms for his entire life.



120.   Mr. Catun Coy was unaware that he suffered from syphilis until 2013, when a Dr. Pablo Werner Ramirez Rivas examined him and tested him and his family members for syphilis.   Mr. Catun Coy was similarly unaware of the Guatemala Experiments, or his father's involvement in them, until Dr. Werner told him about the Experiments approximately three years ago.  Mr. Catun Coy had not previously heard or

learned about his father's involvement in the Guatemala Experiments, his father's or mother's infection with syphilis, his own infection with syphilis, or his children's infection with syphilis, from any other source.

121.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Catun Coy was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses, medical expenses, and other financial loss, and was caused to unknowingly infect his spouse and children with syphilis.

122.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Catun Coy was not infected with syphilis through any means other than the Guatemala Experiments.

D.     Category 4 Plaintiffs

123.   "Category 4 Plaintiffs," also described as "Grandchildren," are Guatemalans who are the grandchildren or great-grandchildren (second or third generation descendants) of a Direct Plaintiff and the sons and daughters of Children (Cat. 3). If the Grandchild's mother was a Child (second generation) or a Grandchild (third generation), she passed syphilis she had been infected with indirectly because of the Guatemala Experiments to the Grandchild in utero or at birth. If the Grandchild's father was a Child (second generation) or a Grandchild (third generation), he passed syphilis he had been indirectly infected with because of the Guatemala Experiments to the

Grandchild's mother, and the Grandchild's mother passed the disease she received from the Child (second generation) or Grandchild (third generation) to the Grandchild in utero or at birth. This is a third form of "secondary exposure" caused by the Guatemala Experiments referred to in the Third Amended Complaint.

124.    Per the Court's Order, Plaintiffs have identified five Grandchildren as representatives of Category 4 Plaintiffs.

*Ronald Roberto Benavente Galvez – Plaintiff No. 70*

125.    Ronald Roberto Benavente Galvez is identified in Exhibit 1 as Plaintiff No. 70.  He was born on October 30, 1988.  He is the grandson of Direct Victim Plaintiff Ramiro Galvez Villalobos and his wife Graciela Ortiz de Galvez (Plaintiffs No. 63 and 64, described above).  He is the son of First Generation Descendant Plaintiff, Ebelin Galvez Ortiz (Plaintiff No. 67) and the sibling of Katarin Elisabet Benavente Galvez (Plaintiff No. 68).  Mr. Benavente Galvez has submitted to serological testing that confirms he is positive for syphilis infection.  He has tested positive for the Nichols Strain of syphilis, just like his grandparents, mother, and sister.  Mr. Benavente Galvez was born with syphilis, having contracted it from his mother, Ebelin Galvez Ortiz, who contracted it from her mother, Graciela Ortiz de Galvez, who contracted it from her husband, Ramiro Galvez Villalobos, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.

126.    Mr. Benavente Galvez has suffered from the signs and symptoms of congenital syphilis since his birth, though he only recently learned that syphilis was the cause of those signs and symptoms.  In particular, he suffers from a deformity of the left

arm, which causes him to be unable to straighten it normally.  He has an indentation in his chest wall, and his legs exhibit a curvature characteristic of congenital syphilis.  He has deformities of both arms, and his hands and feet.  He has had these problems since birth.  He has endured great emotional pain and suffering because others have mocked his physical deformities his entire life and they prevent him from being able to obtain meaningful employment.  Photographs of the deformities of his arms, hands and feet are shown below.



127.     Mr. Benavente Galvez was told as a child that his deformities were caused by juvenile rheumatic arthritis, for which he was prescribed muscle relaxants, which have provided little relief.  He was unaware that he had congenital syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas examined and tested him and his family for syphilis.  Mr. Benavente Galvez was similarly unaware of the Guatemala Experiments until he learned about them from Dr. Werner.  Mr. Benavente Galvez had not previously heard or learned about his grandfather's involvement in the Guatemala Experiments, his mother's or grandparents' infection with syphilis, or his own infection with syphilis, from any other source.

128.     As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Benavente Galvez was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, and was caused to incur hospital expenses, medical expenses, and other financial loss.

129.     All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.    Mr. Benavente Galvez was not infected with syphilis through any means other than the Guatemala Experiments.

### Katarin Elisabet Benavente Galvez – Plaintiff No. 68

130.     Katarin Elisabet Benavante Galvez is identified on Exhibit 1 as Plaintiff No. 68.  She was born on September 7, 1990.  She is the granddaughter of Direct Victim Plaintiff Ramiro Galvez Villalobos and his wife Graciela Ortiz de Galvez (Plaintiffs No.

63 and 64, described above).   She is the daughter of First Generation Descendant Plaintiff, Ebelin Galvez Ortiz (Plaintiff No. 67) and the sibling of Ronald Roberto Benavente Galvez (Plaintiff No. 70).  Ms. Benavente Galvez has submitted to serological testing that confirms she is positive for syphilis infection.  She has tested positive for the Nichols Strain of syphilis, just like her grandparents, mother, and brother.  Ms. Benavente Galvez was born with syphilis, having contracted it from her mother, Ebelin Galvez Ortiz, who contracted it from her mother, Graciela Ortiz de Galvez, who contracted it from her husband, Ramiro Galvez Villalobos, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.  Ms. Benavente Galvez has transmitted syphilis to at least three of her children, who have also tested positive for the Nichols Strain of syphilis.

131.   Ms. Benavente Galvez has suffered from the signs and symptoms of congenital syphilis since her birth.   In particular, she suffers from severe joint pain, headaches, dental problems and tooth loss, swollen lymph nodes, and a mass of fatty tissue on her back.

132.   Ms. Benavente Galvez was diagnosed with syphilis in 2004 when she was pregnant with her first child.  She was treated with penicillin but her symptoms did not resolve.  She was not aware at that time how she had acquired syphilis.  Ms. Benavente Galvez was not aware of the Guatemala Experiments, or the relationship between her disease and the Guatemala Experiments, until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas examined her, tested her for syphilis, and told her about the Guatemala Experiments and her grandfather's involvement in them.   Ms. Benavente

Galvez had not previously heard or learned about her grandfather's involvement in the Guatemala Experiments, her mother's or grandparents' infection with syphilis, or her own infection with syphilis, from any other source.

133.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Ms. Benavente Galvez was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, and was caused to incur hospital expenses, medical expenses, and other financial loss.

134.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.   Ms. Benavente Galvez was not infected with syphilis through any means other than the Guatemala Experiments.

*Cristian Josue Giron Galindo – Plaintiff No. 8*

135.   Cristian Josue Giron Galindo is identified on Exhibit 1 as Plaintiff No. 8. He was born on December 5, 1989.  He is the grandson of Direct Victim Plaintiff Arturo Giron Alvarez (Plaintiff No. 1) and his wife, Basilia Galindo de Giron (Plaintiff No. 2). His grandfather, Mr. Giron Alvarez, is identified in the papers of Dr. John Cutler as a participant in the human experimentation conducted in the Central Penitentiary (*Penitenciaria Central*).  Mr. Giron Galindo is the son of Livia Mercedes Giron and the brother of Yngrid Yanete Rivera Giron (Plaintiff No. 5 and 7, respectively, described above and below, respectively).  Mr. Giron Galindo has submitted to serological testing that indicates he is positive for syphilis infection.  Mr. Giron Galindo was born with

syphilis, having contracted it from his mother, Livia Mercedes Giron, who contracted it from her mother, Basilia Galindo de Giron, who contracted it from her husband, Arturo Giron Alvarez, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.

136.   Mr. Giron Galindo has suffered from the signs and symptoms of congenital syphilis since his birth, though he only recently learned that syphilis was the cause of those signs and symptoms.  In particular, he suffers from headaches, joint pain, pain with urination, blood in his urine, scarring on his penis, peeling of the skin of his hands, disorientation and dizziness, and vision impairment.  He has experienced these symptoms for his entire life.

137.   Mr. Giron Galindo remained unaware that he was suffering from syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas contacted, examined, and tested him and his family members for syphilis.  Mr. Giron Galindo was similarly unaware of the Guatemala Experiments, and his grandfather's involvement in them, until Dr. Werner told him about the Experiments approximately three years ago. Mr. Giron Galindo had not previously heard or learned about his grandfather's involvement in the Guatemala Experiments, his mother's or grandparents' infection with syphilis, or his own infection with syphilis, from any other source.

138.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Giron Galindo was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional

pain and suffering, and moral injury and damage, and was caused to incur hospital expenses, medical expenses, and other financial loss.

139.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Giron Galindo was not infected with syphilis through any means other than the Guatemala Experiments.

### Yngrid Yanete Rivera Giron – Plaintiff No. 7

140.   Yngrid Yanete Rivera Giron is identified in Exhibit 1 as Plaintiff No. 7. She was born on July 19, 1984. She is the granddaughter of Direct Victim Plaintiff Arturo Giron Alvarez (Plaintiff No. 1) and his wife, Basilia Galindo de Giron (Plaintiff No. 2).  Her grandfather, Mr. Giron Alvarez, is identified in the papers of Dr. John Cutler as a participant in the human experimentation conducted in the Central Penitentiary (*Penitenciaria Central*).  Ms. Rivera Giron is the daughter of Livia Mercedes Giron and the sister of Cristian Josue Giron Galindo (Plaintiff No. 5 and 8, respectively, described above and below, respectively).  Ms. Rivera Giron has submitted to serological testing that indicates she is positive for syphilis infection.  Ms. Rivera Giron was born with syphilis, having contracted it from her mother, Livia Mercedes Giron, who contracted it from her mother, Basilia Galindo de Giron, who contracted it from her husband, Arturo Giron Alvarez, who was infected with syphilis as a direct, immediate, and proximate result of the Guatemala Experiments.

141.   Ms. Rivera Giron has suffered from the signs and symptoms of congenital syphilis since her birth, though she only recently learned that syphilis was the cause of

those signs and symptoms.  In particular, she suffers from numbness in her hands, painful body aches and joint pain in the hands, feet, and knees, dizziness, headaches, and blurry vision.  She has experienced these symptoms for her entire life.

142.   Ms. Rivera Giron remained unaware that she was suffering from syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas contacted, examined, and tested her and her family members for syphilis.  Ms. Rivera Giron was similarly unaware of the Guatemala Experiments, and her grandfather's involvement in them, until Dr. Werner told her about the Experiments approximately three years ago. Ms. Rivera Giron had not previously heard or learned about her grandfather's involvement in the Guatemala Experiments, her mother's or grandparents' infection with syphilis, or her own infection with syphilis, from any other source.

143.   As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Ms. Rivera Giron was caused to suffer painful and permanent injuries to her body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, and was caused to incur hospital expenses, medical expenses, and other financial loss.

144.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Ms. Rivera Giron was not infected with syphilis through any means other than the Guatemala Experiments.

*Cristian Josue Catun Tzul – Plaintiff 418*

145.   Cristian Josue Catun Tzul is identified on Exhibit 1 as Plaintiff 418.  He was born on November 9, 1992.  He is the grandson of Direct Victim Plaintiff Fidel Catun (Plaintiff No. 411) and his wife, Angela Coy de Catun (Plaintiff No. 412).  He is the son of Ambrocio Fidel Catun Coy (Plaintiff No. 414).  Both Mr. Catun Tzul and his father have submitted to serological testing that confirms they are positive for syphilis infection.  Mr. Catun Tzul was born with syphilis, having contracted it from his mother, who contracted it from her husband, Ambrocio Fidel Catun Coy, who contracted it from his mother, Angela Coy de Catun, who contracted it from her husband, Direct Victim Plaintiff Fidel Catun, who was infected as a direct, immediate, and proximate result of the Guatemala Experiments.  Mr. Catun Tzul has suffered from the signs and symptoms of congenital syphilis since his birth, though he only recently learned that syphilis was the cause of those signs and symptoms.  Mr. Catun Tzul has been in a wheelchair since a very young age as a result of the effect of congenital syphilis on his back, legs, and knees.  He cannot walk and has severe pain and swelling in his knees, as well as a soft tumor of inflammation on his back.  He suffers from chronic conjunctivitis.  When he was a young child, Mr. Catun Tzul suffered a severe rash with pus-filled pustules.  He has experienced these symptoms for his entire life.  Some are depicted in these photos:






146.    Mr. Catun Tzul remained unaware that he was suffering from syphilis until approximately three years ago, when Dr. Pablo Werner Ramirez Rivas contacted, examined, and tested him and his family members for syphilis.  Mr. Catun Tzul was similarly unaware of the Guatemala Experiments, and his grandfather's involvement in them, until Dr. Werner told him about the Experiments approximately three years ago. Mr. Catun Tzul had not previously heard or learned about his grandfather's involvement in the Guatemala Experiments, his mother's or grandparents' infection with syphilis, or his own infection with syphilis, from any other source.

147.    Mr. Catun Tzul remained unaware that he was suffering from syphilis until approximately three years ago, when a Dr. Pablo Werner Ramirez Rivas, a physician consultant for the Plaintiffs, contacted, examined, and tested him and his family members for syphilis.  Mr. Catun Tzul was similarly unaware of the Guatemala Experiments, and his grandfather's involvement in them, until he learned of them from Dr. Werner approximately three years ago.  Mr. Catun Tzul had not previously heard or learned about his grandfather's involvement in the Guatemala Experiments, his mother's, fathers, or grandparents' infection with syphilis, or his own infection with syphilis, from any other source.

148.    As a direct, immediate, and proximate result of the negligence and intentional actions of the Defendants, Mr. Catun Tzul was caused to suffer painful and permanent injuries to his body, was caused to sustain severe mental anguish, emotional pain and suffering, and moral injury and damage, was caused to incur hospital expenses,

medical expenses, and other financial loss, and was caused to unknowingly infect her heirs with syphilis.

149.   All of the injuries and damages stated above were caused directly, immediately, proximately, and solely by the negligence of the Defendants.  Mr. Catun Tzul was not infected with syphilis through any means other than the Guatemala Experiments.

E.   Category 5 Plaintiffs

150.   "Category 5 Plaintiffs," also described as "Wrongful Death Plaintiffs (Cat. 5)," are Guatemalans who are the Parent, Spouse or Child of a Deceased Plaintiff who died as a result of syphilis acquired as a result of the Guatemala Experiments. All of the Wrongful Death Plaintiffs are also members of Categories 1, 2, 3, 4, and/or 6.

151.   Per the Court's Order, Plaintiffs have identified eight Wrongful Death Plaintiffs as representative Wrongful Death Plaintiffs/Category 5.   They include the following individuals, identified in the preceding paragraphs:

    a.   Francisco Garcia Alvarez (Plaintiff No. 349) (beneficiary for the wrongful death of his wife, Adelina Mollinedo de Garcia (Plaintiff No. 350));

    b.   Alva Violeta Echevarria (Plaintiff No. 81) (beneficiary for the wrongful death of her husband, Mariano Humberto Guzman (Plaintiff No. 80));

    c.   Lesbia Lucila Giron Galindo (Plaintiff No. 3) (beneficiary for the wrongful death of her father and mother, Arturo Giron Alvarez (Plaintiff No. 1) and Basilia Galindo de Giron (Plaintiff No. 2));

    d.  Guillermo Caal Pop (Plaintiff No. 60), Antonio Caal Pop (Plaintiff No. 61), and Aurelia Caal Pop (Plaintiff No. 62) (beneficiaries for the wrongful death of their father and mother, Antonio Caal Ramirez (Plaintiff No. 58) and Asuncion Pop (Plaintiff No. 59));

    e.  Victor Vicente Catun Coy (Plaintiff No. 413) and Ambrocio Fidel Catun Coy (Plaintiff No.414) (beneficiaries for the wrongful death of their father and mother, Fidel Catun (Plaintiff No. 411) and Angela Coy de Catun (Plaintiff No.412)).

F.    <u>Category 6 Plaintiffs</u>

152.    "Category 6 Plaintiffs," also described as "Estate Plaintiffs," are Guatemalans who died as a result of syphilis acquired as a result of the Guatemala Experiments.  The claims of all of these "Estate Plaintiffs" are being brought by their heirs, next of kin, or personal representatives.

153.    All of the individuals identified as "Estate of" on Exhibit 1 are currently deceased.  They are Category 6 Plaintiffs.  The Estates related to the Representative Plaintiffs identified above include the following:

    f.  Estate of Adelina Mollinedo de Garcia (Plaintiff No. 350);

    g.  Estate of Mariano Humberto Guzman (Plaintiff No. 80);

    h.  Estate of Arturo Giron Alvarez (Plaintiff No. 1);

    i.  Estate of Basilia Galindo de Giron (Plaintiff No. 2);

    j.  Estate of Antonio Caal Ramirez (Plaintiff No. 58);

    k.  Estate of Asuncion Pop (Plaintiff No. 59);

l.  Estate of Fidel Catun (Plaintiff No. 411);

m.  Estate of Angela Coy de Catun (Plaintiff No.412).

**The Defendants**

154.   The Plaintiffs are suing seven Defendants: Johns Hopkins Hospital, Johns Hopkins University, Johns Hopkins University School of Medicine, Johns Hopkins Bloomberg School of Public Health, the Johns Hopkins Health System Corporation, (collectively "The Johns Hopkins Defendants," "Johns Hopkins," or "Hopkins")), The Rockefeller Foundation, and Bristol-Myers Squibb Company. Each of these Defendants will be discussed separately below.

A.   The Johns Hopkins Defendants

155.   Johns Hopkins Hospital, Johns Hopkins University, and the Johns Hopkins Health System Corporation are corporate entities created and existing under the laws of the State of Maryland with their principal places of business located in Baltimore, Maryland. At all times relevant to this case, from their creation until today, these Defendants have regularly conducted business in Maryland from their principle places of business in Baltimore City.

156.   Johns Hopkins University School of Medicine and the Johns Hopkins Bloomberg School of Public Health, formerly known as the Johns Hopkins School of Hygiene and Public Health, are business entities created and existing under the laws of the State of Maryland with their principal places of business located in Baltimore, Maryland. At all times relevant to this cause of action, these entities were predecessor entities, successor entities, and/or servants or agents of Johns Hopkins Hospital, Johns

Hopkins University, and the Johns Hopkins Health System Corporation and were owned, controlled, and operated by them from their principle places of business in Baltimore City.

157.   Johns Hopkins actively participated in, joined and participated in a conspiracy to further, and aided and abetted the Guatemala Experiments with the knowledge, intent, and purpose that its actions would result in the nonconsensual, nontherapeutic testing of human test subjects.

<u>Johns Hopkins' Decentralized Organizational Structure</u>

158.   Unlike today, Johns Hopkins did not have an institutional review board in the 1940s or 1950s.   An institutional review board (IRB) is an internal committee formally designated to approve, monitor, and review medical, biomedical, and behavioral research involving humans.   Instead, the institution granted policymaking and decision-making authority to the senior physicians responsible for Johns Hopkins' various schools and departments. These doctors were granted institutional authority to establish binding policy, modify or change existing policy, and enter into agreements between Johns Hopkins and other entities, including governmental entities and third parties.

159.   At this time, Hopkins was "an extremely decentralized institution made up of insular cultures,"[4] with senior doctors given the authority to run "departments [that] were largely autonomous" with "the freedom and resources to work in their own way

---

[4]     Maryann Feldman, Pierre Desrochers, and Janet Bercovitz, *Commercialization at Johns Hopkins University*, found in *Building Technology Transfer Within Research Universities: An Entrepreneurial Approach* 166 (T. Allen and R. O'Shea 2014) (asserting that Johns Hopkins has always been and remains a decentralized institution).

with minimal central direction or planning."[5] This structure encouraged and incentivized Johns Hopkins' physicians to effectively act as entrepreneurs, developing their own budgets, organizing research in their areas as they saw fit, determining the intellectual direction of their departments or areas, establishing their own governmental contacts in Washington, and incurring major administrative commitments for Johns Hopkins, without the bureaucratic need for prior or supervisory approval.[6] This structure was developed specifically to encourage innovative and creative research models. The institution, by promoting this autonomous and decentralized environment, authorized its senior researchers to act in Johns Hopkins interest in any way they chose. By intentionally choosing not to place institutional control over these researchers, Johns Hopkins consented to the decisions and agreements made by the researchers and bound itself to those decisions.

160. As outlined in more detail below, a number of these senior doctors -- Drs. J. Earle Moore, Dr. Lowell Reed, Dr. Thomas Turner, and Dr. Harry Eagle -- used their institutional policymaking and decision-making power to cause Johns Hopkins, as an institution, to knowingly and intentionally violate the Plaintiffs' customary, well-established, and universal right to be free from nonconsensual, nontherapeutic human experimentation and crimes against humanity.

---

[5] Elizabeth Fee, *Disease and Discovery: A History of the Johns Hopkins School of Hygiene & Public Health 1916 to 1939* 96 (2016) (describing the philosophy imbued into Johns Hopkins by Dr. William Welch, one of its "founding four doctors").

[6] *See id.*

161. These men -- who now have their names on buildings on Johns Hopkins' campuses -- designed, developed, directed, oversaw, implemented, and aided and abetted the Guatemala Experiments. They also conspired with each other and third parties to encourage and otherwise ensure that the Experiments went forward. They put the advancement of "science" and the "greater good," along with their own and Johns Hopkins' business interests, above the lives and well-being of the Guatemalan test subjects, their sexual partners, spouses, children, and grandchildren.

162. Johns Hopkins actively participated in the Guatemala Experiments with the knowledge and intent that its actions would result in the nonconsensual, nontherapeutic testing of human test subjects.

163. Johns Hopkins is also vicariously liable for the actions of its agents, servants, employees, and co-conspirators.

### Dr. J. Earle Moore

164. Dr. J. Earle Moore was one of the senior physicians at Johns Hopkins who was given full policymaking and final decision-making authority to bind the institution. Dr. Moore was a long-time Hopkins employee; he served as the Director of Department L, a clinic and research center focused on syphilis; and he was the head of a large, multi-departmental team of Johns Hopkins' doctors and researchers who conducted research on sexually transmitted diseases.

