# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| ESTATE OF ARTURO GIRON ALVAREZ, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil No.: TDC-15-950 |
| THE JOHNS HOPKINS UNIVERSITY, et al., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Currently pending are plaintiffs' Motion to Compel Defendants to Respond to Requests for Production of Documents, Interrogatories, Requests for Admissions, Notice of Designee Depositions, and Requests for Entry and Inspection of Defendants' Archives ("Plaintiffs' Motion to Compel") (ECF No. 252), defendants' Joint Brief in Opposition to Plaintiffs' Motion to Compel ("Defendants' Joint Opposition") (ECF No. 264), the Johns Hopkins defendants' Supplemental Brief in Opposition to Plaintiffs' Motion to Compel ("Johns Hopkins Opposition") (ECF No. 264-1), The Rockefeller Foundation's Separate Memorandum of Law in Opposition to Plaintiffs' Motion to Compel ("TRF's Opposition") (ECF No. 264-2), Bristol-Myers Squibb Company's Supplemental Brief in Opposition to Plaintiffs' Motion to Compel ("BMS' Opposition") (ECF No. 264-3), and plaintiffs' Reply to Defendants' Opposition to Motion to Compel Discovery ("Plaintiffs' Reply") (ECF No. 274). Also pending are defendants' Motion to Compel (ECF No. 253), plaintiffs' Response to Defendants' Motion to Compel ("Plaintiffs' Opposition") (ECF No. 265), and defendants' Reply in Support of Defendants' Motion to Compel ("Defendants' Reply") (ECF No. 273). For the reasons stated below,

plaintiffs' Motion to Compel is granted in part and denied in part, and defendants' Motion to Compel is granted in part and denied in part.

## I. __Plaintiffs' Motion to Compel__

### a. __Archive Access and Rule 30(b)(6) Depositions__

Plaintiffs request that the court compel defendants to allow plaintiffs to enter and inspect the archives of the Johns Hopkins defendants and The Rockefeller Foundation ("TRF") and compel all defendants to produce witnesses to testify about the matters set forth in plaintiffs' Rule 30(b)(6) deposition notices. (ECF No. 252 at 12). Plaintiffs state that they first made informal requests to access these archives in May of 2018 and noted depositions pursuant to Fed. R. Civ. P. 30(b)(6) seeking information about the organization of the archives so that they could serve proper and tailored Rule 34 Notices to Enter and Inspect. (ECF No. 252 at 8). Plaintiffs state that they were unable to reach an agreement with defendants, and re-noted these depositions on February 1, 2019, seeking archival information as well as additional information regarding the activities of defendants' agents in the studies, including "employment practices, reimbursement practices, remuneration, obtainment of grant money, and other tenants of employment for doctors and academics at the time the studies were conceived and performed." (ECF No. 252 at 9). That day, they also filed formal Requests for Entry to the archives of TRF and the Johns Hopkins defendants. Id.

Plaintiffs state that no witnesses appeared for the 30(b)(6) depositions, and defendants have only recently agreed to allow plaintiffs access to their archives, subject to conditions which are unacceptable to plaintiffs. (ECF No. 252 at 9–10). Specifically, plaintiffs state, TRF has offered plaintiffs the right to inspect some, but not all, of its archives, if plaintiffs agreed to

waive their right to take 30(b)(6) depositions. (ECF No. 252 at 9). Similarly, plaintiffs state, the Johns Hopkins defendants have offered to allow plaintiffs access to some, but not all, of its archives, upon plaintiffs' agreement to conditions including "accomplishing the review in 2 weeks, waiving their 30(b)(6) requests, waiving other rights to discovery, and following a three-page protocol for inspection dictated by Hopkins (including the presence of a 'babysitter,' limitations on copying of documents, and other self-serving conditions that would be nearly impossible to meet)." (ECF No. 252 at 9–10).

Plaintiffs argue that these "partial and conditional offers of [the Johns Hopkins defendants] and [TRF] are not contemplated by the Federal Rules and are not acceptable to [p]laintiffs . . . [p]laintiffs should not have to waive the rights they have under the Federal Rules to utilize other discovery mechanisms in exchange for access to archives . . . [and] [p]laintiffs have the right to take corporate designee depositions noted almost a year ago about the organization of [d]efendants' archives, and about [d]efendants' employees' activities connected with the experiments at issue." (ECF No. 252 at 10). Plaintiffs further argue that direct access to these archives is essential, as "[a]ll of the individuals who played a role in the Experiments are now deceased . . . [t]here is no one to depose and [p]laintiffs must prove their case through documentary evidence." Id. They further argue that "[i]t is highly likely that the archives of these institutions contain documentary evidence that will support [p]laintiffs' claims" and argue that "it is apparent that [d]efendants have not performed a thorough search of their own archives for documents responsive to [p]laintiffs' discovery requests." (ECF No. 252 at 10, 12).

As to plaintiffs' requests for Rule 30(b)(6) depositions, defendants argue that these requests "are unnecessary and beyond the scope of what is required under the Federal Rules and

the guidance of this [c]ourt." (ECF No. 264 at 6). Defendants note that plaintiffs originally agreed to hold these depositions in abeyance while defendants answered questions about their archives. Id. Defendants state that they provided these answers in July and August of 2018, and that plaintiffs never followed up or raised any deficiencies as to these answers before re-noting new, broader depositions. (ECF No. 264 at 7). Defendants argue that these notices should be quashed. Id. First, defendants state that "[t]o the extent that plaintiffs intend to probe the sufficiency of defendants' earlier document collections, such 'discovery about discovery' is frequently not permitted." Id. (citing Fish v. Air & Liquid Sys. Corp., Civil No. GLR-16-496, 2017 WL 697663, at *6 (D. Md. Feb. 21, 2017) ("'Discovery on discovery' is not an appropriate topic of discovery and numerous courts have disallowed such discovery.") To the extent that plaintiffs want information about archival organization, defendants state that plaintiffs have already received this information via less burdensome means. (ECF No. 264 at 7–8). With respect to the new topics raised in plaintiffs' February 1, 2019 notices, defendants argue that these inquiries are "ridiculously overbroad," go "well beyond what the [c]ourt contemplated when it extended the discovery deadline," and that some inquiries are "wholly irrelevant to the issues in this lawsuit." (ECF No. 264 at 8). Finally, defendants argue that the information sought is not "reasonably available" to defendants. Id. Defendants note that the individuals who might have possessed such information are deceased and argue that "[t]he only relevant information would come from the documents that defendants have already produced," and, accordingly, "the depositions are completely unnecessary." (ECF No. 264 at 8–9).

As to plaintiffs' request for archival access, although defendants argue that "[t]he Federal Rules do not entitle plaintiffs access to defendants' archives for the purpose of re-doing

defendants' discovery efforts," the Johns Hopkins defendants and TRF have agreed to allow plaintiffs access to their archives, subject to the conditions set forth in their respective protocols, "solely as an accommodation to plaintiffs." (ECF No. 264 at 9–10).

