# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ESTATE OF ARTURO GIRON ALVAREZ, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil No.: TDC-15-950 |
| THE JOHNS HOPKINS UNIVERSITY, et al., | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Currently pending are defendants' Motion for Discovery and Sanctions ("Motion") (ECF No. 262), defendants' Supplemental Brief in Support of Request for Discovery and Motion for Sanctions ("Supplemental Brief") (ECF No. 271), plaintiffs' counsel's Memorandum in Opposition to Defendants' Motion for Discovery and Sanctions ("Opposition") (ECF No. 300), plaintiffs' counsel's Supplement to Plaintiffs' Counsel's Opposition to Defendants' Motion for Discovery and Sanctions ("Supplemental Opposition") (ECF No. 326) and defendants' Reply Brief in Support of Request for Discovery and Motion for Sanctions ("Reply") (ECF No. 332). In their Motion, defendants allege that plaintiffs' counsel have abused the litigation process and argue that plaintiffs' claims are "based on manufactured evidence, false sworn statements, and unsupportable allegations that even a cursory investigation would have shown." (ECF No. 262 at 1). Defendants ask the court to (1) "permit defendants to pursue targeted discovery to ensure that the full scope of the abuses are uncovered and to allow defendants to use that discovery in support of an anticipated future motion under Rule 11" and (2) "require plaintiffs' counsel to reimburse defendants for the fees and expenses incurred as a result of their improper litigation conduct."

(ECF No. 262 at 1–2). The issues have been fully briefed, and no hearing is necessary. Loc. R. 105.6. For the reasons stated below, defendants' Motion (ECF No. 262) is denied.

## I.    BACKGROUND

Defendants allege that "recent discovery has revealed that plaintiffs' claims are based on manufactured evidence, false sworn statements, and unsupportable allegations that even a cursory investigation would have shown were unfounded." (ECF No. 262-1 at 7). Defendants ask the court to allow defendants to "conduct targeted discovery to determine the full extent of plaintiffs' litigation abuses." (Id. at 35). Specifically, defendants state that they anticipate filing a motion for sanctions[1] under Federal Rule of Civil Procedure 11 asking for dismissal of all claims. (Id.) Prior to filing this motion, however, defendants ask permission to pursue targeted discovery "[t]o ensure that the [c]ourt has the information it needs to properly evaluate that motion, and to ensure that the full extent of plaintiffs' counsel's abuses are properly evaluated." (Id.) Defendants also request that plaintiffs' counsel "be ordered to reimburse defendants for the substantial costs needlessly incurred as a result of the bad faith abuses described herein." (Id. at 10). In response, plaintiffs' counsel argue that "there has been no 'bad faith' on the part of [p]laintiffs' counsel justifying either the award of money sanctions, or the time-consuming, resource-draining exercise of discovery and rummaging through counsel's privileged files." (ECF No. 300 at 11). Although defendants raise many allegations against plaintiffs' counsel, (ECF No. 262 at 5–27), the court will address only those allegations which are most relevant to the instant Motion.

### A.  Pre-Lawsuit Investigation

Defendants state that depositions of Selected Plaintiffs and their family members, taken in Guatemala, "revealed that many of the factual allegations of the [Third Amended Complaint

---

[1] I note that, pursuant to the Case Management Order (ECF No. 180), before filing any such motion, defendants must first seek a pre-motion conference with the court and file a Notice of Intent to File a Motion. (ECF No. 180).

("TAC")] are false and many of the plaintiffs likely have no connection to the Guatemala Experiments." (ECF No. 262-1 at 14–15). Defendants further state that testimony from these depositions suggested that "plaintiffs' counsel did not undertake reasonable efforts to ensure that only proper plaintiffs were named in their complaint." (Id. at 16). Defendants first raise concerns about the process by which plaintiffs were recruited for the lawsuit. (Id. at 15). Defendants note that "[d]eponents told a consistent story about how they were recruited," that they met plaintiffs' counsel's investigator, Roberto Paiz (along with his wife, Clara), "between 2012 and 2013 when he came to town looking for people whose names appeared on a list he held" and that Mr. and Mrs. Paiz "organized local 'information sessions' to recruit plaintiffs." (Id.) While defendants state that "[i]t appears likely that at least one list Mr. Paiz relied on was a list of names within a 2011 report issued as part of the Guatemala-led investigation into the Guatemala Experiments" (the "Archival Report"), defendants also note that "[t]he majority of deponents did not know what the list was or why their or their family members' names would have been included." (Id. at 17). Accordingly, defendants argue that "[f]urther discovery is warranted to determine if there is any factual basis for linking the persons named as plaintiffs to the Guatemala Experiments other than similarities to a name in the Archival Report and what Mr. Paiz told these plaintiffs about their loved one's experiences." (Id. at 18).

Next, defendants raise concerns about the evidence used to identify plaintiffs alleged in the TAC to have been exposed to syphilis at a school in Puerto de San Jose as part of the Guatemala Experiments. (Id.) Defendants state that plaintiffs' counsel produced "certifications" created by Norma Alicia Lorenzo Lopez, the school's former director, purporting to bear the official letterhead and seal of the school and stating that certain plaintiffs attended the school during the relevant time period. (Id. at 19). During Ms. Lopez's deposition, however, defendants state that

Ms. Lopez testified that no written records of students from this time period exist, and that she did not have the legal authority to issue such certifications. (Id. at 19–20). Defendants also allege that "Ms. Lopez testified that she had no personal basis to make the statements in her certifications." (Id. at 20). Instead, defendants argue, she merely introduced Mr. and Mrs. Paiz to members of the community, and Mr. and Mrs. Paiz then accumulated information about the former students. (Id.) Accordingly, defendants argue, Ms. Lopez "relied exclusively on 'sworn statements' provided to her by the plaintiffs and generated by Ms. Paiz" when issuing the certifications. (Id.) Defendants note, however, that "[e]ven if these sworn statements were reliable, she could not have reviewed each of them in person before issuing the certification," especially in light of the fact that "one of the individuals had already died at the time he supposedly delivered his sworn statement to her in person." (Id. at 21). Defendants now seek discovery into the files of plaintiffs' counsel and their agents "to ascertain the provenance of the so-called 'sworn statements' that formed the sole basis for Ms. Lopez's 'certifications,'" as well as "discovery into the true provenance of these misleading 'certifications,' and how and why plaintiffs' counsel named as plaintiffs in this lawsuit individuals for whom there appears to be no documentary evidence indicating they attended the school during the relevant time period, let alone that they were intentionally exposed to syphilis." (Id.)