165. Dr. Moore had the authority to (and frequently did) enter into binding agreements committing Hopkins, and the doctors, researchers, and resources under his control, to work on research projects with governmental entities and other third parties.

Johns Hopkins gave him complete discretion to make these decisions and, once made, they became established institutional programs and policies.

166.   Alternatively, if Dr. Moore's decisions were subject to approval by the Presidents or Boards of the Johns Hopkins institutions, the Presidents and Boards acted with full knowledge and information about the nature of the Guatemala Experiments and their actions -- approving his work, allowing Hopkins' staff and resources to be used to support the Experiments, and other actions -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments.

167.   Before the Guatemala Experiments, Dr. Moore used his authority and resources at Hopkins to design, implement, and oversee two of the most infamous nonconsensual, nontherapeutic human experiments in American history.

168.   In the first experiment, the Tuskegee Study, Dr. Moore designed a research protocol that identified poor, uneducated, rural African-American sharecroppers infected with syphilis, but either did not inform them or actively deceived them about their condition so they would not get treatment. Dr. Moore (as the senior clinical consultant) and others wanted to catalogue the effects as untreated syphilis ravaged the men's bodies.

169.   While the Tuskegee Study answered some questions about chronic syphilis and the areas of the body it affected, it did not answer questions about prophylaxis, means of infection, treatment regimens, the risk of reinfection after treatment, and the pathogenicity of different syphilis strains.

170.   In the second experiment, the Terre Haute Experiment, Dr. Moore designed a research protocol to go further -- the intentional infection of federal prison inmates with gonorrhea so that he (again as a clinical advisor) and others could test the effectiveness of various treatment options on a large pool of test subjects.

171.   The Terre Haute Experiment did not answer any of Dr. Moore's questions. Restrictions on infection techniques and concerns about public reaction and lawsuits doomed it. The rate of infection was too low and other doctors and scientists were worried about public reaction and lawsuits if the true nature of the experiments was discovered.

172.   The Guatemala Experiments gave Dr. Moore a chance to take what worked, from his perspective, in Tuskegee and Terre Haute: the secrecy afforded by conducting nonconsensual experiments on poor, uneducated, and isolated test subjects (Tuskegee), and the creation of a large pool of test subjects so that a wider variety of questions could be answered (Terre Haute). It also gave him the chance to avoid what did not work: passive monitoring instead of actively directing the infections (Tuskegee) and dealing with restraints imposed on infection techniques, concerns about informed consent, and concerns about lawsuits and negative publicity (Terre Haute).

173.   Dr. Moore committed himself and the Hopkins' doctors, researchers, and resources over whom he had authority to the Guatemala Experiments.

174.   As the Director of Department L and the head of the large, multi-departmental team of Hopkins doctors and researchers who were conducting research on sexually transmitted diseases, Dr. Moore was intimately involved in all aspects of the

Guatemala Experiments. He used his authority and resources to design, carry-out, and oversee the Experiments. As he had done in the prior experiments, Dr. Moore identified the mentally ill patients committed in the asylum, the prison inmates, and the orphans and children that would be used as test subjects. He knew that these people were not informed about the risks or true nature of the Experiments and could not and did not give informed consent. He designed the research protocols -- including the portion that required the Experiments to be nonconsensual and nontherapeutic -- and the various tests that were used in the Experiments. He used his position and his contacts in the medical and governmental community to ensure the Experiments were approved. He and his staff used Johns Hopkins' resources to provide medical and logistical support for the Experiments. As the Experiments were winding down, he was involved in the enrollment of Dr. Cutler (one of the researchers in Guatemala) at Johns Hopkins so that he and others could keep Dr. Cutler under control and prevent him from disclosing information Dr. Moore and others wanted to keep confidential. Dr. Moore used his position of authority and his resources to keep the Experiments concealed for decades.

175.   Dr. Moore intended, designed, and developed the Guatemala Experiments to be nonconsensual and nontherapeutic. He knew the test subjects were not going to be, and were not being, informed about the risks or true nature of the Experiments, and, because of their age or condition, could not give their informed consent. He wanted the largest pool of test subjects possible, and wanted to infect and experiment upon them in as short of a time as possible. All of his actions related to the Experiments were motivated by a misplaced desire to advance "science" and Johns Hopkins' position in the

medical and public health fields. All of his actions were taken in the course of his employment with Johns Hopkins via authority granted to him by Johns Hopkins.

176.    Dr. Moore not only designed the Guatemala Experiments, he also directed, oversaw, encouraged, contributed to, and aided and abetted it and its day-to-day violations of rights that occurred over the course of years in Guatemala. He exercised his complete autonomy and, once made, his decision became established institutional policy for all of the Johns Hopkins Defendants.

### Dr. Lowell Reed

177.    Dr. Lowell Reed[7] was another one of the senior doctors at Hopkins who had policymaking and final decision-making authority. Dr. Reed was a long-time employee of Hopkins; he served as the Dean of the Hopkins School of Public Health, Chairman of the Department of Biostatistics, Vice-President of Hopkins University and Hospital, and, in the early 1950s, he also served as the President of Johns Hopkins University. Dr. Reed had policymaking and final decision-making authority in these areas.

178.    Dr. Reed had the power to (and frequently did) enter into contracts, agreements, and partnerships committing the Hopkins doctors, researchers, and resources under his control to work on research projects with governmental entities and other third parties. These decisions did not need approval and were unrestrained by rules or policies.

---

[7] Dr. Reed also served as a Scientific Director of The Rockefeller Foundation's International Health Division throughout the 1940s.

He was given complete discretion in making these decisions and his actions became institutional policies and customs.

179.   Alternatively, if Dr. Reed's decisions were subject to approval by the Presidents or Boards of the Hopkins institutions, they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his work, allowing Hopkins' staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

180.   Dr. Reed committed himself and the Johns Hopkins doctors, researchers, and resources he had authority over to the Guatemala Experiments.

181.   As the Dean of the Johns Hopkins School of Public Health, and Dr. Moore's collaborator, Dr. Reed was intimately involved in all aspects of the Guatemala Experiments. He used his authority and resources to design, carry out, and oversee the Experiments. As he had done in the prior experiments, he worked with Dr. Moore to design the research protocols and the various tests used in the Experiments. He used his position at the School of Public Health and his contacts in the medical and governmental community to ensure the Experiments were approved. He and his staff used the School of Public Health's resources to provide medical and logistical support for the Experiments. As the Experiments were winding down, he oversaw the enrollment of Dr. Cutler in the School of Public Health so that Dr. Cutler could complete his work and be controlled and prevented from disclosing information that Dr. Reed, Dr. Moore, and others wanted to be

kept confidential. And, he used his position and resources to keep the Experiments concealed for decades.

182.    As the head of the Department of Biostatistics, Dr. Reed worked with Dr. Moore and others to define the data needed, determine how it was to be collected, how it was to be transmitted, and how it was to be analyzed at Johns Hopkins. He worked with Dr. Cutler and the researchers on the ground to ensure that they knew the answers to all of these questions and would report data in a useful and careful manner. He and his staff used departmental resources to provide logistical and analytical support for the Experiments. The data and information Dr. Reed received clearly identified the location and ages of the test subjects, meaning that he was fully aware at all times that they were people who could not, would not, and did not give consent to the Experiments. As the Experiments were winding down, he and his staff continued to collect and analyze the data that was generated. And, he used his position and resources to prevent his staff and others from publically discussing or publishing about the Experiments.

183.    Dr. Reed intended, designed, and developed the Guatemala Experiments to be nonconsensual and nontherapeutic. He wanted the largest pool of test subjects possible and to infect and experiment upon it in as short of a time as possible. All of his actions related to the Experiments were motivated by a misplaced desire to advance "science" and Johns Hopkins' position in the medical and public health fields. All of his actions were taken in the course of his employment with Hopkins.

184.    Dr. Reed not only participated in the design of the Guatemala Experiments, he also directed, oversaw, encouraged, contributed to, and aided and abetted it and its

day-to-day violations of rights that occurred over the course of years in Guatemala. He exercised his complete autonomy and, once made, his decision became established institutional policy supported by the imprimatur of Johns Hopkins.

Dr. Thomas Turner

185.   Dr. Thomas Turner was one of the senior researchers at Johns Hopkins who had policymaking and final decision-making authority. Dr. Turner was a long-time employee of Johns Hopkins, he served as the Chair of Johns Hopkins' Department of Bacteriology, and later became the Dean of the Johns Hopkins School of Medicine and Archivist for the Johns Hopkins medical institutions. Dr. Turner had policymaking and final decision-making authority over the doctors and researchers in, and resources of, the departments and areas he controlled.

186.   Dr. Turner had the power to (and frequently did) enter into contracts, agreements, and partnerships committing the Hopkins doctors, researchers, and resources under his control to work on research projects with governmental entities and other third parties. These decisions did not need approval and were unrestrained by rules or policies. He was given complete discretion in making these decisions and his actions became institutional policies and customs.

187.   Dr. Turner committed himself and the Johns Hopkins doctors, researchers, and resources he had authority over to the Guatemala Experiments.

188.   Alternatively, if Dr. Turner's decisions were subject to approval by the Presidents or Boards of the Johns Hopkins institutions, they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his

work, allowing Hopkins staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

189.   As the Chair of Johns Hopkins' Department of Bacteriology, and Dr. Moore's collaborator, Dr. Turner was intimately involved in all aspects of the Guatemala Experiments. He used his authority and resources to design, carry-out, and oversee the Experiments. As he had done in the prior experiments, he worked with Dr. Moore to design the research protocols and the various tests used in the Experiments. He used his position in the Department of Bacteriology and his contacts in the medical and governmental community to ensure the Experiments were approved. He and his staff used the Department's resources to provide medical and logistical support for the Experiments. As the Experiments were winding down, Dr. Moore helped enroll Dr. Cutler at Johns Hopkins so that Dr. Moore and his colleagues could keep Dr. Cutler under control and prevent him from disclosing information they wanted to keep confidential. And, Dr. Turner used his position and resources to keep the Experiments concealed for decades.

190.   Dr. Turner also used the staff, resources, and laboratories in the Department of Bacteriology to infect rabbits with *Treponema cuniculi* (*T. cuniculi*, a form of rabbit syphilis) and *Treponema pallidum* (the Nichols strain, a laboratory strain of human syphilis originally isolated by The Rockefeller Foundation in 1912 from a patient with neurosyphilis) and ship them to Guatemala, directly and/or through Dr. Charlotte

McLeod, the protégé he trained at Johns Hopkins who was working for the Public Health Service (PHS).

191.    Dr. Turner, personally and as the Chair of the Department, had spent considerable time and resources researching *T. cuniculi* and the Nichols strain. He instructed Dr. Cutler to inject test subjects with *T. cuniculi* to test its pathogenicity and, once it was found to be virulent (meaning test subjects were being infected with *T. cuniculi*), to conduct numerous experiments and collect and send him data.

192.    Dr. Turner also instructed Dr. Cutler to conduct experiments to explore the potential for *T. cuniculi* as an immunizing agent for syphilis. Dr. Turner, Dr. McLeod, and doctors in Guatemala communicated about infection rates and the similarities and differences between patients infected with *T. cuniculi*, the Nichols strain, and other strains. The data and information Dr. Turner received clearly identified the location and ages of the test subjects, meaning that he was fully aware at all times that they were people who could not and did not give consent to the Experiments.

193.    Dr. Turner knew the testing was nonconsensual, but he wanted sufficient time to conduct his work and a large enough test subject population to make it scientifically valid.

194.    Dr. Turner intended, designed, and developed the Guatemala Experiments to be nonconsensual and nontherapeutic. He wanted the largest pool of test subjects possible and to infect and experiment upon it in as short of a time as possible. All of his actions related to the Experiments were motivated by a misplaced desire to advance

"science" and Johns Hopkins' position in the medical and public health fields. All of his actions were taken in the course of his employment with Hopkins.

195.   Dr. Turner not only participated in the design of the Guatemala Experiments, he also directed, oversaw, encouraged, contributed to, and aided and abetted it and its day-to-day violations of rights that occurred over the course of years in Guatemala. He exercised his complete autonomy and, once made, his decision became established institutional policy.

Dr. Harry Eagle

196.   Dr. Harry Eagle was one of the senior doctors at Hopkins who had policymaking and final decision-making authority. Dr. Eagle was an employee of Johns Hopkins and served as the Director of the Johns Hopkins Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics and, when it was reorganized, as the Director of the Public Health Service-Johns Hopkins Laboratory of Experimental Therapeutics, and also as the Director of the Venereal Disease Research and Postgraduate Training Center. Dr. Eagle had policymaking and final decision-making authority over the doctors and researchers in, and resources of, the Laboratory and Training Center.

197.   Dr. Eagle had the power to (and frequently did) enter into contracts, agreements, and partnerships committing the Hopkins doctors, researchers, and resources under his control to work on research projects with governmental entities and other third parties. These decisions did not need approval and were unrestrained by rules or policies. He was given complete discretion in making these decisions and his actions became institutional policies and customs.

198.   Dr. Eagle committed himself and the Johns Hopkins doctors, researchers, and resources he had authority over to the Guatemala Experiments.

199.   Alternatively, if Dr. Eagle's decisions were subject to approval by the Presidents or Boards of the Johns Hopkins institutions, they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his work, allowing Hopkin' staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

200.   As the Director of the research laboratory, and Dr. Moore's collaborator, Dr. Eagle was intimately involved in all aspects of the Guatemala Experiments. He used his authority and resources – both at Hopkins and as a member of the Syphilis Study Section and the Chairman of Subcommittee on the Treatment of Experimental Syphilis With Penicillin -- to design, carry-out, and oversee the Experiments. As he had done in the prior experiments, he worked with Dr. Moore to design the research protocols and the various tests used in the Experiments. He used his position and his contacts in the medical and governmental community to ensure the Experiments were approved. And, he and his staff used the Department's resources to provide medical and logistical support for the Experiments.

201.   Dr. Eagle also used the Laboratory of Experimental Therapeutics and its staff and resources to further the use of the Nichols strain of syphilis in the Guatemala Experiments. He and his researchers had extensively evaluated Nichols and understood

its pathogenicity. Dr. Eagle coordinated and communicated information about Nichols and received information about infection rates and the effects of Nichols on test subjects in the Experiments. The data and information Dr. Eagle received clearly identified the location and ages of the test subjects, meaning that he was fully aware at all times that they were people who could not and did not give consent to the Experiments.

202.   Between Drs. Turner and Eagle at Johns Hopkins and the PHS, multiple shipments of rabbits infected with *T. cuniculi*, the Nichols strain, and other strains of syphilis were shipped from the United States to Guatemala throughout the course of the Experiments. These infected rabbits were used to infect the Guatemalan test subjects.

203.   Dr. Eagle also wanted to further his Laboratory's research into the use of arsenic and bismuth as treatment for patients with syphilis. He used the Laboratory's staff and resources, directly or in conjunction with others, to ship arsenic and bismuth to Guatemala. He instructed Dr. Cutler to administer arsenic and bismuth at different levels and at different times to newly infected test subjects to evaluate their efficacy. Dr. Cutler and the researchers in Guatemala closely followed dosing schedules Dr. Eagle provided and refined on an ongoing basis. Like the data on the Nichols Strain, the data Dr. Eagle received about arsenic and bismuth clearly identified the location and ages of the test subjects, meaning that he was fully aware at all times that they were people who could not, would not, did not give consent to the Experiments.

204.   Dr. Eagle also acted to aid and abet the Experiments. When Dr. Cutler learned that the wife of Dr. Carlos Tejada, the Chief of the Guatemalan Army Medical Department, fell ill with life-threatening, acute mercury poisoning, Dr. Eagle supplied Dr.

Cutler with British anti-lewisite, the antidote for Mercury poisoning, from his lab at Hopkins. British anti-lewisite was not commercially available at the time, so Dr. Eagle's actions had a strong effect on Dr. Tejada, and ensured the researchers had open access to military personnel in Guatemala.

205.    Dr. Eagle also used the Venereal Disease Research and Postgraduate Training Center and its staff and resources to conceal the Experiments. As the Experiments were winding down, he was involved in the enrollment of Dr. Cutler at Johns Hopkins so that he and others could keep Dr. Cutler under control and prevent him from disclosing information Dr. Eagle and others wanted to be kept confidential. And, he used his position and resources to keep the Experiments concealed for decades.

206.    Dr. Eagle intended, designed, and developed the Guatemala Experiments to be nonconsensual and nontherapeutic. He wanted the largest pool of test subjects possible and to infect and experiment upon them in as short of a time as possible. All of his actions related to the Experiments were motivated by a misplaced desire to advance "science" and Johns Hopkins' position in the medical and public health fields. All of his actions were taken in the course of his employment with Hopkins.

207.    Dr. Eagle not only participated in the design of the Guatemala Experiments, he also directed, oversaw, encouraged, contributed to, and aided and abetted it and its day-to-day violations of rights that occurred over the course of years in Guatemala. He exercised his complete autonomy and, once made, his decision became established institutional policy

B.      The Rockefeller Foundation

208.    Plaintiffs are suing The Rockefeller Foundation. Except where noted, the Defendant is referred to as "The Rockefeller Foundation," "Rockefeller," or "the Foundation."

209.    The Rockefeller Foundation is a corporation created and existing under the laws of the State of New York. At all times relevant to this case, from its creation until today, The Rockefeller Foundation has regularly conducted business in Maryland.

210.    The Rockefeller Foundation was approved for a charter by the State of New York in 1913. Its stated mission has always been to promote national and international research in the area of public health.

211.    Rockefeller was not formed to simply be a passive source of funding. Its board and managing members have always selected research partners and projects to further its mission, and then used its contacts, influence, and organizational power to rally institutional and governmental support, push the projects through the planning and oversight stages into the implementation stage, and direct, control, and oversee the research itself.

212.    The Rockefeller Foundation's philosophy has always been that it is a partner, not a patron,[8] and it works through governments, not for them.

213.    In the 1930s and 1940s, The Rockefeller Foundation had a more hierarchical decision-making process than Johns Hopkins. At various points, certain key men were given independent policymaking and decision making authority. These men

---

[8]      G.E. Vincent, 6 *The Rockefeller Foundation: A Review for 1919,* 17 (1919).

acted independently and had final authority to establish binding policy, modify or change existing policy, and enter into binding contracts and agreements with academic, research, and governmental entities and third parties.

214.   As outlined in more detail below, a number of these key men -- Dr. Thomas Parran, Dr. Frederick Soper, and Dr. George Strode -- used their institutional policymaking and decision-making power to cause The Rockefeller Foundation, as an institution, to knowingly and intentionally violate the Plaintiffs' customary, well-established, and universal right to be free from nonconsensual, nontherapeutic human experimentation.

215.   These men designed, developed, encouraged, contributed to, directed, oversaw, implemented, and aided and abetted the Guatemala Experiments because they put the advancement of "science" and the Foundation's interests above the lives and well-being of the Guatemalan test subjects and their sexual partners, wives, children, and grandchildren.

216.   The Rockefeller Foundation actively participated in, joined and participated in a conspiracy to further, and aided and abetted the Guatemala Experiments with the knowledge, intent, and purpose that its actions would result in the nonconsensual, nontherapeutic testing of human test subjects.

217.   The Rockefeller Foundation is also vicariously liable for the actions of its agents, servants, employees, and co-conspirators.

## The Rockefeller Foundation, Syphilis, and Sexually Transmitted Diseases

218.    From its inception through the 1940s, The Rockefeller Foundation was very interested in the prevention and treatment of syphilis and other sexually transmitted diseases.

219.    This interest linked The Rockefeller Foundation and Johns Hopkins from 1914 onward. The two organizations were partners at the highest levels, and The Rockefeller Foundation funded not only the research that Johns Hopkins and its doctors conducted, but also Johns Hopkins Hospital, Johns Hopkins University, Johns Hopkins University School of Medicine, Johns Hopkins Bloomberg School of Public Health, and their predecessors.

220.    A more thorough description of The Rockefeller Foundation's involvement in the research that led to the Guatemala Experiments and the Experiments themselves is outlined in the Facts section. The individual actions of the key men are described below.

## Dr. Thomas Parran

221.    Dr. Thomas Parran was one of the key authority figures at The Rockefeller Foundation who had policymaking and final decision-making authority. Though Dr. Parran's career spanned many roles, he was always, and remained, an agent, servant, and high ranking member of The Rockefeller Foundation.

222.    Dr. Parran's policymaking and decision-making authority allowed him to enter into binding agreements committing The Rockefeller Foundation to research projects with academic, research, and governmental entities and other third parties. It also

allowed him to control the direction of the Foundation's scientific programs. Dr. Parran was given complete discretion in making these decisions and, once made, they became established institutional policies and customs.

223.   To the extent that Dr. Parran discussed his decisions with the Chairman or other trustees and members of The Rockefeller Foundation, they either acted in an advisory role or simply went along with or endorsed his decisions. These decisions became established institutional policy.

224.   Alternatively, if Dr. Parran's decisions were subject to approval by the President or Board of The Rockefeller Foundation, he or they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his work, allowing Rockefeller staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

225.   Dr. Parran had many roles in the 1930s and 1940s. He was a trustee and member of Rockefeller's Board of Directors, a member of Rockefeller's Board of Scientific Directors, and a Scientific Director for Rockefeller's International Health Division. He was also a researcher and member of the U.S. Public Health Service, serving as its Surgeon General from the mid-1930s.

226.   Dr. Parran performed the responsibilities of these jobs simultaneously and acted for the benefit of both organizations. Dr. Parran saw the mission of The Rockefeller

Foundation and the work of the PHS as coextensive, and he considered his actions on venereal diseases to further both organizations.

227.  Dr. Parran, both as a member and trustee of The Rockefeller Foundation and as Surgeon General of the PHS, used his authority and resources to work with Dr. Moore in designing, carrying-out, and overseeing the infamous nonconsensual, nontherapeutic human experiments described in the Johns Hopkins section above.

228.  When these experiments did not answer questions about infection rates, prophylaxis, the effect penicillin treatment had on reinfection rates, and others, Dr. Parran committed The Rockefeller Foundation and its staff and resources to the Guatemala Experiments.