The Johns Hopkins defendants state that they have offered plaintiffs access to the Alan Mason Chesney Medical Archives of the Johns Hopkins Medical Institutions ("Medical Archives")[1] "on terms consistent with the customary orderly and careful review and processing of archival materials." (ECF No. 264-1 at 2). Defendants state that plaintiffs "summarily rejected this offer without even responding to the Johns Hopkins [d]efendants directly," and instead raised their concerns about the Johns Hopkins defendants' conditions to the court. (ECF No. 264-1 at 2–3). Specifically, the Johns Hopkins defendants state that they sent plaintiffs "1,879 pages of indices to review and identify folders or boxes of documents that they would like to inspect." Id. They further state that, within two weeks of receipt of the list of folders or boxes that plaintiffs would like to inspect, they would make those documents available for plaintiffs, and plaintiffs would have two weeks to review the requested material.[2] (ECF No. 264-1 at 3). The Johns Hopkins defendants also asked that an attorney be present during plaintiffs' review at the archives to "liaise between plaintiffs and the archivists," comply with Maryland Attorneys' Rule of Professional Conduct 19-304.2[3], and ensure that there was no waiver of the

---

[1] While plaintiffs also requested access to the "William H. Welch Medical Library and the Library of the Institute of the History of Medicine," the "Welch Library at the School of Public Health," and the "Abraham M. Lilienfeld Library Hampton House," (ECF No. 264-9 at 5), the Johns Hopkins defendants state that these locations "do not hold the kind of primary source material that would be responsive to plaintiffs' requests." (ECF No. 264-1 at 4). Further, the Johns Hopkins defendants state, the Welch Library and the Lilienfeld Library "simply house reading rooms where no materials of any kind are held." Id. (emphasis removed).

[2] At the time, this review was to be completed by April 30, 2019, as the undergraduates who work at the Medical Archives and are primarily responsible for retrieving and processing materials requested by patrons would be entering their exams period after April 30. (ECF No. 264-1 at 3).

[3] Maryland Attorneys' Rule of Professional Conduct 19-304.2 states that "in representing a client, an attorney shall not communicate about the subject of the representation with a person who the attorney knows is represented in the

5

attorney-client privilege or work-product doctrine. (ECF No. 264-1 at 4–5). Additionally, the Johns Hopkins defendants require that any copying be done by the Johns Hopkins archivists' preferred vendor, which they state is necessary to preserve the physical integrity of the papers in the archives. (ECF No. 264-1 at 5). Finally, the Johns Hopkins defendants conditioned access to their archives on plaintiffs' withdrawal of their Rule 30(b)(6) deposition notices. Id. The Johns Hopkins defendants argue that they are merely trying to come to a compromise and accomplish the most efficient path for resolution of the outstanding discovery disputes by allowing plaintiffs access to the archives, which would likely moot their need for such depositions. (ECF No. 264-1 at 6).

Similarly, TRF offered plaintiffs access to the Rockefeller Archive Center ("RAC"), "an independent organization founded in 1974 that houses numerous archival collections, including the Rockefeller Foundation Archives." (ECF No. 264-2 at 3). TRF notes that it "maintains ownership and control of the documents within its own archival collection," but it "does not control the RAC, its physical facilities, or its staff, and has no possession, custody or control of the documents in the RAC's other archival collections." Id. Accordingly, TRF offered access to its archival records upon terms "developed in collaboration with RAC staff to fashion an orderly process that would allow plaintiffs' counsel to view any documents they requested (within reason, with disputes as to scope to be resolved by the [c]ourt) without disrupting the RAC's regular activities." (ECF No. 264-2 at 3–4). TRF also notes that "[t]hese terms are nearly identical to the rules applicable to any other researcher who visits the RAC." (ECF No. 264-2 at

---

matter by another attorney unless the attorney has the consent of the other attorney or is authorized by law or court order to do so. If the person represented by another attorney is an organization, the prohibition extends to each of the organization's (1) current officers, directors, and managing agents and (2) current agents or employees who supervise, direct, or regularly communicate with the organization's attorneys concerning the matter or whose acts or omissions in the matter may bind the organization for civil or criminal liability."

4). Specifically, TRF states that plaintiffs were invited to use a publicly available online finding tool to identify records they wished to review, which would then be retrieved and delivered to plaintiffs by trained archivists. Id. Although plaintiffs would not be permitted to remove documents from the premises, the RAC would arrange for photocopying of any requested pages. Id. As to TRF's condition that plaintiffs withdraw their Rule 30(b)(6) notice, TRF stated that they believed this was reasonable in light of TRF's prior document production and the facts that "(i) TRF provided detailed written information in response to plaintiffs' questions about the policies and procedures of the RAC and the volume of files potentially responsive to plaintiffs' requests; (ii) TRF directed plaintiffs to a comprehensive online finding tool for its archival records; and (iii) pursuant to TRF's offer, plaintiffs would be able to review virtually any TRF records for which there is a good-faith argument as to relevance." Id. TRF notes that plaintiffs did not respond to their invitations. (ECF No. 264-2 at 5).

Given that the Johns Hopkins defendants and TRF have offered to allow plaintiffs access to their archives, it appears that there is no dispute remaining between the parties, and plaintiffs' Motion to Compel is moot as to this issue. Plaintiffs' access to these archives, however, is subject to the reasonable conditions set forth by the Johns Hopkins defendants and TRF. After reviewing the pleadings, I find that all conditions requested by the Johns Hopkins defendants[4] and TRF are reasonable, with the exception of the condition that plaintiffs withdraw their Rule 30(b)(6) deposition notices. Although I acknowledge defendants' efforts to avoid the necessity of such depositions, I cannot say at this time that there are no areas of inquiry that may be relevant to plaintiffs' case. As currently drafted, however, Plaintiffs' Rule 30(b)(6) deposition

---

[4] I note that the Johns Hopkins defendants' prior deadline of April 30, 2019 for plaintiffs to complete their archival visits has passed and understand that the parties will need to set a mutually agreeable schedule for these visits.

notices (ECF Nos. 264-6, 264-5, 264-6), are clearly overly broad, particularly in view of the upcoming archive visits and defendants' prior document production. Accordingly, plaintiffs' motion to compel compliance with the outstanding Rule 30(b)(6) notices is denied. Plaintiffs shall first conduct their archive visits, and, in the event that plaintiffs believe that there remain narrowed areas of inquiry that need to be addressed via Rule 30(b)(6) depositions, they may revise and reissue their Rule 30(b)(6) deposition notices. I trust that plaintiffs will be judicious in limiting the scope of these deposition notices, given the extensive information already provided by defendants and plaintiffs' upcoming archive visits, both of which should result in a significantly narrowed scope for Rule 30(b)(6) depositions. After plaintiffs serve these narrowed notices, the parties shall use my informal discovery dispute procedure (ECF No. 168) if disputes remain.

> **b.** **Plaintiffs' First Set of Requests for Production of Documents and Things**

Plaintiffs ask the court to compel defendants to supplement their responses to plaintiffs' First Set of Requests for Production of Documents and Things (ECF Nos. 264-22, 283-1, 283-2). (ECF No. 252 at 2). Plaintiffs raise several complaints as to all defendants' responses to these requests.

> **i.** **Defendants' Limited Scope of Document Production**

Plaintiffs argue that defendants improperly defined the scope of plaintiffs' discovery requests and placed unreasonable restrictions on their document production. (ECF No. 252 at 13). First, plaintiffs argue that the Johns Hopkins defendants and TRF unilaterally defined the term "Guatemala Experiments" to apply solely to "'U.S. Government sponsored research,' thereby excluding [their] own participation from [their] self-imposed definition." (ECF No. 252

at 13, 20). In response, the Johns Hopkins defendants note that, "[c]ontrary to plaintiffs' assertion, the Johns Hopkins [d]efendants did not limit their review or productions only to 'U.S. Government sponsored research,'" and corrected that misconception in a letter to plaintiffs dated July 26, 2018. (ECF No. 264 at 13 n.8 (citing ECF No. 264-18)). Similarly, TRF states that it did not use the definition "U.S. Government sponsored research" to exclude otherwise responsive documents relating to TRF's alleged involvement in those studies, but rather solely used that definition "to identify the studies in question by tracking the description used by the Presidential Commission." (ECF No. 264 at 15–16 (citing Presidential Commission for the Study of Bioethical Issues ("PCSBI") Report at 2 (describing the experiments as "medical research supported by the United States and conducted in Guatemala between 1946 and 1948")). Given these representations[5] by the Johns Hopkins defendants and TRF, it appears that plaintiffs' claim that defendants' document production was limited in this regard is without merit, and plaintiffs' Motion to Compel is denied as to this issue.