Defendants also raise concerns about the methods used by plaintiffs' counsel to prepare plaintiffs' interrogatory answers. Defendants note that, prior to their depositions in Guatemala, deponents provided interrogatory answers in English that included an affirmation that the contents were true and correct to the best of the individual's knowledge, information, and belief. (Id. at 21–22). During the depositions, however, defendants state that "plaintiffs repeatedly testified that they signed interrogatory answers without understanding the contents." (Id. at 22). Defendants

also state that "[t]he interrogatory answers are riddled with demonstrably false statements." (Id.)
Defendants argue that "[h]aving plaintiffs sign answers to interrogatories that they could not understand, which contain false information, constitutes bad-faith abuse of the judicial process." (Id. at 23). Accordingly, defendants request discovery of "[p]laintiffs' U.S. Counsel's communications regarding the preparation and execution of interrogatory answers by plaintiffs." (Id. at 35).

Finally, defendants allege that "[p]laintiffs' counsel have a pattern of 'dropping' plaintiffs and claims in this case when forced to provide evidence." (Id. at 33–34). Defendants note that plaintiffs' counsel now seek to dismiss at least 684 of the 842 plaintiffs identified in the TAC, including all claims for children, grandchildren, and wrongful death plaintiffs, as well as claims for spousal infection with syphilis. (Id. at 34). Defendants argue that "plaintiffs' counsel have long insisted that they could prove a direct causal link between all plaintiffs infected with syphilis and those individuals who allegedly contracted syphilis in the Guatemala Experiments." (Id. at 12). Specifically, defendants argue, the TAC stated that "many [plaintiffs] have the Nichols strain" of syphilis, which would allegedly link plaintiffs to the Guatemala Experiments. (Id. at 13). Defendants note, however, that plaintiffs' counsel only produced 10 lab reports that showed that a plaintiff tested positive for the Nichols strain, although 842 plaintiffs were named in the TAC.[2] (Id.) Further, defendants argue, plaintiffs' counsel failed to produce positive test results for three plaintiffs specifically identified in the TAC as individuals who "tested positive for the Nichols Strain of syphilis." (Id. at 14 (quoting ECF No. 127 at ¶¶ 59, 73)). Defendants further allege that "it is quite likely that some or all of the lab tests on which plaintiffs claimed to rely were never

---

[2] In their Supplemental Brief, defendants note that plaintiffs belatedly turned over approximately 1,700 additional pages of lab reports, but state that, even including these reports, "plaintiffs have turned over no more than 15 Nichols results out of 842 original plaintiffs." (ECF No. 271 at 3 n.3).

performed at all," as they were allegedly performed by plaintiffs' expert Dr. Orozco.[3] (Id.). In sum, defendants argue that, had plaintiffs' counsel conducted a diligent investigation prior to filing this lawsuit, they would have discovered that these claims were unfounded. (Id. at 7). Defendants argue that, because plaintiffs' counsel did not conduct a diligent investigation, defendants have incurred the substantial burden and expense of "time expended conducting factual investigation concerning the several hundred plaintiffs who supposedly have been dropped and to discover falsehoods that were known or should have been known by plaintiffs' counsel at the outset." (Id. at 34).

In response, by way of background, plaintiffs' counsel notes that, following the publication of the U.S. Presidential Commission's Report on the Guatemala Experiments in 2011, the attorneys of the Meridian 361 International Law Group began investigating the experiments from the United States. (ECF No. 300 at 17). At the same time, Juan Pablo Rodriguez and his law firm, Escritorio Jurídico Rodriguez Fajardo y Asociados ("RFA") began its own investigation in Guatemala, with the assistance of an investigative team led by Roberto and Clara Paiz. (Id. at 18). Specifically, the team's investigation "included obtaining documentary evidence about the Experiments from archives, using the list of victims named in the Guatemalan Archival Report, and working with sociologists to identify regions of the country from which different names originated." (Id. at 19). RFA and its investigative team met with current and former representatives of the Guatemala Office of the Human Rights Ombudsman, including Dr. Pablo Werner, who was retained by RFA to "screen potential clients to determine whether they exhibited signs and symptoms consistent with an STD, and if so, to author a report."[4] (Id.) RFA later

---

[3] Defendants raise several concerns about the credibility and conduct of Dr. Orozco, as further detailed below.

[4] In their Supplemental Opposition, plaintiffs' counsel argue that "Dr. Werner's Rule 26 report lends further support to [p]laintiffs' counsel's position that they acted in good faith by relying on the investigation of this well-credentialed Guatemalan physician and government humans rights official." (ECF No. 326 at 2). Specifically, plaintiffs' counsel

retained Dr. Abdiel Orozco to test blood from potential clients for exposure to syphilis.  (Id.)  RFA then entered into agreements for legal services directly with plaintiffs and, in the fall of 2013, entered into an agreement with plaintiffs' U.S. counsel.  (Id. at 19–20).  Counsel then operated "under a necessary division of labor," with U.S. counsel handling the litigation in this court, and RFA handling aspects of the case centered in Guatemala.  (Id. at 20).

Plaintiffs' counsel argue that defendants "fail to consider the unique nature of this international litigation, the circumstances facing Plaintiffs' counsel, and the backgrounds of the Plaintiffs themselves."  (Id. at 33).  Specifically, plaintiffs' counsel argue that they "reasonably relied on the work of a Latin American attorney familiar with the language and culture of Latin America, who had the presence and proper connections inside Guatemala to investigate locally and screen potential clients."  (Id.)  As to RFA's investigation, plaintiffs' counsel argue that RFA properly investigated plaintiffs' claims by using the Archival Report to identify the names of Guatemalan individuals who were victimized by the Guatemala Experiments, interviewing victims, confirming that the individuals and families they interviewed had a connection to the Guatemala Experiments through identification documents and witness interviews, obtaining sworn affidavits or written statements confirming the plaintiffs' relationship to the Guatemala Experiments, and retaining two well-credentialed medical officials to screen clients and perform laboratory testing.  (Id. at 33–34).  Further, plaintiffs' counsel argue, they "made their own reasonable efforts within their abilities to review RFA's client pool and evidence supporting their claims" by reviewing witness statements medical and laboratory reports and interviewing

_____

argue, Dr. Werner was extensively involved in the investigation and screening process, as he "used the names of victims on the Guatemalan Archival Report to locate 'family nuclei' connected to the Experiments . . . 'defined the strategy for diagnostic evaluation of the victims' by medical screening," and performed two interviews to ensure that an individual had both a connection to the Guatemala Experiments and the signs and symptoms of exposure to syphilis."  (Id. at 1–2).

plaintiffs, Drs. Werner and Orozco, and American experts regarding the transmission of STDs and laboratory testing. (Id. at 34–35). Accordingly, plaintiffs' counsel argue, they properly relied on RFA and Drs. Werner and Orozco, individuals with localized knowledge and resources, to conduct initial screening of plaintiffs. (Id. at 36).