229.  Dr. Parran was intimately involved in all aspects of the Guatemala Experiments. He used his authority and resources to work with Dr. Moore and others in designing, carrying-out, and overseeing the Experiments. He helped identify and was very aware that the Experiments were being performed on mentally ill patients committed to an asylum, the prison inmates, and the orphans and children that could not and did not give informed consent. He worked on and agreed with the research protocols -- including the portions that required the Experiments to be nonconsensual and nontherapeutic -- and the various tests that were used in the Experiments. He used his position and his contacts in the medical and governmental community to ensure the Experiments were approved. He and his staff at both the Foundation and PHS to provide medical and logistical support for the Experiments. He was continually informed about the Experiments and their

results. And, he used his position and resources to keep the Experiments concealed for decades.

230.    Dr. Parran intended, designed, and developed the Guatemala Experiments to be nonconsensual and nontherapeutic. He knew the test subjects were not going to be and were not being informed about the risks or true nature of the Experiments, and, because of their age or condition, could not give their informed consent. He wanted the largest pool of test subjects possible and to infect and experiment upon them in as short of a time as possible.

231.    Dr. Parran also directed, oversaw, encouraged, contributed to, and aided and abetted the Guatemala Experiments and the day-to-day violations of rights that occurred over the course of years there. All of these actions were taken in the course of his employment with The Rockefeller Foundation.

<u>Dr. Frederick Soper</u>

232.    Dr. Frederick Soper was a key man at The Rockefeller Foundation who had policymaking and final decision-making authority. He was a longtime Rockefeller employee and an Associate Director of Rockefeller's International Health Division.

233.    In 1946, The Rockefeller Foundation and Johns Hopkins needed to appoint a "Responsible Investigator" for the Guatemala Experiments. The cooperation of this person was essential because he was <u>supposed to be</u> the person with the primary responsibility of protecting the rights, safety, and well-being of the Experiments' test subjects; supervising the research on the ground; and ensuring informed consent was obtained from all test subjects. The investigator needed to be someone that Dr. Parran,

Dr. Moore, and others with full knowledge of the Experiments could trust with the full details of the Experiments, someone who was willing to allow the Experiments to be nontherapeutic and nonconsensual, and someone who would work to conceal the true nature of the Experiments and prevent damaging details from getting out.

234.   Dr. Soper was briefed on the Guatemala Experiments and agreed to serve as its "Responsible Investigator."

235.   When Dr. Soper acted as the "Responsible Investigator" for the Guatemala Experiments, he was acting directly for The Rockefeller Foundation and he had full policymaking and decision-making authority, both at the PASB level and as the investigator in Guatemala, to support and direct the work being done as he saw fit. He exercised his complete autonomy and, once made, his decision became established institutional policy.

236.   Alternatively, if Dr. Soper's decisions were subject to approval by the President or Board of The Rockefeller Foundation, he or they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his work, allowing Rockefeller staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

237.   In January 1947, The Rockefeller Foundation assigned Dr. Soper to the Pan American Sanitary Board (PASB) where he was immediately designated as the "Responsible Investigator" for the Guatemala Experiments. Dr. Soper later wrote that his

move was not of abandonment of The Rockefeller Foundation but rather of fulfilling its program. He believed it was "quite in keeping with Foundation policy" to make his services available to the PASB because he "remained on [the Foundation's] staff during [his] first four years" with the PASB.[9]

238.   Chester Barnard, President of The Rockefeller Foundation, correctly wrote that Dr. Soper's move to the PASB "was designed to cover most of the purposes which the [Rockefeller's International Health Division] pursued in Latin America."[10] He explained that Dr. Soper was successful because the PASB "adopted" the IHD's policies and philosophies.

239.   Dr. Soper oversaw and was responsible for all of the work performed in Guatemala by Dr. Cutler and researchers involved in the Experiments. He continued to report to his supervisor, Dr. Strode, both in person and through written reports and updates. He continued to report to Dr. Parran, in writing and in multiple in person meetings. He wrote reports to The Rockefeller Foundation's Executive Committee detailing the work being performed. He leaked details of PASB policies to Dr. Strode before they became public so he and the Foundation could coordinate their programs. And, he worked behind the scenes with Rockefeller to coordinate their policies with the PASB's policies. As Dr. Lewis Hackett, another Director of the International Health

---

[9]   Frederick Soper, Ventures in World Health 317, 320 (1977).

[10]   L. Hackett, *IHD and Other International Health Organizations* (1950).

Division explained, with Dr. Soper's help "the two programs did not come into conflict."[11]

240.   Throughout the Guatemala Experiments, Dr. Soper remained an employee and Associate Director of The Rockefeller Foundation. It paid his entire salary, expenses, and costs. It paid his health insurance and an annuity from which he drew income. He retained free access to Rockefeller Foundation offices in New York, Sao Paulo, Brazil, and Buenos Aires, Argentina. He received agendas and comments from meetings of The Rockefeller Board of Scientific Directors, even though non-board members had never received them before. Dr. Soper acted for the benefit of The Rockefeller Foundation and he considered his actions to further its goals.

241.   Dr. Soper was intimately involved with the details and implementation of the Guatemala Experiments. He knew that the actions being taken on the ground in Guatemala were nonconsensual and nontherapeutic, and his actions were intended to and did result in the day-to-day violations of rights that occurred over the course of years there.

<u>Dr. George Strode</u>

242.   Dr. George Strode was a key man at The Rockefeller Foundation who had policymaking and final decision-making authority. He was a longtime Rockefeller employee and served as the Director of Rockefeller's International Health Division.

---

[11]   *See* Hackett, *IHD and Other International Health Organizations*.

243.   As the Director of IHS, Dr. Strode had full policymaking and decision-making authority to act as he saw fit. He exercised his complete autonomy and, once made, his decisions became established institutional policy.

244.   Dr. Strode's policymaking and decision-making authority allowed him to enter into binding agreements committing the International Health Division to research projects with academic, research, and governmental entities and other third parties. It also allowed him to control the direction of the IHD's scientific programs. Dr. Strode was given complete discretion in making these decisions and, once made, they became established institutional policies and customs.

245.   To the extent that Dr. Strode discussed his decisions with the President of The Rockefeller Foundation or its trustees and members, they either acted in an advisory role or simply went along with or endorsed his decisions. These decisions became established institutional policy.

246.   Alternatively, if Dr. Strode's decisions were subject to approval by the President or Board of The Rockefeller Foundation, he or they acted with full knowledge and information about the nature of the Experiments and their actions -- approving the work of Dr. Soper, allowing Rockefeller staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an intentional act and decision, made at the corporate level and with institutional intent, to support and further the nonconsensual, nontherapeutic Experiments conducted.

247.   Dr. Strode worked with Dr. Parran in planning and overseeing the Guatemala Experiments. He and Dr. Parran arranged for Dr. Soper to be assigned to the

PASB to further the policies and interests of The Rockefeller Foundation. He kept Dr. Parran and The Rockefeller Foundation's Executive Committee and Scientific Directors informed at all times. And, he worked with Dr. Soper in implementing and covering-up the Experiments.

248.    Dr. Strode was intimately involved with the details and implementation of the Guatemala Experiments. He knew that the actions being taken on the ground in Guatemala were nonconsensual and nontherapeutic, and his actions were intended to and did result in the day-to-day violations of rights that occurred over the course of years there.

C.    Bristol-Myers Squibb

249.    Plaintiffs are suing Bristol-Myers Squibb, successor of Bristol Laboratories and E.R Squibb & Sons, Inc.'s Squibb Institute For Medical Research. Except where noted, the Defendant is referred to as "Bristol-Myers" or "Squibb."

250.    Bristol-Myers Squibb Company is incorporated under the laws of the State of Delaware. It maintains a principal place of business in the State of New York. At times relevant to this Complaint, it was known as Bristol, Myers; Bristol-Myers; E.R. Squibb & Sons, Inc.; Bristol Laboratories; and the Squibb Institute For Medical Research, as well as other unknown corporate names. At all times relevant to this case, from its creation until today, Bristol-Myers Squibb Company has regularly conducted business in Maryland.

Bristol-Myers and the Guatemala Experiments

251.   Bristol Laboratories and E.R Squibb & Sons, Inc.'s Squibb Institute For Medical Research, predecessors of Bristol-Myers Squibb, actively participated in, joined and participated in a conspiracy to further, and aided and abetted the Guatemala Experiments with the knowledge and intent that its actions would result in the nonconsensual, nontherapeutic testing of human test subjects.

252.   High ranking corporate officers at Bristol Laboratories and the Squibb Institute -- Dr. Oskar Wintersteiner, Dr. Geoffrey R. Rake, Dr. Arthur P. Richardson, and Dr. Delmas K. Kitchen -- coordinated with Dr. Parran, Dr. Moore, and others involved in planning and implementing the Guatemala Experiments.

253.   Dr. Wintersteiner was the Director of Research at the Squibb Institute in the 1940s and discovered the process to create sodium penicillin G.

254.   Dr. Rake was the Medical Director of the Division of Microbiology at the Squibb Institute in the 1940s. He obtained and used grants to investigate the use of penicillin as a prophylaxis for syphilis, the central focus of the Guatemala Experiments.

255.   Dr. Richardson was the Head of the Division of Pharmacology at the Squibb Institute in the 1940s. He committed Bristol Laboratories and E.R Squibb & Sons to provide all of the penicillin to the Guatemala Experiments and work extensively with Dr. Cutler and researchers on the ground.

256.   Dr. Kitchen was the Medical Director at Bristol Laboratories in the 1940s. He met with Dr. Soper, discussed all access of the Guatemala Experiments, and developed the testing protocols that were used.

257.    These men knew that the pool of test subjects in Guatemala was made up of mentally ill people in insane asylums, prison inmates, orphans, and school children. They knew that the test subjects were not informed about the purpose and goals of the Experiment, the nature and extent of the risks they were being subjected to, and their role. They also knew that the test subjects were not aware that they were being experimented upon, being intentionally infected with syphilis or another sexually transmitted disease, would suffer significant personal injury, and would pass the disease on to their sexual partners, spouses, children, and grandchildren. They also knew that the test subjects could not, would not, and did not give their informed consent.

258.    Despite this, Bristol Laboratories and the Squibb Institute wanted to conduct clinical tests using penicillin G. Conducting clinical trials in the United States would be difficult, expensive, and time consuming, and the two entities, through these men, wanted to move forward as quickly as possible.

259.    Bristol Laboratories and the Squibb Institute gave these high ranking corporate officers the power to make discretionary decisions on their own and delegated decision making authority to them and they acted to commit the companies to the Guatemala Experiments.

260.    These men acted independently and had final authority to establish binding policy, modify or change existing policy, and enter into binding contracts and agreements with academic, research, and governmental entities and third parties.

261.    These men exercised their institutional policymaking and decision-making power to cause Bristol Laboratories and the Squibb Institute, as institutions, to knowingly

and intentionally violate the Plaintiffs' customary, well-established, and universal right to be free from nonconsensual, nontherapeutic human experimentation.

262.    Alternatively, if these men's decisions were subject to approval by the Presidents or Board of Bristol Laboratories and/or the Squibb Institute, they acted with full knowledge and information about the nature of the Experiments and their actions -- approving his work, allowing Bristol Laboratories and the Squibb Institute's staff and resources to be used to support the Experiments, and others -- established institutional policy and amounted to an institutional intent, and decision to support and further the nonconsensual, nontherapeutic Experiments conducted.

263.    These men exercised their power to encourage, contribute to, direct, oversee, and aid and abet the Guatemala Experiments by committing their companies to the Experiments and putting the companies' interests and financial gain above the lives and well-being of the Guatemalan test subjects and their sexual partners, wives, children, and grandchildren.

264.    Bristol-Myers Squibb is also vicariously liable for the actions of its predecessors' agents, servants, employees, and co-conspirators.

## Statement of Facts

265.    In addition to the facts described above, the following Fact Section identifies and describes the actions and omissions of the Defendants.

1910 to 1930

266.    The Rockefeller Foundation was approved for a charter by the State of New York in 1913. Its stated mission was to promote national and international research in the area of public health.

267.    The Rockefeller Foundation, however, was not formed to simply be a passive source of funding.  Its board and managing members selected research partners and projects to further its mission, and then used its contacts, influence, and organizational power to rally institutional and governmental support, push the projects through the planning and oversight stages into the implementation stage, and direct, control, and oversee the research itself.

268.    The Rockefeller Foundation's philosophy has always been that it is a "partner, not a patron,"[12] and it works through governments, not for them.

269.    From the outset, The Rockefeller Foundation was very interested in the treatment and prevention of syphilis. In 1914, it helped Johns Hopkins establish a clinic in Baltimore City – later known as "Department L" (for *lues venerea*) – to collect data and study patients with syphilis. A year later, in 1915, The Rockefeller Foundation selected Johns Hopkins over a number of more established medical institutions to build a School of Hygiene and Public Health, now known as the Johns Hopkins Bloomberg School of Public Health.

270.    In 1917, Dr. Alan Chesney worked for The Rockefeller Foundation and its Institute in New York. When a position later opened to serve as the Director of

---

[12]    G.E. Vincent, 6 *The Rockefeller Foundation: A Review for 1919* 17 (1919).

Department L and a professor at the Johns Hopkins School of Medicine, Dr. Chesney started what would become a pattern over the course of the next fifty years: he took the job at Hopkins, but also continued his relationship with The Rockefeller Foundation. Dr. Chesney later wrote that he viewed his work at Johns Hopkins as a continuation of his responsibilities at the Foundation.

271.    Over the course of the next 10 years, and for the remainder of his life, Dr. Chesney worked to deepen the connections between Johns Hopkins and The Rockefeller Foundation. He oversaw the doctors and researchers studying syphilis at Hopkins and secured a steady stream of funding for their work from Rockefeller. He also served on the Foundation's committees and kept it informed about his work and the work of his Johns Hopkins colleagues.

272.    As the 1920s drew to a close, Dr. Chesney groomed Dr. J. Earle Moore, another Hopkins' syphilologist and Foundation member, to take over for him in Department L. Dr. Moore was the first practicing physician to be named a full professor at the medical school, and he also became an adjunct professor at the School of Public Health. Dr. Moore had deep ties to The Rockefeller Foundation, having received and overseen numerous grants from them.

273.    When Dr. Chesney was appointed Dean of the Johns Hopkins School of Medicine in 1929, he and The Rockefeller Foundation successfully lobbied Johns Hopkins' leadership and Dr. Moore become the new Director of Department L.

B.    1930 to 1940

274.    Dr. Moore cultivated and expanded the symbiotic relationship between Johns Hopkins and The Rockefeller Foundation throughout the 1930s. When the decade started, Hopkins had highly qualified doctors who wanted to conduct research on syphilis and other sexually transmitted diseases. The Rockefeller Foundation used its resources to support those efforts and, by the end of the decade, it and Hopkins controlled almost all of the syphilis and sexually transmitted disease research conducted in the United States.

275.    As the relationship grew in the early 1930s, Hopkins benefited economically and in its public recognition and prestige. The Rockefeller Foundation's grants paid for Johns Hopkins to hire and pay doctors, researchers, and staff and to build new facilities. This success built on itself. Johns Hopkins was able to seek and obtain additional investments from wealthy donors and other foundations, and to attract additional highly qualified medical students, post-graduates, doctors, and researchers.

276.    With The Rockefeller Foundation's help, Dr. Moore and Johns Hopkins' Department L were becoming famous throughout the world. Dr. Moore and the Johns Hopkins doctors he oversaw and mentored published extensively, and they trained doctors who, over time, assumed important positions in health departments throughout the United States and in many parts of the world.

277.    Dr. Moore published textbooks on syphilis and was the editor of the *American Journal of Syphilis, Gonorrhea, and Venereal Diseases* and on the Board of Editors for the *Journal of Chronic Diseases*, the two most influential journals in the field.

278.    Even with Johns Hopkins' widening fame and The Rockefeller Foundation's resources and support, however, there were limits to what these institutions and their scientists could accomplish. While they investigated health problems and their work was producing results, they did not have sufficient manpower to conduct large scale ground operations -- recruiting test subjects, testing them, collecting and analyzing data, and conducting experiments.

279.    The landscape for large-scale public health projects slowly began to change in the mid-1930s. Dr. Thomas Parran, a member of Rockefeller's Board of Scientific Directors, was named Surgeon General of the United States Public Health Service. He, along with other members of The Rockefeller Foundation, successfully pushed for greater support and funding for the PHS and the National Institute of Health, allowing them to hire doctors and researchers -- many of whom had been trained by Dr. Moore and his colleagues at Johns Hopkins -- to investigate public health issues.

280.    Dr. Parran also helped draft the Social Security Act, which allowed the federal government to begin offering grants to the states to fund the investigation of disease and problems of sanitation. Together, this meant that there were a number of government doctors and researchers Dr. Moore and others could use to conduct ground operations, making large scale health projects possible.

281.   As one commentator noted, "[f]or the first time in history, medicine's intellectual elite had the opportunity not only to set an example for the rest of the profession but actually to direct the conduct of therapeutic research on a national scale."[13]

282.   Syphilis and sexually transmitted diseases started to became a fertile and lucrative ground for public-private cooperation. By the end of the decade, research on syphilis and other sexually transmitted diseases received more federal funding than any other field of medical research. It also had the potential to generate patents, processes, and treatments that could provide other significant streams of income to Johns Hopkins and other institutions, in addition to the reputational benefits associated with being the leading syphilis research organizations.

C.   The Tuskegee Study of Untreated Syphilis in the Negro Male

283.   The Tuskegee Study of Untreated Syphilis in the Negro Male, started in the early 1930s, is a well-known and infamous example of one of the first large-scale public health projects that combined the expertise and scientific know-how of Dr. Moore and his colleagues at Hopkins and the manpower and organizational support of Dr. Parran, representing both The Rockefeller Foundation and the Federal Government.

284.   Dr. Parran and a collaborator at the PHS, Dr. Raymond Vonderlehr, with the input of Dr. Moore, proposed a study to evaluate the effect of untreated syphilis on the human economy among people now living and engaged in their daily pursuits. They wanted to determine whether anti-syphilitic treatment was unnecessary for men in the

---

[13]   Harry Marks, *The Progress of Experiment: Science and Therapeutic Reform in the United States, 1900-1990* 99 (1997).

late-stages of the disease. They proposed Macon County, Alabama, home of the Tuskegee Institute, a PHS research partner, as the site of the study.

285.    At the time, Macon County had 27,000 residents, 82% of whom were African-Americans, most living in rural poverty in shacks with dirt floors, no plumbing, and poor sanitation. It was estimated that fifty percent of the African-American population in the county had syphilis. One PHS official wrote that Macon County was perfect "due to the paucity of doctors, rather low intelligence of the Negro population in this section, depressed economic conditions, and the very common promiscuous sex relations of this population group . . . ."[14] And, just as importantly, they were expected to be eager to participate and easy to fool because they "had never in their lives been treated by a doctor."[15]

286.    Dr. Moore wanted the Tuskegee Study to go forward. He believed that it would give him and his Hopkins colleagues access to potentially important clinical data. Just as important, it also had the potential of leading to the development of lucrative tests, processes, and medications. Dr. Moore and his colleagues could design and oversee the experiment while the work on the ground was conducted by PHS's doctors and researchers.

287.    Despite the fact that the Committee was led by Dr. Moore and dominated by Johns Hopkins doctors, the proposal was met with resistance from a vocal minority.

---

[14]    Allan Brandt, *Racism and Research: The Case of the Tuskegee Syphilis Study* 5 (1978) (attributing the quotation to Dr. Taliaferro Clark of the PHS).

[15]    *Id.*

Other doctors and researchers questioned the Study's morality and its overall importance in the field.

288.    Dr. Parran called on Dr. Moore for help. Dr. Moore and his colleague at Hopkins, Dr. Lowell Reed, reworked the wording of the resolution to sanitize it, removing specifics about the nature of the experiments and its test subjects, something they referred to as removing the "unwarranted exposition of detail."

289.    Dr. Moore also wrote a favorable peer review of the study and publically supported it.  In a letter to Dr. Taliaferro Clark, head of the PHS, on September 28, 1932, he stated that while he had some concerns that "[s]yphilis in the negro is in many almost a different disease from syphilis in the white," he believed that monitoring the progression of the disease in untreated African-American males over time "would be of immense value."

290.    Over a short period of time, Dr. Moore and his Hopkins colleagues were able to quiet the concerns of the doctors opposed to the experiment and it was approved. As one commentator noted, Dr. Moore's approval "carried great weight in moving the study forward."[16]

291.    Dr. Parran appointed Dr. John Mahoney, a PHS researcher, to oversee the Tuskegee Study.

292.    Shortly after Dr. Mahoney's appointment, Dr. Moore wrote to Dr. Parran's Assistant, Dr. Clark, and outlined what would become the scientific foundation and

---

[16]      Brandt, *Racism and Research* at 6 (quoting Dr. Moore).

testing protocol for the Tuskegee Study. Dr. Moore defined the scope of the original survey, identified the population of test subjects, proposed the methods of selecting them, and selected the tests that would be used. While others had urged a smaller amount of field work, he wrote that the entire adult male population of the county should be surveyed, but only men over the age of 30 who can give a definite history of infection should be allowed to participate. To select test subjects, he wrote that examiners should pay particular interest to 15 physical features that he listed in detail to pick up those patients with minor abnormalities in the central nervous system and those with syphilitic aortitis. He also wrote that the examiners should take urine, blood, and spinal fluid samples for laboratory testing. And, he warned against enrolling patients with "[a] mere history of a penile sore only would not be adequate," however, because "the average negro has had as many penile sores as rabbits have offspring." Dr. Moore, closed his letter assuring Dr. Clark and the PHS that he and his staff at Hopkins were available to assist them.

293.   Dr. Moore could have designed the Tuskegee Study so that the researchers obtained proper informed consent. He could have instructed the researchers to tell the men that they had syphilis and let them choose to either opt out of the Study and get treatment, or participate in the Study and allow Dr. Moore and others to monitor them as syphilis ravaged their bodies. He knew, however, that doing so would effectively doom the Study -- he knew that none of the test subjects would give consent and the Study would not have a large enough test population to be meaningful.