Next, plaintiffs argue that the Johns Hopkins defendants and TRF improperly limited the scope of production to documents between the years 1946 and 1948. (ECF No. 252 at 13, 20). Plaintiffs argue, however, that "planning for the Guatemala experiments began in 1945, and the last known follow-up testing was done in 1957." (ECF No. 252 at 13). Plaintiffs also request information from the 1930s and early 1940s relating to defendants' involvement in the Tuskegee and Terre Haute syphilis studies, but this information will be addressed separately after I receive supplemental briefing from the parties. (ECF No. 283). As a result of these restrictions, plaintiffs argue, "information concerning the activities of [defendants'] researchers collaborating on Tuskegee, Terre Haute, and Guatemala; the funding and control of the Guatemala

---

[5] I note that plaintiffs did not object or otherwise respond to these representations in their Reply.

experiments (done prior to 1946), the development of the Guatemala protocol (done prior to 1946), the motivation for Guatemala (spurned by events before 1946), the issue of standard of care for obtaining consent in the Guatemala project (standardized before 1946), follow-up after the Guatemala experiments (lasting well into the 1950s), and many other issues, was shielded from discovery without rationale."  (ECF No. 252 at 13).

As to the time restrictions, defendants argue that they "limited production of documents in response to certain requests to documents from within [1946–1948] because that is the period during which plaintiffs allege the Guatemala Experiments occurred."[6]  (ECF No. 264 at 13 (citing ECF No. 127 at ¶ 408 ("According to the records currently available, at least 1,308 psychiatric patients, prison inmates, and soldiers were intentional [sic] infected in the Guatemala Experiments from 1946 to 1948."))  The Johns Hopkins defendants also argue that "plaintiffs do not articulate a valid basis for why the Johns Hopkins [d]efendants would have any documents related to experimentation that occurred in the 1950s, except that Dr. Cutler was a student at Johns Hopkins for one year during that period," and note that they "have already produced all documents in their possession related to Dr. Cutler's studies at their institutions, including his application."  Id.  In sum, the Johns Hopkins defendants argue, "[p]laintiffs' request for documents beyond the 1946–1948 time period is thus not proportional to the needs of the case, and there is no justification to impose on defendants the burden of reviewing and producing those documents."  (ECF No. 264 at 14).  Nonetheless, they state that they have offered for plaintiffs to identify materials at the Medical Archives and that they will make these documents

---

[6] The Johns Hopkins defendants do note that they produced documents from beyond this time range in response to some of plaintiffs' requests, such as the complete biographical files of Drs. Moore, Turner, Eagle, and Reed.  (ECF No. 264 at 14 n.11).

available for plaintiffs' review, "consistent with the relevance and burden objections that they have made and subject to any rulings by this [c]ourt." Id.

TRF argues that, unlike the Johns Hopkins defendants, it did not limit its production to the years 1946–1948. (ECF No. 264 at 15). TRF notes that, in response to various requests with no time limit, it produced responsive records between 1945 and 1950 or 1940 and 1950. Id. TRF further argues that its offer for plaintiffs to conduct their own search for relevant documents by inspecting its archives moots plaintiffs' critiques of TRF's earlier production. (ECF No. 264 at 16).

In their Reply, plaintiffs argue that "[t]here is no justification for the Hopkins [d]efendants to unilaterally refuse to produce documents before 1946 and after 1948," and note that "no other [d]efendant has made such a limitation." (ECF No. 274 at 6). Plaintiffs further argue that the experiments "continued in the form of tissue sampling and analysis until 1957, meaning that documents directly related to the experiments likely exist well beyond even 1957." (ECF No. 274 at 6–7). Accordingly, plaintiffs argue that the Johns Hopkins defendants' time limitation "is self-serving, illogical, and unrelated to the actual facts of this case," and should be expanded. (ECF No. 274 at 7).

Plaintiffs' objection regarding defendants' limited time frame is well-founded. At the outset, any documents related to defendants' involvement in the Guatemala experiments are relevant, including any planning done prior to the start of the actual experimentation, as well as any follow-up testing performed after the conclusion of the experiments. Accordingly, it is proper for defendants to produce documents responsive to plaintiffs' requests for the time frame between the years 1945 (when plaintiffs allege that planning for the Guatemala experiments first

began) and 1957 (when plaintiffs allege that the last known follow-up testing was completed). While the Johns Hopkins defendants briefly argue that it is unduly burdensome and not proportional to the needs of the case to require defendants to produce documents beyond the 1946–1948 time range (ECF No. 264 at 14), they have failed to articulate any particular burden. It is also noteworthy that the other defendants, TRF and BMS, did not apply such a narrow span of time when answering similar document requests. (ECF Nos. 264 at 15, 264-3 at 4). Finally, while defendants have offered to allow plaintiffs access to their archives, this does not excuse defendants' obligation to fully respond to all properly issued discovery requests. Accordingly, defendants[7] are ordered to supplement their responses to plaintiffs' First Set of Requests for Production of Documents and Things and produce documents responsive to plaintiffs' requests for the timeframe between 1945 and 1957 within 21 days of this order.[8]

### ii. Defendants' Deficient Document Production

Plaintiffs also argue that defendants have refused to produce documents that plaintiffs "know are in [defendants'] possession and control, and directly responsive to [p]laintiffs' requests." (ECF No. 252 at 13). As to the Johns Hopkins defendants, plaintiffs state that, "based on what they have obtained from third party sources, including the U.S. Government, the notes of their own expert, and from their review of the recently-produced indexes and indexes that are publicly available regarding Hopkins' archives, it is apparent to [p]laintiffs that Hopkins has either performed a very limited review of documents in its possession, has produced documents

---

[7] It is unclear whether plaintiffs raise these same objections to BMS' production, as plaintiffs merely state that they "will not waste time repeating the arguments made above." (ECF No. 252 at 22). Nonetheless, it does appear that BMS' production was limited, at times, to the years 1945 to 1955. (ECF No. 264-3 at 4). Accordingly, BMS shall also supplement its responses if it possesses relevant documents for the entire period from 1945 to 1957.

[8] If a party believes that it will not be able to comply with any deadline included in this order, the parties should mutually agree upon an appropriate schedule for production and inform the court.

12

subject to inappropriate and self-imposed restrictions on what is relevant, or is purposefully withholding documents." (ECF No. 252 at 19). Plaintiffs similarly argue that TRF has failed to produce documents responsive to discovery requests seeking information regarding activities of key employees at issue in the case, which plaintiffs argue "are calculated towards uncovering information that supports their theory that Dr. Soper, Dr. Parran, and other agents of The Rockefeller Foundation are directly liable and liable for aiding and abetting on account of its employees' assistance with designing, funding, and providing personnel to support the experiments." (ECF No. 252 at 21). Plaintiffs provide non-exhaustive lists of materials that they believe the Johns Hopkins defendants and TRF have in their possession and control and ask that these defendants be compelled to produce these documents, along with a document index for the materials already produced, and any additional ones to be provided. (ECF No. 252 at 15–22).