Plaintiffs' counsel also argue that "[d]efendants dishonestly misrepresent witness testimony and improperly attribute 'discrepancies' between allegations in the Complaint, interrogatory answers, documents, and deposition testimony to 'bad faith' or 'manufacturing evidence' on the part of [p]laintiffs' counsel, when such discrepancies occur in all civil litigation." (Id. at 35). Specifically, they argue, "[i]nconsistencies between witness testimony and documentary evidence happen routinely in civil litigation" and these "discrepancies" are "matters for cross-examination and determination by the jury at trial." (Id. at 36). Plaintiffs' counsel note that most of these deponents have received only a few years of primary education, some cannot read or write, and many have received little modern medical care. (Id.) Additionally, plaintiffs' counsel argue, "[t]here was undoubtedly an element of unfamiliarity, discomfort, and trepidation" associated with the depositions, particularly when "[t]he culture in many rural areas of Guatemala is such that embarrassing personal information is not discussed publicly, particularly with members of the opposite sex, and on top of that, the language barrier is significant." (Id. at 37). In light of these difficulties, plaintiffs' counsel argue, witness testimony does not establish that any allegation in the TAC or interrogatory answers[5] was false, but rather creates questions of fact for the jury to resolve. (Id.)

---

[5] As to defendants' argument that the interrogatory answers were signed by plaintiffs without knowing or understanding what they were signing, plaintiffs' counsel argues that the answers were prepared based on U.S. counsel's interviews with plaintiffs in Guatemala, and that U.S. counsel sent the English version to Mr. Rodriguez for him to explain the documents to plaintiffs and ask them to verify the information and sign. (ECF No. 300 at 39–40 n.29).

Plaintiffs' counsel argues that "[p]erhaps the most glaring example of Defendants' misrepresentation of witness testimony regards the deposition of Norma Alicia Lorenzo Lopez." (Id. at 43). Plaintiffs' counsel note that defendants claim that the "certifications" signed by Ms. Lopez attesting to the fact that fifteen plaintiffs were students at the Puerto de San Jose school in the 1940s "were 'manufactured, false, and invalid' because Ms. Lopez had 'no personal basis' on which to make them, did not rely on her own knowledge of the community, and 'merely introduced' RFA's investigators to the victims, who then 'gathered information about who attended the school.'" (Id. at 44–45 (quoting ECF No. 262-1 at 18)). Rather, plaintiffs' counsel argue, Ms. Lopez actually testified that she was the principal of the school at the time, but that records from the school had been destroyed. (Id. at 45). To assist RFA and their investigative team identify students, however, she spoke with town residents, starting with individuals she knew had attended the school, and "asked them to recall their classmates until she had created a list of people." (Id.) Accordingly, plaintiffs' counsel argue, Ms. Lopez "gathered information" about students from the school, "based on her knowledge, the knowledge of others she knew, and the common knowledge of the community," and signed "certifications" to that effect.[6] (Id. at 46). While Ms. Lopez did testify that "she learned that she was not supposed to sign documents on behalf of the school for use in this case," plaintiffs' counsel argue that "[s]he did not 'violate' any official Guatemalan government law or 'rules'" in signing these certifications. (Id.)

In their Reply, defendants argue that "plaintiffs' U.S.-based counsel cannot avoid responsibility for the work of their foreign co-counsel," Mr. Rodriguez. (ECF No. 332 at 12).

---

[6] As noted by plaintiffs, the translated certifications state that the writer certifies that "by historic references of the school and testimony of students that shared between the years nineteen forty six and nineteen forty eight, today all of legal age," each plaintiff "was student of this educational center in the aforementioned period of time," which "also verified by neighbors of this community and in addition is based on Sworn Declaration document of the aforementioned." (ECF No. 263-17 at 3). Accordingly, plaintiffs argue, Ms. Lopez's "'[c]ertifications' merely state that it is well-known among the community that a particular person was a pupil at the school between the years of 1946 and 1948." (ECF No. 300 at 46).

Defendants argue that "[m]uch of the investigatory work to prepare this case appears to have been undertaken in 2012–13" by Mr. Rodriguez and his firm, RFA. (Id. at 8). Defendants note, however, that "[t]hroughout this period, Mr. Rodriguez was a partner in the Meridian 361 law firm." (Id. at 8–9). Defendants also note that, throughout the case, Mr. Rodriguez and RFA have been listed on pleadings and motions as "Of Counsel," U.S. counsel have referred to Mr. Rodriguez as "co-counsel," and plaintiffs' counsel have described this case as being brought by three firms, including RFA, on each of their respective websites. (Id. at 9–10). Accordingly, defendants argue, "[p]laintiffs' counsel cannot deputize Mr. Rodriguez to take crucial actions on their behalf and then disclaim knowledge when those actions give rise to a legal dispute." (Id. at 11). Defendants further argue that "[a]t a minimum, further discovery is warranted to get to the bottom of the counsels' division of responsibility, Mr. Rodriguez's misconduct . . . and which of plaintiffs' counsel was involved in, knew of, or had reason to know of the misconduct." (Id. at 13).