294.   Drs. Parran and Moore knew that their actions would lead to many of the men in the Study suffering and dying from syphilis. Dr. Moore had previously written that a person's "probability of progression, relapse, or death" from syphilis was markedly higher if the disease was left untreated.[17] He had also written that every patient with latent syphilis may be, and perhaps is, infectious to others, meaning that both he and Dr. Parran knew that the decision not to provide these men with treatment meant that they would pass the disease on to their sexual partners, wives, and children.

295.   At the end of the day, Drs. Parran and Moore put the interests of "science" and their institutions above the interests of not only the 600 men who participated in the Study, but also above the interests of their sexual partners, wives, children, and grandchildren, to whom they would inevitably pass their disease.

296.   When the researchers reached Macon County, they followed Dr. Parran and Dr. Moore's instructions. They did not mention the word "syphilis." Instead, they announced they had come to test people for "bad blood" -- an ambiguous local term used to describe a host of conditions. Surveys taken later showed that most of the men thought they were receiving treatment for rheumatism or bad stomachs.

297.   Following Dr. Moore's plan, approved by Dr. Parran and implemented by Dr. Mahoney, approximately 600 impoverished, uneducated African-American men over the age of 30 were enrolled in the nontherapeutic, nonconsensual human experiment. To encourage enough men to agree to participate, researchers provided initial treatment --

---

[17]   Allan Brandt, Racism and Research: The Case of the Tuskegee Syphilis Study 5 (1978) (quoting Dr. Moore's 1933 textbook).

treatment that made them feel better. Once enough participants had enrolled, however, the researchers, without the subjects' knowledge, switched them to inadequate dosages or placebos -- aspirin and iron tonic -- that they said would cure their "bad blood."

298.   Dr. Moore was party to this deception and his involvement continued throughout the Study. As the first phase of the experiments began, researchers were concerned that the test subjects would object to spinal punctures (spinal taps) because they were very painful and often caused significant complications. In a letter asking for more supplies, one researcher wrote that "[i]t is desirable and essential . . . to maintain the interest of each of the cases examined by me through to the time when the spinal puncture can be completed. ... It is my desire to keep the main purpose of the work from the negros in the county and continue their interest in treatment. ... It would probably cause the entire experiment to collapse if the clinics were stopped before the work is completed."[18] Dr. Moore considered the issue and he and the PHS agreed that the spinal taps "be deferred to the last in order not to unduly disturb our field work by any adverse reports . . . because of some disagreeable sensations following this procedure. These negroes are very ignorant and easily influenced by things that would be of minor significance in a more intelligent group."[19]

299.   Dr. Moore also served as the Study's ranking clinical consultant. He was involved in a number of important decisions throughout the course of the Study. He

---

[18]   Brandt, Racism and Research at 7.

[19]   *Id*.

trained the PHS doctors in the specific skills they needed in order to implement the Study. He reviewed x-rays and other test results and data generated by the Study. He acted to ensure that he and his colleagues at Johns Hopkins had access to, examined, and analyzed all of the data. In this role, Dr. Moore regularly communicated with Dr. Parran, the PHS, and Dr. Maloney and the researchers in Macon County.  He not only fine-tuned the parameters of the Study, he also closely monitored the results as syphilis ravaged the test subjects' bodies.

300.   Commentators have correctly identified Dr. Moore as the architect of the Tuskegee Study and the person who designed, supervised, conducted, and supported the study while at Hopkins. He provided detailed direction to the PHS doctors in the field, specifying, among other details, the Study's sample size, demographics, and specifics of the examinations and tests. At Hopkins, he trained the PHS doctors in the specific skills they needed in order to implement the Study.

301.   Recognizing Dr. Moore's leadership and the involvement of other private participants in the Tuskegee experiments, other commentators have explained that there was a *quid pro quo* passing between Johns Hopkins and the other private participants who supported the Tuskegee Study and similar studies on one hand, and the Federal Government on the other. The PHS doctors who carried out the Tuskegee Study did not do their work "in a vacuum." Rather, they sought and obtained the Hopkins "imprimatur" for the Study, and were trained and guided by Dr. Moore at Hopkins.[20] In return, Johns

---

[20]     Susan Reverby, *Examining Tuskegee* 18 (2009).

Hopkins and the other private participants who supported the Study benefitted, because they could look to the PHS for funding and organizational prowess.

302.   As anticipated, many of the men in the Study died. This was wholly expected and planned. In a letter written by Dr. Vonderlehr in July of 1933, it was stated early on that "the proper procedure is the continuance of the observation of the Negro men used in this study with the idea of eventually bringing them to autopsy." Post-mortem examinations were intended to uncover information that could not be identified during medical monitoring.

303.   Dr. Moore was involved with the post-mortem process. He worked with local doctors, a nurse connected to the County health department, and doctors and others at the Tuskegee Institute and a local Veterans Hospital to ensure that their bodies were autopsied as quickly as possible and the results were shared with him, his staff and colleagues at Johns Hopkins, and others in the medical community.

304.   Dr. Reed was the head of a biostatistical analysis unit at Hopkins. He and his staff collected and analyzed the data from the Tuskegee Study. This meant that he, and at least some of the researchers under him, worked with the researchers on the ground, and were well aware that no consent was requested or given.

305.   As one commentator explained, this was not a "clinical study by well-intentioned but scientifically naive investigators . . .. [T]he Tuskegee Study was instead the economic exploitation of humans as a natural resource of a disease that could not be

cultivated in culture or animals in order to establish and sustain U.S. superiority in patented commercial biotechnology."[21]

306.   As morally and ethically reprehensible as the work being conducted in Tuskegee was, Drs. Parran and Moore were not finished. Tuskegee produced information about how untreated syphilis affected people, but it did not answer basic questions about the pathogenesis or immunology of the disease. They wanted to conduct related, but more aggressive, studies, using a larger group of people who could be intentionally infected with the disease and then experimented upon.

D.   Early 1940s

307.   In the early 1940s, The Rockefeller Foundation was involved in a handful of public health projects in Guatemala and other countries in Central and Latin America, some directly and others thorough a quasi-public organization named the Pan American Sanitary Board (PASB). With Dr. Parran's guidance, the Foundation opened small outposts in Guatemala and other countries and it paid for several doctors to attend fellowships in the United States. Over time, the Foundation detailed a handful of its employees to visit and staff these outposts. This work gave Rockefeller a base of operations and contacts with and influence over the Guatemalan government and other governments in Central and Latin America.

308.   World War II intensified the interest in the research of sexually transmitted diseases. Dr. Parran was still a Board Member of The Rockefeller Foundation, but he also

---

[21]   Benjamin Roy, *The Tuskegee Syphilis Experiment: Biotechnology and the Administrative State*, 87 J. Nat'l Med. Assoc. 56 (1995).

become a Rockefeller Foundation Trustee and Chairman of its Board of Scientific Directors. In those capacities and as Surgeon General, Dr. Parran did not want the Government to control medical research or direct its path. Instead, he established a system in which "panels" and "study sections" made up of private, academic scientists and doctors -- who he called "reliable men" -- controlled scientific and medical research and experimentation.

309.    Dr. John Stokes, a researcher who was a member of the Syphilis Study Section noted in February of 1947 that "[a]ll the primary allocations of penicillin and fields of work were made by th[e] Subcommittee [on Venereal Disease] and that means virtually made by J. Earle Moore."

310.    With Drs. Moore, Reed, Turner, and Eagle firmly entrenched in positions of institutional control at Johns Hopkins, and Dr. Parran and The Rockefeller Foundation's influence and contacts in the federal government, Johns Hopkins and Rockefeller were poised to take advantage of the increased federal interest in syphilis.

311.    Dr. Moore, with the Foundation's help, placed his colleagues in top leadership positions on the two most important panels and study sections for their research: The Subcommittee on Venereal Diseases and the Penicillin Panel. When concerns were raised that too many Johns Hopkins doctors were appointed, Dr. Moore responded that he saw no reason why the best available scientific talents should not be utilized, even if all of it happens to come from the same place. Packing the panels and study sections allowed Rockefeller and Johns Hopkins to propose, design, approve, authorize, supervise, and direct the most significant syphilis and sexually transmitted

disease research of the time, as well as control who was permitted to be involved in such research..

312.   Because of the unique system in place at the time, Dr. Moore and his colleagues were not federal employees and were not borrowed servants when they participated in the panels and study sections. Instead, they remained Johns Hopkins employees at all times. Johns Hopkins paid their salaries, costs, and expenses. It paid for their health insurance and other benefits. It could give or withhold permission to attend meetings. It continued as if there were not changes to their traditional roles.

313.   Johns Hopkins was very clear that Dr. Moore and his colleagues were acting on its behalf and in the scope of their employment at all times. Participation in the panels and study sections was a mandatory responsibility of their jobs. Tenure and salary increases were directly dependent on these activities. Dr. Moore and his colleagues attended meetings and turned in their receipts and requests for reimbursement following procedures they always used. When conflicts arose, they talked to each other and their administrative assistants and addressed them just as they always had.

314.   Johns Hopkins' interests in its doctors participating in the panels and sections were clear. When its doctors participated, Johns Hopkins enjoyed direct economic and reputational benefits: it placed Hopkins in position to receive lucrative research grants, allowed its doctors to be exposed to cutting-edge knowledge that they could use and pass to their colleagues, and established a network of referrals within the federal government and other institutions. Dr. Moore and his colleagues were able to

direct a large portion of the available federal funding to their own work and, by extension, to Johns Hopkins.

315.   Participation in the panels and sections had other benefits for Johns Hopkins: its reputation and visibility continued to rise, it was able to market itself as an elite medical institution, and it was able to use the notoriety to obtain additional funding and recruit new doctors, researchers, and students.

316.   Johns Hopkins Hospital's stated mission has always been to be the world's preeminent health care institution, to be the leading health care institution in the application of discovery, and to attract and support physicians and other health care professionals of the highest character and greatest skill. Participation and membership in the panels and study sections served all of these institutional goals. While these things did not necessarily immediately translate into tangible economic benefits, they were more important foundational steps to furthering Johns Hopkins' mid- and long-term goals.

317.   The government was also clear that Dr. Moore and his colleagues were not its employees or borrowed servants. The government funded and supported the end-product, but it did not control the doctors or their institutions. Instead, the doctors had "full authority and responsibility" to review applications, approve or disapprove them, and suggest changes or further study. Additionally, they had authority to "discern neglected areas in which research [was] particularly wanting, and to stimulate the interest of workers competent to undertake needed research."[22] One historian has summarized the

---

[22]   Stephen Parks Strickland, The Story of the NIH Grants Program § IV 4 (Draft Ver. Oct. 30, 1987).

government's role this way: it did not provide any "direction, control, supervision, regimentation, or interference in the conduct of the research."[23]

318.    To better position themselves, The Rockefeller Foundation and Johns Hopkins created a Venereal Disease Research and Post-Graduate Training Center and a Research Laboratory at Hopkins.

319.    Johns Hopkins appointed Dr. Eagle as the Director of the Training Center and Laboratory. He was given the power to make policy decisions and final decisions related to the training center and lab. As was the Johns Hopkins' custom, his decisions did not need approval, and they became institutional policies and customs.

320.    Over the course of the next ten years, Hopkins reaped substantial benefits as the Foundation paid for hundreds of health professionals and scientists from Guatemala and other Central and Latin American countries to receive training. Dr. Parran and the PHS also sent many of their doctors and researchers there, deepening Hopkins' relationships with the PHS.

321.    Drs. Eagle and Turner also used the Laboratory to expand their research into syphilis. In particular, Dr. Turner investigated the "immunologic relationships" between two types of syphilis: *T. cuniculi*, a form of syphilis found in rabbits, and, *T. pallidum* (the Nichols strain), a laboratory strain of human syphilis originally isolated by The Rockefeller Foundation in 1912 from a patient with neurosyphilis. He was able to

---

[23]    C J Van Slyke, New Horizons in Medical Research, published in 104 Science 559 (Dec. 13, 1946).

isolate six strains of *T. cuniculi,* and his long-term goal was to determine whether *T. cuniculi* could be used as a cure or treatment of human syphilis.

322.    The Nichols strain was a "laboratory strain" of syphilis, meaning it existed exclusively in research laboratories where it was extensively studied and catalogued. The Nichols strain had a unique structure that made it readily distinguishable from other strains existing in nature. Like other forms of syphilis, the Nichols strain could not live for long outside a host, so rabbits were infected with it and acted as storage devices for the transfer of syphilis between institutions and locations.

323.    By the mid-1940s, Johns Hopkins was the national command and control center and information clearinghouse for all federally-funded investigations into the treatment of syphilis and other STDs. Clinics around the country examined, treated, and followed syphilis patients according to a uniform plan developed by Dr. Moore and his team at Johns Hopkins, recorded their results on forms created at Johns Hopkins, and sent the forms to Johns Hopkins where they were collected and analyzed by Dr. Reed and his team in the Biostatistical Unit. The findings from this research were published by Dr. Moore and his colleagues.

E.    The Terre Haute Prison Experiment

324.    The Terre Haute Prison Experiment is the second infamous example of unethical human experimentation driven by Dr. Parran, Dr. Moore, and their colleagues at The Rockefeller Foundation and Johns Hopkins.

325.    While the Tuskegee Study was producing some information about how syphilis affected untreated people, it did not answer other basic questions. Dr. Moore and

his colleagues wanted to conduct related, but more aggressive studies, using a larger group of people who could be intentionally infected with a sexually transmitted disease and then experiment upon to evaluate the efficacy of different treatment options.

326.   Dr. Moore chaired the Subcommittee on Venereal Diseases. In February of 1942, he wrote to the other members, including his colleagues at Hopkins – Drs. Reed, Turner, Eagle, Lewis Weed (the Dean and Director of the Hopkins School of Medicine), and Russell Nelson (Assistant Director and, later, Director of Hopkins Hospital) – suggesting that physicians in penitentiaries conduct controlled gonorrhea experiments on inmates. The Subcommittee soon began discussing the proposal.

327.   Dr. Moore was pleased with the discussions. He believed that the only satisfactory avenue of scientific approach to this problem is the use of human volunteers.

328.   In October 1942, Dr. Moore wrote to the United States Office of Scientific Research and Development's Committee on Medical Research (CMR), which included several more Johns Hopkins doctors, about supporting gonorrhea prophylaxis experiments on human test subjects.

329.   The Chair of the CMR, Dr. A.N. Richards, was supportive. She indicated that human experimentation was not only desirable, but necessary. Dr. Richards added one caveat not present in the Tuskegee Study, however: "When any risks are involved, volunteers only should be utilized as subjects, and these only after the risks have been fully explained and after signed statements have been obtained which shall prove that the volunteer offered his services with full knowledge and that claims for damages will be waived."

330.   Dr. Moore organized a conference with members he selected to design and specify the details of the Terre Haute Experiment. Dr. Moore's group – once again including his Johns Hopkins colleagues, Drs. Eagle, Reed, Turner, Weed, and Nelson – announced that testing should be performed on prison inmates. They proposed two types of prophylaxis against gonorrhea: (1) the protective action of sulfonamide compounds taken by mouth before exposure to the disease, and (2) the prophylactic action of chemical agents applied locally to the genital tract after exposure to the disease.

331.   Like he had done in the Tuskegee Study, Dr. Moore designed a detailed research protocol. However, unlike in Tuskegee, and in compliance with Dr. Richards' instructions, he also designed a detailed informed consent procedure. He and his colleagues drafted and finalized a participant waiver form that outlined the procedures involved and the specific risks of participation. The form warned that not all subjects would respond to modern treatment methods, and that complications could arise from being treated with older methods. It also listed the side effects of both the modern and older treatments. Dr. Moore also designed a protocol for documenting informed consent. Inmates who wanted to participate in the experiments had to consent and demonstrate an understanding of the consequences of their consent before the officer in charge could give permission for them to volunteer.

332.   A number of test subjects were willing to sign consent forms and participate. Even though they were in prison, the men wanted to contribute to the war effort. They saw participating in the Study as a way to do their part.

333.   Of note, the issue of experimenting on the mentally ill came up during this time. Tellingly, Dr. Moore made it clear, in no uncertain terms, that experiments on the mentally ill were not permitted. He explained that it was clearly undesirable to subject to any experimental procedure persons incapable of providing voluntary consent.

334.   Even as Dr. Moore and his Hopkins colleagues moved forward with the Terre Haute proposal, objections were raised. While some objections were ethical, the much more significant and most hotly debated objections arose out of fear of a public relations backlash or lawsuits if the Experiment's details got out.

335.   Dr. James Paullin, President of the American Medical Association, for example, wrote in January of 1943 that "sooner or later information concerning this method of experimentation is going to become known to the public and sooner or later one of these individuals who has suffered himself for the purpose of this experimental research is going to fall into the hands of a very unscrupulous lawyer." He wrote that he would be forced to oppose the Study "unless [he could] be absolutely assured that there [would] be no kick back . . . ." Other members agreed.

336.   Dr. Moore, with the help of his colleagues, finalized his proposal in February 1943, and submitted it to the Office of Scientific Research and Development.

337.   The proposal continued to face opposition. Some on the Committee were concerned that the Experiment would violate State or local laws. The Director of the Office of Scientific Research and Development, for example, was non-committal. He indicated that he was reserving judgment as to the expediency of going forward pending further study of the potential public relations problems.

338.   To obtain the approval he needed, Dr. Moore contacted the Director the Federal Bureau of Prisons and asked if federal prisoners could be used as test subjects. Dr. Parran, through Dr. Vonderlehr, made a similar request to the Director. After some brief exchanges, Dr. Moore outlined the proposed plan and the Director agreed, contingent on the Study being carried out on a strictly secret basis for at least the time being.

339.   The Director's willingness to supply federal prisoners resolved the state law issues and assurances that the experiments would be kept secret quieted the fears of a public relations backlash or lawsuits.

340.   In March 1943, the Terre Haute Experiment was authorized at a federal penitentiary in Terre Haute, Indiana.

341.   Dr. Parran, Dr. Moore, and their colleagues followed the same scheme they used in Tuskegee: they found a project leader and an investigator who did not allow their ethical concerns to interfere with or limit the project.  They were Dr. Mahoney (project leader) and Dr. John Cutler (investigator), both of whom had been involved in the Tuskegee Study.

342.   Dr. Moore, working in conjunction with Drs. Reed and Eagle, isolated and produced a strain of gonorrhea for use in the Tuskegee Experiment.

343.   Starting in September 1943, experiments began to intentionally infect 241 prisoners with gonorrhea. From the outset, however, there were problems.

344.   First, members of Dr. Moore's committee became increasingly concerned about the potential for bad publicity and adverse legal action. They were worried that the

public would react badly to the intentional infection of prisoners. They also worried that the waivers would not constitute sufficient legal protection for them and the researchers.

345.    Second, the infection rate was not as high as anticipated, and Dr. Cutler could not generate a large enough test population. Dr. Cutler tried a number of infection methods, including injecting men with bacteria taken directly from infected women and varying the doses of the bacteria injected, but was unable to consistently infect the prisoners.

346.    Sensing sentiment of ending the Terre Haute experiments, Dr. Moore intervened by holding a conference at Hopkins in Baltimore in January of 1944. Minutes from the conference signed by Dr. Moore indicate that he was able to persuade the members of the conference "that the human experiment, so far as it bears on prophylaxis, should not be abandoned without further consideration. The experiment has been a difficult one to arrange, and it almost certainly will be impossible to repeat at any time in the near future."

347.    The experiments continued to have problems and, after months of effort, the federal government withdrew its support. Dr. Moore strenuously objected, arguing that World War II created a unique opportunity to conduct the experiments and ending them would squander the opportunity.

348.    Despite his influence, the failure to produce results, coupled with ongoing concerns about a public backlash and lawsuits, grew too great. The Terre Haute Experiment was terminated in 1944.

349.   Dr. Moore wrote asking the Committee to reconsider. He explained that "[THE OPPORTUNITY] HAS NEVER PREVIOUSLY ARISEN ON THE PRESENT SCALE AND WITH THE TERMINATION OF THIS EXPERIMENT IS UNLIKELY TO ARISE AGAIN . . .. THE PUZZLING RESULTS SO FAR OBTAINED MAKE IT OF THE UTMOST IMPORTANCE TO CONTINUE THE STUDY . . .. IT IS THEREFORE URGENTLY RECOMMENDED THAT THE COMMITTEE ON MEDICAL RESEARCH EXTEND THE TIME ON AND THE FINANCIAL APPROPRIATION FOR THE PRESENT CONTRACT, SHOULD THIS PROVE TO BE NECESSARY."

350.   A description of the experiments authored years later explained that the only "conceivable expedient[s]" not tried were "the intraurethral inoculation of pus taken directly from the cervix of urethra of infected females or by the natural method of infection – sexual intercourse."[24]

351.   In an article entitled The Chemotherapy of Syphilis, Dr. Moore wrote in 1945 that the urgency of the problem of the spread of STDs to soldiers fighting in World War II "does not permit . . . that the application of penicillin to the treatment of syphilis in human beings be postponed until all available information can be had from experimental animals. **Experimental study must progress simultaneously in man**." (emphasis added).[25]

---

[24]   Jonathan Moreno, *Undue Risk: Secret State Experiments* 29 (2001) (quoting Dr. Moore).

[25]   Joseph Moore, *The Chemotherapy of Syphilis* (Jan. 1945) (emphasis added).

352.    The Terre Haute Experiments represent a significant progression of the Tuskegee experiments led by Johns Hopkins. In Tuskegee, the researchers observed naturally occurring venereal disease in a loosely controlled population of human subjects, and either treated or failed to treat them. However, the researchers in Terre Haute sought to intentionally infect a tightly controlled population of human subjects with venereal disease, thereby causing the disease to occur in the first place, so that they could test the efficacy of various forms of treatments administered immediately following exposure as a "prophylaxis."