Similarly, plaintiffs argue that, based upon a review of documents produced by BMS and what plaintiffs understand BMS to possess, they have a good faith basis to believe that BMS withheld documents regarding 1) penicillin used during the relevant time period; 2) Dr. Delmas Kitchen, a BMS employee who met and corresponded with Dr. Soper, the Lead Investigator of the Experiments; 3) Dr. Shannon, a BMS researcher who "who was involved in conducting malaria research on human test subjects in Guatemala at the same time as the Guatemala syphilis experiments at issue in this case, and who was updated and informed about the Guatemala experiments by others at the time;" 4) BMS employee Dr. Rake, who researched syphilis prophylaxis at the time of the Experiments; and 5) BMS employee Dr. Oskar Wintersteiner, "who sat on the Antibiotic Study Section, which allocated the use of penicillin at the time of the Guatemala experiments." (ECF No. 252 at 22). Plaintiffs also ask the court to "compel

production of these documents and others that have been referenced in previous correspondence between counsel relating to this discovery dispute, as well as a proper document index." (ECF No. 252 at 23).

In response, the Johns Hopkins defendants argue that the list provided by plaintiffs of potentially responsive documents is misleading, as they have already produced some of these items, and many are facially irrelevant. (ECF No. 264 at 13–14). As to plaintiffs' request that a document index be produced, the Johns Hopkins defendants argue that "[t]he Federal Rules do not require that an index be produced, and defendants' cover letters have indicated to which request the productions are responsive." (ECF No. 264 at 11 n.6). TRF notes that it first provided responses and objections to these requests on June 11, 2018, and that, to date, plaintiffs have failed to confer about these responses and objections. (ECF No. 264 at 14–15). TRF further argues that plaintiffs' critiques of its production are without merit, and that it has repeatedly demonstrated to plaintiffs that it has complied with all discovery obligations. (ECF No. 264 at 15–16). TRF also notes that, like the Johns Hopkins defendants, it assisted plaintiffs in identifying what documents are responsive to each request by letters dated September 6 and 11, October 8, and November 19, 2018. (ECF No. 264 at 15).

BMS similarly notes that plaintiffs failed to raise these concerns in accordance with the court's order by January 4, 2019, and instead waited until after the close of fact discovery to address these issues. (ECF No. 264 at 16–17). BMS further argues that plaintiffs' concerns are unfounded. Specifically, BMS argues that plaintiffs have offered no support for their assertion that BMS has withheld documents, and that BMS cannot produce documents that do not exist. (ECF No. 264-3 at 2). BMS notes that plaintiffs' own expert, Dr. Reverby, testified that "despite

researching the issues, she knew of no basis for concluding that BMS was involved in conducting the Guatemala Experiments." (ECF No. 264-3 at 3). BMS further notes that Professor Lombardo, who served as a senior advisor to the Presidential Commission for the Study of Bioethical Issues that studied the Guatemala experiments, similarly "testified that despite affirmatively looking for the involvement of a pharmaceutical company, he found none." Id. BMS also represents that it has provided documents related to Dr. Wintersteiner and its penicillin during the relevant time period. (ECF No. 264-3 at 4).

While both the Johns Hopkins defendants and TRF argue generally that they have fully complied with their discovery obligations in responding to plaintiffs' document requests, the parties have not provided me with sufficient information to make this determination. Specifically, when addressing plaintiffs' non-exhaustive list of requested documents, the Johns Hopkins defendants merely state that they have produced some and that others are irrelevant (ECF No. 264 at 14), while TRF fails to address the list of requested documents altogether. Similarly, BMS has stated that it produced documents relating to Dr. Wintersteiner and BMS' penicillin during the relevant time frame (ECF No. 264-3 at 4), but for the remaining five categories, merely that "it is unclear what the alleged deficiencies are," and that "BMS cannot produce documents that do not exist." (ECF No. 264-3 at 2, 4). Accordingly, within 21 days of this order, defendants are directed to either: 1) produce plaintiffs' requested documents, identify those documents that it has already produced to plaintiffs, and identify those documents that it is withholding on the basis of irrelevance; or 2) certify that defendants do not possess the requested documents. If disputes remain, the parties shall use my informal discovery dispute procedure (ECF No. 168) to bring any issues to my attention. Defendants are not, however, required to

produce a document index for any document produced or to be produced, as long as they otherwise comply with Rule 34(b)(E)(i).[9]

### c. Plaintiffs' Second Set of Requests for Production of Documents and Things, Plaintiffs' First Set of Requests to Admit, and Plaintiffs' Corrected Interrogatories

Finally, plaintiffs ask the court to compel defendants to respond to its Second Set of Requests for Production of Documents and Things, First Set of Requests to Admit, and Corrected Interrogatories, served on all defendants on or about February 1, 2019. (ECF No. 252 at 23). Plaintiffs state that these requests were properly served in accordance with the court's deadline to serve additional discovery requests, but that defendants have not responded to any of these requests. Id.

In response, defendants preliminarily argue that plaintiffs are improperly attempting to "re-do" the entire discovery process at the last possible moment, despite the fact that the discovery period began on February 6, 2018, and the discovery deadline has already been extended from November 26, 2018, to March 15, 2019. (ECF No. 264 at 17–18). Defendants state that "[p]laintiffs are either trying to harass defendants or engaging in a fishing expedition to scrap for anything that might salvage their case," or both, and argue that "[n]either is a permissible basis for discovery." (ECF No. 264 at 18 (citing Fed. R. Civ. P. 26(c) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."); Topline Sols., Inc. v. Sandler Sys., Inc., Civil No.

---

[9] It appears that the Johns Hopkins defendants have complied with this Rule in the past by providing cover letters that indicate to which request the productions are responsive (ECF No. 264 at 11 n.6), and that TRF has complied by identifying what documents are responsive to each request by letters dated September 6 and 11, October 8, and November 19, 2018 (ECF No. 264 at 15). BMS has not provided any information about its compliance with Rule 34(b)(E)(i). Accordingly, if its' prior discovery responses failed to comply with Rule 34(b)(E)(i), BMS is ordered to supplement these responses, and comply with Rule 34(b)(E)(i) in the future.

ELH-09-3102, 2017 WL 1230817, at *5 (D. Md. Apr. 3, 2017) ("Rule 26(b), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition.")) While defendants argue that plaintiffs are improperly attempting to "re-do" discovery at the last minute, I did not impose any specific restrictions on the parties' ability to serve additional discovery requests when I extended the discovery deadline. Accordingly, I will consider each set of discovery requests served by plaintiffs individually.

### i.    Interrogatories

On February 12, 2019, plaintiffs issued Plaintiffs' (Corrected) First Set of Interrogatories to the Hopkins Defendants (ECF No. 264-15), which contained 17 interrogatories, including subparts. That same day, plaintiffs issued Plaintiffs' (Corrected) First Set of Interrogatories to the Rockefeller Foundation and Bristol Meyers Squibb to be Answered Separately (ECF No. 264-16), which also contained 17 interrogatories, including subparts. Defendants object to these interrogatories and argue that some are overly broad, while others are irrelevant to the claims and defenses in the lawsuit. (ECF No. 264 at 20). Defendants further argue that a few interrogatories "prematurely ask for information that will be disclosed in connection with expert reports and/or in pre-trial." (ECF No. 264 at 21). Finally, defendants argue that "the great majority of [plaintiffs'] interrogatories can be satisfied by plaintiffs' review of archived documents." Id.