Similarly, defendants argue that "[p]laintiffs' counsel cannot explain away their clients' deposition testimony," as "[t]hat testimony reveals significant lapses in professional conduct by plaintiffs' counsel." (Id. at 19). While plaintiffs' counsel represent that they asked Mr. Rodriguez to explain interrogatory answers to plaintiffs, ask them to verify the information, and sign, defendants argue that "some plaintiffs may have received no such instruction."[7] Defendants further argue that plaintiffs' counsel cannot "try to create a triable dispute of fact—and attempt to counter unhelpful deposition testimony—by offering the Court a set of interrogatory responses signed by a witness who did not see a Spanish translation, did not know the purpose of the

_____

[7] Defendants argue that plaintiffs' counsel admit this in their Opposition, as they state that "[t]he fact that some of the [p]laintiffs may have misunderstood the instruction or even did not receive it is not a reason to award sanctions . . . ." (ECF No. 332 at 20 (citing ECF No. 300 at 39 n. 29)). Defendants also argue that this "admission is consistent with several plaintiffs' deposition testimony," id., noting that three plaintiffs testified during their depositions that they signed their interrogatory answers without any explanation, instruction, or translation. (ECF No. 262-1 at 22).

document, did not know that his signature represented an oath as to the truthfulness of its contents . . . and failed to testify consistently in his deposition." (Id.) As to Ms. Lopez' "certifications," defendants argue that Ms. Lopez testified that "she merely introduced individuals who may have been students at the school to the Paizes, and did not participate in interviews during which the Paizes elicited information about their purported school attendance." (Id. at 22–23). Accordingly, defendants argue, "[i]t thus appears that plaintiffs' counsel and their investigators generated evidence by obtaining unauthorized official-looking certifications by a declarant who had no personal knowledge of the statements that she made." (Id. at 23).

### B. Dr. Orozco's Lab Reports and Testing

Defendants also state that, during the course of discovery, they developed several concerns regarding the lab reports and testing performed by plaintiffs' former expert, Dr. Orozco. First, defendants note that, during discovery, plaintiffs produced 257 lab test reports, of which all but four showed a positive result for syphilis and, in some cases, the Nichols strain. (ECF No. 262-1 at 26). On March 3, 2019, however, plaintiffs produced 42 additional reports, 19 of which showed a negative test for syphilis. (Id.) Defendants note that those 19 individuals were included as plaintiffs in the TAC, although the lab reports were dated in December of 2014, prior to the filing of the first complaint. (Id.) Defendants also argue that there is evidence that plaintiffs' counsel possess additional negative lab reports that have not been produced to defendants, as Dr. Orozco testified that he brought "hundreds of lab reports" to his deposition, and that "at least ten percent" of the tests could be negative. (Id. at 27). Defendants state, however, that plaintiffs' counsel refused to produce all of Dr. Orozco's lab reports in discovery.[8] (Id.) Plaintiffs' counsel did permit defendants to view the reports during Dr. Orozco's deposition, and defendants estimate that there

---

[8] Defendants note in their Supplemental Brief that these reports were belatedly produced on April 11, 2019. (ECF No. 271 at 3 n.3).

were approximately 72 total negative lab reports.  (Id.)  Accordingly, defendants argue, plaintiffs'

counsel have withheld key evidence "that <u>disproved</u> the basis for naming individual plaintiffs."[9]

(Id. at 26).

Defendants also note that Dr. Orozco's deposition testimony raised several concerns about

the validity of his testing and reports.  First, defendants note, on March 3, 2019, plaintiffs produced

a set of photographs described by plaintiffs' counsel as "photos of Dr. Orozco's lab provided by

him."  (Id. at 29).  During his deposition, Dr. Orozco testified that he had taken the photographs at

his laboratory and described the equipment shown in the photograph and how he used that

equipment to conduct the tests detailed in his reports.  (Id.)  The next day, defendants realized that

the photographs were actually taken at an unrelated hospital laboratory.  (Id. at 30).   Plaintiffs

subsequently withdrew Dr. Orozco as an expert.  (Id.)  The deposition continued at defendants'

request, however, and defendants note that Dr. Orozco went on to admit that an official sanitary

license for his laboratory had been altered by a handwritten mark changing the "7" in "2017" into

a "9."  (Id. at 31).  Defendants also state that Dr. Orozco testified that he was not listed as an active

member of the Guatemalan College of Pharmacists and Chemists between November 1, 2014 and

March 11, 2015, when he performed the bulk of the tests for this case, although he also stated that

he has retroactively corrected this status.  (Id.)  Defendants further note that Dr. Orozco admitted

that he had copied a large portion of his expert report from other sources, stating that he was

pressured to quickly produce a report by plaintiffs' local counsel, Mr. Rodriguez.   (Id. at 31–32).

Finally, defendants report that Dr. Orozco stated that he did not perform certain DNA sequencing

_____

[9] Defendants also note that one of belatedly produced lab reports "purported to show a negative result of a blood test
for syphilis done on plaintiff Julio Caal Flores" on December 15, 2014, although records produced by plaintiffs show
that Mr. Caal Flores died in 1999.  (ECF No. 271 at 6).  Accordingly, defendants argue, "[t]he newly-produced lab
report . . . tends strongly to suggest that the lab tests on which this entire case is premised were not actually performed."
(Id.)

studies with which the Nichols strain of syphilis could be detected at his own laboratory, instead claiming that he conducted the tests at another lab in Guatemala.[10]  (Id. at 33).

Defendants argue that Dr. Orozco's false deposition testimony "leaves in doubt whether any lab tests were ever performed on any plaintiff."[11]  (Id.)  While defendants note that plaintiffs are no longer relying on Dr. Orozco's tests and have subsequently dropped many claims, defendants argue that "this question is still relevant to defendants' motion for sanctions," noting that "[d]efendants and the [c]ourt do not yet know who was actively complicit in fabricating this evidence."  (Id.)  Accordingly, defendants ask to examine Dr. Orozco's office computer and email system, plaintiffs' U.S. counsel's file of communications with Dr. Orozco and his employees regarding the testing of plaintiffs and the preparation of his report, and Mr. Rodriguez' file, including all communication with Dr. Orozco.  (Id. at 35–36).

In response, plaintiffs' counsel argue that "[d]efendants improperly attribute the misconduct of an expert to [p]laintiffs' counsel."  (ECF No. 300 at 48).  While plaintiffs' counsel acknowledge that Dr. Orozco testified falsely during his deposition, they state that they "absolutely were not complicit in it, and did nothing to encourage or facilitate it."  (Id.)  Rather, plaintiffs' counsel argue, they took immediate action by informing defense counsel and the court and withdrawing Dr. Orozco as an expert.  (Id. at 48–49).  As to the portions of his report that were copied from other sources, plaintiffs' counsel argue that "the substance of the 'plagiarized' portions were simply a step-by-step description of the standard methodology for laboratory tests for syphilis."  (Id. at 49).  Further, plaintiffs' counsel state, "Dr. Orozco did not 'plagiarize' his

---

[10] Defendants also provide an expert report of Hernández de León, an "expert in the regulation of clinical laboratories in Guatemala," that states that Dr. Orozco was not properly licensed to perform the lab tests he claimed to have performed and that, if he did perform the tests at another laboratory, it would have been illegal for the other lab to permit Dr. Orozco to do so.  (ECF No. 271 at 5).