353.    To Dr. Moore, Dr. Parran, and their colleagues, the Terre Haute Experiment demonstrated two things: (1) any large-scale study on the efficacy of prophylactic treatment hinged on researchers' ability to quickly create a large pool of infected test subjects through more aggressive infection methods, and (2) the experiments needed to happen in secret to avoid a public backlash or lawsuits.

F.     Mid-1940s

354.    Dr. Oskar Wintersteiner, the Director of Research at the Squibb Institute, created sodium penicillin G, a drug that he and others at Bristol Laboratories and the Squibb Institute believed would cure or prevent syphilis infections.

355.    Dr. Geoffrey Rake was the Medical Director of the Division of Microbiology at the Squibb Institute. He obtained and used federal grants to conduct limited investigations into penicillin G as a prophylaxis for syphilis. While helpful, Bristol Laboratories and the Squibb Institute needed to go beyond animal studies and find a large pool of human test subjects to conduct clinical trials.

356. Dr. Rake and Dr. Arthur Richardson, Head of the Division of Pharmacology at the Squibb Institute, attended a meeting of Dr. Moore's Subcommittee held at Hopkins that focused on the application of penicillin in a medium of peanut oil and beeswax. Dr. Moore and his Johns Hopkins colleagues talked to Drs. Rake and Richardson and discussed the drug's availability for use in a large-scale experiment.

357. Once again, Dr. Parran, Dr. Moore, and their colleagues at The Rockefeller Foundation and Johns Hopkins were positioned to direct and control the research efforts.

358. While penicillin showed great promise, a number of questions remained unanswered. Dr. Moore and Reed wanted to know whether penicillin therapy left subjects immune to further infection or at risk of re-infection with the same or a different strain of the disease. They wanted to know about penicillin's long-term effectiveness. They wanted to know whether administering penicillin before or immediately after exposure would prevent infection or reinfection. And, they wanted to know about the efficacy of penicillin in different dosages, on different schedules, and in different formats. Similarly, Dr. Turner and Dr. Eagle wanted to explore the pathogenicity of *T. cuniculi* in humans and investigate its potential as a cure or treatment for syphilis.

359. As World War II was drawing to a close, Drs. Parran and Moore, and their colleagues at The Rockefeller Foundation and Johns Hopkins, saw their window of opportunity to understand syphilis and answer their questions closing. The war had provided political and public relations cover for Terre Haute, but the environment was changing. The doctors needed immediate access to a large group of uninfected people

who they could test and experiment upon in a location that they could keep away from prying eyes.

G.    The Guatemala Experiments

360.    In 1946, the Penicillin Panel and the Subcommittee on Venereal Diseases were reconstituted as the Syphilis Study Section. Dr. Moore remained Chairman and Drs. Reed, Turner, Eagle, Weed, and Nelson remained on board, continuing Johns Hopkins' control and dominance over research in the field. Two additions furthered their control: Dr. Wintersteiner from Squibb and Dr. K.F. Maxcy, another Johns Hopkins researcher and a Scientific Director at The Rockefeller Foundation.

361.    The goal of the Study Section was to put even greater decision-making authority in the hands of the private scientific community. In reaching this goal, the Section acted as an "autonomous body, to which the PHS provided liaison and administrative support, but not control." Only the academic and non-governmental researchers had voting privileges.

362.    Dr. Parran, Dr. Moore, and their colleagues, had one more opportunity to build on the ethically shaky foundation set by Tuskegee and Terre Haute. They devised a plan to conduct nontherapeutic, nonconsensual medical experiments on human test subjects in Guatemala.

363.    Drs. Wintersteiner, Rake, and Richardson of Bristol Laboratories and the Squibb Institute were brought into the fold at this point. The men were not going to prove penicillin's efficacy in animal studies. The viability (and profitability) of the drug hinged on conducting penicillin G experiments on human test subjects.

364. Like the other doctors involved in the details of the Guatemala Experiments, Drs. Wintersteiner, Rake, and Richardson had a decision to make. In the end, they put the interests of their companies above the well-being of the Guatemalan test subjects.

365. Dr. Moore would later write that he had taken it upon himself to attempt to enlist the interest of competent investigators in this matter, believing that certain aspects of the experimental studies, especially in the effort to produce infection in animals or in man, should be repeated or extended.

366. Guatemala was an ideal location for the Experiments. First, The Rockefeller Foundation had already established an outpost there and it and Johns Hopkins had connections with national and local government officials, some of whom had been sent to Johns Hopkins' Training Center. These officials were highly cooperative and eager to assist.

367. Second, prostitution was legal and its prisons allowed inmates to have sexual contact with commercial sex workers, providing a method of "normal exposure" (sexual transmission) that was not possible in the Terre Haute Experiments.

368. Third, Guatemala had an underdeveloped legal system and was far enough away from the United States that its organizers could hide their actions from "very unscrupulous lawyers," the public, and doctors who would object and call attention to them if they knew what was going to happen.

369. Fourth, the Guatemalans who were to be targeted as test subjects were almost exclusively poor and uneducated, like the Tuskegee subjects, and many were

indigenous people, even more naive and unaccustomed to medical care than the sharecroppers of Macon County, Alabama.

370.   Dr. Moore designed the Guatemala Experiment. He and his colleagues intended for the researchers in Guatemala to experiment upon people who they intentionally infected. The people targeted, selected, infected, and experimented upon included people from four groups: people with mental illnesses committed to asylums, prison inmates, children in state-run orphanages, and children in state-run schools for the poor.

371.   These test subjects were easily accessed in clusters and were overseen by Guatemalan public officials who were eager to participate. People who tested negative would be excluded from the study. People who tested positive were enrolled (unknowingly to them) as test subjects.

372.   The original plan was to infect the adult male test subjects with syphilis through sexual contact with syphilitic commercial sex workers, and to directly inject other subjects with the disease. Dr. Moore and his colleagues intended for some of the test subjects to be given penicillin and other treatments -- at different times and in varying degrees -- to evaluate their efficacy. They also wanted to re-infect test subjects to see if the earlier treatments made them immune or affected additional treatment. In addition, they wanted to compare the effects of people infected through injection and people infected through sexual transmission, to measure whether virulence was lost or increased when the disease was passed through animals.

373.   Because of their experience with Terre Haute, Dr. Parran, Dr. Moore, and their colleagues knew that it would be difficult to infect test subjects. They recognized that direct infection -- through sexual contact or injections -- would likely be needed to infect a large enough number of people to obtain a representative sample, and that they would need to keep the experiments away from the public in both Guatemala and the United States.

374.   While the researchers in Terre Haute had been able to convince federal prisoners to agree to be infected with gonorrhea as part of the war effort, the Guatemalan test subjects had no such motivations.

375.   Rather than risk the experiments failing or word getting out, Dr. Parran, Dr. Moore, and their colleagues used the lesson they learned in Tuskegee: deceive the poor, unsophisticated, and uneducated test subjects so that the subjects believed that the experiments were meant to protect them.

376.   Each of the groups of victims presented their own advantages. People institutionalized for mental illness and prison inmates were isolated, so the risk of outside (non-intended) exposure to syphilis, and other confounding conditions was low or non-existent. Children had the same benefits, but were also young, healthier, and not yet sexually active. They were also more naive and compliant.

377.   In Terre Haute, Dr. Moore and his colleagues spent considerable time drafting and debating a waiver form that all test subjects had to sign. Researchers in the prison were required to spend considerable time and effort explaining the purpose of the study and giving warnings about the specific risks involved: in short, doing the things

necessary to obtain informed consent. Neither Dr. Parran, Dr. Moore, or anyone else who designed the Guatemala Experiments discussed, much less implemented, these procedures in Guatemala. There was no consent form and no informed consent.

378. Designing the Guatemala Experiments to be nonconsensual – deceiving the test subjects and abandoning the informed consent procedures – allowed Drs. Parran and Moore and their colleagues to infect a large group of people very quickly. As one bioethicist explained, "[t]here was a clear deliberate effort to deceive experimental subjects and also the wider community, both the scientific and lay community, that might have objected to the work."[26]

379. Additionally, the Terre Haute prisoners were motivated to participate in experiments because they believed they were aiding the war effort. That motivation did not exist in Guatemala.

380. Finally, the test subjects being targeted in Guatemala -- the mentally ill, prisoners, and children -- could not give informed consent even if attempts were made to do so.

381. The Study Section was scheduled to meet for a three-day conference on February 8, 1946. Dr. Moore and a handful of close associates, including Dr. Parran and Drs. Eagle, Maxcy, Reed, and Turner, discussed how much information to include in the proposal, and how much information to disclose to the other people involved.

---

[26] Dr. Stephen Hauser, Transcript of Meeting 6, Session 1, of the Presidential Commission for the Study of Bioethical Issues (Aug. 9, 2011).

382.   Even though they controlled the Study Section, the doctors wanted to keep the circle of people who knew that the Guatemala Experiments were going to be nonconsensual small. As they learned from their experiences in Tuskegee and Terre Haute, other doctors and scientists were very concerned about the potential for public relations and legal backlash. They were concerned that information in the wrong ears could bring unwanted attention that would force them to stop the experiments and deny them the information they wanted.

383.   In the end, Dr. Moore and his colleagues described the test subjects as "volunteers," even though they never intended to offer the test subjects a choice or obtain informed consent, and did not offer any additional details about who the test subjects would be.

384.   The deception worked. With it, the support of Dr. Moore, and the influence of Dr. Parran and The Rockefeller Foundation, the Guatemala Experiments were approved on the first day of the meetings.

385.   Dr. Moore and his colleagues went to work immediately to limit the number of people who knew about the nonconsensual experiments. Over $100,000 was allocated at the meeting for the Guatemala Experiments. While a contemporaneous report described other pending grants in detail, Dr. Moore and his colleagues were able to prevent the report from mentioning the Guatemala Experiments or who the test subjects were going to be. Later budget reports also failed to mention the Guatemala Experiments. In a handwritten note written months later, Dr. Moore instructed a committee member to rewrite a budget proposal specifically to remove reference to the Guatemala Experiments.

386.    Drs. Moore, Turner, Reed, and Eagle committed Johns Hopkins -- both Department L and Hopkins' syphilology faculty and resources -- to the nonconsensual Guatemala Experiments, with full knowledge of and control over how the Experiments would be conducted. They made this commitment in the ordinary course of their employment and in furtherance of Johns Hopkins' interests. Their decisions were made individually and collectively as Johns Hopkins policymakers and final decision makers. Because Johns Hopkins did not have an institutional review board, these decisions did not require approval from anyone else.   Drs. Moore, Turner, Reed and Eagle had the authority to bind Johns Hopkins themselves, and they did, with their decisions becoming Johns Hopkins' institutional policy.

387.    Dr. Parran committed The Rockefeller Foundation to the Guatemala Experiments with full knowledge of how the Experiments would be conducted. His commitment was also in the course of his employment and with the Foundation's objectives in mind.

388.    Drs. Wintersteiner, Rake, and Richardson committed Bristol Laboratories and the Squibb Institute to the Guatemala Experiments, with full knowledge of how the Experiments would be conducted. Their commitment was also in the course of their employment and with their companies' interests in mind.

389.    These decisions were not policy-making by inertia or an unwitting mistake. Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues consciously chose this course of action among various alternatives, and their choices were made knowing that the Guatemala Experiments would violate the well-established and universal human

rights of the test subjects.   These decisions bound Johns Hopkins, The Rockefeller Foundation, Bristol Laboratories, and the Squibb Institute because the decision-making individuals were endowed by their respective institutions with the authority to bind those institutions.

390.    Selecting the right person to implement the Guatemala Experiments was essential. This person was going to interact with public officials, train and oversee the researchers in Guatemala, solve problems on his own or in consultation with them, and report the information that needed to be reported and leave out the information that could create problems.

391.    Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues selected Dr. Cutler, the same ethically-flexible young PHS researcher who had worked on the Tuskegee Study and run the Terre Haute Experiment.

392.    In addition to selecting Dr. Cutler, they also had to select the right person to serve as the "Responsible Investigator" for the Experiments. The Responsible Investigator was the person charged with the primary responsibility of protecting the rights and well-being of the Experiments' test subjects. The doctors needed someone they could trust with the full details of the Experiments, someone who was willing to allow them to be nonconsensual, and someone who would assist them in concealing what was going on and preventing damaging details from getting out.

393.    Dr. Parran met with Dr. Frederick Soper, a longtime Rockefeller employee and an Associate Director of Rockefeller's International Health Division, and briefed him

about the Guatemala Experiments in 1946. Dr. Soper, a paid employee of the Foundation, agreed to serve.

394.  According to the proposal for the Guatemala Experiments, the "Responsible Investigator" was required to have extensive knowledge of syphilis and in running and overseeing experiments. Dr. Soper met neither of these credentials. He had no expertise working with syphilis and had never overseen an experiment of this type or magnitude. As a result, his involvement could not have been intended to provide any meaningful substantive instruction towards accomplishing the goals of the experiments. Dr. Soper was selected because of his and willingness to conceal the unethical components of the Experiments.

395.  In January 1947, The Rockefeller Foundation assigned Dr. Soper to the Pan American Sanitary Board (PASB) where he was immediately designated as the "Responsible Investigator" for the Guatemala Experiments.

396.  The Rockefeller Foundation had institutional control over the PASB and periodically used it to implement its policies.

397.  Dr. Soper later wrote that his move was not of "abandonment of The Rockefeller Foundation but rather of fulfilling its program."[27] He also wrote that it was "quite in keeping with Foundation policy to make his services available to the PASB" and that is why he remained on the Foundation's staff.[28]

---

[27]    Frederick Soper, *Ventures in World Health*, 317 & 320 (1977).

[28]    *Id.*

398.    Chester Barnard, President of The Rockefeller Foundation, noted that Dr. Soper's move to the PASB was designed to serve its purposes in Latin America. He explained that Dr. Soper was successful because the PASB adopted the IHD's policies and philosophies. The Rockefeller Foundation also gave the PASB an interest-free loan to build a headquarters in Washington D.C.

399.    Prior to Dr. Soper's arrival, the PASB's mission had been to facilitate the exchange of health information among member countries and act as an advisor about Latin American health issues. With Dr. Soper there, the PASB became directly involved inside a member country for the first time in 40 years.

400.    Throughout the Guatemala Experiments, Dr. Soper remained an employee and Associate Director of The Rockefeller Foundation. It paid his entire salary, expenses, and costs. It paid his health insurance and an annuity from which he drew income. He retained free access to Rockefeller Foundation offices in New York, Sao Paulo, Brazil, and Buenos Aires, Argentina. He continued to report directly to the Director of Rockefeller's International Health Division, Dr. George Strode, both in person and through written reports and updates. He wrote reports to The Rockefeller Foundation's Executive Committee detailing the work performed. He wrote multiple letters and reports to Dr. Parran. He received agendas and comments from meetings of The Rockefeller Board of Scientific Directors, even though non-board members had never received them before. He leaked details of PASB policies to Dr. Strode before they became public so the Foundation could adapt its policies. And, he worked behind the scenes with Rockefeller to coordinate their policies with the PASB's policies. As Dr. Lewis Hackett, another

Director of the International Health Division explained, with Dr. Soper's help the two programs did not come into conflict.

401.  Dr. Soper also met with Dr. Delmas K. Kitchen, Medical Director at Bristol Laboratories. The two men discussed the experiments that were going to be conducted, who they were going to be conducted on, and discussed all of the details necessary to test penicillin G.

402.  Given the number of people infected and the timing and amount of penicillin administered, Drs. Wintersteiner, Rake, Richardson, and Kitchen knew that many of the test subjects had received inadequate treatment and were still infected.

403.  In July 1946, a month before the Guatemala Experiments began, Dr. Turner sent rabbits infected with two *T. cuniculi* strains to the PHS laboratory for use in Guatemala. Letters from the time show that Dr. Turner wanted Dr. Cutler to inject *T. cuniculi* into the test subjects to determine its pathogenicity. Dr. Turner knew that the testing would be nonconsensual, but, like the rest of the doctors who collaborated on the Experiments, he knew that he needed a large enough test subject population and enough time to get the data and information he was looking for.

404.  Dr. Cutler went to Guatemala in August 1946 to organize and begin the Experiments.

405.  The Experiments initially faced the same problem that Dr. Cutler experienced in Terre Haute: despite persistent efforts, not enough people were being infected. The "natural method" -- sexual contact with commercial sex workers known to

have syphilis -- was not nearly as effective as Dr. Moore and his colleagues hoped, resulting in only a 17.9% transmission rate.

406.   Direct inoculation proved to be much more effective. Intracutaneous injections of syphilitic material using the same dirty needle "repeatedly" and "without sterilization of any kind from one patient to the next," achieved a 96.8% transmission rate.

407.   Dr. Cutler was also having some difficulty with the Guatemala military. When the wife of Dr. Carlos Tejada, the Chief of the Guatemalan Army Medical Department, fell ill with life-threatening, acute mercury poisoning, Dr. Eagle supplied Dr. Cutler with British anti-lewisite, the antidote for Mercury poisoning, from his lab at Hopkins. British anti-lewisite was not commercially available at the time, so Dr. Eagle's actions to save the life of Dr. Tejada's wife, had a strong effect on Dr. Tejada, and ensured the researchers had open access to military personnel in Guatemala.

408.   Dr. Cutler and his staff exposed prison inmates in the Penitenciaria Central in Guatemala City; psychiatric patients in the Asilo de Alienados in Guatemala City; orphans in the Hospicio Nacional de Guatemala in Guatemala City; school children in a school in Puerto de San Jose; school children at Casa del Niño in Guatemala City, and others to syphilis. According to the records currently available, at least 1,308 psychiatric patients, prison inmates, and soldiers were intentional infected in the Guatemala Experiments from 1946 to 1948. There are also letters indicating that children were infected, though children were not included in these numbers.

409.   The test subjects were injected with syphilis from four sources: rabbits sent from Dr. Turner's lab at Johns Hopkins that had been infected with *Treponeme cuniculli* (*T. cuniculi*, a form of syphilis found naturally in some rabbits); rabbits sent from Dr. Turner's lab and the PHS infected with *Treponema pallidum* (the Nichols strain, a laboratory strain of neurosyphilis not found in Guatemala that had been isolated and modified by researchers at The Rockefeller Foundation and widely studied at Johns Hopkins and other medical facilities in the United States); rabbits sent from the PHS that had the Frew strain (a strain of syphilis taken from a syphilitic patient at a PHS Hospital in Staten Island in 1947); and fluid taken from the chancres of locals with syphilis (referred to as "street strains").

410.   Following the example set in Tuskegee, Dr. Cutler and the researchers on the ground deceived the Guatemalan test subjects about being infected with syphilis and the nature of the experiments. The researchers did not obtain their subjects' informed consent and did not make a serious attempt to minimize risk even though the subjects included such vulnerable populations as soldiers on active duty, prisoners in prisons and jails, sex workers (some as young as 18), children, people with leprosy, people with epilepsy, people with mental illness, indigenous Guatemalans, native people, and poor people. Unlike Terre Haute, the subjects were not told about the goals of the study, the purposes of the study, the methods, the risks, or the social benefits that might be involved.

411.   Also following the example set in Tuskegee, the researchers deflected questions or told test subjects that the injections were for other conditions or their own

good. In a letter, Dr. Cutler complained about how difficult it was to keep his stories straight:

> As you can imagine we are holding our breaths, and we are explaining to the patients and others concerned with but a few key exceptions that the treatment is a new one utilizing serum followed by penicillin. This double talk keeps me hopping at times.

412.  Also, like Tuskegee, Dr. Cutler and his researchers gave some of the test subjects effective treatment for a short period of time and then, without their consent, switched them to placebos. In a letter describing his plans for "treatment" at a large Guatemalan prison, Dr. Cutler explained that they wanted the inmates to grow accustomed to the use of prophylaxis so there would be no difficulty in carrying on with their plan "at the proper time."

413.  Following the directions given to him by Dr. Moore and others in the control group, Dr. Cutler used the same bait-and-switch approach he used in Tuskegee. In a letter he wrote on January 7, 1947, Dr. Cutler explained that in the beginning of the prison experiments he gave some prisoners effective treatments and others placebos without their consent. He explained that this the "scheme" was "acceptable to all concerned" and would "offer the least risk of trouble":

> So far as the work in the prison goes, it appears that it will have to be barred out as a scheme of prophylaxis for everyone, using a placebo where indicated. To increase the number of exposures we shall bring in the sourcs [sic] of the infection [the commercial sex workers] as indicated along with some not infected so as to allay fears and suspicion. In that way, we shall be able to avoid political repercussions which are even now in the air as the papers are complaining about conditions in the prison now. It is quite probable that we shall pay the men either nothing or a pack of cigarettes or some soap or other items for each extraction of blood. We have had many conferences about this matter and the scheme mentioned above seems to be

the one acceptable to all concerned and is one which offers the least risk of any trouble.

414.    Dr. Cutler was less concerned about the indigenous Guatemalans, people he referred to as the "Indians." In a letter written after he arrived, Dr. Cutler explained that with the Indians in the prison we may well do our work with little or no explanation, as they are only confused by the explanations and knowing what is happening.

415.    Also following the same pattern and common scheme from Tuskegee and Terre Haute, Dr. Moore and his colleagues from Hopkins did not stop their involvement at the design and planning stage.

416.    Dr. Moore, like he had done in both of the prior studies, continued to monitor, supervise, support, aide, encourage, participate in, direct and control the Guatemala Experiments throughout. He regularly corresponded with Dr. Cutler, actively directing the work of the researchers in Guatemala, helping when issues arose, and acting as a conduit of data and information from Guatemala to his colleagues at Johns Hopkins.

417.    Dr. Turner continued to send shipments of syphilitic rabbits to the PHS so that they would be passed-on to Guatemala throughout the experiments. By the late spring or early summer of 1947, Dr. Cutler and Dr. Soper had concluded that *T. cuniculi* was "virulent for man." Dr. Turner and Dr. Cutler, directly and through Dr. Charlotte McLeod, a Hopkins trained researcher at the PHS, communicated about infection rates and the similarities and differences between patients infected with *T. cuniculi*, the Nichols strain, and other strains. The information and data Dr. Turner received included

references to the location and ages of the test subjects, meaning that he was fully aware that they were people who could not give consent.