While defendants object generally to the interrogatories on these bases, this objection is not ripe for my consideration at this time. Additionally, while defendants have offered to allow plaintiffs access to their archives, this does not excuse defendants' obligation to fully respond to the interrogatories at issue. Defendants are ordered to serve responses and objections to

plaintiffs' interrogatories within 21 days of this order. If disputes remain regarding defendants' responses and objections, the parties shall use my informal discovery dispute procedure (ECF No. 168) to bring these issues to my attention. Accordingly, plaintiffs' Motion to Compel is granted as to plaintiffs' interrogatories.

## ii. Requests for Production of Documents

On February 1, 2019, plaintiffs issued Plaintiffs' Second Request for Production of Documents and Things to the Johns Hopkins Hospital, Johns Hopkins University and Johns Hopkins Health System (ECF No. 264-12), Plaintiffs' Second Request for Production of Documents and Things to The Rockefeller Foundation (ECF No. 264-13), and Plaintiffs' Second Request for Production of Documents and Things to Bristol-Myers Squibb Company (ECF No. 264-14). Defendants first object on the basis that the number of Requests for Production of Documents and Things ("RFPs") exceed the amount permitted under Local Rule 104.1.[10] (ECF No. 264 at 22–25). The Johns Hopkins defendants further argue that many of the RFPs are "overly broad and/or irrelevant to the claims and defenses in this lawsuit" and that, to the extent any RFPs are deemed reasonable, providing plaintiffs access to their Medical Archives should moot plaintiffs' RFPs. (ECF No. 264 at 23). TRF argues that plaintiffs improperly "both duplicated their initial set of requests as if the earlier requests had never been served and also added a variety of new requests," many of which are irrelevant and facially overbroad. (ECF

---

[10] Local Rule 104.1 states that, "[u]nless otherwise ordered by the Court, or agreed upon by the parties, no party shall serve upon any other party, at one (1) time or cumulatively, more than thirty (30) requests for production, or more than thirty (30) requests for admission (other than requests propounded for the purpose of establishing the authenticity of documents or the fact that documents constitute business records), including all parts and sub-parts." The Johns Hopkins defendants state that plaintiffs issued 79 RFPs to them in February 2019, including many with subparts, in addition to the 36 previously issued in May 2018. (ECF No. 264 at 22). TRF states that plaintiffs issued 82 RFPs to them in February 2019, some of which included as many as 41 subparts. (ECF No. 264 at 23). I also note that plaintiffs originally issued 32 RFPs, several of which included subparts, to TRF in May 2018. (ECF No. 282-2). Finally, BMS states that plaintiffs first issued 54 RFPs (including subparts) in May 2018, and then issued 108 RFPs (including subparts) in February 2019. (ECF No. 264 at 25).

No. 264 at 23–24). TRF also argues that, given that plaintiffs will be able to conduct their own document searches at TRF archives, "it would be patently unreasonable and contrary to the Rules to require [TRF] to conduct a parallel search for the broad categories of documents newly demanded." (ECF No. 264 at 24–25 (citing Fed. R. Civ. P. 34(b)(2)(B) ("For each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. The responding party may state that it will produce copies of documents or of electronically stored information instead of permitting inspection."))  Finally, BMS argues that plaintiffs' RFPs are "improper and unduly burdensome" because many "are duplicative of requests plaintiffs made in their First Request for Production to BMS," others "seek documents that are not held by BMS and are more appropriately sought from another source," many RFPs "seek documents irrelevant to any party's claims or defenses," some "seek privileged documents that are protected from disclosure," and, finally, "several requests impermissibly seek early Rule 26(a)(2) expert disclosures." (ECF No. 264 at 25).

In response, plaintiffs acknowledge defendants' objection regarding the number of RFPs served, but argue that they could have complied with Local Rule 104.1 "by listing their requests in separate groupings with one of the Selected Plaintiffs as requesting each group," and that "[a]cceptance of the [d]efendants' technical argument would elevate form over substance." (ECF No. 274 at 7). Accordingly, plaintiffs "request permission to serve in excess of Local Rule 104.1 so that the . . . RFPs are re-allocated among the 14 Selected Plaintiffs in order to comply with the technical requirements of Local Rule 104.1," or, alternatively, "request permission to file a motion for leave to so reallocate the discovery requests. (ECF No. 274 at 8). As to

defendants' remaining arguments, plaintiffs state that "[d]efendants have failed to articulate any undue burden with particularity and, contrary to [d]efendants' assertion, discovery is not firmly closed due to the resolution of outstanding discovery issues and anticipated depositions of [d]efendants' expert witnesses."  (ECF No. 274 at 7).

As noted by defendants, plaintiffs have violated Local Rule 104.1 by serving more than 30 RFPs.  While plaintiffs argue that they could have listed their requests in separate groupings with one of the Selected Plaintiffs requesting each group, it does not appear that the interests of, and the merits of the claims relating to, each category of Selected Plaintiffs[11] are so distinct as to warrant the number of RFPs posed by plaintiffs in excess of the limit of 30 RFPs allowed by Local Rule 104.1 to be served on each defendant.  Here, plaintiffs have already served in excess of 30 RFPs during their first round of document requests (ECF Nos. 264 at 22, 25, 282-2), and, accordingly, defendants are not required to respond to their second round of RFPs.  Additionally, plaintiffs will have the opportunity to request additional documents during their search of defendants' archives.  Within two weeks after completing their archive visits, however, plaintiffs may seek leave of the court to issue a limited number of additional RFPs in excess of those already served if plaintiffs believe there are remaining documents to which they have not had access.[12]  Any additional RFPs should be narrow, not duplicative of previous discovery requests, and specifically targeted to each defendant.  Accordingly, plaintiffs' motion is denied as to plaintiffs' second set of RFPs, as currently drafted.

---

[11] While plaintiffs argue that the RFPs should be re-allocated among each of the 14 Selected Plaintiffs, I note that there are only six distinct categories of Selected Plaintiffs (ECF No. 166 at 1), and that plaintiffs have indicated their intention to dismiss some of these claims (ECF No. 264 at 2).

[12] Plaintiffs should file a letter addressed to the undersigned, not to exceed three pages, detailing their need for these additional RFPs, along with a copy of their proposed RFPs.  Defendants will then have two days in which to respond to plaintiffs' request in a letter, also not to exceed three pages.

### iii.    Requests for Admissions

On February 1, 2019, plaintiffs issued Plaintiffs' First Set of Requests to Admit Addressed to All Defendants (ECF No. 264-11), which contained 141 Requests for Admission ("RFAs"), including subparts.  Defendants first object to the number of RFAs, noting that Local Rule 104.1 only allows a party to serve 30 RFAs on another party.  (ECF No. 264 at 19). Defendants then argue that the RFAs are improper, as some "are so imprecise as to render them impossible to address," some "are so vague they cannot be properly addressed," and many "seek information that is irrelevant to the claims and defenses at issue in this lawsuit."  (ECF No. 264 at 19–20).  In sum, defendants argue, "[t]he burden of responding to these excessive and overly broad RFAs greatly outweighs any possible probative value of the requests," noting that "[w]hile some RFAs may have been proper if directed to a particular defendant rather than to all three en masse," plaintiffs failed to do so.  (ECF No. 264 at 20).