[11] In their Supplemental Brief, defendants also state that their expert, Dr. Lukehart, "raised serious questions concerning the fundamental veracity of Dr. Orozco's report and therefore of the lab reports that were the principal bases of the Third Amended Complaint.  (ECF No. 271 at 4).

opinions or conclusions, which were contained in his lab reports for the specific [p]laintiffs, not his Rule 26 report." (Id. at 50). Plaintiffs' counsel also note that "Dr. Orozco was a well-credentialed expert witness" that they had interviewed prior to his deposition, and that "[t]hey had no reason to question the validity of his testing or the opinions he offered regarding the [p]laintiffs' exposure to syphilis." (Id. at 50). Additionally, plaintiffs' counsel argue, "[d]efendants make the unsupported leap that because Dr. Orozco falsely testified about photos of his lab, or copied parts of his report from descriptions on the Internet, it must mean not only that all of his testing was a lie, but also, that [p]laintiffs' counsel must have known about that lie." (Id.) To the contrary, however, plaintiffs' counsel argue that "[d]efendants have no proof that the testing done by Dr. Orozco was fraudulent, and certainly no proof that if it was, [p]laintiffs' counsel knew about it." (Id.) Finally, plaintiffs' counsel argue that they provided Dr. Orozco's lab reports to defendants as soon as they received them from RFA and Dr. Orozco, and therefore "did not purposefully withhold any evidence in bad faith."[12] (Id. at 51)

In their Reply, defendants argue that Dr. Orozco's perjury went both to the heart of his testimony as an expert as well as the heart of plaintiffs' case, as "it was the direct cause of their abandoning the claims of hundreds of plaintiffs that hinged on Dr. Orozco's lab tests, reducing their plaintiff pool to 157 persons." (ECF No. 332 at 15). Defendants also note that they have received 22 new sets of lab reports from a different lab in Guatemala pertaining to plaintiffs who were previously the subject of Dr. Orozco's lab reports showing positive results. (Id. at 16). 16 of these reports, however, now show negative results. (Id.) Accordingly, defendants argue, "[a]ssuming the new reports are valid, it is therefore virtually certain that Dr. Orozco's reports are fabrications." (Id.)

---

[12] As to defendants' argument that Dr. Orozco performed testing on a deceased individual, plaintiffs' counsel state that they were not aware of "reports of testing purportedly performed on dead people." (ECF No. 300 at 51 n.39).

In sum, defendants argue that "plaintiffs' claims are based on manufactured evidence, false sworn statements, and unsupportable allegations that even a cursory investigation would have shown were unfounded." (ECF No. 262 at 1). Accordingly, defendants ask that the court "permit defendants to pursue targeted discovery to ensure that the full scope of the abuses are uncovered and to allow defendants to use that discovery in support of an anticipated future motion under Rule 11." (Id.) Defendants further ask the court to "require plaintiffs' counsel to reimburse defendants for the fees and expenses incurred as a result of their improper litigation conduct." (Id. at 2). In response, plaintiffs' counsel argue that defendants have failed to establish that they are entitled to either request. (ECF No. 300 at 10–11). Similarly, plaintiffs' counsel contest the truth of defendants' allegations. (Id.) It should be noted that many of the arguments raised by defendants involve evidentiary issues and questions of fact that cannot be resolved by the court at this time. Therefore, the limited area of appropriate inquiry, for purposes of the instant Motion, is whether defendants are entitled to either form of relief sought.

## II.    DEFENDANTS' REQUEST FOR DISCOVERY

First, defendants seek what they describe as "targeted discovery" (ECF No. 262-1 at 35) to "investigate the full scope of the abuses that have occurred and to identify all individuals responsible for those abuses." (Id. at 10). Defendants state that they "intend to investigate plaintiffs' false allegations and plaintiffs' counsel's decision to include in this lawsuit hundreds of plaintiffs whose claimed syphilis infection could not possibly have resulted from the Guatemala Experiments." (Id.). Defendants maintain that they "expect to move for dismissal with prejudice under Rule 11 seeking sanctions for the filing of this lawsuit without an adequate pre-suit investigation or a plausible basis to make certain allegations." (Id.) Specifically, defendants ask for discovery to include:

(1) The depositions of Roberto and Clara Paiz;

(2) The deposition of Dr. Werner;

(3) Examination of Dr. Orozco's office computer and email system;

(4) Dr. Werner's investigation file, including all notes and materials relating to plaintiffs, plaintiffs' counsel and the Guatemala Experiment;

(5) Mr. Rodriguez' file, including all communications with Drs. Orozco and Werner, Mr. and Mrs. Paiz, Norma Alicia Lorenzo Lopez, and plaintiffs' U.S. counsel;

(6) The deposition of Juan Pablo Rodriguez;

(7) Plaintiffs' U.S. counsel's file of communications with Dr. Orozco and his employees regarding the testing of plaintiffs and the preparation of his report;

(8) Plaintiffs' U.S. counsel's communications regarding the preparation and execution of interrogatory answers by plaintiffs;

(9) Plaintiffs' U.S. counsel's file regarding communications with Dr. Werner regarding his evaluation of plaintiffs and the preparation of his report;

(10) Plaintiffs' U.S. counsel's file containing communications with Roberto and Clara Paiz regarding their investigation into the litigation, which was conducted before they partnered with plaintiffs' counsel; and

(11) Plaintiffs' U.S. counsel's file containing communications with Norma Alicia Lorenzo Lopez regarding the school children.

(Id. at 35–36).