418.     Dr. Turner instructed Dr. Cutler to conduct experiments to explore all avenues of approach, including the potentialities of *T. cuniculi* as an immunizing agent. Though the records are incomplete, documents that are available show that Dr. Cutler conducted at least 15 "immune experiments" using *T. cuniculi* on people in the insane asylum.

419.     Dr. Eagle, along with Dr. Turner, was an expert in the Nichols strain of syphilis (the laboratory strain). He and other researchers at Johns Hopkins had extensively evaluated the strain and understood its pathogenicity through research funded by The Rockefeller Foundation. Dr. Cutler and the researchers on the ground intentionally infected many of the test subjects with the Nichols strain. Dr. Eagle communicated with Dr. Cutler and the researchers on the ground about infection rates and the effects of the Nichols strain on the test subjections. The information and data he received included references to the location and ages of the test subjects, meaning that he was fully aware that they were people who could not give consent.

420.     Between Drs. Turner and Eagle at Hopkins and the PHS, at least 32 sets of rabbits infected with *T. cuniculi*, the Nichols strain, and other strains of syphilis were shipped from the United States to Guatemala throughout the course of the experiments. It appears that these rabbits were used to infect most of the test subjects.

421.     Dr. Eagle also wanted to further his research into whether arsenic and bismuth were effective treatments for patients with syphilis. To that end, he convinced Dr.

Cutler to administer arsenic and bismuth and different levels and times to newly infected test subjects to evaluate their efficacy. Dr. Cutler agreed and not only performed the testing requested but he and his team also closely followed "schedules" of arsenic and bismuth injections developed and refined by Dr. Eagle on an ongoing basis. Like the Nichols strain, the information and data he received included references to the location and ages of the test subjects, meaning that he was fully aware that they were people who could not give consent. Like Dr. Turner, Dr. Moore knew the testing was nonconsensual, but he wanted sufficient time to conduct his work and a large enough test subject population to make it scientifically valid.

422.    Dr. Reed collected and analyzed the data from the Guatemala Experiments. This meant that Dr. Reed and the doctors and researchers under him worked with Dr. Cutler and his researchers on a regular basis, and he was intimately familiar with the ages of the test subjects, where they were tested, and what was being done to them.

423.    Some combination of Drs. Wintersteiner, Rake, Richardson, and Kitchen were also involved in the day-to-day oversight of the Guatemala Experiments. They communicated with Dr. Moore and his colleagues and Dr. Cutler and the researchers in Guatemala to discuss schedules and levels of inoculation. They collected data about the experiments -- including information and data referencing the location and ages of the test subjects – meaning that they were fully aware that the test subjects were people who could not give consent. Like the others, they knew the testing was nonconsensual, but they needed sufficient time and a large enough test subject population to confirm that their drug was effective in treating and preventing syphilis infections and reinfections.

424. Dr. Soper was aware from the outset that the Guatemala Experiments were nonconsensual. Given its concerns about secrecy, The Rockefeller Foundation would not have appointed him to the PASB to be named as the "Responsible Investigator" without thoroughly vetting him. Additionally, when Dr. Cutler was informed that Dr. Soper was coming for an inspection in June 1947, he wrote a letter asking about the extent of Dr. Soper's knowledge – meaning its true purpose – of the project. In response, Dr. Cutler was assured that Dr. Soper was "entitled to complete confidence."

425. During his first visit, and his subsequent visits, Dr. Soper was fully informed about the nature and extent of the Experiments and the results generated. Dr. Soper made direct contact with the test subjects, and knew that they were not and could not give consent.

426. While working as a Rockefeller employee and as the Experiment's "Responsible Investigator," Dr. Soper traveled to Guatemala and met with Dr. Cutler on at least six occasions. Dr. Soper's diary entries confirms that he had dinner at Dr. Cutler's home in Guatemala, toured the various experiment sites with Dr. Cutler, met with Guatemalan government officials with Dr. Cutler, and, for brief periods of time, engaged in the experiments with Dr. Cutler and the researchers on the ground in Guatemala.

427. Dr. Soper also met with Dr. Parran to discuss the Experiments on at least four occasions. During these conversations, Drs. Soper and Parran discussed the Experiments in detail and discussed how they could proceed.

428. The decision makers at The Rockefeller Foundation were aware that the Guatemala Experiments were nonconsensual. They worked with Dr. Moore and his

colleagues to select Dr. Soper and have him appointed "Responsible Investigator." Dr. George Strode, Dr. Soper's supervisor at The Rockefeller Foundation, and Dr. Parran, a Rockefeller board member, received frequent updates from Dr. Soper and shared information back and forth with Dr. Moore at Hopkins.  Dr. Rolla E. Dyer, a Scientific Director of the International Health Division of The Rockefeller Foundation during the Guatemala Experiments, reviewed Dr. Soper's work annually and met with him on more than one occasion to discuss and offer advice on the Experiments. These actions, and the Foundation's ongoing support for the Experiments, show that the Foundation acted with an intent to encourage, support, and aid and abet the nonconsensual experiments in Guatemala.

429.    A letter written in 1947 by Dr. G. Robert Coatney, a PHS researcher, to Dr. Cutler about a conversation he had with Dr. Parran demonstrates that Dr. Parran was very involved and aware of all of the details about the nonconsensual experiments in Guatemala:

> I saw Dr. Parran on Friday and he wanted to know if I had had a chance to visit your project. Since the answer was yes, he asked me to tell him about it and I did so to the best of my ability. He was familiar with all of the arrangements and wanted to be brought up to date on what progress had been made. As you well know, he is very much interested in the project and a merry twinkle came into his eye when he said, "**You know, we couldn't do such an experiment in this country**."

(emphasis added).

430.    Dr. Parran was so involved in the minute details of the Guatemala Experiments that he personally requested an expedited passport for a Rockefeller Foundation employee who was traveling to Guatemala to work on the Experiments.

431.   Experiments performed in other sites – orphanages and schools – followed the same pattern. Test subjects were never told that they were being intentionally infected with syphilis or other STDs, but instead were deceived into believing that they were being given preventative care, or were being treated for fictitious preexisting conditions.

432.   Numerous documents – those surviving the combined efforts of the physicians and researchers to destroy them after the experiments were terminated – demonstrate that there was a concerted effort to avoid letting the larger medical community and the general public in the United States know that the experiments were nonconsensual.

433.   Dr. Cutler was responsible for issuing periodic reports that were distributed to people outside the group that knew that the experiments were nonconsensual. Before he issued his first report, one collaborator wrote to Dr. Cutler in April 1947, expressing his concern that if "some goody organization got wind of the work, they would raise a lot of smoke." He reminded Dr. Cutler to continue the deception:

> In the report, I see no reason to say where the work was done and the type of volunteer. You know the setup best, but be sure that all angles have been covered.

434.   In April of 1947, Waldemar Kaempffert, the science editor for the New York Times, wrote a short article indicating that Dr. Harry Eagle, a medical researcher at the Johns Hopkins School of Hygiene, had discovered that small doses of penicillin, injected within a few days after exposure, prevented syphilis from developing in rabbits. Mr. Kaempffert lamented that to determine whether similar injections would protect humans from syphilis exposure, "it would be necessary to shoot living syphilis germs into

human bodies, just as Dr. Eagle shot them into rabbits," actions that he described as "ethically impossible."[29]

435.    Shortly after the Kaempffert article was published, Dr. Cutler wrote a handful of letters referencing it. In one, written to an official at the PHS, he wrote:

> It is becoming just as clear to us as it appears to be to you that it would not be advisable to have too many people concerned with this work in order to keep down talk and premature writing. I hope that it would be possible to keep the work strictly in your hands without necessity for outside advisors or workers other than those who fit into your and who can be trusted not to talk. We are just a little bit concerned about the possibility of having anything said about our program that would adversely affect its continuation.

436.    The conspirators discussed the need for secrecy, both in the United States and in Guatemala. Dr. Cutler wrote in June of 1947 that "it is imperative that the least possible be known and said about this project, for a few words to the wrong person here, or even at home, might wreck it or parts of it." He explained that the researchers on the ground agreed that they "should do all possible to keep knowledge of [the] project restricted." And, he asked if his reports could be limited to people in the control group. He explained in another letter that he was "just a little bit concerned about the possibility of having anything said about our program that would adversely affect its continuation."

437.    In June 1947, Dr. Mahoney wrote to Dr. Cutler explaining that the people in the control group were "doing our utmost here to restrict our own conversations and those of others bearing upon the matter." In an effort to guard the secret, he explained that all of Dr. Cutler's reports were being sent to a single reviewer "in a way which we hope will

---

[29]    Waldemar Kaempffert, *Notes on science: Syphilis prevention*, N.Y. Times, April 27, 1947.

prevent their being read by unauthorized persons." He also wrote that he hoped Dr. Cutler "[would] not hesitate to stop the experimental work in the event of there being an undue amount of interest in that phase of the study." He explained that "[i]t would be preferable to delay the work than to risk the development of an antagonistic atmosphere."

438.    In July 1947, Dr. Soper wrote a diary entry while in Guatemala. He wrote, "making serological tests in various places, including children in San Jose and in orphanage. ... Some studies in the natural history of syphilis which inoculates the patient with organism of rabbit syphilis have proven that the rabbit strain is virulent for men."

439.    Dr. Moore and others made efforts to conceal details about the Guatemala Experiments. In 1948, for example, Dr. Moore authored a draft budget proposal for the Syphilis Study Section that referenced "the Guatemala study dealing with the transmission of syphilis to human volunteers." After much discussion, Dr. Moore modified it. By the time it was issued, there was no reference to Guatemala or "volunteers;" instead, the line of the budget for Guatemala simply identified it as the "Proposed Research Program in the Field of Syphilis" without providing any other details.

440.    Dr. Moore wrote to the members of the Syphilis Study Section requesting that they comment on a draft letter to be submitted to Dr. Van Slyke, head of the Research Grants Division of the NIH, regarding the research categories proposed for inclusion in the 1949 fiscal budget. In the draft, Dr. Moore wrote that "three applications," including "the Guatemala Study dealing with the experimental transmission of syphilis to human[s]," received $144,923.84 in grants. Other members of

the section advised Dr. Moore to "leave out reference to the Guatemala experiment." Not only did Dr. Moore remove any mention of the Experiments, he wrote that there were only "two applications" and subtracted out the $105,000 allocated to Guatemala to make it appear as if the budget for the Syphilis Study Section's grant applications totaled approximately $40,000 instead of $145,000.

441.    Similarly, in a letter to Col. Donald Longfellow in the Surgeon General's Office, Dr. Moore identified a number of people inside the control group – including his colleague, Dr. Weed, the Dean and Director of Hopkins' Medical School at the time – who had detailed knowledge of the Guatemala Experiments. The letter also shows Dr. Moore's ongoing efforts to keep the details of the Experiments a secret held by a relative few. When he mentioned the "extensive experimental study in human volunteers in Guatemala" to Dr. Longfellow, he noted that he was "not at liberty to quote [the results]" in writing, presumably because he feared the details would get out. From the letter, it appears Dr. Moore preferred to discuss the details of the Experiments in person.

442.    A Recommendation Form written in December 1948, establishes that children in "the National Orphanage in Guatemala City" and "certain school groups in San Jose and others cities in Guatemala" and people in "the insane institution in Guatemala City" were all infected with syphilis as part of the Experiments. Dr. Juan Funes, a local researcher, was tasked with monitoring these people, providing them with various forms of treatment, and reporting on his findings.

443.    In 1949, Dr. Parran resigned as Surgeon General, though he continued his various affiliations with The Rockefeller Foundation. The appointment of a new Surgeon

General risked exposure of the Guatemala Experiments. Dr. Mahoney wrote Dr. Cutler a letter in February stating that because of Dr. Parran's departure, they needed "to get [their] ducks in line" and bring the Experiments "to the innocuous stage as rapidly as possible."

444.   Dr. Cutler left Guatemala for a job as a lecturer at Hopkins in 1950. Over the next few years, Dr. Cutler continued to process data obtained during the Guatemala Experiments and met with and sent reports to Dr. Moore, Dr. Turner, Dr. Soper, and others about his findings. Those reports were never published, but instead, were labeled "SECRET-CONFIDENTIAL," and all of the identifying details contained in the documents were removed. They remained secret for decades.

445.   The Guatemala Experiments continued for a few more years under the supervision of Dr. Soper and Dr. Funes, a Guatemalan doctor whose PHS fellowship was paid by The Rockefeller Foundation. Dr. Funes traveled to Baltimore for meetings with agents and employees of Hopkins, and reported to individuals at Hopkins and Rockefeller about the Experiment's human subjects.

446.   Additionally, patient cards from that time establish that while Dr. Cutler was working at Hopkins he continued to be very involved in the Experiments. One patient card, for example, has handwritten entries from Dr. Cutler dated September 1952 and April 1954, where he provided clinical advice for the ongoing treatment of one of the test subjects who had been infected with syphilis.

447.   When the Guatemala Experiments were terminated, there was no public comment or explanation. The research sites closed down and all interaction with the test subjects were terminated.

448.   The Guatemalan test subjects were never told that they had been infected with syphilis, warned about the consequences of being exposed to and infected with it, or given any follow-up care, treatment, or education to minimize their pain and suffering. In fact, when the experiments were terminated, nothing was done to prevent the Guatemalan test subjects from passing the diseases on to their sexual partners, spouses, children, and other descendants. Generations of Guatemalans have suffered and died, and will continue to suffer and die, from these diseases.

H.   1950s to 2010

449.   The Guatemala Experiments and the intentional infection of Guatemalan psychiatric patients, prison inmates, soldiers, and children were kept secret for more than sixty-years.

450.   Dr. Parran, Dr. Moore, Dr. Wintersteiner and their colleagues knew that their actions would impact Guatemala for generations. Dr. Moore had written several articles discussing the transmission rate from syphilitic mothers to children. In one, he estimated that syphilitic women who became pregnant gave birth to living syphilitic infants -- infants that with congenital syphilis and could pass the disease on to others -- more than half the time. As leading men in their field, this was not new information to them.

451.    The doctors and researchers involved in the Guatemala Experiments were avid writers of textbooks, medical journal articles, and other material; they spent their lives publishing articles about their research. Despite this fact, none of them ever submitted a single article about the Guatemala Experiments for review or publication.

452.    Dr. Moore, for example, wrote an article published in 1950 reporting on recent American advances in venereal disease research. Even though he surveyed the federally supported research conducted from 1947 to 1949, and wrote about tests and processes that the researchers in Guatemala had used, he did not even reference the Guatemala Experiments at all.

453.    While Bristol Laboratories and the Squibb Institute ultimately obtained approval for the use of penicillin G, they never cited to the Guatemala Experiments or produced and any records generated there.

454.    In 1958, The Rockefeller Foundation sent a letter to all of its active and former officers and staff reminding them that any Rockefeller papers they have in their possession were the property of the Foundation and may not be sold, given away, published, or quoted without the Foundation's consent.

455.    Dr. Jonathan Zenilman, a current Hopkins Professor, explained that given how frequently the men involved published, "[s]omebody must have told them to stop the work, and put a stop to it, and . . . don't publish."

I.    Fraudulent Concealment and Conspiracy

456.    As set forth in "the Defendants" section and in this section, the Defendants entered into an agreement and conspiracy to design, develop, and implement the

Guatemala Experiments. They were very concerned about scrutiny – scrutiny by the test subjects, scrutiny by other academics and researchers, scrutiny from the American public, scrutiny from the Guatemalan public, scrutiny from "goody organizations," and scrutiny from "unscrupulous lawyers." Every decision the Defendants made, at every level of the conspiracy, focused on misdirection, deception, and avoiding scrutiny. And, it used fraud as a tool to make this happen.

457.   Johns Hopkins and The Rockefeller Foundation used their power and influence to design and develop the Guatemala Experiments and to get them approved. They worked with a small group of people in the federal government to lay the groundwork – facilities, access, manpower, and other resources – for the Experiments.

458.   As the planning progressed, the predecessors of Bristol-Myers Squibb joined the conspiracy and provided other assistance – penicillin G, scientists and others to develop schedules, scientists and others to fine-tune and oversee the use of penicillin in Guatemala, and information and oversight as the work was conducted and concluded. The researchers on the ground interacted with, and ultimately followed, the lead of the Bistol and Squibb scientists.

459.   The facts outlined above show that the Defendants coordinated with each other and other members of the conspiracy, received continual updates, worked with each other and others in the control group to overcome obstacles and obtain greater access to the test subjects, and instituted operational security procedures – limiting written communications, discussing matters in meetings, destroying documents, and others – to protect the Experiments and ensure that they continued.

460.    Though other people and entities were added to the conspiracy over time, Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb exerted substantial and significant control over it. Without their combined efforts, the Guatemala Experiments would not and could not have happened.

461.    The tools and protocols of the deception and fraudulent concealment that happened in the United States and Guatemala arose out of the lessons Dr. Moore, Dr. Parran, and their colleagues learned in Tuskegee and Terra Haute. The similarities are striking: they instructed the researchers to deflect questions, give evasive or incomplete answers, and lie. They used effective medical treatment to draw people in, infected them with syphilis, and then gave them placebos as they watched what happened. And, they regularly communicated about the need to keep information away from the test subjects, other scientists, and other people outside the control group.

462.    As the Defendants planned, the Plaintiffs accepted the lies and deceptions they were given and never questioned what was done to them, even after suffering from physical symptoms that they incorrectly attributed to natural causes.

463.    The Defendants, directly and in concert with one another and others, also acted to conceal the Experiments after they were abruptly discontinued. They instructed the researchers on the ground to close their facilities and not tell the test subjects anything. The researchers followed these instructions and did not tell the test subjects they had been experimented upon, they had been exposed to or infected with syphilis or a disease, and they did not give them health information or education so they could minimize their pain and suffering or prevent the passage of the disease to their sexual

partners, spouses, children, and grandchildren. They researchers closed the facilities and then left Guatemala, removing any connection to the Defendants.

464.    The Defendants' concealment and conspiracy of silence continued for decades. The doctors and researchers involved -- who spent their lives publishing papers and writing chapters describing their research -- were told not to publish anything about the Experiments. They were told to destroy their notes and other paperwork and to not mention what had gone on in Guatemala. The fact that the truth about Guatemala did not come out until September 2011 -- more than 60 years later -- shows how successful the Defendants' conspiracy and concealment efforts were.

465.    The Defendants also continue to fraudulently conceal their involvement in the Guatemala Experiments. Even after the Experiments were discovered and publicized in September 2011, each of the Defendants made public statements denying any role or involvement in them.

466.    Neither the direct nor indirect victims had any reason to know they were impacted and injured as a result of the Guatemala Experiments until sometime after 2011 when the Guatemala Experiments were publicized.

J.    The United States' Investigation

467.    Susan Reverby, a Professor of Women's and Gender Studies at Wellesley College, was conducting research into the Tuskegee Study when she unearthed long-hidden documents containing information about the Guatemala Experiments. In 2010, she passed an unpublished paper about the Experiments onto a colleague who, in turn, passed it onto government officials in the health care field.

468.   On October 1, 2010, President Barack Obama telephoned President Alvaro Colom of Guatemala to apologize for actions of the researchers. During the call, President Obama expressed "deep regret" for the actions of the American researchers and extended his apology "to all those affected."

469.   In November 2010, President Obama asked the United States Presidential Commission for the Study of Bioethical Issues to conduct a fact-finding investigation into the Guatemala experiments. He instructed the Commission to seek the insights and perspective of international experts, including from Guatemala, consult with its counterparts in the global community, and provide him with a report of its findings and recommendations.

470.   The United States Presidential Commission reviewed documents from the National Archive, Pan American Health Organization, Department of Defense, Department of Veterans Affairs, and others. It requested, but did not receive, documents from the government of Guatemala. The Commission conducted three public hearings where it heard from experts in law, history, medicine, and ethics, and received testimony from members of the public."

471.   The Presidential Commission did not hear from the Guatemalan test subjects themselves, however. It appears that no, or at least little, effort was made to interview them.

472.   In September 2011, the Commission issued its report, entitled "Ethically Impossible: STD Research in Guatemala from 1946 to 1948." Though the Commission was missing important information, and the report was limited in some key respects, it

found substantial evidence reflects efforts by the researchers to limit knowledge of the Guatemalan activities as much as possible to colleagues predisposed to support it.

473.   After reviewing the information it developed, the Commission described the Guatemala experiments as unconscionable, gross violations of ethics, egregious moral wrongs, and violations of human rights and morality, not only in light of modern ethical norms, but also against the researchers' own understanding of medical ethics practices and requirements of the day. It explained that the actions of those involved truly shock the conscience, precisely because of their medical context.

474.   The Commission did not focus its attention on the American doctors and medical institutions involved, Johns Hopkins, The Rockefeller Foundation, or Bristol-Myers. It did not interview employees of any of these institutions, or review documents that they possessed.

475.   Despite this, the Commission still noted that "leading academic scientists" encouraged and supported the work "hidden from public scrutiny in the United States." It stated that these people targeted the most vulnerable populations in Guatemala "because of their inability to protect themselves or to have others represent their interests." These individuals, the Commission explained, were also morally culpable for the wrongs committed in Guatemala.

K.   The Guatemalan Investigation

476.   After President Barack Obama telephoned President Alvaro Colom of Guatemala to apologize in October 2010, President Colom called the experiments crimes against humanity. Following President Obama's lead, he issued a decree forming the

Guatemalan Presidential Commission for Elucidation of the Experiments Conducted on Human Subject in Guatemala During the Period of 1946 to 1948 and asking it to conduct its own, parallel investigation.

477.   The Guatemalan Presidential Commission reviewed documents from the Central American Archives, Guatemalan National Police Historical Archives, and the Directorate of the Guatemalan Peace Archives. Legal analysis was provided by the office of the Guatemalan Attorney General and the final ethics opinion was issued by the Guatemalan Health Department's National Committee on Ethics.