In response, plaintiffs argue again that they could have complied with Local Rule 104.1 "by listing their requests in separate groupings with one of the Selected Plaintiffs as requesting each group" and that "[d]efendants have failed to articulate any undue burden with particularity." (ECF No. 274 at 7).  As noted above, however, it does not appear that the excessive number of RFAs posed by plaintiffs is warranted when the interests of, and the merits relating to the claims of, each category of Selected Plaintiff are largely similar.  Plaintiffs have not, however, previously issued any RFAs.  Accordingly, plaintiffs may revise and reissue 30 RFAs to each defendant within 21 days of this order.  These RFAs should, however, be specifically tailored to each defendant, rather than boilerplate to all defendants.  Additionally, within 21 days from the date of this order, plaintiffs may seek leave of the court to serve a limited number of additional

RFAs in excess of the 30 allowed under Local Rule 104.1.[13]  Plaintiffs should, however, provide specific arguments as to why there is good cause for the court to allow additional RFAs, and any additional RFAs should be narrow and specifically targeted to each defendant.  Accordingly, plaintiffs' Motion to Compel is denied as to plaintiffs' RFAs, as currently drafted.

## II.    Defendants' Motion to Compel

### a.    Medical Records

Defendants request that the court compel plaintiffs to produce the medical records of all Selected Plaintiffs.  (ECF No. 253-1 at 1).  Defendants also ask that plaintiffs produce the medical records of non-Selected Plaintiffs Aurelia Caal Pop, Antonio Caal Pop, Maria Elena Bol, Jorge Armondo Bol, and Norma Alicia Lorenzo, who were designated as fact witnesses with information relevant to Selected Plaintiffs and deposed in Guatemala during the week of February 4, 2019.[14]  Id.  Specifically, they request that plaintiffs provide documents responsive to defendants' Request for Production No. 1, which asks all selected representative plaintiffs to produce "all medical records and laboratory reports of any kind pertaining to you . . . ."  (ECF No. 253-1 at 3 (quoting ECF No. 253-3 at 6).  Defendants note that these documents were first requested via The Johns Hopkins University's Second Request for Production of Documents and Things to Plaintiffs, which was served on plaintiffs on March 29, 2018, and later requested in two conferences with the court, during depositions in Guatemala, and by correspondence following those depositions.  Id.  Defendants further state that plaintiffs provided an untimely

---

[13] As previously noted, Plaintiffs should file a letter, not to exceed three pages, to the court, detailing their need for these additional RFAs, along with a copy of their proposed RFAs.  Defendants will then have two days in which to respond to plaintiffs' request in a letter, also not to exceed three pages.

[14] Antonio Caal Pop and Aurelia Caal Pop are siblings of Selected Plaintiff Guillermo Caal Pop.  (ECF No. 253-12 at 3).  Maria Elena Bol and Jorge Armondo Bol are siblings of Selected Plaintiff Ricardo Bol.  Id.  Defendants allege that Norma Alicia Lorenzo "was instrumental in recruiting Selected Plaintiffs, and she submitted declarations purporting to identify them."  (ECF No. 273 at 4).

response on November 21, 2018, but that production was deficient, and note that plaintiffs made no objections to the requests. (ECF No. 253-1 at 4). Defendants also state that "[d]eposition testimony obtained in Guatemala the week of February 4, 2019, confirmed that [p]laintiffs have withheld numerous medical records."[15] Id. Defendants argue that this request "strikes at the core of [p]laintiffs' claims, because the medical records and laboratory reports would show whether any of the [p]laintiffs even had syphilis," and "records reflecting medical treatment are critical to [p]laintiffs' claims that they are suffering from the symptoms associated with their alleged syphilis." (ECF No. 253-1 at 3, 5).

In response, plaintiffs argue that defendants seek to compel plaintiffs to produce additional discovery regarding non-Selected Plaintiffs in violation of the court's Initial Procedural Order (ECF No. 167). (ECF No. 265 at 2). Plaintiffs further argue that "[m]ost of the deponents who are the subject of the Motion to Compel are not Selected Plaintiffs, and no discovery was ever served on them – until a Notice of Deposition seeking production of documents was received on February 1, 2019, the Friday before depositions began in Guatemala on February 4, 2019."[16] (ECF No. 265 at 2). Finally, plaintiffs state that "they will not be proceeding with the claims of grandchildren and children of the 'Direct Victims' of the Experiments, and are in the process of obtaining the proper consent to dismiss those claims," and

---

[15] Defendants provide several examples of documents referenced during the depositions of Selected Plaintiffs that were never produced, and further state that "the depositions in Guatemala confirmed not only that medical records for the Selected Plaintiffs and related witnesses exist but were not produced, but also that other records have not been searched for and collected at all." (ECF No. 253-1 at 4–9).

[16] Plaintiffs specify that "[d]efendants have never served Rule 34 Requests for Production of Documents on the majority of the Plaintiffs listed in their Motion to Compel, because those individuals are not Selected Plaintiffs . . . . In the spirit of cooperation, [p]laintiffs agreed to permit the depositions of these non-Selected Plaintiffs and agreed to an unlimited scope of those depositions, but to be clear, [d]efendants' grievance is that these non-Selected Plaintiffs did not produce documents pursuant to Notices of Deposition served on counsel days before the depositions were taken, not Rule 34 requests." (ECF No. 265 at 5 n.3).

23

that "most of the individuals whose records are sought by [d]efendants in their Motion to Compel are individuals whose claims will not be pursued." Id.

Nonetheless, plaintiffs state that they will produce any medical records that plaintiffs have in their possession. (ECF No. 265 at 3). Plaintiffs state, however, that many of the other medical records sought by defendants either do not exist or are not in their possession. (ECF No. 265 at 5). Plaintiffs argue that "the proper method to obtain such records is by way of Rule 45 subpoena served on the third party, not a Rule 34 Request for Production of Documents." Id. (citing Ayers v. Cont'l Cas. Co., Civil Action No. 5:05CV95, 2007 WL 2156553, at *5 (N.D. W.Va. July 25, 2007) (adopting the reasoning of Clark v. Vega Wholesale, Inc., 181 F.R.D. 470, 472 (D. Nev. 1998) and holding that Fed. R. Civ. P. 34 "requires an item in a request for production of documents to be in the possession, custody or control of the served party and that medical records held by a physician do not meet this description")). Plaintiffs further argue that "if and only if the records are not obtainable by way of subpoena should the court to compel a plaintiff to sign an authorization so that the defendant can obtain the records." (ECF No. 265 at 6). Plaintiffs state that they "have no objection to [d]efendants obtaining medical records through third party subpoenas or other official requests," and state that "[t]hey will cooperate to sign authorizations without being compelled to do so," but argue that defendants have improperly "demanded that [p]laintiffs go out and obtain the records themselves." Id.

In their Reply, defendants argue that "[p]laintiffs misconstrue the scope of defendants' motion to compel," arguing that their motion "appropriately covers all medical records for the Selected Plaintiffs in addition to the medical records for the non-Selected Plaintiffs who were deposed in Guatemala." (ECF No. 273 at 1). As to plaintiffs' argument that discovery should

be limited to Selected Plaintiffs, defendants argue that discovery regarding Selected Plaintiffs includes discovery of family members of Selected Plaintiffs. (ECF No. 273 at 2). Defendants further argue that they requested medical records for the non-Selected Plaintiffs deposed in Guatemala months prior to the depositions.[17] As to plaintiffs' argument that many of the medical records are not in plaintiffs' possession, defendants state that this court "has repeatedly required plaintiffs to produce medical records held by third parties because a patient has the right to ask his or her provider for them, and the records are therefore in the patient's 'control.'" (ECF No. 273 at 5 (citing Mezu v. Morgan State Univ., 269 F.R.D. 565, 580 (D. Md. 2010); Testerman v. Procter & Gamble Mfg. Co., Civil No. CCB-13-3048, 2015 WL 151370, at *2 (D. Md. Jan. 9, 2015)). Defendants further state that requiring plaintiffs to produce these medical records is practical, as only plaintiffs know which hospitals and doctors may hold pertinent records. (ECF No. 273 at 5).