In response, plaintiffs' counsel argues that "discovery is not permitted on Rule 11 motions except in the most extraordinary circumstances." (ECF No. 300 at 57–58). Further, plaintiffs' counsel state, "although [d]efendants classify their request as only seeking 'targeted' discovery, what they actually seek is every single document and communication between [p]laintiffs' counsel, RFA and his Investigative Team, withdrawn expert witnesses, and even a plaintiff (Norma Lopez), over a span of more than six years." (Id.) Accordingly, plaintiffs' counsel argue, "[t]here is nothing 'targeted' about their request," and note that "[a]llowing [d]efendants this branch-out discovery into opposing counsel's extensive files would be a sweeping, time and resource-

intensive exercise that would grind this case to a halt, just when the parties are trying to conclude discovery and litigate a pending appeal in the Fourth Circuit." (Id. at 58–59). Further, plaintiffs' counsel argue, "[d]efendants' motion does not demonstrate any "extraordinary circumstances" that justify their desire for a unilateral fishing expedition into Plaintiffs' counsel's files." (Id.)

As noted by plaintiffs, the Advisory Committee Notes to Federal Rule of Civil Procedure 11 state:

> To assure that the efficiencies achieved through more effective operation of the pleading regimen will not be offset by the cost of satellite litigation over the imposition of sanctions, the court must to the extent possible limit the scope of sanction proceedings to the record. Thus, discovery should be conducted only by leave of the court, and then only in extraordinary circumstances.

Fed. R. Civ. P. 11, Advisory Committee Notes (1983). While there is a relative dearth of case law addressing what constitutes "extraordinary circumstances" to justify discovery regarding the imposition of sanctions,[13] "courts [a]re generally unsympathetic to discovery specifically dealing with Rule 11 motions (as opposed to general discovery which uncovers Rule 11 violations)." Thomas Geisler, Jr., Proof of Violation of Federal Rule of Civil Procedure 11 and of Sanctions Thereunder, 47 Am. Juris. Proof of Facts 3d 241 § 13 (2019) (originally published in 1998). The Seventh Circuit Court of Appeals has noted that "[t]h[e] court's 'experience in litigation, its knowledge of the standards of the bar of the court, and its familiarity with the case before it, and by reference to the relevant criteria under the Federal Rules,' . . . the record in the case, and the surrounding circumstances" may afford the court an adequate basis to determine whether sanctions are necessary under Rule 11 without the need for satellite discovery. Indianapolis Colts v. Mayor & City Council of Baltimore, 775 F.2d 177, 183 (7th Cir. 1985) (quoting William Schwarzer, Sanctions Under the New Federal Rule 11—A Closer Look, 104 F.R.D. 181, 195 (1985)).

---

[13] I also note that defendants have failed to provide any law regarding the standard governing requests for discovery pursuant to Rule 11, let alone law that supports their position that they are entitled to such discovery.

Specifically, in <u>Indianapolis Colts</u>, the Court found that the district court did not abuse its discretion in denying defendant's request for discovery related to its Rule 11 motion as to plaintiff's motivation in filing an interpleader claim when the court was able to determine from the record and surrounding circumstances that the plaintiff did not have an improper motivation. <u>Id.</u>

Additionally, the Tenth Circuit Court of Appeals has noted that "[t]here is no requirement in Rule 11 for a sanctions trial." <u>Burbridge Mitchell & Gross v. Peters</u>, 622 F. App'x 749, 758 (10th Cir. 2015). In <u>Burbridge Mitchell & Gross</u>, the defendants moved to compel arbitration pursuant to an alleged arbitration clause in the parties' engagement agreement. <u>Id.</u> at 756. The plaintiff informed the defendants that it had never entered into said engagement agreement and stated that it would file a Rule 11 motion for sanctions if the defendants did not withdraw the motion to compel arbitration. <u>Id.</u> The defendants failed to do so, and the plaintiff filed a Rule 11 motion, which the district court granted, finding that "there is not enough evidentiary support to say that there was" an engagement agreement, that the defendants made "an insufficient reasonable inquiry" prior to filing the motion to compel arbitration, and that "the evidentiary support was insufficient to support [the defendants'] factual contentions." <u>Id.</u> at 756–57. On appeal, however, one of the defendants argued that "the district court abused its discretion by not allowing discovery or conducting a trial on the existence of the engagement agreement." <u>Id.</u> at 758. The Court found, however, that the district court did not abuse its discretion in limiting the scope of sanction proceedings to the record as contemplated by Rule 11 when the defendant failed to identify "extraordinary circumstances" justifying pre-sanctions discovery. <u>Id.</u>

This court has similarly noted the importance of limiting the scope of sanctions proceedings to the record. In <u>Capitol Radiology, LLC v. Sandy Spring Bank</u>, Civil Action No. DKC-09-1262,

2010 WL 2595781, at *1 (D. Md. June 24, 2010), this court declined to consider evidence outside of the record when ruling upon the defendant's Rule 11 motion for sanctions. Id. at *2. Specifically, the defendant argued that the plaintiff should be sanctioned for bringing a breach of contract claim against the defendant for wrongfully calling the plaintiff's loans into default. Id. The defendant prevailed on summary judgment, and in support of its motion for sanctions, argued that the evidence established that "[p]laintiff wrongfully argued that [d]efendant had breached the contract when [p]laintiff had actually breached the contract first." Id. The court declined to consider evidence that the plaintiff may have breached the agreement first, however, noting that "it was unnecessary for the court to examine that evidence in order to award summary judgment in Defendant's favor by finding that Plaintiff could not prove that Defendant had breached the contract." Id. The court further noted that it was declining to undertake this further analysis in accordance with Rule 11's goal of "assur[ing] that the efficiencies achieved through more effective operation of the pleading regimen will not be offset by the cost of satellite litigation over the imposition of sanctions." Id. (citing Fed. R. Civ. P. 11, Advisory Committee Notes (1983)).

Similarly, in CTP Innovations, LLC v. Cenveo Corp., MDL No. 14-MD-2581, 2017 U.S. Dist. LEXIS 605, at *1 (D. Md. Jan. 4, 2017), this court declined to reopen a case that was dismissed for lack of standing and allow discovery in support of a Rule 11 motion. Id. at *6. The defendant asked the court to order the plaintiff to respond to previous discovery requests and argued that said discovery "would reveal that [the plaintiff] did not perform adequate pre-filing investigation," which would subject the plaintiff to sanctions under Rule 11. Id. at *4–*5. The defendant also argued that it needed discovery "to properly assess its basis to recover attorneys' fees." Id. at *5. The court noted, however, that, under Rule 11, the court should limit the scope of sanctions proceedings to the record and allow discovery only in "extraordinary circumstances."