478.   The Guatemalan Presidential Commission largely echoed the findings of the American Presidential Commission, repeatedly commenting on the flagrant, deliberate violation of the Guatemalan test subjects. It explained that the experimentation constituted a violent transgression of the dignity of the individuals involved, of the medical profession, and society, calling it an immoral act of huge impact and a crime against humanity.

479.   The historical context was not lost on the Guatemalan Commission. It noted that the Guatemalan Experiments were getting started at the same time Nazi doctors and corporations were being sentenced for engaging in the same type of nonconsensual experiments. This was particularly damning given the issuance of the Nuremberg Code which specifically prohibited this type of practice.

480.   Further, like the United States President Commission, the Guatemalan Presidential Commission concluded that the planners and implementers of the experiments were successful in keeping their actions hidden.

L.     Plaintiffs' Counsel's Investigation

481.   Plaintiffs' counsel built on the information obtained during the American and Guatemalan Commission investigations, reviewing the Commission's documents, but also many other documents not reviewed by either Commission. Investigators, working with Guatemalan health officials, used government documents to identify many of the test subjects, and tracked them and their descendants down so they could be interviewed and tested.

482.   All of the Plaintiffs have syphilis and many have the Nichols strain, demonstrating that they were infected directly or indirectly as a result of the Guatemala Experiments and the actions of the Defendants.

483.   As outlined elsewhere, none of the Plaintiffs were aware that they had syphilis or that their syphilis came from the Guatemala Experiments until well after September 2011, when they were identified, contacted, and tested.

**COUNT I**
**TORTIOUS VIOLATION OF WELL ESTABLISHED AND**
**CUSTOMARY NORMS OF INTERNATIONAL LAW –**
**THE PROHIBITION AGAINST NONCONSENSUAL HUMAN**
**EXPERIMENTATION AND CRIMES AGAINST HUMANITY**

484.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference as if they were fully set-forth herein.

485.   The Alien Tort Statute (ATS), codified as 28 U.S.C. § 1350, provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." It

authorizes non-United States citizens to assert claims in federal district courts, and federal district courts to recognize international law causes of action, arising from torts that violate customary international law or a treaty of the United States. ATS claims can be brought for direct violations and accessory violations, including vicarious liability, aiding and abetting, and civil conspiracy. Federal common provides remedies for these violations.

486.   ATS claims are, by definition, "hybrid common law-international law claims." International law defines the legal norms at issue and federal common law provides remedies to foreign nationals injured as a result of the violation of those norms.

487.   All of the Plaintiffs in this case, with the exception of Ramiro Anibal Galvez Ortiz (Plaintiff No. 76), are "aliens" within the meaning of the ATS.   These people, referred to in this Count as "Plaintiffs" or "ATS Plaintiffs," are foreign nationals and citizens of Guatemala. They are not citizens of the United States.

488.   The prohibition against nonconsensual human experimentation is well-established and universally condemned under customary international law.

489.   During the Nuremberg Trials, which occurred before the Guatemala Experiments, the International Military Tribunal was given the power to try and punish people who acted in the interest of the Axis powers, whether as private persons or as members of a corporation. In addition to twenty-two "major" Nazi war criminals, the Tribunal tried a number of doctors and German industrialists. In the first of these cases, known as the "Doctors' Trials", fifteen German doctors were tried for performing nonconsensual human experiments, including the testing of drugs for immunization

against malaria, epidemic jaundice, typhus, smallpox, and cholera, during World War II. The Tribunal rejected the doctors' argument that there were no universal standards of research ethics. It found that "human experiments [on non-consenting test subjects] are contrary to the principles of the law of nations as they result from usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." The doctors were hanged and the German corporations were forced to pay penalties and dismantled.

490. <u>The prohibition against nonconsensual human experiments and crimes against humanity</u>. The prohibition against nonconsensual human experimentation is derived from numerous and varied international and domestic arenas including, but not limited to, the following laws, agreements, resolutions, treaties, conventions, customs, decisions, teachings and pronouncements:

a.  Hippocratic Oath, 500 B.C.,

b.  Teachings of Plato in the Laws, 428 B.C.-348 B.C.,

c.  Decision of the High Court of Justice of England and Wales, King's Bench Division, in <u>Slater v. Baker and Stapleton</u>, 1767,

d.  Teachings of Willcock, John William, The Laws Relating to the Medical Profession, 1830,

e.  The Beaumont Code, 1833,

f.  Code of Ethics of the American Medical Association, 1847,

g.  An Act to Consolidate and Amend the Statute Law of England and Ireland Relating to Offences Against the Person, 1861,

h.  Decision of the Leeds Assizes in the Case of the Extensive Diffusion of Syphilis by a Midwife, 1883,

149

i.      An Act to Consolidate and Amend in Certain Respects the Criminal Law of New South Wales, 1883,

j.      Teachings of Jaggard, Edwin, Hand-Book of the Law of Torts, 1895,

k.      Teachings of Osler, M.D., William, in The Principles and Practice of Medicine, 1898,

l.      Decision of the Prussian Royal Disciplinary Court in the Case of Albert Neisser, 1900,

m.      Regulations Issued by the Royal Prussian Minister of Religious Educational and Medical Affairs, 1900,

n.      Decision of the Supreme Court of Minnesota in *Mohr v. Williams*, 1905,

o.      Section 229 of German criminal law, 1905,

p.      Teachings of Osler, M.D., William, in the Congress of American Physicians and Surgeons, 1907,

q.      Teachings of the Earl of Halsbury, in The Laws of England, Being a Complete Statement of the Whole Law of England by the Right Honourable the Earl of Halsbury, Lord Chancellor of Great Britain,

r.      Teachings of Hornsby, M.D., John Allan, in The Modern Hospital, 1913,

s.      Decision of the New York Court of Appeals in *Schloendorf v. Society of New York Hospital*, 1914,

t.      Teachings of W. B. Cannon in "The Right and Wrong of Making Experiments on Human Beings," Journal of the American Medical Association, 1916,

u.      Decision of the Delaware Superior Court in *State v. Lankford*, 1917,

v.      Article 20, Section 242(1) of the New York Penal Code, 1921,

w.      Pan American Sanitary Code, 1924,

x.      Circular of the Reich Minister of the Interior, the German Weimar Republic, Guidelines for Human Experimentation, 1931,

y.      Decision of the Supreme Court of Michigan in *Fortner v. Koch*, 1935,

z.      Inter-Allied Resolution on German War Crimes, January, 1942,

aa.     Moscow Declaration of the United States, the Soviet Union and the United Kingdom, "speaking in the interest of the thirty-two United Nations", October, 1943,

bb.     Charter of the United Nations, June, 1945,

cc.     Potstdam Conference Convened by the United States, the Republic of China and Great Britain, and their Joint Potsdam Declaration Calling for Justice for Victims of Japanese Cruelty and Respect for Fundamental Human Rights, July, 1945,

dd.     Establishment of the International Military Tribunal for the Prosecution of Nazi War Criminals (Including Nazi Doctors) by the United States, Soviet Union, United Kingdom and France "acting in the interest of all the United Nations" in the London Agreement and London Charter of August 8, 1945,

ee.     Allied Control Council Law No. 10 of December 20, 1945,

ff.     Indictment of Nazi Doctors before the International Military Tribunal in Nuremberg for Conducting Nonconsensual, Nontherapeutic Human Experiments, November 21, 1946,

gg.     Requirements for Experiments on Human Beings, Report of the Judicial Council Adopted by the House of Delegates of the American Medical Association, December, 1946,

hh.     Conviction of Nazi Doctors in the International Military Tribunal in Nuremberg for Conducting Nonconsensual, Nontherapeutic Human Experiments, August, 1947,

i.      Nuremberg Code of August, 1947,

jj.     Decision of the Supreme Commander of the Allied Powers Granting Immunity from Prosecution to Japanese Imperial Army Medical Corps Researchers for Conducting Nonconsensual, Nontherapeutic Human Experiments from 1934-1945, March, 1948,

kk.    Charter of the Organization of American States, April, 1948,

ll.    American Declaration of the Rights and Duties of Man, April 1948,

mm.    United Nations General Assembly, Universal Declaration of Human Rights, December, 1948,

nn.    World Medical Assembly, International Code of Medical Ethics, October, 1949,

oo.    Decision of the Soviet Khabarovsk Tribunal Convicting Japanese Imperial Army Medical Corps Researchers for Conducting Nonconsensual, Non-Therapeutic Human Experiments from 1934-1945, December, 1949,

pp.    Teachings of Wiggers, Carl J., Basic Ethical Principles for the Conduct of Human Experiments, 1950,

qq.    World Medical Assembly, Principles for Those in Research and Experimentation, 1955,

rr.    World Medical Association, Declaration of Helsinki, 1964,

ss.    Judgments of the Tuskegee Syphilis Study Ad Hoc Advisory Panel, Convened by the United States Public Health Service, 1972,

tt.    Findings of the Select Committee on Intelligence and the Select Committee on Health and Scientific Research of the Committee on Human Resources, United States Senate, Regarding MKULTRA Experiments, 1977,

uu.    Council for International Organizations of Medical Services, International Ethical Guidelines for Biomedical Research Involving Human Subjects, 1982,

vv.    United Nations General Assembly International Covenant on Civil and Political Rights, 1982,

ww.    United Nations General Assembly Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1984,

xx.    World Conference on Human Rights, Vienna Declaration and Programme of Action, 1993,

yy.     European Convention on Human Rights and Biomedicine, 2005,

zz.     customary international law,

aaa.    common law of the United States of America,

bbb.    common law of the State of Maryland, and

ccc.    other applicable sources of legal norms.

491.    The prohibition against crimes against humanity is also well-established and such crimes are and, at all relevant times were, universally condemned under customary international law.

492.    <u>Deliberate and intentional acts</u>. The Defendants, directly and by and through their agents, servants, and employees, deliberately and intentionally violated the well-established and customary norms of international law prohibiting nonconsensual human experimentation and crimes against humanity. They made conscious decisions to design and develop the Guatemala Experiments so they would be nonconsensual and nontherapeutic. They made conscious decisions to gather support from other academics and the government and obtain approval for the Experiments. They made conscious decisions in directing and overseeing the implementation of the Experiments, including frequent communications with each other, Dr. Soper, Dr. Cutler, and the researchers on the ground. And, they made conscious decisions in keeping the Experiments a secret and covering them up for decades.

493.    <u>Knowledge and Purpose</u>. At all times relevant to this cause of action, the Defendants and their agents, servants, and employees acted with the knowledge that the

Guatemala Experiments would be nonconsensual and nontherapeutic and constitute crimes against humanity.

494.    The Defendants and their agents, servants, and employees intentionally and purposefully <u>designed</u> and <u>developed</u> the Experiments to be nonconsensual and nontherapeutic and to constitute crimes against humanity. They wanted to infect as large a pool of potential test subjects with syphilis as possible in as little time as possible, and decided that obtaining informed consent would compromise both goals. They knew how to create and implement protocols to obtain informed consent and waivers, they had been forced to do so in Terra Haute. They didn't want that type of restriction in Guatemala. Instead, they made a conscious, purposeful decision to make the Experiments nonconsensual because they wanted to act quickly before changing political leadership, fears of public reaction and lawsuits, or inadvertent disclosure forced them to stop prematurely, the way they felt it had happened in Terra Haute. They chose not to design or create procedures and protocols with respect to obtaining informed consent – procedures and protocols that they had implemented in prior experiments. They targeted and selected test subjects – mental patients, prisoners, and children – that could not provide consent. And, they adopted and adapted much of the nonconsensual, nontherapeutic testing model they had created, designed, and implemented in Tuskegee.

495.    The Defendants and their agents, servants, and employees acted to ensure the Experiments would be <u>implemented</u> in violation of the prohibitions against nonconsensual human experimentation and crimes against humanity. They purposefully selected the team of researchers that would implement the Experiments on the ground –

the same men who had implemented the nonconsensual, nontherapeutic Tuskegee Study – because they knew they would implement their plan for nonconsensual, nontherapeutic experiments and could be trusted to not disclose the nature of the experiments. They also took a direct role in instructing the men not to obtain consent. Like in Tuskegee, they instructed the men on the ground to tell the test subjects that they were receiving treatment for unrelated or nonexistent conditions, not to tell them they were being experimented upon, not to disclose the true nature of the experiments, and to deflect questions, give evasive or incomplete answers, and lie to the test subjects. And they acted knowing that their decisions would result in hundreds of men, women, and children being infected with an extremely painful and debilitating disease that they would pass on to their sexual partners, spouses, children, and grandchildren.

496.   The Defendants knew and it was foreseeable that their employees would injure and harm the Guatemalan test subjects.

497.   And, the Defendants and their agents, servants, and employees to ensure the Experiments would continue to be implemented in violation of the prohibitions against nonconsensual human experimentation and crimes against humanity. Throughout the course of the Experiments, and with knowledge that they were being conducted in a nonconsensual, nontherapeutic manner, the Defendants continued to support them. They isolated, produced, and shipped various strains of syphilis; they oversaw the Experiments on the ground, providing technical and medical assistance; they acted to protect the Experiments in both Guatemala and the United States; and they interacted with the men on the ground in the collection and analysis of the experimental data. Each of these

actions constituted a conscious, purposeful decision to violate the rights of the test subjects.

498. <u>Direct Action</u>. The individual doctors named in the Defendants Section, the Fact Section, and this Section, and others in their respective institutions, were given policymaking and decision making authority and the final power to bind their institutions by their decisions. When these men acted to design, develop, approve, encourage, direct, oversee, participate in, implement, cover-up, and aid and abet the Experiments, as institutions and collectively as part of a conspiracy, they committed their respective institutions to the Guatemala Experiment, and their actions and decisions became their respective institutions' policies and those policies, made their institutions directly liable for the foreseeable consequences of their actions. Johns Hopkins, The Rockefeller Foundation, and Bristol-Myers Squibb gave these men the power to act on their behalf, and the corporations are legally responsible for the grave and foreseeable harms and injuries caused by their decisions and actions.

499. <u>Conspiracy</u>. The Defendants and their agents, servants, and employees knowingly and purposefully joined and participated in a conspiracy, consisting of a plurality of corporations, institutions, and people, to violate the prohibitions against nonconsensual human experimentation and crimes against humanity. The Defendants knew that the Experiments would be nonconsensual and constitute crimes against humanity and intentionally, consciously, and purposefully joined and participated in the enterprise.

500.   The Defendants knowingly and purposefully agreed, or took concerted action, with each other and others to participate in a series of unlawful acts. And each Defendant, directly and through their agents, servants, and employees, performed one or more overt acts pursuant to and in furtherance of the common scheme.

501.   The Defendants are liable for the violations of the rights of the Direct Plaintiffs and ATS Plaintiffs because they collectively made conscious decisions to participate in the conspiracy and they took action, individually and collectively, as part of a common scheme and plan to design, develop, approve, encourage, direct, oversee, implement, and cover-up the nonconsensual, nontherapeutic, human subject experiments in Guatemala.

502.   Aiding and Abetting. The Defendants and their agents, servants, and employees, deliberately, intentionally, and purposefully aided and abetted others who violated the well-established and customary norms of international law prohibiting nonconsensual human experimentation and crimes against humanity. When the individual doctors identified in the Defendants Section, Facts Section, and below, were given decision making and policymaking authority from their institutions, they made conscious and deliberate decisions to aid and abet the design, development, and implementation of the Experiments and to cover them up and keep them hidden from public or legal scrutiny. These decisions made the institutions legally responsible for the grave and foreseeable harms and injuries they caused.

503.   Each of the Defendants aided and abetted the Guatemala Experiments in different ways. However, the intent and purpose of their actions was to encourage and

make it possible for Dr. Soper, Dr. Cutler, and the researchers on the ground to conduct the nonconsensual experiments and infect the test subjects, including the Direct Plaintiffs, with syphilis.

504.   The Defendants' practical assistance had a substantial effect on the actions of Dr. Cutler and the researchers on the ground in conducting the nonconsensual experiments and infecting the test subjects, including the Direct Plaintiffs, with syphilis. The Defendants' actions caused the Direct Plaintiffs and their Spouses, Children, and Grandchildren to suffer grave and foreseeable damages.

505.   <u>Vicarious liability</u>. As corporate entities, the Defendants are vicariously liable for the tortious actions of their agents, servants, and employees. The individual doctors named in the Defendants Section, the Fact Section, and in this Section, and others in their respective institutions, acted as their agents, servants, and employees and acted within the scope of their employment for, what they believed, was the benefit of their principles, masters, and employers. These actions violated the well-established and customary norms of international law prohibiting nonconsensual human experimentation and crimes against humanity. To the extent that there was institutional control over these persons, the Defendants failed in their duties to properly oversee, supervise, and control these persons and their failures caused or contributed to all of the harms and injuries described.

506.   As outlined in the Defendants Section, the Facts Section, and below, the Defendants violated the prohibitions against nonconsensual human experimentation and crimes against humanity in the following ways:

Johns Hopkins

507.   Drs. J. Earle Moore, Dr. Lowell Reed, Dr. Thomas Turner, and Dr. Harry Eagle, individually and collectively, used their institutional policymaking and decision making power to cause Johns Hopkins, as an institution, to knowingly and intentionally violate the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

508.   They also, or alternatively, used their institutional policymaking and decision making power to join a conspiracy with the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

509.   They also, or alternatively, used their institutional policymaking and decision making power to aid and abet the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

510.   These doctors, acting as Johns Hopkins or on their own, put the interests of "science" and Johns Hopkins above the interests of the Direct Plaintiffs, Spouses, Children, and Grandchildren they knew would and did suffer and die as a result.

511.   Dr. Moore. Dr. Moore was the Director of Department L and the head of a large, multi-departmental team of Hopkins' doctors and researchers who were conducting research on sexually transmitted diseases. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing Hopkins and the doctors, researchers, and resources under his control at Hopkins to the Guatemala Experiments.

512.   Dr. Moore exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that Hopkins and its doctors would participate in the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

513.   Dr. Moore engaged in fraud and deceit so the Guatemala Experiments would be approved, designed and developed the Experiments' nonconsensual testing protocols, oversaw the selection of Dr. Cutler as the Experiments' ranking doctor and Dr. Soper as its "responsible investigator" with instructions to allow nonconsensual experimentation and prevent anyone outside a close circle of conspirators to know about the true nature of the Experiments, oversaw the selection of the Guatemalan test subjects – including people with mental illnesses and children who could not give informed consent,  oversaw the day-to-day conduct of the researchers on the ground in Guatemala as they conducted the nonconsensual experimentation, facilitated the shipping of rabbits infected with *T. cuniculi* and the Nichols strain to Guatemala so they could be used to infect the Guatemalan test subjects, and engaged in fraud and deceit to cover-up the nonconsensual nature of the Experiments at the time it was terminated and for decades after that and until his death.

514.   <u>Dr. Reed</u>. Dr. Reed was the Dean and Director of the Hopkins School of Public Health, head of the Department of Biostatistics, the Vice President of Hopkins University, the Vice-President of Hopkins Hospital, and, starting in 1950, was the President of Johns Hopkins University. He had authority to enter into a binding

agreement with the other Defendants, the PHS, and third parties, committing Hopkins and the doctors, researchers, and resources under his control at Hopkins to the Guatemala Experiments.

515.    Dr. Reed exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that Hopkins and its doctors would participate in the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

516.    Dr. Reed engaged in the same conduct as Dr. Moore, and also used the staff and resources of the School of Public Health, Department of Biostatistics, and Johns Hopkins University to support, encourage, and aid and abet the nonconsensual experiments.

517.    <u>Dr. Turner</u>. Dr. Turner was the Chair of Hopkins' Department of Bacteriology and later became the Dean of the Hopkins School of Medicine. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing Hopkins and the doctors, researchers, and resources under his control at Hopkins to the Guatemala Experiments.

518.    Dr. Turner exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that Hopkins and its doctors would participate in the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

519.   Dr. Turner engaged in the same conduct as Dr. Moore, and also infected rabbits with *T. cunniculi* and the Nichols strain and shipped them to Guatemala (directly or through the PHS); instructed Dr. Cutler to infect test subjects with *T. cuniculi* to test it pathogenicity and to evaluate it as a treatment, instructed Dr. Cutler to infect test subjects with the Nichols strain, oversaw the researchers as they experimented on the test subjects, and used the staff and resources of the Department of Bacteriology to support, encourage, and aid and abet the nonconsensual experiments.

520.   <u>Dr. Eagle</u>. Dr. Eagle was the Director of the Johns Hopkins Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing Hopkins and the doctors, researchers, and resources under his control at Hopkins to the Guatemala Experiments.

521.   Dr. Eagle exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that Hopkins and its doctors would participate in the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

522.   Dr. Eagle engaged in the same conduct as Dr. Moore, and also infected rabbits with *T. cuniculi* and the Nichols strain and shipped them to Guatemala (directly or through the PHS); instructed Dr. Cutler to infect test subjects with the Nichols strain, sent arsenic and bismuth to Guatemala so Dr. Cutler and the researchers there could experiment on the test subjects without their consent, oversaw the researchers as they

experimented on the test subjects, used fraud and deceit to cover-up the nature of the Experiments by arranging for Dr. Cutler to come to Hopkins as the Experiments were winding down so Dr. Eagle could prevent Dr. Cutler from disclosing information that he and others wanted to keep confidential, and used the staff and resources of the Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics to support, encourage, and aid and abet the nonconsensual experiments.

523.   <u>The President and Board of Johns Hopkins</u>. In the alternative, if the named doctors lacked the institutional decision making and policy making power to commit Johns Hopkins to the Guatemala Experiments, their actions were approved, adopted, ratified, and given institutional decision making and policy making power by Johns Hopkins' Presidents and Boards. Their actions were so significant and occurred over such a long period of a time that they constituted institutional policies and actions.

<u>The Rockefeller Foundation</u>

524.   Drs. Thomas Parran, Frederick Soper, and George Strode, individually and collectively, The Rockefeller Foundation, as an institution, to knowingly and intentionally violate the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

525.   They also, or alternatively, used their institutional policymaking and decision making power to join a conspiracy with the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

526.   They also, or alternatively, used their institutional policymaking and decision making power to aid and abet the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

527.   These doctors, acting on behalf of The Rockefeller Foundation, put the interests of "science" and The Rockefeller Foundation above the interests of the Direct Plaintiffs, Spouses, Children, and Grandchildren they knew would and did suffer and die as a result.