As noted by defendants, the medical records of Selected Plaintiffs are highly relevant to defendants' claims and were properly requested by defendants in The Johns Hopkins University's Second Request for Production of Documents and Things to Plaintiffs. (ECF No. 253-3 at 6). Accordingly, plaintiffs are required to produce all medical records of Selected Plaintiffs. While plaintiffs have agreed to produce medical records that Selected Plaintiffs currently possess, plaintiffs are also required to produce all relevant medical records, even if

---

[17] Defendants state that, "[p]ursuant to the [c]ourt's August 8, 2018 order, see ECF No. 183, defendants identified the non-Selected Plaintiffs they wanted to depose on August 10, 2018, see ECF No. 253-12. On December 26, 2018, defendants requested 'all documents pertaining to the witness[es] that are responsive to any of Defendants' outstanding document requests, or a certification that all responsive documents have been produced.'" (ECF No. 273 at 4 (quoting ECF No. 273-1 at 1)). Defendants also state that, "[o]n January 7, 2019, defendants reiterated this request, asked for properly executed interrogatory answers for all deponents, and requested that plaintiffs produce originals of all identity documents pertaining to each deponent." (ECF No. 273 at 4–5) (citing ECF No. 273-2 at 3–4)). Finally, defendants state, "[o]n January 11, defendants again noted that they expected plaintiffs to produce 'all documents pertinent to [each individual being deposed] at least 14 days in advance of the deposition.'" (ECF No. 273 at 5 (citing ECF No. 273-3 at 2)).

25

such records are currently held by third parties. This court has previously held that a plaintiff's medical records "are within [the plaintiff's] possession and control and therefore discoverable under Rule 34(a)(1), if relevant." Mezu v. Morgan State Univ., 269 F.R.D. 565, 580 (D. Md. 2010) (ordering that the plaintiff was obligated to produce medical records from her physicians in Maryland and Nigeria showing that she was sick and unable to travel to show that her absence from work was justified and to support her claim of Family Medical Leave Act retaliation). Accordingly, defendants' motion to compel is granted as to this issue, and plaintiffs are required to obtain all medical records for all Selected Plaintiffs.[18]

As to the non-Selected Plaintiffs deposed in Guatemala, four of these non-Selected Plaintiffs (Antonio Caal Pop, Aurelia Caal Pop, Maria Elena Bol, and Jorge Armondo Bol) are siblings of Selected Plaintiffs that plaintiffs allege were born with syphilis from their parents, alleged direct victims of the Experiments. (ECF No. 253-12 at 3). While plaintiffs argue that these individuals are not Selected Plaintiffs, and that full discovery is therefore not appropriate, defendants properly identified each individual as a fact witness with information relevant to the claims of their relatives, who are Selected Plaintiffs. (ECF No. 253-12). Additionally, while plaintiffs argue that defendants did not issue Rule 34 document production requests for non-Selected Plaintiffs, it is clear that plaintiffs were placed on notice that defendants requested the medical records of these non-Selected Plaintiffs by the parties' correspondence prior to the

---

[18] Plaintiffs briefly argue that they will not be proceeding with the claims of grandchildren and children of the "Direct Victims" of the Guatemala experiments, and state that they are in the process of obtaining the proper consent to dismiss those claims. (ECF No. 265 at 2). Plaintiffs have made this representation to the court for quite some time. As noted by defendants, however, "[t]he anticipated withdrawal of certain claims does not relieve [p]laintiffs of their obligation to search for and produce" relevant documents responsive to this request, particularly in light of the fact that these records were first requested over a year ago. (ECF No. 253-1 at 11).

deposition and defendants' deposition notices.[19] Accordingly, defendants' motion to compel is granted as to this issue, and plaintiffs are required to obtain and produce all medical records for non-Selected Plaintiffs Antonio Caal Pop, Aurelia Caal Pop, Maria Elena Bol, and Jorge Armondo Bol, within 21 days of this order.

The fifth non-Selected Plaintiff, Norma Alicia Lorenzo, "was deposed because she was instrumental in recruiting certain Selected Plaintiffs, and she submitted declarations purporting to identify them." (ECF No. 273 at 5). The only medical records sought by defendants from Ms. Lorenzo, however, seem to be those of her mother, who is not a Selected Plaintiff, but which plaintiffs have already agreed to produce. (ECF No. 265 at 4). Further, it is not clear why Ms. Lorenzo would have any other medical records relevant to any Selected Plaintiff. Accordingly, defendants' motion to compel production of medical records as to Norma Alicia Lorenzo is denied.

### b. Lab Test Reports and Data

Defendants request that plaintiffs be compelled to produce complete lab test reports and data generated by Dr. Orozco, who was previously designated as an expert witness for plaintiffs but was withdrawn by plaintiffs on March 6, 2019. (ECF No. 253-1 at 1). Defendants state that they served an Amended Notice of Deposition <u>Duces</u> <u>Tecum</u> on Dr. Orozco on February 19, 2019 and requested that Dr. Orozco bring documents relevant to the litigation[20] to his deposition,

---

[19] As noted by defendants, they first asked for documents responsive to defendants' outstanding discovery requests for these non-Selected Plaintiffs on December 26, 2018. (ECF No. 273 at 4). While none of defendants' outstanding discovery requests explicitly asked for documents from non-Selected Plaintiffs, it is clear from the context of the correspondence that defendants were asking plaintiffs to produce documents responsive to their prior discovery requests from the non-Selected Plaintiffs chosen for deposition, in addition to the Selected Plaintiffs. <u>See</u> ECF No. 273-1 at 2. Further, defendants explicitly asked for several relevant documents during the depositions and reiterated these requests after the depositions. (ECF No. 253-5 at 2).

[20] Specifically, defendants' requests included the following:

which took place on March 5 and 6, 2019. (ECF No. 253-1 at 9–10). Defendants note that plaintiffs did not serve any objections to this Amended Notice, but that, during his deposition, Dr. Orozco stated that he had not seen a copy of the deposition notice or reviewed it with anyone, and defendants identified numerous records that had not been produced, including reports on lab tests that Dr. Orozco claims to have performed. (ECF No. 253-1 at 10). Defendants note that plaintiffs have produced 299 such lab reports, but that "Dr. Orozco testified in his deposition that he performed exams on approximately 1,100 to 1,200 people in connection with this litigation." Id. Defendants further state that Dr. Orozco brought 580 lab reports to his deposition, but that "[p]laintiffs' counsel refused to produce all of the approximately 580 lab reports on the ground that they plan to drop those Plaintiffs from the case." Id. Defendants argue that, as long as these plaintiffs remain in the case, they are entitled to these reports. Id. Plaintiffs have agreed, however, to produce "over 1700 lab reports, representing all of the test reports that were provided by Dr. Orozco." (ECF No. 265 at 7). It is unclear, however, whether Dr. Orozco possesses any additional lab reports that were not provided to plaintiffs' counsel. Accordingly, plaintiffs are directed to determine whether there are any additional lab reports that have not yet been produced to defendants, and produce any remaining lab reports, or certify that Dr. Orozco does not possess any additional lab reports, within 21 days of this order.