Id. (citing Fed. R. Civ. P. 11, Advisory Committee Notes (1983)). The court found that discovery was not appropriate under the circumstances, as the defendant had failed to present "extraordinary circumstances" to "justify reopening the instant case to allow the requested discovery so as to resurrect a long dormant Rule 11 issue." Id. at *5–*6.

Here, while defendants request additional discovery so that defendants can "investigate the full scope of the abuses that have occurred and . . . identify all individuals responsible for those abuses," (ECF No. 262-1 at 10), neither of these goals constitute "extraordinary circumstances" justifying a need for satellite discovery. I also note that neither of defendants' stated objectives for additional discovery are supported by their own Motion or the case law before the court. While defendants ask permission to "investigate the full scope of abuses," defendants also state that they "could seek dismissal now based on the matters discussed in [the Motion]." (ECF No. 262-1 at 10). Specifically, defendants allege that, based on the discovery that they already possess, that "plaintiffs' claims are based on manufactured evidence, false sworn statements, and unsupportable allegations that even a cursory investigation would have shown were unfounded." (ECF No. 262 at 1). Indeed, defendants dedicate a significant portion of their Motion setting out these allegations in great detail. Accordingly, defendants have not established that their goal of uncovering additional evidence of alleged litigation abuse to support an anticipated Rule 11 motion is an "extraordinary circumstance" justifying satellite discovery.

Similarly, while defendants argue that additional discovery is necessary to "identify all individuals responsible" for the alleged litigation abuses, defendants also ask the court to sanction all of plaintiffs' U.S. counsel by awarding costs and attorneys' fees. (ECF No. 262-1 at 36). While defendants request discovery to answer the question of "who knew and who should have known" about Dr. Orozco's fraud, (ECF No. 332 at 16), they also argue that "[r]egardless, it is clear that

had plaintiffs' counsel conducted a diligent investigation, they would have discovered the fraud." (ECF No. 262-1 at 14). Additionally, defendants argue that "[t]here are also several reasons to believe that <u>all</u> of plaintiffs' counsel either knew or should have known that Dr. Orozco did not conduct the supposed lab testing or that his 'results' were not to be trusted." (ECF No. 332 at 16). Defendants similarly argue in their Reply that <u>all</u> counsel are responsible for "their collective misconduct and vexatious multiplication of this proceeding." (ECF No. 332 at 8). Given defendants' arguments that all of plaintiff's counsel share the responsibility for the alleged litigation abuses, defendants' articulated need to "identify all individuals responsible" is also not an "extraordinary circumstance" justifying satellite discovery.

In sum, I find that defendants have not established that there are "extraordinary circumstances" justifying satellite discovery in support of defendants' anticipated Rule 11 motion. Rather, as noted by plaintiffs' counsel, "[d]efendants' request is exactly the type of 'satellite litigation' against which the Advisory Committee sought to protect." (ECF No. 300 at 58 (citing Fed. R. Civ. P. 11, Advisory Committee Notes (1983))). Should defendants file a Rule 11 motion, the "court's 'experience in litigation, its knowledge of the standards of the bar of the court, and its familiarity with the case before it, and by reference to the relevant criteria under the Federal Rules,' . . . the record in the case, and the surrounding circumstances" would afford the court a sufficient basis to determine whether sanctions are necessary. <u>Indianapolis Colts</u>, 775 F.2d at 183 (7th Cir. 1985). Accordingly, defendants' request for additional discovery is denied.

## III. DEFENDANTS' REQUEST FOR ATTORNEYS' FEES

Defendants also request that the court "order plaintiffs' counsel to reimburse defendants for expenses that have been needlessly incurred as a result of their bad faith and vexatious conduct." (ECF No. 262-1 at 39). Defendants argue that "this case has involved, among other

things: perjury, altered documents, the withholding of crucial evidence, false interrogatory answers that were certified without any plausible basis, failure to comply with notices of deposition <u>duces tecum</u>, and documents created in violation of Guatemala law." (<u>Id.</u> at 38). While defendants note that "[s]ome misdeeds were committed by plaintiffs' experts, some by investigators, and some by a former school director," defendants argue that "all responsibility lies at the feet of plaintiffs' counsel who retained and directed these agents." (<u>Id.</u>) Defendants further argue that "[t]he conduct of plaintiffs' counsel has vexatiously multiplied these proceedings" and that "defendants have wasted enormous time and money investigating the particular facts surrounding individual plaintiffs who no longer are part of this lawsuit." (<u>Id.</u> at 39). In sum, defendants argue, "[a]ll this occurred because plaintiffs' counsel, 'pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound . . . .'" (<u>Id.</u> (quoting <u>Dal Pozzo v. Basic Mach. Co.</u>, 463 F.3d 609, 614 (7th Cir. 2006) (internal quotations and citations omitted))). Accordingly, defendants argue that the court should impose sanctions in the form of attorneys' fees to defendants pursuant to: (1) the court's inherent authority to impose sanctions; (2) 28 U.S.C. § 1927; and/or (3) Federal Rule of Civil Procedure 26(g).

First, defendants argue that the court should exercise its inherent authority to impose sanctions to award attorneys' fees to defendants. (<u>Id.</u> at 36 (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45–46 (1991)). Specifically, defendants argue, "[i]t 'is well-settled that fraud on the court or abuse of the judicial process warrants use of the inherent power to impose sanctions on the offending party or its counsel, or both.'" (<u>Id.</u> at 37 (quoting <u>Suntrust Mortg., Inc. v. AIG United Guar. Corp.</u>, No. 3:09-cv-529, 2011 WL 1225989, at *13 (E.D. Va. March 9, 2011))). Defendants also note that "[t]he [c]ourt may also exercise its inherent authority to order reimbursement of legal fees and costs incurred by one side as a result of the other side's bad faith conduct." (<u>Id.</u> (citing

Six v. Generations Fed. Credit Union, 891 F.3d 508, 519 (4th Cir. 2018); Chambers, 501 U.S. at 45–46)). Similarly, defendants argue, the court "has power to impose sanctions under 28 U.S.C. § 1927, which provides that any attorney 'who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" (Id. at 38 (quoting 28 U.S.C. § 1927)).