528.   Dr. Parran. Dr. Parran was a trustee and Chairman of The Rockefeller Foundation's Board of Directors, a member of The Rockefeller's Board of Scientific Directors, and a Scientific Director for Rockefeller's International Health Division. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing the Foundation and the doctors, researchers, and resources under his control to the Guatemala Experiments.

529.   Dr. Parran exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that The Rockefeller Foundation and its doctors would participate directly in, join a conspiracy for the purpose of effectuating, or aid and abet the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

530.   Dr. Parran engaged in fraud and deceit so the Guatemala Experiments would be approved, designed and developed the Experiments' nonconsensual testing

protocols, joined a conspiracy to effectuate the Experiments, aided and abetted the accomplishment of the Experiments, oversaw the selection of Dr. Cutler as the Experiments' ranking doctor and Dr. Soper as its "responsible investigator" with instructions to allow nonconsensual experimentation and prevent anyone outside a close circle of conspirators to know about the true nature of the Experiments, assigned Dr. Soper to the PASB so he would be able to oversee and control the Experiments, oversaw the selection of the Guatemalan test subjects – including people with mental illnesses and children who could not give informed consent,  oversaw the day-to-day conduct of the researchers on the ground in Guatemala as they conducted the nonconsensual experimentation, facilitated the shipping of rabbits infected with *T. cuniculi* and the Nichols strain to Guatemala so they could be used to infect the Guatemalan test subjects, and engaged in fraud and deceit to cover-up the nonconsensual nature of the Experiments at the time it was terminated and for decades after that and until his death.

531.   <u>Dr. Soper</u>. Dr. Soper was an Associate Director of Rockefeller's International Health Division and the "responsible investigator" for the Guatemala Experiments. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing the Foundation and the doctors, researchers, and resources under his control to the Guatemala Experiments.

532.   Dr. Soper exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed to serve as the "responsible investigator" for the Experiments so they could be nonconsensual and hidden through lies and deceit from the doctors outside of the small circle of conspirators

and the public. In accepting this position, Dr. Soper knowingly and intentionally disregarded his obligations to protect the rights and well-being of the Guatemalan test subjects and caused them to be gravely harmed. He also exercised his power when he agreed to remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

533.    Dr. Soper oversaw the selection of the Guatemalan test subjects – including people with mental illnesses and children who could not give informed consent, oversaw the day-to-day conduct of the researchers on the ground in Guatemala as they conducted the nonconsensual experimentation, facilitated the shipping of rabbits infected with *T. cuniculi* and the Nichols strain to Guatemala so they could be used to infect the Guatemalan test subjects, used fraud and deceit to prevent anyone outside a close circle of conspirators to know about the true nature of the Experiments, and engaged in fraud and deceit to cover-up the nonconsensual nature of the Experiments at the time it was terminated and for decades after that and until his death.

534.    Dr. Strode. Dr. Strode was the Director of Rockefeller's International Health Division. He had authority to enter into a binding agreement with the other Defendants, the PHS, and third parties, committing the Foundation and the doctors, researchers, and resources under his control to the Guatemala Experiments.

535. Dr. Strode exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that The Rockefeller Foundation and its doctors would participate in the Experiments, remain

in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

536. Dr. Strode oversaw the selection of Dr. Cutler as the Experiments' ranking doctor and Dr. Soper as its "responsible investigator" with instructions to allow nonconsensual experimentation and prevent anyone outside a close circle of conspirators to know about the true nature of the Experiments, assigned Dr. Soper to the PASB so he would be able to oversee and control the Experiments, oversaw the selection of the Guatemalan test subjects – including people with mental illnesses and children who could not give informed consent,  oversaw Dr. Soper as he instructed the researchers on the ground in Guatemala to conduct the nonconsensual experimentation, and engaged in fraud and deceit to cover-up the nonconsensual nature of the Experiments at the time it was terminated and for decades after that and until his death.

537. The President and Board of The Rockefeller Foundation. In the alternative, if the named doctors lacked the institutional decision making and policy making power to commit The Rockefeller Foundation to the Guatemala Experiments, their actions were approved, adopted, ratified, and given institutional decision making and policy making power by the Foundation's President and Board of Directors. Their actions were so significant and occurred over such a long period of a time that they constituted institutional policies and actions.

Bristol-Myers Squibb

538. Drs. Oskar Wintersteiner, Geoffrey R. Rake, Arthur P. Richardson, and Delmas K. Kitchen, individually and collectively, used their institutional policymaking

and decision making power to cause Bristol Laboratories and the Squibb Institute, predecessors of Bristol-Myers Squibb, as institutions, to knowingly and intentionally violate the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

539.   They also, or alternatively, used their institutional policymaking and decision making power to join a conspiracy with the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

540.   They also, or alternatively, used their institutional policymaking and decision making power to aid and abet the other Defendants and a small group of third parties for the purpose of effectuating the Guatemala Experiments and violating the Direct Plaintiffs' rights to be free from nonconsensual human experimentation.

541.   Dr. Wintersteiner was the Director of Research at the Squibb Institute in the 1940s and discovered the process to create sodium penicillin G. Dr. Rake was the Medical Director of the Division of Microbiology at the Squibb Institute in the 1940s. He obtained and used grants to investigate the use of penicillin as a prophylaxis for syphilis, the central focus of the Guatemala Experiments. Dr. Richardson was the Head of the Division of Pharmacology at the Squibb Institute in the 1940s. He committed Bristol Laboratories and E.R Squibb & Sons to provide all of the penicillin to the Guatemala Experiments and work extensively with the ranking doctor and researchers on the ground. And, Dr. Kitchen was the Medical Director at Bristol Laboratories in the 1940s. He met with Dr. Soper, discussed all access of the Guatemala Experiments, and developed the testing protocols that were used.

542.   Each of these men exercised his power for the purpose of conducting nonconsensual human experiments in violation of the law of nations when he agreed that Bristol Laboratories and the Squibb Institute and their doctors and staff would directly participate in the Experiments, remain in the Experiments as they continued, and assist in covering-up the Experiments while they were going on and for decades after they ended.

543.   They engaged in fraud and deceit so the Guatemala Experiments would be approved, joined a conspiracy to effectuate the Experiments, aided and abetted the accomplishment of the Experiments, designed and developed the Experiments' nonconsensual testing protocols, oversaw the selection of Dr. Cutler as the Experiments' ranking doctor and Dr. Soper as its "responsible investigator" with instructions to allow nonconsensual experimentation and prevent anyone outside a close circle of conspirators to know about the true nature of the Experiments, assigned Dr. Soper to the PASB so he would be able to oversee and control the Experiments, oversaw the selection of the Guatemalan test subjects – including people with mental illnesses and children who could not give informed consent,  oversaw the day-to-day conduct of the researchers on the ground in Guatemala as they conducted the nonconsensual experimentation, facilitated the shipping of rabbits infected with *T. cuniculi* and the Nichols strain to Guatemala so they could be used to infect the Guatemalan test subjects, and engaged in fraud and deceit to cover-up the nonconsensual nature of the Experiments at the time it was terminated and for decades after that and until his death.

544.   These men knew that the pool of test subjects in Guatemala was made up of mentally ill people in insane asylums, prison inmates, orphans, and school children. They

knew that the test subjects were not informed about the purpose and goals of the Experiment, the nature and extent of the risks they were being subjected to, and their role. They also knew that the test subjects were not aware that they were being experimented upon, being intentionally infected with syphilis or another sexually transmitted disease, would suffer significant personal injury, and would pass the disease on to their sexual partners, spouses, children, and grandchildren. They also knew that the test subjects count not and did not give their informed consent.

545.    Despite this, these men, acting individually, as Bristol Laboratories and the Squibb Institute, as part of a conspiracy, and aiders and abettors, acted to conduct clinical tests using penicillin G. Conducting clinical trials in the United States would be difficult, expensive, and time consuming, and the two entities, through these men, wanted to move forward as quickly as possible. Even though they knew their actions would result in the nonconsensual experimentation on the Guatemalan test subjects, these men agreed to go forward. This intentional and deliberate decision put the interests of "science" and their companies above the interests of the Direct Plaintiffs, Spouses, Children, and Grandchildren they knew would suffer and die as a result.

546.    Dr. Cutler and the researchers on the ground used Penicillin G and followed the instructions and advice of Bristol Laboratories and the Squibb Institute throughout the Experiments.

547.    These doctors, acting as Bristol Laboratories and the Squibb Institute or on their own, put the interests of "science" and their companies' interests above the interests

of the Direct Plaintiffs, Spouses, Children, and Grandchildren they knew would and did suffer and die as a result.

548. Their actions were so significant and occurred over such a long period of a time that they constituted institutional policies and actions.

549. <u>Touch and concern</u>. The claims and conduct described in this Third Amended Complaint touch and concern the territory of the United States with sufficient force to displace the presumption against extraterritoriality, so as to permit this Court to exercise its original jurisdiction under the Alien Tort Statute, and recognize the foregoing international law causes of action for violations of customary international law:

a. The Defendants are corporations incorporated and registered to do business in the United States, under the domestic laws of Maryland, New York, and other States.

b. The Defendants maintain their headquarters in the United States.

c. The Defendants conduct substantial business, academic, research and development activities in the United States, are major employers and taxpayers in the United States, and they and their activities are licensed and regulated in the United States by State and federal regulatory agencies enforcing State and federal regulations

d. The Defendants are iconic American institutions and recognized as such worldwide.

e. The doctors involved in the Guatemala Experiments were licensed by state agencies to practice medicine.

f. The doctors involved in the Guatemala Experiments were in prominent leadership roles in their respective institutions in the United States.

g.      The doctors and researchers involved were United States citizens employed and working in the United States, and paid salaries denominated in United States dollars in the United States.

h.      Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues conceived, designed, developed, planned, directed, and supervised the Guatemala Experiments in and from the United States.

i.      Dr. Moore's plan for the Guatemala Experiments was developed at meetings and conferences in the United States.

j.      The Defendants' conspiracy underlying the Guatemala Experiments was formed and maintained in the United States.

k.      Defendants funded, supplied, and supported the Guatemala Experiments with money, equipment, and material sourced in the United States.

l.      The doctors served on panels and study sections to authorize, fund, guide, monitor and facilitate the Guatemala Experiments all from within the United States.

m.      Drs. Moore, Turner, and Eagle, and Drs. Parran and Strode developed and/or procured *T. cuniculi*, the Nichols strain, and other strains of syphilis used in the Guatemala Experiments in or from laboratories located in the United States, and then sent them from the United States to Guatemala.

n.      Drs. Moore, Turner, and Eagle, and Drs. Wintersteiner, Rake, Richardson, and Kitchen developed and/or procured the penicillin, BAL, and other drugs being used and tested in the Guatemala Experiments in or from laboratories located in the United States, and then sent them from the United States to Guatemala.

o.      Dr. Moore and is colleagues wrote the initial proposal, revised proposal, and protocols and instructions for the Guatemala Experiments in the United States.

p.      Dr. Cutler, the ranking doctor who implemented the Guatemala Experiments, was a United States citizen, employed by the United States government, and paid in the United States.

172

q.  Dr. Soper, the "Responsible Investigator" for the Guatemala Experiments, was a United States citizen, employed by a United States corporation, and paid in the United States.

r.  Dr. Reed and his colleagues and Drs. Drs. Wintersteiner, Rake, Richardson, and Kitchen collected, received, and analyzed testing data and results from the Guatemala Experiments in the United States.

s.  Dr. Parran, Dr. Moore, and their colleagues designed the Guatemala Experiments as a continuation and furtherance of the Tuskegee Study and the Terre Haute Experiment, two of the most infamous human experiments in American history.

t.  Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues all received, collected, analyzed, monitored, and discussed reports from the Guatemala Experiments in the United States.

u.  Dr. Parran, Dr. Moore, Dr. Wintersteiner, and their colleagues all supported, encouraged, provided moral support for, supervised, monitored, and aided and abetted the Guatemala Experiments from the United States.

v.  After he left Guatemala, Dr. Cutler returned to the United States and received reports from the ongoing Experiments, directed ongoing interventions on human subjects in the Experiments, and drafted a report on the Experiments from here.

w.  The decisions to not inform the Subject Plaintiff's or anyone else about the Guatemala Experiments was made in the United States.

x.  The decision to not provide any ongoing medical treatment or education to the Subject Plaintiffs, or to anyone else affected by the Guatemala Experiments, was made in the United States.

y.  The decision to cover-up the nature, scope, purpose, and impact of the Guatemala Experiments was made, and their active concealment occurred, in the United States.

z.   The President of the United States, the Secretary of State, the Secretary of the Department of Health and Human Services, and the Presidential Commission for the Study of Bioethical Issues publicly apologized for the Guatemala Experiments in the United States

550.   <u>Color of law</u>. The Defendants' violation of customary international norms and the perpetration of crimes against humanity were under the color of law. The Defendants, institutionally and by and through their agents, servants, employees, and co-conspirators, acted in conjunction with high-ranking officials in Guatemala and the United States. In Guatemala, this included the directors of the asylums, prisons, orphanages, and schools. It also included the Guatemalan military. In the United States, this included the PHS and other organizations. The Defendants worked with these sources to gain resources and access to the vulnerable populations they used as test subjects and conduct the work on the ground.

551.   <u>Causation of grave injury and harm</u>. As a result of the Defendants' deliberate, intentional, and purposeful actions, the Category 1 Plaintiffs, also known as the Direct Plaintiffs, were caused to suffer grave and foreseeable injuries that were severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur loss of earnings and loss of earning capacity, other economic losses, and have incurred and likely will in the future incur additional damages and economic losses.

552.   As a result of the Defendants' deliberate, intentional, and purposeful actions, the Category 2 Plaintiffs, also known as the Spouses, were caused to suffer grave and foreseeable injuries that were severe, debilitating and painful personal injury to their

bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur loss of earnings and loss of earning capacity, other economic losses, and have incurred and likely will in the future incur additional damages and economic losses.

553.   As a result of the Defendants' deliberate, intentional, and purposeful actions, the Category 3 Plaintiffs, also known as the Children, were caused to suffer grave and foreseeable injuries that were severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur loss of earnings and loss of earning capacity, other economic losses, and have incurred and likely will in the future incur additional damages and economic losses.

554.   As a result of the Defendants' deliberate, intentional, and purposeful actions, the Category 4 Plaintiffs, also known as the Grandchildren, were caused to suffer grave and foreseeable injuries that were severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. All of the Plaintiffs were forced to incur loss of earnings and loss of earning capacity, other economic losses, and have incurred and likely will in the future incur additional damages and economic losses.

555.   As a result of the Defendants' deliberate, intentional, and purposeful actions, the deceased Plaintiffs died of complications arising out of being infected with and the progression of syphilis. The Category 5 Plaintiffs, also known as the Wrongful Death Plaintiffs, are the parents, spouses, or children of the decedents. Under the ATS or

analogous state law, these persons are entitled to damages for the recovery of pecuniary loss and for the mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, and education occasioned by the loss of their loved ones.

556.   As a result of the Defendants' deliberate, intentional, and purposeful actions, the deceased Plaintiffs died of complications arising out of being infected with and the progression of syphilis. Prior to their deaths, these decedents were caused to suffer grave and foreseeable injuries that were severe, debilitating and painful personal injury to their bodies, as well as mental, emotional, psychological, and other non-economic losses. They were also forced to incur loss of earnings and loss of earning capacity, other economic losses. The Category 6 Plaintiffs, also known as the Estate Plaintiffs, are the legally recognized heirs of the decedents. Under the ATS or analogous state law, these persons stand in the shoes of the decedents and are entitled to recover the damages these people suffered up to the time of their deaths.

557.   Actual malice. The Defendants, directly, as co-conspirators, and as aiders and abettors, acted with actual malice, acted unlawfully, deliberately, knowingly, intentionally, and/or wantonly, and in an extraordinary and outrageous manner characterized by wanton and reckless disregard for the rights of the Plaintiffs. The actions were undertaken without legal justification or excuse, but instead, with an evil or rancorous motive, the purpose being to deliberately and willfully injure the Plaintiffs and to act with reckless disregard for their safety and their lives.

558.   As a result of the malicious, unlawful, deliberate, knowing, intentional, willful, wanton, extraordinary, heinous, and outrageous conduct associated with experimenting on the Direct Plaintiffs without their consent and in a manner constituting a crime against humanity, the allegations of which are expressly incorporated herein by reference, Plaintiffs are entitled to an award of damages. The Defendants acted with actual malice, knowledge of their wrongdoing, and with conscious disregard of the severe injuries and death they caused to both the test subjects and their descendants.

WHEREFORE, and for the foregoing reasons, each of the Plaintiffs, as personal injury victims, wrongful death beneficiaries, representatives of the Estates of their family members, and otherwise, claim compensatory damages, including noneconomic and economic damages, against Johns Hopkins, The Rockefeller Foundation, and Bristol Myers-Squibb in an amount exceeding seventy-five thousand dollars ($75,000), and punitive damages in the amount of one billion dollars ($1,000,000,000). Plaintiffs ask that their claims be decided by a jury and that it also decide the appropriate amount of both compensatory and punitive damages.

## COUNT II
## CLAIM FOR DAMAGES UNDER THE GUATEMALAN CIVIL CODE[30]

559.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by

---

[30]   In its September 9, 2016 Decision Re: Second Amended Complaint, the Court held that "the claims under Guatemala law are moot with regard to Plaintiffs who can assert claims under the ATS." *See* Court's Decision, p. 24.  Plaintiffs contend that they have multiple types of claims against the Defendants, which are concurrently viable and applicable, and that they should not be preliminarily limited to asserting just one type of claim.  Therefore, Plaintiffs, and all of them, assert this claim under Guatemalan law, in addition to the claims they are asserting under other legal theories.

reference.

560.   This cause of action arises under Section 2277 of the 1933 Guatemalan Civil Code and Sections 1645 and 1646 of the 1963 Guatemalan Civil Code. The conduct set forth above in this Lawsuit constitutes various harms that are compensable under these Guatemalan Civil Code provisions, which provide that any person who causes harm to another is obligated to repair the harm.

561.   Defendants, by their acts, negligence, imprudence, and/or intentional conduct, as set forth in this Third Amended Complaint, immediately and directly caused harm to each of the Plaintiffs, and Defendants are obligated to repair the harm under Guatemalan law.

562.   The Guatemalan legal standard for proving causation is set forth in Article 1443 of the 1933 Guatemalan Civil Code, which states that the damage suffered by the Plaintiffs "must result as an immediate and direct consequence" of the Defendants' wrongful acts. The "immediate and direct" standard is comparable to the American legal standard of proximate causation, and permits recovery not just for Direct Victims, but also for spouses, children, and grandchildren of Direct Victims. The terms "immediate" and "direct" under Guatemalan law do not require immediacy in the temporal sense. Rather, those terms require that the Plaintiffs' injuries flow from the wrongful act without the intervention of another active agent. This claim, therefore, is pursued by each of the Plaintiffs. Plaintiffs' injuries, set forth above in representative detail in accordance with the Court's September 7, 2016 Decision Re: Second Amended Complaint and incorporated herein by reference, are the direct, immediate, and proximate result of

Defendants' negligent, imprudent, reckless, and intentional actions, and are compensable under Guatemalan law.

563.   In addition, those individuals listed on Exhibit 1 as "Estates" died as an immediate and direct result of the Defendants' wrongful acts.  Their heirs and next-of-kin, identified in Exhibit 1, have a right to recover compensation under Guatemalan law for their own pain and suffering caused by the loss of a loved one, as well as for the financial support provided to them by their deceased loved one.   In other words, Guatemalan law recognizes the equivalent of "wrongful death" claims as those claims are commonly known under principles of American jurisprudence.

WHEREFORE, each of the Plaintiffs claim damages, including moral and economic damages, individually, and by and on behalf of the Estates identified in Exhibit 1, for wrongful death, survival, and personal injury claims, recoverable under Guatemalan law in an amount exceeding seventy-five thousand dollars for each Plaintiff, to be determined by a jury.[31]

---

[31]   Plaintiffs have omitted their claims under Maryland Law, set forth in the Second Amended Complaint as Counts II through X, pursuant to the Court's September 7, 2016 Decision Re: Second Amended Complaint.  By omitting those claims herein, though, Plaintiffs do not intend to waive them, and instead intend to preserve those claims in accordance with Young v. City of Mount Ranier, 238 F.3d 567, 573 (4th Cir. 2001).

Dated: December 9, 2016                    Respectfully submitted,


                                           By:    /s/ *Paul D. Bekman*
                                                _____

                                           Paul D. Bekman (Bar No. 00019)
                                           E. Dale Adkins, III (Bar No. 01425)
                                           Laurence A. Marder (Bar No. 02443)
                                           Gregory G. Hopper (Bar No. 26150)
                                           Emily C. Malarkey (Bar No. 28197)
                                           Ryan S. Perlin (Bar No. 20840)
                                           BEKMAN, MARDER & ADKINS, L.L.C.
                                           300 West Pratt Street, Suite 450
                                           Baltimore, Maryland 21201
                                           410-539-6633
                                           *Attorneys for Plaintiffs*

                                           F. R. Jenkins (Maine Bar No. 4667)
                                           Matthew R. Caton (Maine Bar No. 4664)
                                           MERIDIAN 361 INTERNATIONAL LAW
                                                GROUP PLLC
                                           97A Exchange Street, Suite 202
                                           Portland, Maine 04101
                                           866-338-7087
                                           *Attorneys for Plaintiffs (Pro Hac Vice)*


*Of Counsel for the Plaintiffs*:
JUAN PABLO RODRIGUEZ
ESCRITORIO JURIDICO RODRIGUEZ FAJARDO Y ASOCIADOS
Centro Profesional Cipreses, Nivel 5, Oficina 505
Caracas, Distrito Federal,
Republica Bolivariana de Venezuela