---

7. All Documents created by You and/or given to You relating to this litigation, including but not limited to any notes, photos, or recording taken or charts created in connection with Your examination of any plaintiffs or potential plaintiffs in this litigation.
8. All serological, DNA and other lab data or reports—whether positive, negative, void, or inconclusive—generated for any Person included in [the full list of original plaintiffs].
9. The originals of all lab reports generated for any Person included in [the full list of original plaintiffs].

(ECF No. 253-1 at 9–10 (citing ECF No. 253-17 at 9)).

Accordingly, it appears that no dispute remains as to these lab reports, and defendants' Motion to Compel is denied as moot on this issue.

Defendants also state that Dr. Orozco's testimony "suggested that many of the lab reports that were produced during the ligation are not the original reports but had been generated later and modified to include, among other things, laboratory stamps." Id. Defendants note that Dr. Orozco testified that the original results "may be stored in the computers in his laboratory," and that "the original results were printed on sheets of paper by a thermal printer." (ECF No. 253-1 at 10–11). Defendants request that plaintiffs be compelled to produce all of these original reports. (ECF No. 253-1 at 11). Finally, defendants state that Dr. Orozco testified that he produced statistics about certain plaintiffs to the Guatemala Ministry of Health's Sexually Transmitted Diseases Unit, but that those records have not been produced, although they fell within several discovery requests, such as The Johns Hopkins' Second Request for Production of Documents and Things to Plaintiffs and the Amended Notice of Deposition Duces Tecum of Dr. Orozco. Id.

In response, plaintiffs state that they do not have any additional documents from Dr. Orozco. (ECF No. 265 at 7). Specifically, plaintiffs state, they "do not represent or control Dr. Orozco . . . do not have authority to accept a subpoena on his behalf . . . [and] do not have access to his computer to produce any electronic records or 'thermal printouts.'" Id. Accordingly, plaintiffs argue, "[t]o the extent [d]efendants seek additional documents from Dr. Orozco, [p]laintiffs believe the proper way to obtain them is by way of subpoena served on Dr. Orozco himself." Id.

In their Reply, defendants argue that "these records were requested when Dr. Orozco was still plaintiffs' expert and under plaintiffs' control" and "should have been collected and produced at that time or at minimum brought to his deposition." (ECF No. 273 at 6). Defendants further argue that "[t]he fact that plaintiffs withdrew Dr. Orozco does not change their discovery obligations or mean that defendants must now issue a subpoena." Id.

Here, defendants have established that these documents were properly requested in The Johns Hopkins' Second Request for Production of Documents and Things to Plaintiffs and the Amended Notice of Deposition <u>Duces</u> <u>Tecum</u> of Dr. Orozco. These requests were served on plaintiffs prior to Dr. Orozco's deposition on March 5, 2019, and plaintiffs were therefore required to produce the requested documents by this date. Although plaintiffs later withdrew Dr. Orozco as an expert witness, this does not obviate the need for plaintiffs to cure their earlier failure to comply with their discovery obligations. Accordingly, defendants' Motion to Compel is granted as to these requests, and plaintiffs are directed to produce the documents at issue within 21 days of the date of this order.

Although defendants also briefly request that plaintiffs be compelled to produce all documents requested in a subpoena <u>duces</u> <u>tecum</u> to Dr. Werner (ECF No. 273 at 6), this request is premature. Although the court is not aware if Dr. Werner's deposition has yet been scheduled, plaintiffs have represented to the court during a telephone conference held on March 27, 2019, that they would use good faith efforts to schedule this deposition and assist in the production of documents relating thereto. (ECF No. 251). Accordingly, defendants' motion to compel is denied without prejudice as to these documents.

### c. Original Documents

Finally, defendants ask that the court compel plaintiffs to produce "originals of certain illegible or incomplete documents bearing on the identity of [p]laintiffs." (ECF No. 253-1 at 1). Specifically, defendants state that they issued deposition notices <u>duces</u> <u>tecum</u> to eleven plaintiffs[21] who were deposed in Guatemala during the week of February 4, 2019. (ECF No. 253-1 at 13). These notices "requested that [p]laintiffs bring with them to their depositions '[t]he original versions of any document for which a photocopy was previously produced.'" <u>Id.</u> (citing ECF No. 253-20). Defendants state that plaintiffs failed to produce these documents, although plaintiffs did not serve any objections to the deposition notices. <u>Id.</u> Defendants argue that these original copies are critical, as many photocopies produced are illegible, and state that "there is evidence that documents produced in this litigation have been altered." <u>Id.</u> Defendants also state that they requested these materials again on February 12, 2019, after the depositions were completed. (ECF No. 253-1 at 14 (citing ECF No. 253-5)).

In response, plaintiffs state that they "have produced photocopies of vital documents such as birth certificates, marriage certificates, death certificates, and government identification cards," but "are unable, and should not be required, to turn over 'originals' of these documents to [d]efendants' lawyers in the United States and be without them for weeks or months." (ECF No. 265 at 8). Plaintiffs further argue that defendants are able to obtain their own copies of birth, death, or marriage certifications from the National Registry of Persons ("RENAP") in Guatemala. <u>Id.</u> Plaintiffs state that "[d]efendants can point to only **one** example of an 'illegible' photocopy that may require examination of the original: the military registration of Antonio Caal

---

[21] These plaintiffs are Carlos Garcia Garcia, Guillermo Caal Pop, Ramiro Galvez Villalobos, Reginaldo Ramirez Mendez, Victor Vicente Catun Coy, Antonio Caal Pop, Aurelia Caal Pop, Jorge Armondo Bol, Maria Elena Bol, Norma Alicia Lorenzo Lopez and Ricardo Bol. (ECF No. 253-1 at 13).

Ramirez (a Direct Victim and Selected Plaintiff) from the 1940s," and state that they are making good faith efforts to secure the original of this document. (ECF No. 265 at 9). Plaintiffs also state that, if there are other specific documents in plaintiffs' possession that defendants believe require examination of an original, plaintiffs' counsel will make similar good faith efforts to obtain them. Id.

In their Reply, defendants state that they "are willing to resolve plaintiffs' purported concern by agreeing to inspect the documents in Guatemala in the offices of defendants' local counsel." (ECF No. 273 at 7). As to plaintiffs' argument that defendants should obtain their own copies of documents from RENAP, defendants argue that plaintiffs turned over numerous incomplete documents from RENAP and failed to cure these errors when asked to do so by defendants. (ECF No. 273 at 8). Defendants further argue that "[r]equiring defendants to seek out documents from RENAP imposes more cost and burden on defendants and is not an acceptable alternative to plaintiffs complying with their discovery obligations." Id.

Here, defendants properly requested that plaintiffs produce "[t]he original versions of any document for which a photocopy was previously produced" at or before the scheduled depositions during the week of February 4, 2019 in Guatemala. (ECF No. 253-20). Plaintiffs failed to do so, and accordingly, defendants are entitled to inspect the original versions of these documents. Further, plaintiffs' suggestion that defendants should be required to obtain original records from RENAP is unreasonable, particularly in light of defendants' agreement to inspect the documents in Guatemala to alleviate plaintiffs' concerns about relinquishing possession of these documents. Accordingly, defendants' Motion to Compel is granted on this issue, and

plaintiffs must make these documents available for defendants to view in Guatemala within 21 days of this order.

**III.**     **Conclusion**

For the foregoing reasons, plaintiffs' Motion to Compel (ECF No. 252) is GRANTED in part and DENIED in part and defendants' Motion to Compel (ECF No. 253) is GRANTED in part and DENIED in part.  A separate order will be issued.


Date:  May 21, 2019                                           _____/s/_____
                                                                        Beth P. Gesner
                                                                        Chief United States Magistrate Judge