As noted by plaintiffs' counsel, "[u]nder both § 1927 and the court's inherent power, the burden of demonstrating an entitlement to attorneys' fees rests on the moving party." Stradtman v. Republic Servs., Inc., 121 F. Supp. 3d 578, 581 (E.D. Va. 2015) (citing Morris v. Wachovia Secs., Inc., 448 F.3d 268, 284 (4th Cir.2006)). Further, "[t]o prevail in a motion for sanctions pursuant to either 28 U.S.C. § 1927 or the inherent power of the court, the movant must show that his adversary has acted in 'bad faith.'" (ECF No. 300 at 10 (citing E.E.O.C. v. Great Steaks, Inc., 667 F.3d 510, 522 (4th Cir. 2012); United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993)). Plaintiffs' counsel further note that the Fourth Circuit defines "bad faith as "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." (Id. (quoting In re 1997 Grand Jury, 215 F.3d 430, 436 (4th Cir. 2000) (citation omitted))). Here, plaintiffs' counsel argue that "[t]here has been no 'bad faith' on the part of [p]laintiffs' counsel justifying . . . the award of money sanctions." (Id. at 11). Specifically, plaintiffs' counsel argue that they have not acted in bad faith, made false claims, perpetrated a fraud on the court, withheld or manufactured evidence, suborned perjury, filed false interrogatory answers, or dismissed claims to avoid disclosing relevant information. (Id.) Rather, plaintiffs' counsel argue, they have, in good faith, followed the court's instructions, have not

multiplied the proceedings vexatiously, and have "tapered the case to ensure that only sound evidence and credible claims see the courtroom." (Id.)

In their Reply, defendants acknowledge that sanctions under 28 U.S.C. § 1927 are subject to an objective bad faith test, while sanctions under the court's inherent power are governed by a subjective bad faith standard. (ECF No. 332 at 26–27). Defendants fail, however, to even address whether the facts presented by defendants establish that plaintiffs' counsel's conduct meets either standard. Instead, defendants merely reiterate their request for additional discovery to determine the "totality of circumstances" of the case, which courts consider when determining whether "bad faith" exists. (Id. 27 (citing Carolin Corp. v. Miller, 886 F.2d 693, 701, 703 (4th Cir. 1989))). Given that defendants have failed to address the pivotal question of whether plaintiffs' counsel acted with the requisite mens rea under either standard, defendants have failed to meet their burden of establishing that they are entitled to sanctions under either the court's inherent authority to award sanctions or 28 U.S.C. § 1927. See Stradtman, 121 F. Supp. 3d at 581 (burden is on movant to prove entitlement to attorneys' fees under either source of authority).

Defendants also argue that the court has power to impose sanctions under Federal Rule of Civil Procedure 26(g), "which provides that, by signing an interrogatory answer, the signing attorney certifies that, to the best of the signer's knowledge, information and belief, 'formed after reasonable inquiry,' the response is, among other things, not interposed for any improper purpose." (Id. at 37 (quoting Fed. R. Civ. P. 26(g))). Defendants further note that "[a]n attorney who fails to make this inquiry makes an improper certification and is subject to mandatory sanction." (Id. at 37–38 (citing Rojas v. Town of Cicero, Ill., 775 F.3d 906, 909 (7th Cir. 2015); Bernal v. All Am. Inv. Realty, Inc., 479 F. Supp. 2d 1291, 1334 (S.D. Fla. 2006))).

In response, plaintiffs' counsel argue that they met with Selected Plaintiffs in Guatemala, discussed the interrogatories, and properly drafted answers "based on information obtained during those interviews and other information in counsel's possession." (Id. at 39–40 n.30). Plaintiffs' counsel further state that they asked Mr. Rodriguez to explain to plaintiffs what the answers were, ask them to verify the information, and sign. (Id.) Plaintiffs' counsel note that "verbal discussion is the only way for counsel and RFA's investigators to transmit information" to plaintiffs and argue that "[t]he fact that some of the [p]laintiffs may have misunderstood the instruction or even did not receive it is not a reason to award sanctions, and hardly shows that [p]laintiffs' counsel acted in bad faith or perpetrated a fraud on the [c]ourt." (Id.)

Here, defendants similarly fail to offer support for their argument that the court should impose sanctions under Federal Rule of Civil Procedure 26(g). In their Opposition, plaintiffs' counsel detail the efforts undertaken by both U.S. and local counsel in preparing plaintiffs' interrogatory answers. (ECF No. 300 at 39–40 n.30). In their Reply, however, defendants do not address whether this conduct establishes a violation of Rule 26(g), much less whether said conduct warrants a finding of sanctions. Instead, defendants merely state that:

> It is extraordinary that plaintiffs' counsel would try to create a triable dispute of fact—and attempt to counter unhelpful deposition testimony—by offering the Court a set of interrogatory responses signed by a witness who did not see a Spanish translation, did not know the purpose of the document, did not know that his signature represented an oath as to the truthfulness of its contents, . . . and failed to testify consistently in his deposition.

(ECF No. 300 at 20). Given that defendants have failed to address the threshold question of whether the conduct of plaintiffs' counsel establish a violation of Rule 26(g) or otherwise support their request for sanctions under this Rule, defendants have failed to establish that they are entitled to attorneys' fees.

In conclusion, defendants have failed to establish that plaintiffs' counsel acted with the requisite state of mind to warrant an award of attorneys' fees under either the court's inherent power or 28 U.S.C. § 1927 or to establish that plaintiffs' counsel violated Federal Rule of Civil Procedure 26(g). Accordingly, defendants' request for an award of attorneys' fees is denied. Further, I would observe that, given defendants' articulated intention to file a Motion for Sanctions, defendants' request for attorneys' fees is more appropriately presented in the context of that motion. I also note that, in practice, this court has found that it is more appropriate and timely to consider such motions after the resolution of a case on its merits. See, e.g., Capitol Radiology, LLC v. Sandy Spring Bank, Civil Action No. DKC-09-1262, 2010 WL 2595781, at *1 (D. Md. June 24, 2010) (addressing a motion for sanctions under Rule 11 after resolution of the case at the summary judgment stage). Here, given the October 11, 2019 deadline for the filing of summary judgment motions, the merits of the case will soon be addressed. Therefore, I would observe that any motion for sanctions, including the award of attorneys' fees, would be more timely addressed after the resolution of the merits of the case.[14]

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion for Discovery and Sanctions (ECF No. 262) is denied. A separate order will issue.

Date: August 27, 2019

_____/s/_____
Beth P. Gesner
Chief United States Magistrate Judge

---

[14] As noted above, defendants must follow the procedures outlined in the Case Management Order regarding Motions Practice (ECF No. 180 at 2) prior to filing any motion.