IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ESTATE OF ARTURO GIRON ALVAREZ, et al. | |
| **Plaintiffs** | Civil Action No. 1:15-cv-0950 TDC |
| v. | |
| THE JOHNS HOPKINS UNIVERSITY, et al. | |
| **Defendants** | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

PAUL D. BEKMAN (#00019)
E. DALE ADKINS III (#01425)
LAURENCE A. MARDER (#02443)
EMILY C. MALARKEY (#28197)
GREGORY G. HOPPER (#26150)
RYAN S. PERLIN (#20840)
ARYEH M. RABINOWITZ (#20225)
BEKMAN, MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
410-539-6633
*Attorneys for Plaintiffs*

F. R. JENKINS (*Admitted pro hac vice*)
MATTHEW R. CATON (*Admitted pro hac vice*)
MERIDIAN 361 INTERNATIONAL LAW GROUP PLLC
97A Exchange Street, Suite 202
Portland, Maine 04101
866-338-7087
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................v

OVERVIEW.... ...............................................................................................1

SUMMARY OF THE EVIDENCE..................................................................2

THE PLAINTIFFS............................................................................................4

FACTUAL BACKGROUND ............................................................................6

    *The Rockefeller Foundation – A Partner, Not A Patron ….* ..........................6

    *Hopkins And Venereal Disease Research Prior To The 1940s* ...................8

    *Tuskegee And Terre Haute….* ................................................................... 10

    *Creation Of The Syphilis Study Section* ................................................... 12

    *Approval Of The Guatemala Experiments By The SSS And Appointment Of Dr. Soper As Investigator* ........................................................................ 15

    *Dr. Soper And Dr. Parran's Knowledge Of And Involvement With The Experiments* ............................................................................................... 19

    *Knowledge And Involvement Of Hopkins' Physicians* .............................23

    *Summary….* ................................................................................................28

SUMMARY JUDGMENT STANDARD…..................................................29

ARGUMENT: PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT…. .......30

    I.    THE ALIEN TORT STATUTE…. .......................................................30

    II.    EACH OF THE DEFENDANTS HAD AGENTS WHO WERE DIRECTLY INVOLVED IN AND/OR AIDED AND ABETTED OR CONSPIRED TO FACILITATE NONCONSENSUAL HUMAN EXPERIMENTATION IN THE GUATEMALA EXPERIMENTS ................... 31

        A.    Overview of applicable agency law...................................... 31

        B.    Drs. Parran and Soper were agents of TRF, either solely or dually, throughout their involvement with the Guatemala Experiments ........33

        C.    In the course of their work for TRF, Drs. Parran and Soper directly participated in the Guatemala Experiments, and were aiders and

abettors or co-conspirators of nonconsensual and unethical human experimentation ................................................................................... 37

D.   Drs. Moore, Turner, Eagle, and Reed were agents of Hopkins throughout their involvement with the Guatemala Experiments ........ 40

E.   In the course of their work for Hopkins, Drs. Moore, Turner, Eagle, and Reed directly participated in the Guatemala Experiments and were aiders and abettors or co-conspirators of nonconsensual and unethical human experimentation .......................................................................... 44

F.   The 22 Plaintiffs bringing this Motion were victims of nonconsensual medical experiments in violation of customary international law, and each Plaintiff suffered an injury as a result ........................................... 47

*The Selected Plaintiffs* .......................................................................... 48

*Evidence Supporting the Injury of 18 Other Victims* ........................... 50

CONCLUSION ................................................................................................. 52

ARGUMENT:   OPPOSITION   TO   DEFENDANTS'   MOTION   FOR   SUMMARY JUDGMENT…. ................................................................................................. 53

I.   THERE IS AT LEAST A DISPUTE OF FACT ABOUT DEFENDANTS' RESPONSIBILITY FOR THE GUATEMALA EXPERIMENTS …........................................................... 53

II.   DEFENDANTS MISCONSTRUE AND MISAPPLY THE APPLICABLE AGENCY LAW .... 55

A.   The borrowed servant doctrine does not apply to this case ................. 55

B.   The doctrine of *respondeat superior* does apply to this case ............... 57

C.   The *Monell*-like standard has no place under the ATS ........................ 60

D.   Even if a *Monell*-like standard applied, the evidence in this case is sufficient to meet that standard ............................................................. 62

III.   THIS CASE DOES NOT INVOLVE AN IMPERMISSIBLE "EXTRATERRITORIAL" APPLICATION OF THE ATS .................................................................................. 64

IV.   DEFENDANTS ARE NOT ENTITLED TO ANY IMMUNITY ..................................... 65

A.   Defendants are not entitled to the protection of either derivative sovereign or derivative absolute immunity ........................................... 65

B.   Defendants are not entitled to the protection of charitable immunity . 69

V.   DEFENDANTS' PLAINTIFF-SPECIFIC DEFENSES LACK MERIT ............................. 71

**A.**     **Evidence of identity raises a jury question**.............................................. **71**

**B.**     **Evidence regarding infection with an STD is not required to show that a plaintiff was a victim of a nonconsensual experiment**....................... **73**

**C.**     **The Estate Plaintiffs have "standing"**.................................................... **75**

**D.**     **"Battery" claims are not novel**................................................................ **76**

**E.**     **Limitations have not yet run**.................................................................... **77**

**F.**     **Summary** ................................................................................................... **78**

**CONCLUSION**.......................................................................................................................... **79**

## TABLE OF AUTHORITIES

**Cases**

*Akbar v. Calumet City,* 632 F. App'x 868 (7th Cir. 2015) ........................................................76

*Al Shimari v. CACI Premier Tech., Inc.,* 758 F.3d 516 (4th Cir. 2014) .......................................64

*Al Shimari v. CACI Premier Tech., Inc.,* 324 F. Supp. 3d 668 (E.D. Va. 2018)..........................31

*Al Shimari v. CACI Premier Tech., Inc.,* 368 F. Supp. 3d 935 (E.D. Va. 2019), *appeal dismissed,* 775 F. App'x 758 (4th Cir. 2019) ...............................................................................................................65

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................................30

*Aziz v. Alcolac, Inc.,* 658 F.3d 388 (4th Cir. 2011) .....................................................................31

*Baldwin v. City of Greensboro,* 714 F.3d 828 (4th Cir. 2013) ....................................................29

*B.C. Ferry Corp. v. Invicta Sec. Serv. Corp.,* No. CA023277, 84 A.C.W.S. (3d) 195 (B.C. Ct. App. 1998) (Canada) ................................................................................................................................58

*Bowoto v. Chevron Texaco Corp.,* 312 F. Supp. 2d 1229 (N.D. Cal. 2004) .................................58

*Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663 (2016) .......................................................65, 68-69

*Celotex v. Catrett,* 477 U.S. 317 (1986) .....................................................................................29

*Chairman, Ry. Bd. v. Das,* 2 L.R.I. 273 (2000) (India) ...............................................................58

*Cilecek v. Inova Health Sys. Servs.,* 115 F.3d 256 (4th Cir. 1997) ............................................68

*Coates v. Vilsack,* 2015 WL 1013402 (D. Md. Mar. 6, 2015).................................................29-30

*Cox v. Cnty. of Prince William,* 249 F.3d 295 (4th Cir. 2001) ...................................................29

*Cunningham v. Gen. Dynamics Info. Tech., Inc.,* 888 F.3d 640 (4th Cir. 2018) ..............................65

*Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1 (2001)...............................56

*Doe VIII v. Exxon Mobile Corp.,* 654 F.3d 11 (D.C. Cir. 2011), *vac. on other grounds,* 527 F. App'x 7 (D.C. Cir. 2013) (Mem.)...................................................................................................................... 58, 70

*Ellul v. Congregation of Christian Bros.,* 774 F.3d 791 (2d Cir. 2014) .....................................77-78

*Estate of Alvarez v. Johns Hopkins Univ.,* 205 F. Supp. 3d 681 (D. Md. 2016) ("*Alvarez II*") ......................
.......................................................................................................... 1, 30, 31, 47, 74, 76-77

*Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670 (D. Md. 2017) ("*Alvarez III*") .....................
.................................................................................................31, 32-33, 55-58, 61, 74, 76-77

*Field v. Mans*, 516 U.S. 59 (1995) ........................................................................................70

*Filarsky v. Delia*, 566 U.S. 377 (2012) ..................................................................................69

*Flomo v. Firestone Nat. Rubber Co.*, 643 F.3d 1013 (7th Cir. 2011) .............................................60

*Garcia v. Sebelius*, 867 F. Supp. 2d 125 (D.D.C. 2012) .......................................................4, 66

*Gomez v. Toledo*, 446 U.S. 635 (1980) ..................................................................................65

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..............................................................................65

*In re Global Crossing Ltd, Sec. Litig.*, 2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005) ...........................55-56

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014) ...............................................66, 68

*Johnson & Johnson* (Ireland) Ltd. v. CP Sec. Ltd., I.R. 362 (H.Ct. 1986) (Ireland) ..............................58

*Kimmy Sueng King-on v. Attorney Gen.*, H.K.L.R. 331 (C.A. 1987) (Hong Kong) .................................58

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) .............................................. 30, 64

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) ...................................................................32

*Lister v. Hesley Hall, Ltd.*, 1 A.C. 215 (H.L.) (2002) (England and Wales) ...................................58

*Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442 (4th Cir. 1996) .....................................66, 69, 71

*Michigan v. U.S. Army Corp. of Engineers*, 667 F.3d 765 (7th Cir. 2011) ....................................70

*Miskin v. Baxter Healthcare Corp.*, 197 F. Supp. 2d 669 (D. Md. 1999) ......................................29

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) .........................55, 60-62

*Moodalay v. The East India Company*, 28 Eng. Rep. 1245 (Ch.) 1246, 1 Bro. C.C. 469 (1785) ................59

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ........................................................64

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014) .............................63

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ..............................................................62-63

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ........................70

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) ................................................64

*Roe v. Howard*, 917 F.3d 229, 240 n.6 (4th Cir. 2019) ................................................................64

*Shelling v. Farmer*, 93 Eng. Rep. 756; 1 Str. 646 (1725) .............................................................59

*Shields v. Illinois Dept. of Corr.*, 746 F.3d 782 (2d Cir. 2014) ....................................................61

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ...........................................................................30

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) .......................................................................63

*The Case of Thomas Skinner, Merchant v. The East India Company*, 6 State Trials 710 (H.L.) 711 (1666) ..59

*Wilson v. Kittoe*, 337 F.3d 392 (4th Cir. 2003) .............................................................................65

*Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18 (1940) ...............................................................66

**Statutes**

22 U.S.C. §§ 288, 288a ...................................................................................................................66

28 U.S.C. § 1350 ..................................................................................................................30, *passim*

42 U.S.C. § 1983 ..................................................................................................................61, 65, 69

**Federal Rules**

Fed. R. Civ. P. 56 ............................................................................................................................29

Fed. R. Evid. 803 ............................................................................................................................74

Fed. R. Evid. 807 ............................................................................................................................74

**Other Authorities**

WILLIAM P. KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS 499 (5th ed. 1984) .........58

Restatement (First) of Agency §§ 1, 2, 226, 227, 227 cmt. b, 229, 230 ...........................32-33

Restatement (Second) of Agency §§ 219, 226, 227 cmt. B ............................ 33, 56, 58, 66, 68

Restatement (Second) of Torts §§ 895E, 895E cmt. D .......................................................70

Ruth Faden, *Op-Ed: Compensation*, HOPKINS BERMAN INSTITUTE BIOETHICS BULLETIN, (July 21, 2012), http://bioethicsbulletin.org/archive/op-ed-compensation ..........................................1

Susan M. Reverby, *Restorative Justice and Restorative History for the Sexually Transmitted Disease Inoculation Experiments in Guatemala*, AM. J. PUBLIC HEALTH, 1163-64 (2016) ............................................1

## OVERVIEW

This lawsuit arises out of an Experiment involving the purposeful and non-consensual transmission and attempts to transmit sexually transmitted diseases (STD) (syphilis, chancroid, and gonorrhea) to vulnerable and unsuspecting Guatemalan citizens 73 years ago. The subjects were men and women – some under the age of majority – who were patients in a mental institution, incarcerated in a prison, or conscripted to the military, as well as children at a school. The studies were real. The people who were injured are real. This has been the conclusion of at least three governmental bodies in two countries that have investigated.[1] Third party researchers – and Defendants' own employees – have called for justice on behalf of the victims.[2] Judge Garbis, in his decision denying Defendants' Motion to Dismiss the Second Amended Complaint, affirmed that "**there is no doubt that at least some of the Plaintiffs [in this lawsuit] suffered injury from the Guatemala Study**." *Estate of Alvarez v. Johns Hopkins Univ.,* 205 F. Supp. 3d 681, 683 (D. Md. 2016) (*Alvarez II*) (emphasis added).

A U.S. Presidential Commission convened by President Obama investigated the Experiments and concluded that the total number of victims was 5,128, and the number of people intentionally exposed to STD was 1,308. J.R. 19 (Ex. 1). The Department of Health and Human Services determined that, of 497 subjects inoculated with infectious syphilis, 87% could be considered to have laboratory evidence of acquiring the disease. J.R. 5330 (Ex. 280). The Guatemalan Government compiled an "Archival Report" listing 3,780 **actual names** of individual victims gleaned from the records it reviewed. J.R. 3562-3793 (Ex. 179). The Guatemalan Presidential Report identified as

---

[1] This includes the United States Presidential Commission (J.R.  1 *et seq.* (Ex. 1)), the Guatemalan Government (J.R. 3169 *et seq.* (Ex. 177)), and the U.S. Department of Health & Human Services (J.R. 5330 *et seq.* (Ex. 280).

[2] *See, e.g.,* Ruth Faden, *Op-Ed: Compensation*, HOPKINS BERMAN INSTITUTE BIOETHICS BULLETIN, (July 21, 2012), http://bioethicsbulletin.org/archive/op-ed-compensation; Susan M. Reverby, *Restorative Justice and Restorative History for the Sexually Transmitted Disease Inoculation Experiments in Guatemala*, AM. J. PUBLIC HEALTH, 1163-64 (2016).

responsible parties, among others, Dr. Thomas B. Turner of Johns Hopkins; Dr. Thomas Parran, the U.S. Surgeon General and The Rockefeller Foundation Trustee; and Dr. Fred Soper, another senior staff member of The Rockefeller Foundation, and principal Investigator for the Guatemala Experiments. J.R. 3184; 3232 (Ex. 177).

Defendants do not dispute the improper, unethical, and nonconsensual nature of the Experiments, or the fact that they were purposefully kept secret for decades.

## SUMMARY OF THE EVIDENCE

The Guatemala Experiments were not, as Defendants would have the Court believe, the result of one or two rogue Government scientists going "off script." Instead, the Experiments resulted from a coordinated, concerted effort by Defendants' employees and other scientists to construct, direct, aid and abet the project before it was created, when it was approved, and while it was underway. Undisputed facts confirm that agents of Johns Hopkins (Hopkins)[3] and The Rockefeller Foundation (TRF) shepherded the proposal for the Experiments through the federal research funding process, participated in the conduct of the Experiments, knew of the nonconsensual and intentional nature of the Experiments, and had the ability to – but did not – stop, modify, or limit them. When they took these actions, these individuals were not acting as Government agents, but rather, on behalf and for the benefit of TRF and Hopkins, and their respective scientific and research goals and reputations.

---

[3] Plaintiffs have brought suit against The Johns Hopkins University, The Johns Hopkins University School of Medicine, The Johns Hopkins Hospital, The Johns Hopkins Bloomberg School of Public Health, and The Johns Hopkins Health System Corporation. Collectively, these entities are referred to in this Memorandum as "Hopkins." Although Hopkins argues that only The Johns Hopkins University is a proper Defendant, (*see* pages 17-18 of Hopkins' Brief), as outlined in detail in this Memorandum, the evidence suggests that additional proper Defendants at least include The Johns Hopkins School of Medicine and School of Public Health, where Defendants' physicians had academic appointments and worked at the time of the Guatemala Experiments.

As will be described in detail below, TRF and Hopkins are liable for their agents' conduct on behalf of their respective institutions for controlling, approving, aiding and abetting the Guatemala Experiments. A brief summary of the evidence is as follows:

### The Rockefeller Foundation:

- TRF Trustee and Scientific Director Thomas Parran, who was eager to further his own STD research, the research endeavors of his colleagues, and the mission of TRF's International Health Division, gave final approval for the Experiments to occur.

- Dr. Parran was well aware of the nonconsensual nature of the Experiments.

- Dr. Parran, who knew longtime TRF employee Frederick Soper from his work on behalf of TRF's International Health Division, specially appointed and "assigned" Dr. Soper to the PASB, where he became the official "Investigator" for the Guatemala Experiments, thus using TRF's *modus operandi* of embedding its agents in other institutions to carry out its mission.

- As "Investigator" and "responsible official," Dr. Soper was responsible for ensuring the well-being of the subjects. He did not live up to this expectation. Dr. Soper traveled to Guatemala and was unquestionably kept in "confidence" regarding the true nature of the experiments, including the fact that vulnerable people were being purposefully infected with disease.

- During 1947, when the majority of the intentional exposure experiments were occurring in Guatemala, Dr. Soper was paid not by the PASB, but by TRF. TRF contributed to an annuity retirement and insurance program. Dr. Soper remained an Associate Director of the IHD, and "on staff" with TRF, through 1950.

- Dr. Soper continued to work closely with and report to TRF for years thereafter, writing that he considered his assignment to the PASB to be one of fulfilling the international health program of TRF.

- The Experiments could not have happened if Dr. Parran did not approve their funding, and if they did not have an Investigator who would accept the intentional exposure of non-consenting subjects to oversee them. But for the actions of Drs. Parran and Soper, the Experiments could not have occurred. Both men had the ability to stop the Experiments and chose not to.

### Johns Hopkins

- The Guatemala Experiments were a natural extension of research being conducted by a number of Hopkins syphilis researchers. Those researchers, led by Dr. Joseph

Earle Moore, and frustrated at the lack of ability to pursue their research on human subjects, took advantage of their appointment to the Syphilis Study Section to generate an opportunity to do so in secret in Guatemala.

- As chair of the SSS, Dr. Moore was in charge of an autonomous body that was created to formulate and approve federally-funded research, free from government control. He chose his Hopkins colleagues Drs. Reed, Turner and Eagle to be on the SSS.

- While serving on the SSS, Drs. Moore, Turner, Eagle and Reed were paid by Hopkins, not by the Government. Their participation on the SSS benefited Hopkins through increased reputation, honor, access to research data and planning, and ensuring further funding for continued research.

- The SSS members devised "the Guatemala Study dealing with the experimental transmission of syphilis to human volunteers and improved methods of prophylaxis," before their very first meeting. Drs. Moore, Eagle, Turner and Reed voted to approve the Experiments when they could have said no. They re-approved them a year later, despite knowing of their illicit nature. They deliberately sought to conceal that nature.

- Drs. Moore, Turner, and Eagle were actively involved in ensuring that the Experiments included extensions of the research they were conducting in the United States. This research of course was expected of and benefitted their employer, Hopkins.

- The Experiments could not have happened but for these key scientists at Johns Hopkins, as members of the Syphilis Study Section, conceiving of them, proposing them, approving their funding, and participating in them. They had the ability to stop the Experiments and chose not to.

## THE PLAINTIFFS

Although this lawsuit was initially filed on behalf of 842 Plaintiffs, as of the time this Cross-Motion is filed, 107 remain, 22 of whom join in the instant motion for summary judgment (*see* pages 47-52 *infra*) and all of whom oppose Defendants' Joint Motion for Summary Judgment on All Claims.[4] They fall into two categories:

---

[4] Throughout their pleadings, Defendants repeatedly and incorrectly state that the Plaintiffs and their counsel involved in this lawsuit are the same parties and lawyers who were involved in a different lawsuit brought in the United States District Court for the District of Columbia in 2012. *See Garcia v. Sebelius,* 867 F. Supp. 2d 125 (D.D.C. 2012). That is not true. Plaintiffs' counsel in this case were not involved in *Garcia* and the Plaintiffs who brought this case are different individuals.

(1)      **Purposeful Infection Victims from the Asylum/Prison/Army**: Forty-four (44) of the remaining Plaintiffs assert that they were victims of purposeful and nonconsensual infection experiments when they were at the Asylum, Prison and Army in Guatemala City. J.R. 4201 (Ex. 182). Almost all of their names were included on the Guatemalan Archival Report.[5] J.R. 3562-3793 (Ex. 179). Contemporaneous documentation produced by the United States National Archives and Records Administration (NARA) details experiments performed on at least 20 of these Plaintiffs, and is discussed in detail in an Affidavit prepared by Plaintiffs' expert in infectious disease, Jeffrey Klausner, M.D., who has interpreted this data and testified about it in discovery. J.R. 4342-4704 (Ex. 188-207) (NARA records); J.R. 4705-17 (Ex. 208) (Affidavit); J.R. 1243 *et seq.* (Ex. 35) (Deposition).

(2)      **Victims of Nonconsensual Serological Testing from the Puerto de San Jose (PSJ) School and Orphanage**: The other 63 Plaintiffs allege that they were subjected to nonconsensual medical experiments in the form of blood draws, spinal taps and other such testing without their consent as schoolchildren**.** J.R. 4203-04 (Ex. 183). It is undisputed that such testing was performed on schoolchildren as part of the Guatemala Experiments: in their attempts to develop an accurate blood test for detecting syphilis, the experimenters wanted to work with blood from a population that was likely not exposed to sexual transfer of the disease. J.R. 49-53 (Ex. 1). They traveled to the coastal town of Puerto de San Jose to extract blood from schoolchildren to serve this purpose, and published about these "serological tests" in contemporaneous medical literature. *Id.; see also* 191 (Ex. 1, fn. 288). The testing is described by both the U.S. and Guatemalan Commissions that investigated. *Id.* (U.S. Report); J.R. 3207, 3253-54 (Ex. 177).

---

[5] Defendants correctly asserted that there were an additional 31 "spouse" Plaintiffs. Plaintiffs' counsel has decided to dismiss or withdraw from these claims and will do so in due course.

## **FACTUAL BACKGROUND**

The factual background that follows applies both to Plaintiffs' Motion for Summary Judgment, and Opposition to Defendants' Joint Motion for Summary Judgment on All Claims, which begins on page 53 *infra*.

### *The Rockefeller Foundation – A Partner, Not A Patron*

The Rockefeller Foundation (TRF) was founded in 1913; its stated mission has always been to promote national and international research in the area of public health. J.R. 4719-20 (Ex. 209). TRF's philosophy is that it is "a partner, not a patron," and it works through governments and private agencies, not for them. *Id. See also* J.R. 4747 (Ex. 210).

The International Health Division (IHD) was TRF's sole operating division, deploying not only funding, but also personnel. It was responsible for TRF public health initiatives. The IHD was led by a Director and Associate Directors, each of whom is deemed an "officer" of the corporation. J.R. 2223-24 (Ex. 95). The Director and Associate Directors performed the administrative and executive functions of the IHD, and initiated work on public health programs. J.R. 2217-20 (Ex. 106). The Director and Associate Director were supported by a Board of six Scientific Directors, who were charged with making recommendations and with approving programs and policies and making designations within the budget. J.R. 2224 (Ex. 95); J.R. 2217-20 (Ex. 106).

The IHD pursued aggressive public health programs, employing non-traditional methods of scientific experimentation and scholarship designed to accelerate results. J.R. 4718-20; 4723-25 (Ex. 209). TRF policy was to "hide itself behind its work and keep to the front the local agencies through which the work is being done." J.R. 4720 (Ex. 209) ("It became the policy of the International Health Division **to work through official governmental agencies**.") (emphasis added). Thus, the programs were nominally run by external agencies, but TRF directed the programs through senior TRF scientists

that it had assigned to and embedded in these agencies as "directing personnel." J.R. 4719-21 (Ex. 209).

TRF's research efforts were not limited to the United States. By the 1940s, TRF's international health projects involved a number in Latin America, including in Guatemala. J.R. 4754-55 (Ex. 211). Those programs included investigations into syphilis. J.R. 4723-25 (Ex. 209). Relevant to this case, TRF assigned and embedded its employee Dr. Frederick Soper in the Pan American Sanitary Bureau in furtherance of the Guatemala Experiments. J.R. 4967 (Ex. 235); 4968 (Ex. 236); 4979 (Ex. 241).

Commencing in the early 1900s, sexually transmitted disease (STD) research was a primary interest of the IHD – an interest that linked it with Hopkins for decades. In 1915, TRF selected Hopkins over a number of other medical institutions to build a School of Hygiene and Public Health. J.R. 4760-61 (Ex. 212). For decades thereafter, TRF frequently funded venereal disease research by Hopkins physicians, including some of the physicians whose conduct is at issue in this case. J.R. 4767 (Ex. 213). One relevant example is the funding of Thomas Turner, M.D.'s Johns Hopkins Syphilis Study, in which Dr. Turner was investigating immunities involving the bacteria that causes syphilis, with the ultimate goal of attempting to develop a prophylaxis, or vaccine, for the disease. J.R. 2725-27 (Ex. 168); J.R. 4800 (Ex. 220). In a Report given to TRF in 1946 about the study, Dr. Turner reported that rabbits inoculated with *t. cuniculi* (rabbit syphilis) developed an enhanced immunity to infection, suggesting it could be used in a vaccine. His report to Rockefeller noted that "[T]he procedures employed in these experiments were such that no interpretation in terms of **the natural disease in man is permissible….**" J.R. 4769 (Ex. 214) (emphasis added). As described below, Dr. Turner would ultimately pursue his investigation into *t. cuniculi* as a potential syphilis vaccine through the Guatemala Experiments.

TRF's agents relevant to the Guatemala Experiments include the following individuals, whose role will be discussed in greater detail below:

- <u>Dr. Thomas Parran</u>. Dr. Parran was syphilis researcher, U.S. Public Health Service (PHS) employee, and PHS Surgeon General during the Guatemala Experiments. He was also a Trustee of TRF, and was one of six Scientific Directors of its International Health Division. One of, if not the, primary goal during Dr. Parran's tenure as Surgeon General was the eradication of syphilis. J.R. 23-24 (Ex. 1); 4778 (Ex. 215) ("Parran, as the Surgeon General from 1936 to 1948, made a focus on syphilis the hallmark of his tenure."); J.R. 5338 *et seq.* (Ex. 281).

- <u>Dr. Frederick Soper</u>. Dr. Soper was an epidemiologist educated at the Johns Hopkins School of Public Health established with the help of TRF, but left Hopkins in 1925 to work for TRF in its public health endeavors, including in Latin American and Asia. He was an Associate Director of the IHD during the Guatemala Experiments, and, as discussed below, became the "Investigator" and "responsible official" for the Experiments beginning in 1947, while continuing to be an employee of TRF. J.R. 4785 *et seq.* (Ex. 216).

### Hopkins And Venereal Disease Research Prior To The 1940s

Hopkins was a leader in venereal disease research for decades leading up to World War II. By the early 1940s, Hopkins' Joseph Earle Moore, M.D. was "one of American's foremost syphilologists who has played a prominent part in the development of [Hopkins'] national venereal disease control program and particularly in the scientific and clinical aspects of syphilis treatment." J.R. 4788 (Ex. 217). Dr. Moore was a senior physician at Hopkins who was the Director of Department L (for *lues venerea*), a clinic focused on syphilis. J.R. 4789-92 (Ex. 218). By the mid-1940s, Dr. Moore had published textbooks about venereal diseases, and had trained many other doctors in the area. J.R. 4762-65 (Ex. 212). He served as an advisor to the Surgeon Generals regarding STD control, including Dr. Parran, who was one of his "closest personal friends." J.R. 25 (Ex. 1); 4788 (Ex. 217). "Under Moore's demanding and strict hand that would inspire many, generations of physicians learned how to do research on syphilis in humans and rabbits, and to care for patients with various venereal diseases." J.R. 4780 (Ex. 215) According to Plaintiff's expert Professor Susan Reverby, the historian who uncovered the papers relating to the Guatemala Experiments, Dr. Moore was "the godfather of syphilis studies." At the time, "everybody [wa]s checking in with him about how [syphilis research] [i]s being done." J.R. 1118 (Ex. 34).

8

Besides Dr. Moore, other Hopkins physicians relevant to this Motion include the following individuals, each of whom were integrally involved in STD research leading up to and during the Guatemala Experiments, and who sat on the advisory panel that formulated and approved them:

- Dr. Thomas Turner. Dr. Turner was Chair of the Hopkins School of Public Health's Department of Bacteriology, and would later become Dean of the School of Medicine. J.R. 4793-99 (Ex. 219). Dr. Turner was a prior employee of TRF, but after leaving to work for Hopkins, continued to receive financial support to conduct syphilis research from TRF. *See, e.g.,* J.R. 4800-08 (Ex. 220). As stated above, Dr. Turner's research interest, funded largely by TRF, focused on using *t. cuniculi,* (rabbit syphilis), to attempt to develop a prophylaxis, or vaccine, appropriate for humans. *Id.*

- Dr. Harry Eagle. Dr. Eagle was Director of the Hopkins Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics. J.R. 1993-1995 (Ex. 93). Dr. Eagle's research interests included attempting to develop penicillin as a prophylaxis or treatment for syphilis.

- Lowell Reed. Dr. Reed was Dean of the Hopkins School of Public Health, Chairman of the Department of Biostatistics, and Vice President of Johns Hopkins University and Hospital. J.R. 4812-16 (Ex. 222). He also was one of six Scientific Directors of the IHD of TRF at the time. J.R. 4818 (Ex. 223), 4822-23 (Ex. 224).

By the mid-1940s, largely through the efforts of these leaders, Hopkins had established itself as the national command and control center and information clearinghouse for all federally-funded investigations into the treatment of syphilis and other STDs. J.R. 4832-34 (Ex. 225). Clinics around the country examined, treated, and followed syphilis patients according to a uniform plan developed by Dr. Moore, recorded their results on forms created at Hopkins, and sent the forms to Hopkins, where they were collected and analyzed by Dr. Reed and his team in the Central Statistical Unit. *Id.* The findings from this research were published by Dr. Moore and his colleagues. *Id.* The research increased Hopkins' reputation as a leader in the field, and positioned it for continued receipt of grant and other monies to perform research to further build that reputation. J.R. 1092 (Ex. 34) (explaining that obtaining grant money for research "helps Hopkins stay on top of being the best medical school doing the research").

9

Indeed, by 1947, Hopkins was "second in grants by U.S. for medical research," receiving $750,000 "on recommendation of Dr. Thomas Parran" (the close personal friend of Dr. Moore). J.R. 5460-61 (Ex. 292). The "funds [went] into work considered most essential to the improvement of the nation's health," and "the largest grants to the Hopkins have been for work in venereal diseases," including the syphilis research of Drs. Moore, Turner and Eagle. *Id.*

### Tuskegee And Terre Haute

Prior to the Guatemala Experiments, agents of TRF and Hopkins were integrally involved in two other notoriously unethical studies involving human subjects and sexually transmitted disease: first, the Tuskegee Syphilis Study. Tuskegee infamously involved the intentional failure to treat hundreds of African-American sharecroppers suffering from syphilis in Macon County, Alabama. Dr. Moore and Dr. Parran collaborated on this study together. J.R. 4773, 4780 (Ex. 215) ("Moore was central to what happened [in Tuskegee] and provided the Hopkins imprimatur on the efforts.").

Although Tuskegee was providing information about how syphilis affected untreated people, Dr. Moore wished to study the efficacy of different treatment options. In 1942, he reached out to colleagues at Hopkins – including Dr. Reed, Dr. Turner, Dr. Eagle, and others – suggesting that penitentiaries conduct purposeful exposure experiments on inmate "volunteers." J.R. 4886 (Ex. 226). Dr. Moore and his colleagues formulated a protocol for what eventually became the Terre Haute Federal Prison Experiment conducted in 1943-1944, in which inmates were purposefully inoculated with gonorrhea. J.R. 35 (Ex. 1). The project was supported by Surgeon General Dr. Parran, and carried out in the federal prison by his PHS employees, Dr. John Mahoney and Dr. John Cutler, both of whom worked at the PHS's Venereal Disease Research Laboratory in Staten Island, New York (which Dr. Parran had established when he was head of the PHS Venereal Disease Division in 1927 prior to becoming Surgeon General). J.R. 26-27; 32 (Ex. 1). Drs. Mahoney and Cutler reported, however, to Dr. Moore, who had "oversight responsibility" for their work. J.R. 34 (Ex. 1).

When the Terre Haute experiments were terminated against his wishes as a result of concerns about the ethics of obtaining human "volunteers" for such a study, Dr. Moore considered it a "blow," and strenuously objected, stating his belief that experiments in man must continue. J.R. 35 (Ex. 1.); 4898 (Ex. 227) ("The urgency of the military situation does not permit, however, that the application of penicillin to the treatment of syphilis in human beings be postponed until all available information can be had from experimental animals. **Experimental study must progress simultaneously in man**.") (emphasis added).

The U.S. Presidential Commission that investigated the Guatemala Experiments concluded that the cessation of the improper efforts to infect people in Terre Haute led the researchers to seek out other, secret methods of continuing to pursue their research, paving the way for the Guatemala Experiments:

> The experiments in Terre Haute presaged the work in Guatemala in a number of ways. They demonstrated how military and science leaders actively sought improved methods to combat STDs and **their willingness to endorse experiments using human volunteers to improve prophylaxis**. They also provided a scientific impetus for the experiments in Guatemala; the inability to develop a reliable method for gonorrheal infection in Terre Haute left the researchers unable to address their primary research goal, more effective prophylaxis, and wondering about alternative infection strategies. The investigators and reviewing committee viewed the Terre Haute experiments as a rare opportunity, and both Dr. Cutler and Dr. Mahoney viewed the work as unfinished. The chance to do additional experiments in Guatemala presented an unexpected and welcome opportunity.

> The Terre Haute research offered an important precedent for exploring and applying ethical constraints related to individual consent. These considerations did not constrain the later research in Guatemala. Conducting the experiments in Guatemala provided an opportunity to work with reduced concern for some of the key obstacles associated with the Terre Haute experiments: fear of adverse legal consequences and bad publicity.

J.R. 36 (Ex. 1) (emphasis added).

*Creation Of The Syphilis Study Section*

In 1944, Congress passed Public Law 410, known as the Public Health Service Act, which, for the first time, privatized the direction and control of federally-funded scientific research by placing it in the hands of the country's leading private sector scientists and researchers, sitting on Public Health Service "Study Sections." Each Study Section would originate, review and approve research proposals before referring them to Surgeon General Parran as the head of the National Research Advisory Council of the PHS for a final funding decision. J.R. 42-43 (Ex. 1); J.R. 492 (Ex. 12).

Despite Defendants' contentions that the Study Section members were merely government "consultants," from the beginning, it was clear that the Study Sections were to operate as autonomous bodies, free of Government direction, supervision and control, and that they were to be the thought leaders behind the direction of scientific research. Indeed, the purpose of the grant proposal and approval process under the Study Sections was to permit leading private sector researchers to propose and direct research they deemed necessary in their respective fields. As Dr. Van Slyke, then the head of the newly-created Research Grants Office of the National Institutes of Health said, the purpose was:

> [T]o stimulate research in medical and allied fields by making available funds for such research and by actively encouraging scientific investigation of specific problems on which scientists agree that urgently needed information is lacking. Accompanying this purpose is complete acceptance of a basic tenant of the philosophy upon which the scientific method rests: **The integrity and independence of the research worker and his freedom from control, direction, regimentation, and outside interference.**
>
> ....
>
> Each Study Section, consisting essentially of outstanding civilian scientists, constitutes a scientific group **with full authority and responsibility to make expert recommendation as to whether a research project is acceptable[.]**
>
> ....

Research under the Research Grants program is conducted **with full independence and autonomy of the research investigator**. **Support of research through the use of Research Grants funds does not imply in any way any degree of Federal control, supervision, or direction of the research project**.

….

[T]he U.S. Public Health Service Research Grants program represents a sincere and continuing effort to supply Federal funds for the support of necessary additional research in the fields of medical and related science **without interposing any degree of government restriction, control, supervision, or regimentation.** The program is a scientific one, scientific guidance of **which lies wholly in the hands of scientists**.

J.R. 1854, 1856, 1858, 1859 (Ex. 77) (emphasis added). As one commentator noted, "[f]or the first time in history, medicine's intellectual elite had the opportunity not only to set an example for the rest of the profession but **actually to direct the conduct of therapeutic research on a national scale**." J.R. 4981 (Ex. 229) (emphasis added).

Professor Reverby has testified that the Study Sections were not "arms of the government," but rather they were:

[S]een as an independent advisory board. … It's really important to have the smartest people you can find make these independent judgments.

You're not – maybe you're getting a small per diem. It's not like the government is paying your salary. You're not on staff to the government. You are the expert in the world.

….

And so what Moore and all of those [academic institutions] are trying to do is to say this is – we're the best. We're going to create the science, and we're going to act independently to tell the government where to put its money.

J.R. 1159-60 (Ex. 34).

Similarly, Paul A. Lombardo, who served as a senior advisor to the U.S. Presidential Commission and testified as a witness in this case, said that the goal of the Study Section rubric was:

13

> Just give – find the best people, give them the money, and get out of the way.
>
> Do not micromanage them, don't make them fill out forms. They'll find a way of being innovative and creative, and that's what they do best.
>
> So the Guatemala study starts in this crucible of people who are – have that mindset.

J.R. 488 (Ex. 12); *see also* 489 ("everybody else who's part of the study section, I think, shares the same ethos of, you know, give them the money and turn them loose"); J.R. 5255-68 (Ex. 264) (Dr. Lombardo's article detailing the new Study Section rubric and the role it played in the Guatemala Experiments).

The first study section of the 21 to be created was the Syphilis Study Section (SSS). J.R. 43 (Ex. 1). Dr. Moore was chosen to be its first chairman because of his reputation as the leader in the field. *Id; see also* J.R. 4780-82 (Ex. 215). Dr. Moore hand-selected three other Hopkins physicians to join the twelve-member SSS, including Drs. Turner, Reed, and Eagle, which meant that Hopkins represented a majority of the private (non-military) members of the Section. J.R. 44 (Ex. 1).

The members of the Study Sections received no compensation from the Government for their service; rather, they continued to be paid by their respective academic institutions. *See* Joint Stipulation of Facts No. 22. Hopkins in turn enjoyed direct economic and reputational benefits from its physicians' involvement in these committees in the form of research grants, a network of referrals from the federal government and other academic institutions, and increased visibility and notoriety as an elite medical institution. J.R. 1158 (Ex. 34). Participation on a Study Section

> [W]ould have been a bonus and important to Hopkins' position that it continue to maintain as the key research institution in America as the major medical research institution … [t]hat it was important – and that's in the letters that are in the Hopkins' files, that **this would bring honor and money to Hopkins to continue to raise its profile in the world**. J.R. 1158 (Ex. 34) (Emphasis added).

As explained by Prof. Reverby, participation bestowed a benefit to Hopkins "[b]ecause it was prestigious, because it … was a way in which to try to find other funds." It was a way to be seen as "the best people" "**and therefore would gain money and prestige for Hopkins**[.]" J.R. 1159 (Ex. 34) (emphasis added).

### Approval Of The Guatemala Experiments By The SSS And Appointment Of Dr. Soper As Investigator

Once appointed and in control of the SSS, with autonomy to design and fund studies without government oversight or control, Dr. Parran and Dr. Moore and his colleagues on the SSS found their opportunity to continue the research that they had been unable to finish in Terre Haute, but this time, outside of the United States. J.R. 26 (Ex. 1) ("The Terre Haute experiments were conducted and supported by many of the same people involved in the Guatemala experiments, including [Dr. Parran and Dr. Moore].") Indeed, "[t]he Terre Haute experiments had the same goals as the Guatemala experiments (i.e., to find a suitable STD prophylaxis) and had a similar study design." *Id.* The opportunity was a "gold mine of a way to do the kind of research these guys have been aching to do for a really long time." J.R. 1159 (Ex. 34).

Prior to proposing the research for a grant, the concept for the Guatemala Experiments was "officially approved," and "conferences" were held to discuss feasibility and other practical issues. J.R. 265 (Ex. 4). Guatemala was chosen as the location for the secret project for numerous reasons, including a connection with Dr. Juan Funes, a Guatemalan physician who had worked as a fellow at the VDRL in Staten Island. J.R. 41 (Ex. 1). In addition, commercial sex work was legal in Guatemala, and the U.S. already had other researchers positioned there. J.R. 42 (Ex. 1).  J.R. 4952 (Ex. 230) ("Because of the relatively fixed character of the population and because of the highly cooperative attitude of the officials … an experimental laboratory in Guatemala City has been established.").

When the SSS met for the first time in February 1946, the idea for Guatemala had been formed, and the grant application – which has never been located – was ready for a vote. The SSS

recommended approval for Research Grant (RG) 65 on the first day of its meeting, allocating $110,450 to the "Pan American Union" for the experiments, making it the largest federally-funded experiment at the time.[6] J.R. 43-44 (Ex. 1); 186 (Ex. 1); J.R. 4359 (Ex. 284). Subsequent documentation refers to the title of the study as "the Guatemala Study dealing with the **experimental transmission of syphilis to human volunteers and improved methods of prophylaxis**." J.R. 231 (Ex. 2) (emphasis added). The title is particularly important because it specifically referred to "transmission" to "human volunteers," and any research involving "prophylaxis" would necessarily involve exposing humans to disease. J.R. 2951 (Ex. 175). At the time, it was well-known that, among other qualifications, an appropriate "volunteer" must be an adult, must be "acceptable from the standpoint of mental status," "ab[le] to cooperate," and assured to have "possessed a thorough understanding of the purpose underlying the study and the possible risks involved." J.R. 5466 (Ex. 293). (It is not disputed that the "volunteers" used in the Guatemala Experiments did not meet this definition.)

The grant was approved by Dr. Parran as the Surgeon General, and, after "cooperative agreements" were reached with officials in Guatemala, Dr. Cutler began work there in August of 1946. J.R. 44-45 (Ex. 1); J.R. 129-130 (timeline). These agreements permitted:

> [E]xtensive types of research and work in venereal disease such as: … establishing prophylactic, diagnostic, and treatment facilities, research in diagnostic and treatment, and finally prophylactic studies. This meant that staff had authority to work with the medical and other authorities of the public health service rapid treatment center for venereal disease, in the governmental hospitals, **with medical installations and officers of the military, with institutions caring for the orphans and the insane, and with the penal system.**

J.R. 266 (Ex. 4) (emphasis added).

---

[6] The Pan American Union (PAU) consisted of 21 American nations. The Pan American Sanity Bureau was the coordinating health agency for the Member States of the PAU. J.R. 2275 (Ex. 108).

In early 1947, the SSS considered and renewed funding for the Experiments, and the NAHC through Dr. Parran voted to renew RG 65(C). J.R. 4265 (Ex. 185). Correspondence among SSS members shortly thereafter evidences a concerted effort to conceal the nature of the experiments by removing the phrase "experimental transmission" "to human volunteers" from the title: one member wrote that he "suggest[ed] it be rewritten to leave [out] reference to the Guatemala experiment," and Dr. Turner from Hopkins recommended the more sanitized "clinical and epidemiological studies." Ex. 4955 (Ex. 231) 4966 (Ex. 232). The conclusion of this discussion is an omission of any reference to the Guatemala Experiments. J.R. 4957-64 (Ex. 233). Clearly the members of the SSS knew the true nature of these Experiments was to be kept from unnecessary scrutiny. J.R. 4782 (Ex. 215).

The renewed grant was again issued to the Pan American Sanitary Bureau. This time, an "Investigator" was listed for the grant: Dr. Fred Soper, an employee of TRF since 1920, and an Associate Director of its International Health Division. J.R. 4265 (Ex. 185). The "Investigator" of a project was charged with, among other roles, ensuring "[n]ecessary safeguards for the care and protection of persons and property." J.R. 5345 (Ex. 283). *See also* Ex. 257 at 5043 (Lederer at 112) (investigator responsible for being a "safeguard for the welfare of research subjects").

Prior to this time, the PASB was a relatively inactive organization that did not even meet annually. Dr. George Strode, the Director of the TRF International Health Division, had ambitions to develop the PASB to carry out IHD work as early as 1945, but he needed a replacement for its retiring director. J.R. 2484 (Ex. 120); J.R. 4965-66 (Ex. 234). During the annual meeting of TRF's Trustees in 1946, Dr. Strode spoke about this with Dr. Parran, who was familiar with the extensive international health work of Dr. Soper on behalf of TRF. J.R. 2270 (Ex. 108).

Dr. Soper was thereafter officially "assigned" by Dr. Strode from TRF to the PASB. J.R. 4967 (Ex. 235) ("This will serve to inform you that, as of February 1, 1947, you are assigned to the Pan American Sanitary Bureau, which has recently elected you as its Director.") *See also* J.R. 4968 (Ex. 236)

("I have been appointed to the Bureau by the R.F."). Dr. Soper's assignment from TRF to the PASB was in keeping with TRF's *modus operandi* of placing its employees in private institutions and government agencies to further its goals, and "was designed to cover most of the purposes which [TRF's International Health Division] pursued in Latin America." J.R. 4972 (Ex. 237). Under Dr. Soper, "**IHD policies and philosophy have been adopted**. The PASB will eventually take over our functions." *Id.* (Emphasis added.) Dr. Soper commented at the time that he felt he "was no longer a free agent to decide, on the basis of personal preference or of [his] own financial interest, where [he] would work." J.R. 4965-66 (Ex. 234).

After being "assigned" by TRF to the PASB, and becoming "Investigator" for the Guatemala Experiments, Dr. Soper continued to be paid by TRF in 1947 – the year in which the majority of the intentional exposure experiments occurred in Guatemala. J.R. 129-130 (timeline); J.R. 2276 (Ex. 108) ("In 1947 the Foundation assigned me to the Bureau and continued my salary payments during that year."). *See also* J.R. 4965-66 (Ex. 234); 4967 (Ex. 235); 5049 (Ex. 257). TRF contributed to his retirement annuity and life insurance that year. J.R. 4975 (Ex. 238); 4976-77 (Ex. 239). These benefits were only available to "full-time staff." J.R. 4978 (Ex. 240).

Even after the PASB began paying his salary in 1948, Dr. Soper remained on "staff" with TRF as Associate Director of the IHD, while the Guatemala Experiments were still underway. J.R. 4979 (Ex. 241) ("Please accept my thanks for the arrangements you are making to **keep my name on the staff** as Associate Director during the period I am with the [PASB]") (emphasis added); *see also* J.R. 4981 (Ex. 242) (commenting that unlike a particular Assistant Director whose status was "on leave," TRF continued to list Dr. Soper as an Associate Director). He continued to be an Associate Director, attended meetings of the IHD Directors, and considered himself an employee of TRF until 1950, when he resigned. J.R. 4785 (Ex. 216); 4985 (Ex. 243); 4988 (Ex. 244), 4989 (Ex. 245), 4990 (Ex. 246), 4991 (Ex. 247), 4992 (Ex. 248).

Dr. Soper's assignment to the PASB from TRF was not an "abandonment" of his work with TRF, but rather, a "fulfilling its program," as he stated in his memoirs: "**It was quite in keeping with The Rockefeller Foundation policy** to make my services available to PASB and **I remained on its staff** during my first four years with the Bureau." J.R. 2273, 2276 (Ex. 108) (emphasis added). Dr. Strode wrote to Dr. Soper in late 1947 commending his assignment, which "brings honor to the International Health Division." J.R. 4993 (Ex. 249).

### Dr. Soper And Dr. Parran's Knowledge Of And Involvement With The Experiments

It is abundantly clear that high-level TRF and Hopkins agents were integrally involved in the Guatemala Experiments, knew of their nonconsensual and inappropriate nature, took affirmative steps to support them, and could have stopped them from occurring. At TRF, those individuals included Dr. Soper and Dr. Parran.

Dr. Soper: As stated, Dr. Soper became the "Investigator" and "responsible official" of the Guatemala Experiments in 1947, during which time the intentional exposure experiments began. J.R. 129-130 (timeline). The "Investigator" is by definition "**the individual who is in charge of the study**." J.R. 5042 (Ex. 257) (emphasis added). According to an expert identified by Defendants, the primary role of the Investigator is to be "the most important safeguard for the welfare of research subjects" or to "protect the welfare of the subject." J.R. 5043-44 (Ex. 257). See also J.R. 5345 (Ex. 283). Dr. Soper wholly failed to protect the subjects of the Guatemala Experiments.

Dr. Soper traveled to Guatemala at least twice during the Experiments in his capacity as Investigator. During his first trip in July 1947, while the intentional exposure experiments were well underway, he had dinner at the home of Dr. Cutler. J.R. 2646 (Ex. 142). Apprehensive about Dr. Soper's upcoming visit, Dr. Cutler wrote to Dr. Mahoney before he arrived, inquiring about "the extent of Dr. Soper's knowledge of our project," and stating "we shall tell him as soon as he arrives on July 7 that the less he talks the better." J.R. 400 (Ex. 10). Dr. Mahoney responded that he "ha[d] never met

Dr. Soper," but that Dr. Soper was "**the responsible official of the study and as such is entitled to complete confidence**." J.R. 395 (Ex. 8) (emphasis added).

Just after their first meeting, Dr. Soper's diary entries confirm that Dr. Cutler did in fact entrust Dr. Soper with his confidence, as even the U.S. Presidential Commission and an expert witness for the defense have confirmed. J.R. 207 (Ex. 1 note 598); J.R. 2951 (Ex. 175) ("Q: Do you have any doubt that Dr. Soper is being told that there is artificial inoculation of individuals with gonorrhea? A: That's how I would interpret this portion of his diary."). Dr. Soper knew detailed information about the experiments being pursued in Guatemala, including that individuals were being inoculated with syphilis and gonorrhea, that rabbit syphilis was being used and was "virulent" in man, and that serological testing was being done on children in the town of San Jose:

> Dr. Cutler's 15 words. Studying the prophylaxis of GC [gonorrhea] and syphilis. Dr. Arnold has developed a type of pro[phylaxis] which has been studied a bit on humans for GC and for syphilis in the rabbit. Now trying to determine the normal infection rate in GC and are engaged in **artificial inoculation of GC**. Gives opportunity to make severe test of pro methods. There is suggesting evidence making method look good against GC.
>
> In syphilis are making serological tests in various places, **including children in San Jose and in orphanage**. …
>
> ….
>
> Some studies in the natural history of syphilis which **inoculates the patient with organism of rabbit syphilis**.
>
> **Have proven that the rabbit strain is virulent for man**.

J.R. 2658-59 (Ex. 142) (emphasis added).

Dr. Cutler and Mahoney continued to report regularly to Dr. Soper and kept him apprised of details in a manner that indicates they considered Dr. Soper in charge of the project. Dr. Cutler wrote, for example, in the fall of 1947 that, "as you may know, Dr. Salvadó is the one directly responsible for **the opportunities which we enjoy at the asylum**." J.R. 4994 (Ex. 250) (emphasis added). In

November 1947, Dr. Soper's diary entries report statistics regarding the percentage of people who acquired gonorrhea infections from "positive" women, including being advised that they were "very enthusiastic with results of **experimental infections**," and that "some girls are more dangerous than others." J.R. 5001 (Ex. 251); 5002 (Ex. 252) (emphasis added). In August of 1948, in order to continue to maintain access to the asylum after Dr. Salvadó left for the United States, Dr. Cutler asked Dr. Soper to appoint Dr. Salvadó's brother. J.R. 5003 (Ex. 253). Dr. Mahoney reported to Dr. Soper as the project was winding down, asking for instructions about disposal of equipment and other details. J.R. 5343-44 (Ex. 282).

It is also clear that Dr. Soper reported back to TRF during his "assignment" to the PASB, evidencing the continued control TRF had over his activities, and the importance of his assignment to TRF's international health endeavors. In October 1947, Dr. Soper attended the meeting of the Board of Directors of TRF's IHD and made a report about "this year's development[s]." J.R. 5000 (Ex. 251). He met with Dr. Parran throughout 1947 and into 1948, and also reported to Dr. Strode in 1947 and a year later. J.R. 2679 (Ex. 150); 5007 (Ex. 254); 5010 (Ex. 255).

Their work together in Guatemala brought Dr. Cutler and Dr. Soper – who had not known each other before the Experiments began – together as professional colleagues. In 1950, when Dr. Cutler had left Guatemala and was applying for admission to the Johns Hopkins School of Public Health, Dr. Soper wrote him a letter of recommendation in which he stated that Dr. Cutler had done an "excellent job leading the Venereal Disease Program in Guatemala which included studies in **the transmission**, serology and treatment of venereal disease," and lauded Dr. Cutler's "ability to deal with authorities and handle patients under extremely difficult conditions." J.R. 5014 (Ex. 256) (emphasis added).

The proof of Dr. Soper's knowledge regarding the nonconsensual and intentional nature of the Guatemala Experiments is so strong that it led an expert witness designated by the Defendant –

Susan Lederer, Ph.D. – to recant her earlier testimony that Dr. Soper had no knowledge of artificial exposure. J.R. 5051 (Ex. 257) ("This might be an opportunity to offer a correction to my own report … it is clear from [Soper's] diary entry that there had been artificial inoculations with gonorrhea.")

<u>Dr. Parran:</u> It is equally undeniable that Dr. Parran – who was integrally involved in syphilis and research on humans for decades (including the Terre Haute experiments), who was highly motivated to ensure that studies in man continue, and was the individual responsible for final approval of the Guatemala Experiments – was intimately involved of the nature of the studies. J.R. 5147, 5153 (Ex. 258) ("[T]his was an area where Doctor Parran had tremendous interest because of his own interests. So I suspect that basically he was aware and approved the study."). Rather than choose from career PHS employees, he personally hand-selected loyal TRF employee Fred Soper to be the Investigator for the experiments. He was aware of their nature, and was eager to use the opportunity in Guatemala to help syphilis researchers in the U.S., such as his friends on the SSS. J.R. 2633 (Ex. 138). Dr. Parran "has become keenly interested in the Guatemala project. He seems to be very hopeful that we will be able to assist other interested persons in working out problems in syphilis and gonorrhea[.]")

In early 1947, during which time intentional exposure experiments were underway in Guatemala, a PHS researcher mentioned to Dr. Cutler a recent meeting with Dr. Parran in which the subject of the Guatemala Experiments arose. He commented that Dr. Parran "was familiar with all the arrangements and wanted to be brought up to date on what progress had been made. As you well know, he is very much interested in the project, and a merry twinkle came into his eye when he said, '**You know, we couldn't do such an experiment in this country.**'" J.R. 2636 (Ex. 139) (emphasis added).

Finally, in early 1948, when Dr. Parran was not re-appointed to be Surgeon General, Dr. Mahoney made it clear that the Experiments should progress as rapidly as possible: "we have lost a

very good friend and that it appears to be advisable to get our ducks in line. In this regard we feel that the Guatemala project should be brought to the innocuous stage as rapidly as possible." J.R. 5249 (Ex. 259). The desire to quickly conclude the Experiments because Dr. Parran was no longer a shield proves that he was aware that they were anything but "innocuous."

Dr. Parran's involvement with the Guatemala Experiments was so significant that it led the American STD Association to remove his name from its highest career achievement award in 2013. J.R. 5179-80 (Ex. 258); 5251 (Ex. 260). In an article describing why his name was removed from the award, Dr. Lombardo wrote that Dr. Cutler's files "suggest[] Parran not only knew the details of Cutler's work, but also endorsed it with full awareness of its ethical toxicity." J.R. 5252 (Ex. 261).

### Knowledge And Involvement Of Hopkins' Physicians

It is equally clear that the Johns Hopkins members of the SSS who conceived, recommended and approved the Guatemala Experiments – acting in furtherance of the research goals of their academic institution – not only were aware of the illicit nature of the Experiments, but actively sought to participate in them for their own research purposes. J.R. 4783 (Ex. 215) ("Differing members of the study section kept tabs on the research ... received Cutler's regular reports and wanted in on this chance to use humans for these kinds of inoculation studies.") As they were just getting underway in the fall of 1946, Dr. Mahoney of the PHS commented to Dr. Cutler that he was "frequently asked as to the progress that is being made in the Guatemala study," and that "[m]any people appear to be aware of its existence and interested in the studies to be undertaken." J.R. 5253 (Ex. 262). A month later he repeated that "your show" in Guatemala "is already attracting rather wide and favorable attention up here." J.R. 5254 (Ex. 263).

Dr. Lombardo has testified that at least some of the SSS members who were aware of specifically what was going on in Guatemala and advocated participation include the Hopkins members: Dr. Moore, Dr. Turner, and Dr. Eagle. J.R. 498 (Ex. 12) ("Moore knew a great deal"); 504

(Eagle knew what was going on and … Turner also knew what was going on, enough so that they were willing to say, Gee, can't we do our own work there?"); *see also* J.R. 5259-61 and 5263-64 (Ex. 264) ("Several .., study section members attempted to advance their own work as part of the grant they had already approved.").

Dr. Moore: Dr. Moore was the preeminent syphilis researcher of the day and was chosen to be Chair of the Syphilis Study Section because he was the best of the best. Disappointed in the way Terre Haute was abruptly brought to a halt, he had every motivation to seek out a way to continue to perform research on humans.

It is beyond question that Dr. Moore knew that the Guatemala Studies involved nonconsensual transmission of disease, and that he engineered them that way:[7]

> Moore thought that they shouldn't have stopped Terre Haute and he wanted to see – that he knew he had to have the experimentation in humans to understand all of this, that the animal studies were too limited. **And so there was this great opportunity to do it in Guatemala. And he was pushing to have that happen.**

J.R. 1155-56 (Ex. 34) (emphasis added). Dr. Reverby has opined that Dr. Moore was "too thorough a scientist to ever have approved this without knowing exactly what was going on[;]" and "[h]e would have to have seen the details or he wouldn't have approved it." J.R. 1116; 1157 (Ex. 34) ("Moore's fingerprints are all over this."); J.R. 498 (Ex. 12) ("Moore knew a great deal[;]" "I know that people like Dr. Moore knew.")

As the studies were underway, Dr. Moore wrote to a member of the Surgeon General of the Army's office that, as a result of the inability to reliably "produce infection" in the Terre Haute study, "Dr. Mahoney and his group, under the auspices of the United States Public Health Service, have undertaken an extensive **experimental study in human volunteers in Guatemala which results I**

---

[7] Contemporaneous documentation suggests that Dr. Moore was planning a trip to Guatemala. J.R. 46 (Ex. 1); J.R. 5254 (Ex. 263). It is unknown if he ever went.

**am not at liberty to quote**[.]" J.R. 1914-16 (Ex. 88) (emphasis added). He was referring of course to the very study that his own Study Section had reviewed and approved (and of course, it was not possible to obtain "volunteers" from populations like insane people and children, as Dr. Moore well knew from his experience in Terre Haute. *See* J.R. 5466 (Ex. 293) (article by Dr. Mahoney and Cutler and edited by Dr. Moore in which the definition of "volunteer" was reviewed). He went on to state:

> As Chairman of the Board of the Sub-Committee on Venereal Diseases and of the Syphilis Study Section, **I have taken upon myself** to enlist the interest of competent investigators in this matter, believing that **certain of the experimental studies especially in the effort to produce gonococcal infection in animals or in man should be repeated and extended**. J.R. 1915 (Ex. 88) (emphasis added).

Dr. Moore advocated for other professionals in syphilis research to be allowed to travel to Guatemala and participate in the Experiments. *See id. See also* J.R. 1156-57 (Ex. 34); J.R. 498 (Ex. 12). He was kept apprised of the work of another researcher from Duke University, Hans Neurath, who received a grant to perform research on false positive testing for syphilis; from correspondence from Dr. Neurath, Dr. Moore was obviously aware that testing in Guatemala involved "known syphilitic human sera," and work on patients in an asylum and the San Jose Orphanage. J.R. 5269 (Ex. 265), 5270-71 (Ex. 266).

Dr. Turner: Dr. Turner was also aware of, and participated in, the Guatemala Experiments. J.R. 1113 (Ex. 34) ("I know that Turner was interested and was following what was going on."), 1123 ("Turner obviously knew. And this makes clear that they knew that the study was inoculation in human volunteers. So they knew what was being done."); J.R. 2961 (Ex. 175) (confirming that Dr. Turner "was aware of the Guatemala research as it was ongoing"); J.R. 504 (Ex. 12) ("Turner also knew what was going on"). When Dr. Cutler was preparing his final report on the Guatemala Experiments (which

was never published) while at the Hopkins School of Public Health in the early 1950s, he consulted with Dr. Turner. J.R. 5275 (Ex. 267) ("Turner, T.B.: personal communication"); J.R. 5448 (Ex. 291).[8]

As mentioned earlier, Dr. Turner had been working with the support and funding of TRF to attempt to use rabbit syphilis to develop a vaccine for humans, but he could not test his theory without human experimentation. He thought that Guatemala would be the place to do that. Dr. Mahoney of the PHS wrote that Dr. Turner "approached me with a suggestion that we endeavor to determine the pathogenicity of the spirochete cuniculi [rabbit syphilis] in the human" as part of the Guatemala Experiments. J.R. 5253 (Ex. 262); 5254 (Ex. 263). Syphilitic rabbits were in fact shipped from Dr. Turner's lab at Johns Hopkins to the VDRL in Staten Island, and then on to Dr. Cutler in Guatemala, where they were used in the Experiments. *Id. See also* J.R. 1092 (Ex. 34); 5276-83 (Ex. 268-273). Indeed, it was during the experiments that Dr. Cutler was able to prove, using those rabbits and as reported to the Investigator Dr. Soper on his visit, that "rabbit strain is virulent for man." J.R. 2658-59 (Ex. 142); *see also* J.R. 4046, 4053, 4057-59, 4062 (Ex. 180) (identifying individuals exposed to "rabbit syphilis").

Dr. Eagle: Hopkins' Dr. Harry Eagle also acted to aid and abet the Experiments, and strenuously advocated coming to Guatemala to participate in person. It is clear from contemporaneous correspondence that Dr. Eagle knew that the Experiments involved inoculating human beings. In May of 1947, Dr. Mahoney said that "Harry Eagle is about to complain to the Surgeon General [Parran] that I have not been extremely enthusiastic about allowing him to enter the Guatemala Study. As you may know, he has done considerable animal work in prophylaxis in syphilis by use of penicillin **and can only prove the thesis by a human experiment**." J.R. 88 (Ex. 1); J.R. 5284-85 (Ex. 274) (emphasis added). This letter and one sent shortly thereafter evidence a mid-1946

_____

[8] Exhibits 4 and 102 of the Joint Record are duplicates of "Part I" of Dr. Cutler's final report. There are seven parts in total. *See* J.R. 249 (Ex. 4) (listing the parts).

"meeting" in Washington between PHS researchers "and our consultants" (SSS members, including Drs. Moore and Eagle) "at which the latest developments in our work [in Guatemala] could be reviewed." Dr. Eagle specifically wanted his research integrated into the experiments. J.R. 5286-88 (Ex. 275 and 276).

Immediately thereafter, Dr. Eagle published an article regarding the use of penicillin as a prophylaxis against syphilis, in which he stated that "[s]uch administration is to be considered in persons recently exposed to a known infectious source. **Studies are now in progress** to determine whether a single injection of penicillin will prevent syphilitic infection in the recent contacts of known primary and secondary cases." J.R. 5304 (Ex. 277) (emphasis added). Dr. Eagle was clearly referring to the Guatemala Experiments, where exactly that work was being carried out. J.R. 504 (Ex. 12) ("Eagle knew what was going on").

And, when Dr. Cutler learned that the wife of Dr. Carlos Tejada, the Chief of the Guatemalan Army Medical Department, fell ill with life-threatening, acute mercury poisoning, Dr. Eagle supplied Dr. Cutler with British anti-lewisite, the antidote for Mercury poisoning, from his lab at Hopkins. J.R. 1910 (Ex. 86); J.R. 1912 (Ex. 87). British anti-lewisite was not commercially available at the time, so Dr. Eagle's actions had a strong effect on Dr. Tejada, and helped ensure that Dr. Cutler had open access to military personnel in Guatemala on whom to experiment. J.R. 5307 (Ex. 278).

And if this evidence were not enough, it is further clear that Drs. Moore, Turner and Eagle were aware of details of the Guatemala Experiments from minutes of a meeting held at Hopkins of the members of the SSS's Subcommittee on Venereal Diseases in 1952, after the Experiments had ended. In attendance were Drs. Moore, Eagle, Turner, and Cutler. The minutes reflect that Dr. Turner raised the subject of "studies by Mahoney in which many substances were effective against syphilis if used during the first two hours." J.R. 5310 (Ex. 279); *see also* J.R. 83 (Ex. 1). This was a clear reference to research conducted in Guatemala, in which exactly that experiment was conducted.

In sum, what occurred in Guatemala was no secret among this close group of Hopkins researchers. They devised the plan, approved it, and actively participated while it was underway. It is critical to note that, although these Hopkins researchers published prolifically about their research at the time, they never described in any of those publications any detail regarding the work that occurred in Guatemala. Dr. Cutler prepared a final report while at the Hopkins School of Public Health in the early 1950s, but it too was never published. J.R. 99; J.R. 5448 (Ex. 291).

### Summary

From the above evidence it is evident that key leaders at TRF and Hopkins were the thought leaders behind the creation of the Guatemala Experiments, shepherded them through the new federal grant funding process, led or participated in them while they were underway, and could have stopped them but did not. As Susan Reverby has opined:

> Cutler, Moore and others on the Syphilis Section knew what they were doing edged over an ethical boundary, but they thought they had the right to do this work because they thought they were the "best men" doing the "best work" in the name of science. **Cutler never acted alone but had the support of the NIH Syphilis Section, Parran, Moore, Soper and others to do what they thought was crucial.** As Spector-Bagdady and Lombardo concluded: "Public health research, however is rarely an individual activity… Many others were complicit in planning, approving, advising and participating in the STD research."

J.R. 4783 (Ex. 215) (emphasis added); 5255 (Ex. 264) (the Guatemala Experiments "were not merely the product of a malevolent individual; they were generated and supported by a structured grant system and a defined research environment;" commenting on Dr. Parran's personal interest and the "personal interest of the Syphilis Study Section [members] in the Guatemala STD experiments, including Drs. Moore, Eagle and Turner).

This concept cannot be stated more succinctly than by Professor Lombardo, who testified that Dr. Parran and the Syphilis Study Section both had the power and ability to stop the Experiments:

> Q.  You would agree with me, would you not, Dr. Lombardo, Professor Lombardo, that Dr. Parran had the power to stop the Guatemala experiments?
>
> A.  Yes.
>
> Q.  Do you also agree with me that the members of the Syphilis Study Section could have decided not to do the experiment?
>
> A.  You mean in the first instance?
>
> Q.  Yes.
>
> A.  They could have recommended that the — that the study not be funded. Yes, that was their prerogative.

J.R. 534 (Ex. 12).

## SUMMARY JUDGMENT STANDARD

It is proper for the Court to grant summary judgment when the moving party establishes, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). "If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts." *Coates v. Vilsack*, 2015 WL 1013402 at *3 (D. Md. Mar. 6, 2015) (*citing Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986)). "A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party," but "[m]ere speculation by the non-moving party cannot create a genuine issue of material fact." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 197 F. Supp. 2d 669, 671 (D. Md. 1999). "The existence of only a scintilla of evidence is not enough to defeat a motion for summary judgment." *Coates*, 2015 WL 1013402 at *3

(*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment." *Id.*

**ARGUMENT:**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

This Cross-Motion for Summary Judgment is being brought on behalf of 22 Plaintiffs (discussed at pages 47-52 infra) because the undisputed evidence establishes that Defendants, through their agents, are liable to those Plaintiffs for their roles in directly participating and aiding and abetting or conspiring to commit nonconsensual human experimentation in violation of international norms. The undisputed evidence also proves that these 22 Plaintiffs were injured as a result of that experimentation and are entitled to compensation for that injury.

## I.    THE ALIEN TORT STATUTE

The Alien Tort Statute (ATS), 28 U.S.C. § 1350, provides:

> The district courts shall have original jurisdiction of any civil action by an alien for tort only, committed in violation of the law of nations or treaty of the United States.

The ATS is "'strictly jurisdictional' . . . [and] does not directly regulate conduct or afford relief. It instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004)).

In *Alvarez II and III*, this Court has already decided that:

- Customary international law, as it existed in the 1940s and 1950s, prohibited medical experimentation on human test subjects without their consent. *See Estate of Alvarez v. Johns Hopkins Univ.*, 205 F. Supp. 3d 681, 689-90 (D. Md. 2016) ("*Alvarez II*").

- The norm against nonconsensual medical experimentation was sufficiently established and definite that it supports a cause of action under the Alien Tort Statute. *See id.*

- "[F]ederal common law and domestic tort law," not international law, determine when corporations can be held liable for the tortious actions of their employees under the ATS. *See Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 688 (D. Md. 2017) ("*Alvarez III*").

- Corporations can be held liable for the actions of their employees under the ATS, whether they are direct perpetrators, or indirect perpetrators who conspire with or aid and abet actual perpetrators. *Alvarez II*, 205 F. Supp. 3d at 694-96.

As stated in the final bullet point, under the ATS, a defendant can be held liable for directly violating customary international law. It can also be held liable for indirectly violating the customary international law if it provided "substantial assistance" to a direct violator with the "purpose" of facilitating the violation (*i.e.,* aiding and abetting). *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011) (following the lead of "[v]irtually every court to address the issue" by holding that aiding and abetting is "well established under the ATS"); *see also Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668, 696-97 (E.D. Va. 2018). The "substantial assistance" requirement is known as the "*actus reus*" element, and the "purpose" requirement is known as the "*mens rea*" element.

## II.   EACH OF THE DEFENDANTS HAD AGENTS WHO WERE DIRECTLY INVOLVED IN AND/OR AIDED AND ABETTED OR CONSPIRED TO FACILITATE NONCONSENSUAL HUMAN EXPERIMENTATION IN THE GUATEMALA EXPERIMENTS

The undisputed evidence in this case establishes that each Defendant, through its agents, is either directly liable for the nonconsensual human experiments in Guatemala, or else aided and abetted and conspired with the purposes of facilitating that violation of customary international law.

### A.   Overview of applicable agency law

The first relevant inquiry is whether the individuals from TRF and Hopkins who played a role in the Guatemala Experiments were in fact the agents of those entities. In *Alvarez III*, the Court set-out a clear roadmap for addressing dual agency and employment issues in this case based on the Restatement (First) of Agency:

Agency arises when a principal manifests assent that an agent shall act on his behalf and subject to his control, and consent by the agent so to act. RESTATEMENT (FIRST) OF AGENCY § 1 (1933).

A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master. *Id.* § 2.

A person may simultaneously be the servant of two masters at one time as to one act, provided that the service to one does not involve abandonment of the service to the other. *Id.* § 226.

A master may also lend a servant to another such that the servant may become the agent of another as to some acts. *Id.* § 227. To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. *Id.* § 229.

A court should consider the following matters of fact to determine whether an act is within the scope of employment: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal. *Id.*

… [A]n employee may be acting within the scope of employment even if the employee engages in acts "specifically forbidden" by the employer and uses "forbidden means of accomplishing results." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999); *see also* RESTATEMENT (FIRST) OF AGENCY § 230.

Comment (b) to § 227 of the Restatement (First) of Agency (Servant Lent to Another Master) notes: In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it. Comment b to RESTATEMENT (FIRST) OF AGENCY § 227.

*Alvarez III*, 275 F. Supp. 3d at 693-94 (the original text was broken into components for emphasis and readability).

As the Court noted, and contrary to the arguments made by Defendants in their Motion for Summary Judgment (discussed further below in Plaintiffs' Opposition thereto), a person may be the servant of two masters at the same time as long as the service to one master did not require the abandonment of the service to the other. RESTATEMENT (FIRST) OF AGENCY § 226. In fact, a dual relationship is **presumed** unless the service performed is antithetical to/against the interests of the original principal or employer, or if there is evidence indicating that the original principal or employer surrendered control. *See* Cmt. (b) to § 227. These same principles are also found in the Restatement (Second) of Agency. *See* RESTATEMENT (SECOND) OF AGENCY §§ 226 (Servant Acting for Two Masters), 227 cmt. b (inference that the original service continues).

### B.    Drs. Parran and Soper were agents of TRF, either solely or dually, throughout their involvement with the Guatemala Experiments

There is no dispute that Drs. Thomas Parran and Frederick Soper were the agents or employees of The Rockefeller Foundation (TRF) during the operative period at issue in this case. To the extent these individuals had any relationship with the government, under the common law, they are legally presumed to have been the dual agents of both TRF and the government. The facts of this case indeed demonstrate that, to the extent these men were not acting exclusively for TRF, they were at least acting for the dual benefit of TRF and the government.

### *Dr. Parran*

Throughout the time at issue in this case, Dr. Parran was an agent of TRF. TRF conducted its business and affairs by and through its Trustees. J.R. 2016, 2020-21 (Ex. 95). Trustees were elected and appointed the officers of the corporation, and were members of the corporation. *Id.* Trustees served on the corporation's executive committee, directed its policies and affairs, and could take

independent action and transact business related to the corporation's programs. J.R. 2016-17, 20-21, 23-24 (Ex. 95).

As explained above, TRF's mission was to promote research in areas of public health both in the United States and abroad. J.R. 4719-20 (Ex. 209). A significant portion of its mission was conducted outside the U.S. by its International Health Division (IHD), its only operational arm, which was managed by a Director and Associate Directors, who were officers of the corporation, and six Scientific Directors. J.R. 2223-24 (Ex. 95); J.R. 2217 – 2220 (Ex. 106); J.R. 4819-23 (Ex. 224).

Dr. Parran was a TRF Trustee, Scientific Director, and member from the mid-1930s into the early 1950s. He served TRF in these roles before he became Surgeon General of the Public Health Service in 1938, and throughout the time he was Surgeon General until 1949. J.R. 4819-23 (Ex. 224).

Even when Dr. Parran was working as Surgeon General of the Public Health Service, he was still working as a dual agent of TRF and for its benefit. TRF's International Health Division was not a passive funding source for projects; it acted as "a partner, not a patron." J.R. 4719-20 (Ex. 209); J.R. 4747 (Ex. 210). TRF did not need to employ an army of public health workers; instead, it used its money and reputation to influence and shape the policies and goals of governments and agencies. It embedded its agents in senior positions inside governments and agencies to act as "directing personnel." J.R. 4719-21 (Ex. 209). This combined strategy – money, influence, and reputation on the outside, and highly-placed senior personnel on the inside – acted as a force multiplier; it enabled TRF to use different channels and methods to get results, and to "hide itself behind its work and keep to the front the local agencies through which the work [was] being done." J.R. 4720 (Ex. 209). In other words, TRF did not work for governments and agencies, it worked through them.

Dr. Parran is a textbook example of TRF's strategy of embedding "directing personnel" inside the government so that it could influence and shape government policy, use the government's resources, and hide its actions from view and criticism. Dr. Parran's position as Surgeon General gave

TRF complete access to the U.S. government's public health programs and resources. His position allowed TRF to influence the way money, personnel, and other resources were allocated. And his position allowed TRF to effectively work through the PHS. Dr. Parran did not abandon the mission or aims of TRF when he worked as Surgeon General – in fact, his work was the fulfillment of TRF's purpose, strategy, and mission.

### Dr. Soper

Another example of this strategy is Frederick Soper. Dr. Soper had been employed by Johns Hopkins before he left for TRF in 1920. J.R. 4785 (Ex. 216). He was TRF's consummate company man, having worked in public health on its behalf for 25 years on a series of disease eradication campaigns. *See* J.R. 2234-81 (Ex. 108); J.R. 4785 (Ex. 216).

The evidence establishes that Dr. Soper was a TRF employee throughout the Guatemala Experiments. As explained above, Dr. Soper was "assigned" by TRF in 1947 to the PASB. J.R. 4979 (Ex. 241). Prior to this time, the U.S. Surgeon General traditionally served as the Director of the PASB. In the 1920s and 1930s, Surgeon General Dr. Hugh Cumming filled this role. When Dr. Parran replaced Dr. Cumming, he did not take over the Directorship, but in the mid-1940s, he and Dr. Strode, the Director of the TRF IHD, had ambitions to change and expand the PASB's role. J.R. 2484 (Ex. 120); J.R. 4965-66 (Ex. 234) (mentioning that he was aware Dr. Strode was "interested in the future development" of the PASB in 1946). They found a suitable replacement in their longtime and loyal employee Dr. Soper, and told Dr. Soper that they wanted to expand the role and influence of the PASB. J.R. 4965-66 (Ex. 234); J.R. 2270 (Ex. 108).

Dr. Soper was thereafter "assigned" by TRF to the PASB through Dr. Strode as Director of the IHD.[9] J.R. 4979 (Ex. 241). But Dr. Soper did not resign from TRF, and did not stop being TRF's

---

[9] Dr. Soper was not completely sold on being assigned to the PASB. He was instead interested in in heading a TRF public health campaign in Egypt and indeed went to Egypt to investigate the

agent while on this assignment. There can be no dispute about this. The arrangement was that TRF –
not the PASB – would pay Dr. Soper's salary and would deposit Dr. Soper's salary check "to [his]
bank account here, as in the past." TRF would also "continue to pay [it's] share of [his] annuity policy"
by deducting it from his "salary to cover that part of the annuity payment charged to [him]." *Id. See
also* J.R. 2276 (Ex. 108); 4965-66 (Ex. 234); 4967 (Ex. 235); 5049 (Ex. 257) (regarding payment of
salary). In addition, TRF not only continued to pay for Dr. Soper's insurance under its insurance plan,
but it doubled the total insurance amount. J.R. 4975 (Ex. 238); 4976-77 (Ex. 239).

Dr. Soper continued to be re-appointed as an Associate Director of the IHD each and every
year through 1950. J.R. 4785 (Ex. 216); 4985 (Ex. 243); 4988 (Ex. 244), 4989 (Ex. 245), 4990 (Ex. 246),
4991 (Ex. 247), 4992 (Ex. 248). He stated under oath on an official government form that TRF was
his employer from January 1920 until October 1950. J.R. 4985 (Ex. 243).

Like Dr. Parran, Dr. Soper is a prime example of TRF's policy of embedding "directing
personnel" inside a government agency so that TRF could influence and shape agency policy and use
the agency's resources as a force multiplier. Dr. Soper's position at the PASB allowed TRF complete
access to the public health programs of the U.S. and the PASB's 20 other member countries in North
and South America and the Caribbean. His position also allowed TRF to influence the way money
and personnel were allocated. As discussed below, his position also allowed him to directly support
and provide cover for the Guatemala Experiments.

Dr. Soper acknowledged his role in TRF's policy of embedding "directing personnel" inside
government agencies, and the way his assignment by TRF to the PASB enabled him to promote TRF's
interests and goals, in his Memoir:

---

position. J.R. 4965-66 (Ex. 234). When he returned on January 4, 1947, he learned that Dr. Parran had
followed through on his intention: Dr. Parran had "declared [him] officially" as the U.S. candidate to
lead the PASB. *Id.* Dr. Soper commented that he felt he "was no longer a free agent to decide, on the
basis of personal preference or of [his] own financial interest, where [he] would work." *Id.*

> I became Director of the [Pan American Sanitary] Bureau on 1 February 1947. My move to the official international health field was **not one of abandonment of The Rockefeller Foundation but rather of fulfilling its program**. It was **quite in keeping with Foundation policy** to make my service available to PASB **and I remained on its staff** during my first four years with the Bureau.

J.R. 2273, 2276 (Ex. 108) (emphasis added). In short, Dr. Soper was and continued to be a TRF for the duration of the Guatemala Experiments.

### C. In the course of their work for TRF, Drs. Parran and Soper directly participated in the Guatemala Experiments, and were aiders and abettors or co-conspirators of nonconsensual and unethical human experimentation

TRF is liable for the direct and indirect actions of its agents Drs. Parran and Soper in violation of international norms under the ATS. Dr. Parran worked to create space and provide cover for the Guatemala Experiments, and pushed them through the necessary authorization and funding channels. He assigned PHS personnel with a history of carrying out unethical human experiments to go perform the Experiments. Dr. Soper's actions were just as important and just as direct: he was assigned by TRF to the PASB and served as Investigator and "responsible official" for the Guatemala Experiments. In addition to overseeing them and allowing them to continue, he assigned and reassigned personnel, allocated equipment and resources, and kept them secret.

#### *Dr. Parran*

As explained above, Dr. Parran had made the eradication of syphilis the hallmark of his career both with TRF and the PHS. J.R. 23-24 (Ex. 1); 4778 (Ex. 215) ("Parran, as the Surgeon General from 1936 to 1948, made a focus on syphilis the hallmark of his tenure."); J.R. 5338 *et seq.* (Ex. 281). He promoted and worked closely with Dr. Joseph Moore of Hopkins for decades, considered him "one of [his] closest friends," and even hosted his 60th birthday celebration. J.R. 4788 (Ex. 217); J.R. 4779 (Ex. 215). Drs. Parran and Moore "shared ideas about research, how to find funding, what should be written for physicians and the public on syphilis, [and] recommended personnel for various

positions[.]" J.R. 4779 (Ex. 215). This collaborative relationship made Drs. Parran and Moore "key" players in the effort to understand and treat syphilis in the 1920s, 1930s, and 1940s. *See id.*

Dr. Parran was no stranger to promoting unethical research and allowing those under him to bend and break ethical rules to get the information he wanted. He presided over the Tuskegee Study of Untreated Syphilis in the Negro Male, a study that infamously involved the intentional failure to treat hundreds of African-American sharecroppers suffering from syphilis in Macon County, Georgia. J.R. 4773, 4780 (Ex. 215) Dr. Parran was also approved and supported the Terre Haute Federal Prison Experiment, a study that took place in a federal prison in Terre Haute, Indiana, in which doctors attempted to infect prisoners with gonorrhea so they could study its effects and potential treatment modalities. J.R. 26-27; 32 (Ex. 1).

With respect to the Guatemala Experiments, Dr. Parran provided "substantial assistance" to the project by serving as the final approver of its funding, thereby satisfying the *actus reus* element of the legal standard. J.R. 44-45 (Ex. 1). He had the power to stop the Experiments by refusing to fund them. J.R. 534 (Ex. 12). As explained above, Dr. Parran also worked with Dr. Strode at TRF's IHD to get Dr. Soper assigned by TRF to the PASB, where he became the "Investigator" and "responsible official" for the Experiments. J.R. 4265 (Ex. 185); J.R. 395 (Ex. 8). Dr. Parran kept up-to-date on the progress of the Experiments, was "keenly interested," almost preoccupied, with the work that was going on, and created a climate of secrecy for the Experiments inside the PHS. J.R. 2633 (Ex. 138); J.R. 2636 (Ex. 139).

Dr. Parran acted for the purpose of supporting the nonconsensual experiments, satisfying the *mens rea* element of the legal standard. There is no question that he knew the Experiments were grossly unethical. He giddily acknowledged to a PHS researcher who had returned from Guatemala, reportedly "with a merry twinkle in his eye," that the Experiments could not be performed in the United States. J.R. 2636 (Ex. 139). He appointed Drs. Cutler and Mahoney, men with a history of

ethical abuses, to run the Experiments on the ground. He had a direct conduit of information from inside the cone of secrecy through these men, Dr. Soper, and, as will be explained below, Dr. Moore.

Independent researchers have testified in discovery about Dr. Parran's *mens rea*. Prof. Lombardo, an ethicist who served as a senior advisor to the U.S. Presidential Commission, wrote in 2013 that the evidence "suggests that Parran not only knew the details of Cutler's work but also endorsed it with full awareness of its ethical toxicity." J.R. 5252 (Ex. 261); 5261 (Ex. 264). (Dr. Parran was "reportedly familiar with all of the arrangements"). Prof. Reverby, the historian who uncovered the unethical experiments in first place, also concluded that the evidence shows that Dr. Parran knowingly gave his support to conduct the unethical experiments. J.R. 4783-84 (Ex. 215).

### Dr. Soper

Dr. Soper also provided "substantial assistance" to the Guatemala Experiments, satisfying the *actus reus* element of the legal standard. He was the Investigator and "responsible official" for the Guatemala Experiments. J.R. 4265 (Ex. 185); J.R. 395 (Ex. 8). As Investigator, he was responsible for ensuring the safety and well-being of the test subjects. J.R. 5345 (Ex. 283) ("Investigator" charged with, among other roles, ensuring "[n]ecessary safeguards for the care and protection of persons and property."); Ex. 257 at 5043 (Lederer at 112) (investigator responsible for being a "safeguard for the welfare of research subjects"). He was responsible for overseeing the Experiments and supervising Dr. Cutler and the other perpetrators on the ground. He controlled the purse-strings, including the payment of local researchers, and he had the authority to replace local researchers and fill vacancies on the team. J.R. 4994 (Ex. 250); 5003 (Ex. 253). He gave the Experiments cover: he was the person to whom Drs. Cutler and Mahoney were reporting in "complete confidence," ensuring that another, less controllable person, would not have access to or stumble across information that could jeopardize the Experiments. J.R. 395 (Ex. 8).

Dr. Soper acted for the purpose of supporting the nonconsensual experiments, satisfying the *mens rea* element of the legal standard. He was undoubtedly aware of the nonconsensual nature of the Experiments. He had an opportunity to see the Experiments first-hand when he traveled to Guatemala for the first time in July 1947, had dinner at Dr. Cutler's home, and met with Dr. Cutler as the Experiments were in full swing. During that visit he commented in his diary regarding "artificial inoculation" using "severe test[s]." J.R. 2658-59 (Ex. 142). *See also* J.R. 5001 (Ex. 251); 5002 (Ex. 252) (referencing "experimental infections"). He wrote that Dr. Cutler was performing "serological tests" on children in an orphanage, people who were understood to be unable to provide consent. He documented that patients were being infected with "rabbit strain" of syphilis. *Id.* He later exchanged letters directly with Dr. Cutler in which they discussed testing on people who clearly could not provide consent: people housed in an "Insane Asylum." J.R. 4994 (Ex. 250). As Investigator, Dr. Soper could have stopped the Experiments, but he did not do so and allowed them to continue.

The assignment of Dr. Soper to the PASB and his position as Investigator were critical to allowing the nonconsensual experiments to occur and keeping them a secret. Dr. Cutler understood this; in his letter to Dr. Mahoney before he met with Dr. Culter, he wrote that he would remind Dr. Soper about the need to maintain operational secrecy when they met: "[I will] tell him as soon as he arrives . . . that the less he talks the better." J.R. 400 (Ex. 10). As Prof. Lombardo noted in an article about the ethics of the Experiments, and also testified in discovery, the emphasis on secrecy and discretion evidences an understanding that the Experiments were grossly unethical, so much so that if anyone outside the cone of secrecy found out what was happening "it would have meant an end to the experimentation." J.R. 5265 (Ex. 264).

### D.   Drs. Moore, Turner, Eagle, and Reed were agents of Hopkins throughout their involvement with the Guatemala Experiments

Like Drs. Parran and Soper to TRF, Hopkins physicians J. Earle Moore, Thomas Turner, Harry Eagle, and Lowell Reed were agents of Johns Hopkins during the Guatemala Experiments.

During this time, Hopkins never abandoned their control over these employees; there was no assertion of control by the U.S. government; and each of these men were actively serving the interests of Hopkins. To the extent these men had were considered to be government agents by virtue of their appointment to the Syphilis Study Section (a fact Plaintiffs dispute, *see* Opposition to Motion to Summary Judgment *infra*), they are presumed to be the dual agents of Hopkins and the government.

Dr. Moore was a powerful figure at Hopkins, in medicine generally, and in the field of STD research. In the 1940s, Dr. Moore served Hopkins as an Associate Professor of Medicine at the School of Medicine, Adjunct Professor in the School of Mental Hygiene and Public Health, and as the Physician-in-Charge of Hopkins' world-renowned syphilis clinic, Department L. J.R. 4789-92 (Ex. 218). Under his leadership, Department L made Hopkins "the center of syphilis research" in America for more than two decades. J.R. 4780 (Ex. 215). According to Dr. Reverby, Dr. Moore was considered to be "the godfather of syphilis studies." J.R. 1118 (Ex. 34). Dr. Moore was also the Chairman of the National Research Council's Subcommittee on Venereal Disease and the Chairman on the Syphilis Study Section that oversaw the approval and funding of all of the research in his field, both positions that brought Hopkins grants and prestige. J.R. 4789-92 (Ex. 218). Based on his work at Hopkins and his overall stature in the field, Dr. Reverby has testified that Dr. Moore was the center of all research on syphilis: "everybody [wa]s checking in with him about how [syphilis research] [wa]s being done." J.R. 1118 (Ex. 34).

Dr. Turner also was a powerful figure at Hopkins and the field of STD research. During the 1940s, he was a Professor of Microbiology at Hopkins and a member of the faculty at its medical school. He was held in such high esteem that in the mid 1950s, he was appointed Dean of the Medical Faculty. J.R. 4793-99 (Ex. 219). Dr. Turner was responsible for significant research and advancements in the understanding of syphilis – much of which was funded by The Rockefeller Foundation. He attracted grants, collaborated with researchers around the world, published widely, and was well-

known in his field. He served on the SSS that approved the Guatemala Experiments under Dr. Moore. J.R. 44 (Ex. 1).

Dr. Eagle was the Director of Hopkins' Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics. J.R. 4809-11 (Ex. 221). He was on the Hopkins faculty, conducted research and published, and, like his colleagues, was appointed by Dr. Moore to serve on the SSS. J.R. 44 (Ex. 1).

Dr. Reed served as Dean of the Hopkins School of Public Health, Chairman of the Department of Biostatistics, and Vice President of Johns Hopkins University and Hospital. J.R. 4812-16 (Ex. 222). The fact that he served in all of these capacities demonstrated that he was an extraordinarily well-respected doctor and researcher, and meant that he had great power and exerted substantial influence at Hopkins and in his field. He also was appointed by Dr. Moore to the SSS. J.R. 44 (Ex. 1).

All the while that Drs. Moore, Turner, Eagle, and Reed served on the SSS, they remained Hopkins' agents rather than agents of the government. Their work on the panel served Hopkins' interests: it reinforced the idea that Hopkins was a top-flight research institution; expanded its influence with the government and other academic institutions; made Hopkins a more attractive destination for scientists, researchers, and students; allowed Hopkins' employees to have access to people with whom they could work, exposed them to new developments in their fields; made it more likely that they and their colleagues could attract new grants and maintain the ones they had, and solidified Hopkins' position as a national command and control center and informational clearing house for all federally-funded research into syphilis and other sexually transmitted diseases. J.R. 4832-34 (Ex. 225); J.R. 1158 (Ex. 34) (having its employee participate on these subcommittees and other entities was "a bonus and important to Hopkins' position . . . as the key research institution in America[;]" participation of its doctors "was prestigious, because it . . . was a way in which to try to

42

find other funds" and to be seen as "the best people" "and therefore would gain money and prestige for Hopkins" allowing it "to continue to raise its profile in the world"). It also created a network of referrals from the federal government and other academic institutions.

The government did not attempt to exert control over the SSS or Drs. Moore, Turner, Eagle, or Reed, and did not pay them for their work. *See* Joint Stipulation of Facts at 22. Instead, it was explicit that the members were private scientists who were expected to operate autonomously, free of government direction, supervision, and control. As Dr. C.J. Van Slyke, then the head of the newly-created Research Grants Office wrote:

> **Support of research through the use of Research Grants funds does not imply in any way any degree of Federal control, supervision, or direction of the research project**.
>
> ....
>
> [T]he U.S. Public Health Service Research Grants program represents a sincere and continuing effort to supple Federal funds for the support of necessary additional research in the fields of medical and related science **without interposing any degree of government restriction, control, supervision, or regimentation.** The program is a scientific one, scientific guidance of **which lies wholly in the hands of scientists**.

J.R. 1858, 1859 (Ex. 77) (emphasis added); *see also* J.R. 4981 (Ex. 229) ("[f]or the first time in history, medicine's intellectual elite had the opportunity not only to set an example for the rest of the profession but **actually to direct the conduct of therapeutic research on a national scale**.") (emphasis added); J.R. 1159-60 (Ex. 34) (Reverby Dep.); J.R. 488-89 (Ex. 12) (Lombardo Dep.) ("everybody else who's part of the study section, I think, shares the same ethos of, you know, give them the money and turn them loose"); J.R. 5255-68 (Ex. 264) (Lombardo article).

Dr. Reverby agrees. She has testified that the Study Sections were not "arms of the government," but rather they were:

> seen as an independent advisory board. … It's really important to have the smartest people you can find make these independent judgments. You're not – maybe you're getting a small *per diem*. It's not like the

> government is paying your salary. **You're not on staff to the government.**

J.R. 1159-60 (Ex. 34).

In sum, Drs. Moore, Turner, Eagle and Reed were Hopkins agents during the time of the Guatemala Experiments and their service on the SSS, and not government employees. At worst, they acted as dual agents, pursuing the interests of both Hopkins and the government.

### E. In the course of their work for Hopkins, Drs. Moore, Turner, Eagle, and Reed directly participated in the Guatemala Experiments and were aiders and abettors or co-conspirators of nonconsensual and unethical human experimentation

Hopkins is liable for the direct and indirect actions of Drs. Moore, Turner, Eagle, and Reed in their capacity approving the Guatemala Experiments while on the Syphilis Study Section, actively participating in them while they were underway, and keeping them a secret during the Experiments and for decades thereafter.

Drs. Moore, Turner, Eagle, and Reed provided "substantial assistance" to the Guatemala Experiments, satisfying the *actus reus* element of the legal standard. As explained above, leading up to the Guatemala Experiments, each of these doctors had questions that he could not answer without experimenting on humans. Dr. Moore's involvement in the Terre Haute Study illustrates how far he was willing to go to achieve his goals: The United States Presidential Commission that investigated the Guatemala Experiments lays out in detail Dr. Moore's involvement with Terre Haute, and Plaintiffs will not repeat it here, other than to state that Dr. Moore knew well at the time that people living in psychiatric institutions were "incapable of providing voluntary consent," and that, in order to get approval to work with prisoners in Terre Haute, Dr. Moore argued that public support for the war was high enough that they could explain the need for the experiments "if questions about intentionally infecting prisoners were raised later." J.R. 31 (Ex. 1). And, when the decision was made to stop the Terre Haute experiment because of an inability to get a large pool of infected test subjects

and lingering concerns about ethical, legal, and public relations issues, Dr. Moore fought against the decision, stating that it might be the last time that they had the power and cover to conduct this type of experiment. J.R. 34-35 (Ex. 1). He wrote that "the urgency of the military situation does not permit, however, that the application of penicillin to the treatment of syphilis in human beings be postponed until all available information can be had from experimental animals. **Experimental study must progress simultaneously in man**." J.R. 35 (Ex. 1); 4898 (Ex. 227) (emphasis added).

Guatemala proved to be this second chance. Two years after the Terre Haute study closed, Dr. Moore was the head of the Syphilis Study Section, where he appointed three of his Hopkins colleagues to fill eight non-military positions (Drs. Turner, Eagle, and Reed). The SSS was at the time in charge of proposing, directing and approving federally-funded research involving syphilis. When the idea of using Guatemala as the location for an experiment involving experiments on syphilis prophylaxis and the intentional infection of test subjects arose, Dr. Moore, with the help of Drs. Turner, Eagle, and Reed (and Parran, as discussed above), jumped at the opportunity. J.R. 1159 (Ex. 34 (It was a "gold mine of a way to do the kind of research these guys have been aching to do for a really long time."). This time, with "reduced concern for some of the key obstacles associated with the Terre Haute experiments: fear of adverse legal consequences and bad publicity," J.R. 36 (Ex. 1), they gathered support, made recommendations, and obtained Dr. Parran's approval for "the Guatemala Study dealing with the **experimental transmission of syphilis to human volunteers and improved methods of prophylaxis**." J.R. 231 (Ex. 2) (emphasis added); J.R. 1155-56 (Ex. 34) ("Moore thought that they shouldn't have stopped Terre Haute and he wanted to see – that he knew he had to have the experimentation in humans to understand all of this, that the animal studies were too limited. And so there was this great opportunity to do it in Guatemala. And he was pushing to have that happen.").

The participation of Drs. Moore, Turner, and Eagle was not limited to approving the Guatemala Experiments; they actively sought to shape the Experiments to advance their own research.

45

J.R. 4783 (Ex. 215) ("members of the study section kept tabs on the research . . . received Cutler's regular reports and wanted in on this chance to use humans for these kinds of inoculation studies.") Their direction of, and participation in, promoting nonconsensual human experiments satisfies the *mens rea* element of the legal standard. When these men encouraged, supported, directed, and participated in the Guatemala Experiments, they did so knowing that the human test subjects were not giving consent.

The involvement of Drs. Moore, Turner and Eagle in the conduct of the Experiments is discussed *supra* at pages 23-28 and need not be repeated at full length here. Below is a summary:

- Dr. Moore, Eagle and Turner knew "a great deal" about what was going on in Guatemala, and wanted to participate. *See* J.R. 498; 504 (Ex. 12); J.R. 1113, 1123 (Ex. 34); J.R. 2961 (Ex. 175); J.R. 5259-61 and 5263-64 (Ex. 264) ("Several . . . study section members attempted to advance their own work as part of the grant they had already approved.")

- Dr. Moore was considered a task master and was "too thorough a scientist to ever have approved this without knowing exactly what was going on." J.R. 1116 (Ex. 34); *see also* 1157 ("[h]e would have to have seen the details or he wouldn't have approved it").

- Dr. Moore admitted that he pushed support for the Experiments: writing, "I have taken upon myself to enlist the interest of competent investigators in this matter, believing that certain of the experimental studies especially in the effort to produce gonococcal infection . . . in man should be repeated and extended." J.R. 1915 (Ex. 88).

- As the studies were underway, Dr. Moore wrote to a member of the Surgeon General of the Army's office that, as a result of the inability to reliably "produce infection" in the Terre Haute study, "Dr. Mahoney and his group, under the auspices of the United States Public Health Service, have undertaken an extensive **experimental study in human volunteers in Guatemala which results I am not at liberty to quote**[.]" J.R. 1914-16 (Ex. 88) (emphasis added).

- Correspondence with Dr. Neurath of Duke University indicates that Dr. Moore was aware that testing in Guatemala involved "known syphilitic human sera," and work on patients in an asylum and the San Jose Orphanage, both populations that he knew could not provide consent. J.R. 5269 (Ex. 265), 5270-71 (Ex. 266).

- With the funding and support of The Rockefeller Foundation, Dr. Turner was conducting research regarding "the pathogenicity" of rabbit syphilis "in the human" in order to try to develop a vaccine for the disease. J.R. 5253 (Ex. 262); 5254 (Ex. 263). Syphilitic rabbits were shipped from Dr. Turner's lab at Johns Hopkins to the VDRL in Staten Island, and then on to Dr. Cutler in Guatemala, where they were used in the Experiments. *See id.; see also* J.R. 1092 (Ex. 34); 5276-83 (Ex. 268-273); J.R. 2658-59 (Ex. 142); *see also* J.R. 4046, 4053, 4057-59, 4062 (Ex. 180) (identifying individuals exposed to "rabbit syphilis").

- Dr. Eagle was also eager to participate in order to "prove the thesis" that penicillin could cure syphilis "by a human experiment." J.R. 88 (Ex. 1); J.R. 5284-85 (Ex. 274); J.R. 5286-88 (Ex. 275 and 276); J.R. 5304 (Ex. 277).

- Dr. Eagle supplied British Anti-Lewisite to help cure the wife of Dr. Carlos Tejada, the Chief of the Guatemalan Army Medical Department, of mercury poisoning so that Dr. Cutler had open access to military personnel in Guatemala on whom to experiment. J.R. 1910 (Ex. 86); J.R. 1912 (Ex. 87); J.R. 5307 (Ex. 278).

In sum, what occurred in Guatemala was no secret among this close group of Hopkins researchers. They devised the plan, approved it, and actively participated while it was underway. Further, Drs. Moore, Turner, Eagle, and Reed maintained the cone of secrecy around the Experiments, both before, during, and after they occurred. Despite the fact that these men published hundreds of medical papers and gave countless presentations and talks between them, not one of them ever published or said anything about what happened. This was because they understood that the Experiments were grossly unethical.

F.   **The 22 Plaintiffs bringing this Motion were victims of nonconsensual medical experiments in violation of customary international law, and each Plaintiff suffered an injury as a result**

In *Alvarez II*, 205 F. Supp. 3d at 689-90), the Court held that customary international law, as it existed in the 1940s and 1950s, prohibited medical experimentation on human test subjects without their consent, and that this norm was sufficiently established and definite to support a cause of action under the ATS. There is no dispute that those involved in the Guatemala Experiments performed nonconsensual medical experiments on test subjects in Guatemala in violation of those norms.

This Motion for Summary Judgment is brought on behalf of 22 individuals who were injured in the Guatemala Experiments. They include four of the remaining "Selected Plaintiffs" chosen prior to the start of discovery as part of Judge Garbis's structured-discovery case management plan, as well as 18 additional individuals for whom there exists contemporaneous documentation from the 1940s regarding their involvement in nonconsensual human experimentation. The undisputed evidence establishes that these 22 individuals were injured by these nonconsensual experiments and are entitled to judgment as a matter of law.

### The Selected Plaintiffs

There undisputed evidence establishes that four of the Selected Plaintiffs chosen for full discovery pursuant to Judge Garbis's case management plan were injured in the Guatemala Experiments.[10] Defendants have no proof to the contrary.

1.    **Manuel Chun Mucu** (Plaintiff 649) is a Direct Victim Selected Plaintiff from the insane asylum in Guatemala City. According to contemporaneous documentation produced by the National Archives and interpreted by Plaintiffs' expert witness, Jeffrey Klausner, M.D., an infectious disease physician at the University of California (J.R. 5503-5599 (Ex. 294)), Mr. Mucu was purposefully exposed to both syphilis and gonorrhea during the Guatemala Experiments.[11] J.R. 4542-4560 (Ex. 200); J.R. 4712-13 (Ex. 208); J.R. 1276-77, 1280 (Ex. 35. His penis was scarified and syphilis was

---

[10]  Plaintiffs had to choose the "Selected Plaintiffs" prior to receiving unredacted documentation from the National Archives. See note 11, *infra*.

[11]  Exhibits 188 through 207 consist of documentation regarding 20 "Direct Victim" Plaintiffs who were the subjects of human experimentation as part of the Guatemala Experiments. The documents were produced by the National Archives and Records Administration (NARA) in early 2018 pursuant to a subpoena issued by Plaintiffs' counsel seeking unredacted records of Dr. Cutler's experiments (*i.e.* identifying the research subjects' names). The records produced by NARA are voluminous and are not organized by research subject. Plaintiffs' counsel extracted from those voluminous documents any documents relating to Plaintiffs in this lawsuit to create Exhibits 188-207. Exhibit 208, the Affidavit of Jeffrey Klausner, M.D., summarizes those records; the "NARA" page references in his Affidavit refer to the documents produced by the National Archives.

applied with a pledget. *Id.* He was also inoculated with gonorrhea by applying a solution of pus from a gonorrhea-infected inmate into his urethra at the tip of his penis. Syphilis tests conducted through 1949 were positive, despite receiving penicillin.[12] *Id.*

2. **Ramiro Galvez Villalobos** (Plaintiff 63) is a Direct Victim Selected Plaintiff who was the subject of blood draws while he was a minor child and student at a school in the town of Puerto de San Jose, where it is undisputed that the researchers performed serological testing in order to perfect a blood test to detect syphilis. J.R. 49-53; 191 (Ex. 1); J.R. 3207, 3253-54 (Ex. 177). Mr. Villalobos has given a deposition in which he testified to his memory of being injected with what he believed to be vaccinations. J.R. 1743-45, 1754-64 (Ex. 77). The former Director of the school has signed a Sworn Declaration (and testified at deposition) that it is well-known in the community that Mr. Villalobos attended the school as a child during the relevant time period. J.R. 5357-58 (Spanish); 5359-60 (English translation).

3. **Arturo Girón Alvarez** (Plaintiff 1) is an Estate Selected Plaintiff. He was an inmate in the penitentiary in Guatemala City. According to contemporaneous documentation produced by the National Archives, Mr. Alvarez had suffered from a syphilis infection in the past, but the infection was latent at the time he was a prisoner in the penitentiary. J.R. 4342-58 (Ex. 188); J.R. 4706 (Ex. 208); J.R. 1270-75 (Ex. 35). On May 14, 1947, he was re-infected in the Guatemala Experiments with syphilis obtained from the testicles of a syphilitic rabbit. *Id.* He developed swelling at the site of injection and in his lymph nodes, followed by red painful lesions. Despite treatment with penicillin, he was not cured of his re-infection with syphilis. *Id.*

---

[12] Although Defendants claim that a 2019 syphilis test was negative, that fact is immaterial given that it was conducted over 70 years later, at a time when antibodies would be expected to dissipate. J.R. 4713 (Ex. 208).

Mr. Alvarez's daughter has signed a Sworn Declaration attesting to the fact that during his life, her late father shared memories of being subjected to "medical practices" while he was imprisoned.[13] J.R. 1850-51 (Ex. 76 (Spanish)); J.R. 4198-99 (Ex. 181 (English translation)).

4.     **Francisco Garcia Alvarez** (Plaintiff 349) is an Estate Selected Plaintiff. He was a prisoner in the Penitentiary in Guatemala City. He has signed a Sworn Declaration under oath in which he attested to the fact that while jailed, he was offered cigarettes by foreign doctors in exchange for being stripped naked, examined, and given shots, including in his genitals. J.R. 1844-85 (Ex. 74). He stated that he began to ooze pus from his genitals three days after receiving shots, and that the foreign doctors continued to see him for approximately nine months thereafter. *Id.* His family would testify at trial that he made similar statements to them prior to his death.[14]

### Evidence Supporting the Injury of 18 Other Victims

In addition to these four Selected Plaintiffs, the NARA records and other evidence confirm that 18 other individuals are entitled to judgment based on undisputed evidence that they were the victims of the Guatemala Experiments (regardless of whether they were designated as "Representatives"). These individuals are the following people: Martin Caal (Plaintiff 9); Juan de Dios Alvarado (Plaintiff 145); Mateo Caal Tzib (Plaintiff 307); Francisco Sub (Plaintiff 437); Fidel Ramos (Plaintiff 467); Maria Lopez (Plaintiff 499); Felix Molina Pop (Plaintiff 557); Margarita Garcia (Plaintiff 563); Adan Vasquez (Plaintiff 577); Juan Mendez (Plaintiff 598); Carlos Perez Lopez (Plaintiff 630); Jose Molina (Plaintiff 656); Maria Mendez (Plaintiff 662); Juan Caal Pacay (Plaintiff 716); Daniel de

---

[13] Although Plaintiffs offered to make her available for deposition, Defendants declined to depose Mr. Alvarez's daughter on the grounds that she had not yet been named as the Representative of Mr. Alvarez's Estate at the time the defense counsel traveled to Guatemala for depositions.

[14] Although Plaintiffs offered to make Mr. Alvarez's son and personal representative available for deposition, Defendants declined to depose him on the grounds that he had not yet been named as the Representative of Mr. Alvarez's Estate at the time the defense counsel traveled to Guatemala for depositions.

Leon (Plaintiff 723); Jose Lopez Hernandez (Plaintiff 733); Antonio Perez Santiago (Plaintiff 762); and Alfredo Moran (Plaintiff 775).

A complete description of the injuries sustained by these 18 individuals is contained in Exhibit 208 (J.R. 4705-4717) and Exhibits 189 through 199 (J.R. 4359-4541) and 201 through 207 (J.R. 4561-4707). In the interest of time, Plaintiffs will not summarize the injuries sustained by each person, but adopt and incorporate the Affidavit of Dr. Klausner, which does just that. J.R. 4705-4717 (Ex. 208). The following is a description of two illustrative individuals:

1.     **Maria Mendez** (Plaintiff 662) is the mother of Reginaldo Ramirez Mendez, who was designated to be a "Child" Representative Plaintiff under Judge Garbis's initial case management order. J.R. 5364 (Ex. 287). Ms. Mendez was a patient in the insane asylum who was purposefully injected with an emulsion made from rabbit testicles infected with the Frew strain of syphilis in February of 1948. J.R. 4601-14 (Ex. 202); 4714-15 (Ex. 208). She was successfully infected, as confirmed by subsequent lab testing conducted regularly through 1950. *Id.* Her son gave a deposition in which he identified a photograph of his mother, taken from the documents produced by the National Archives relative to the experiments in the asylum:

Q:     Who is it?

A:     That is my mother:

Q:     Is there any doubt in your mind?

A:     No, no, no. Not at all. … [T]his my mother.

J.R. 5931 (Ex. 287) (testimony); J.R. 4614 (Ex. 202) (photo).

2.     **Alfredo Moran** (Plaintiff 775) was a soldier in the Honor Guard of the Guatemalan Army. Documentation from the Guatemalan Army confirms his service in the Honor Guard between April 1, 1947 and December 31, 1948. J.R. 5427-28 (Spanish) and 5429-31 (English translation) (Ex. 288A & B). Contemporaneous documentation produced by the National Archives in turn confirms

that members of the Honor Guard were in fact subjects of the Guatemala Experiments in December of 1947, when researchers infected them with gonorrheal pus from another infected subject. J.R. 4696-4704 (Ex. 207); J.R. 4716 (Ex. 208). Mr. Moran's name is identified on those documents as being one of the victims of this very experiment. *Id.* Subsequent cultures confirmed that he was infected with gonorrhea. *Id.*

## **CONCLUSION**

Based on the above evidence, Plaintiffs ask the Court to find that there is no dispute of material fact and enter judgment on these 22 Plaintiffs' behalf on the following issues:

1.  Drs. Thomas Parran and Frederick Soper were agents of The Rockefeller Foundation, either solely or dually, throughout their involvement with the Guatemala Experiments.

2.  In the course of their work for TRF, Drs. Parran and Soper directly participated in the Guatemala Experiments and aided and abetted nonconsensual human experimentation. Dr. Parran was one of the primary supporters of the Experiments and acted as a driving force for it, giving final approval for the study to occur. Dr. Soper was named the Investigator for the project, making him responsible for ensuring ethical conduct and the well-being of the subjects. He had direct contact with Dr. Cutler and other PHS employees, directly oversaw the work that was being done, and he and Dr. Parran both fully understood the extent of ethical violations that were occurring. Both of these high-ranking and powerful men could have stopped the nonconsensual experimentation, but instead they choose to be aiders and abettors and co-conspirators who acted with full knowledge and for the purpose of promoting the nonconsensual and unethical human experimentation.

3.  Drs. J. Earle Moore, Thomas Turner, Harry Eagle, and Lowell Reed were agents of the Johns Hopkins entities throughout their involvement with the Guatemala Experiments.

4.  In the course of their work for Hopkins, Drs. Moore, Turner, Eagle, and Reed directly participated in the Guatemala Experiments and aided and abetted nonconsensual human experimentation. Their careers and Hopkins' national reputation was built on researching and treating sexually transmitted diseases, and they saw that the window of opportunity for human experimentation was closing. These men used their power and role on the Syphilis Study Section to formulate and approve the Experiments for funding. Drs. Moore, Turner and Eagle actively sought to use the Experiments as an extension of research they were doing at Hopkins. These men aided and abetted and conspired with full

knowledge and for the purpose of promoting the nonconsensual and unethical
human experimentation.

5.     The 22 Plaintiffs who bring this motion were the victims of nonconsensual
       human experimentation and suffered an injury therefrom, entitling them to
       compensation under the Alien Tort Statute.


## ARGUMENT:
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants are not entitled to judgment. *First*, the evidence, as set forth at great length above,
at the very least demonstrates that there are questions of fact regarding the roles and agency of the
key individuals involved, and Defendants' responsibility for their agents' actions in directing, aiding
and abetting, and conspiring to commit the nonconsensual human experimentation that occurred in
the Guatemala Experiments. *Second,* Defendants misconstrue and misapply the applicable agency law,
and advocate for an inappropriate legal standard under the ATS (one that this Court has already
criticized). *Third*, this case does not involve an impermissible "extraterritorial" application of the ATS
because Defendants' tortious conduct occurred in the United States. *Fourth*, Defendants are not
entitled to immunity of any kind. *Finally,* the defenses mounted against the claims of specific Plaintiffs
and Plaintiff groups are factually and legally incorrect.

Defendants' Motion for Summary Judgment on All Claims should be denied.

## I.     THERE IS AT LEAST A DISPUTE OF FACT ABOUT DEFENDANTS' RESPONSIBILITY FOR THE GUATEMALA EXPERIMENTS

In their Motion for Summary Judgment, TRF and Hopkins cite snippets of testimony and
argue that favorable inferences should be drawn from documents, as if that testimony and those
inferences were uncontested fact. They assert that "[g]overnment investigations have confirmed that
the Guatemala Experiments were a U.S. and Guatemalan government operation[.]" Def. Jt. Brief at 1,
4-5. They assert that their agents and employees "were [not] meaningfully involved" in the
Experiments, but instead were simply "outside consultant scientists" who "aided" the federal

government by providing advice on grant proposals. *Id.* at 4, 13. (Defendants must only be referring to the U.S. Presidential report; the Guatemalan Government's identified Dr. Thomas Turner, Dr. Thomas Parran, and Dr. Fred Soper as responsible actors. J.R. 3184; 3232 (Ex. 177)).

The job of this Court in deciding the instant motion is not to simply adopt as gospel what the United States Presidential Commission says. Although its report is one helpful piece of evidence, the Court must also evaluate the proof that has been amassed *in this lawsuit*. That evidence includes mountains of evidence compiled from voluminous exchange of documents, weeks spent inspecting Defendants' archives, documents obtained by subpoena from federal agencies, depositions, and other discovery – much of which was never seen or considered by the governments that investigated. Hopkins, for example, produced **only 139 pages** of documents to the U.S. Commission, and The Rockefeller Foundation produced **none,** and was not even part of the Commission's investigation.[15] J.R. 158 (Ex. 1); J.R. 5600-5601 (Ex. 295) (summarizing records reviewed). Indeed, the accumulation of this evidence is in part what led Professor Reverby, who discovered the records of Dr. Cutler in the first place, to agree to serve as an expert on behalf of Plaintiffs to testify regarding the role TRF and Hopkins' physicians played in initiating and supporting the Experiments.

This evidence amply demonstrates that the Guatemala Experiments were not simply a "government" project or the result of "rogue" government health workers conducting their own personal, secret experiments for the gain of the government alone. Plaintiffs will not repeat that evidence here for the sake of brevity, and refer the Court to their Cross-Motion for Summary Judgment and the facts and argument set forth at length above at pages 2 through 47.

---

[15] In addition, the U.S. Presidential Commission had important documents that it inexplicably omitted from referencing in its report, such as Dr. Moore's letter to Col. Longfellow in which he acknowledged that they could not do such experiments in the United States. J.R. 1913-16 (Ex. 88).

The evidence abundantly establishes that there is at the very least a question of fact regarding the roles of TRF and Hopkins agents in formulating, funding, approving, implementing, supporting, and participating in the Experiments, as well as covering them up during and after they were over. There is at least a question of fact regarding what control, if any, the government exerted over these men and whether, in their roles in the Experiments, Drs. Parran, Soper, Moore, Turner, Eagle and Reed were acting at least in part on behalf and for the benefit of their respective institutions such that they were dual agents. Accordingly, Defendants' motion should be denied.

## II.  DEFENDANTS MISCONSTRUE AND MISAPPLY THE APPLICABLE AGENCY LAW

Defendants misconstrue and misapply the agency law at issue in this case. They claim that their agents were "borrowed servants" of the United States government, and that the basic principles of *respondeat superior* do not apply in a case arising under the ATS. They are wrong about both. They also urge the Court engage in judicial policymaking and do what no other federal court has done in an ATS case: apply a much narrower and more restrictive standard of corporate liability based on *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978). As this Court suggested in *Alvarez III,* however, *Monell* has no application to this case, and Defendants' creative reliance on it should be rejected once and for all.

### A.  The borrowed servant doctrine does not apply to this case

TRF and Hopkins repeatedly cite to the borrowed servant doctrine in support of their argument that their agents were acting on behalf of the government at the time of the Guatemala Experiments.[16] The borrowed servant doctrine, however, does not apply. Instead, the relevant inquiry

---

[16] Throughout their briefs, Defendants continuously and improperly cherry-pick quotations and take citations out of context to conveniently mold support for their arguments. For example, at page 13 of Defendants' Joint Brief, Defendants cite to *In re Global Crossing Ltd. Sec. Litig.*, 2005 WL 1881514 at *3 (S.D.N.Y. Aug. 5, 2005), an unreported New York case, for the proposition that it is "'legally unjustified' to infer that an employee acts on behalf of one principal while undertaking actions on behalf of a different principal." However, in context, the phrase "legally unjustified" in that case

is whether – to the extent their agents had any relationship with the government at all – those TRF and Hopkins actors were dual agents.

As the Court explained in *Alvarez III*, "[a] person may simultaneously be the servant of two masters at one time as to one act, provided that the service to one does not involve abandonment of the service to the other" and "[i]n the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it." 275 F. Supp. 3d at 693-94. In fact, a dual relationship is **presumed** unless the service performed is antithetical to/against the interests of the original principal or employer, or if there is evidence indicating that the original principal or employer surrendered control. *See* Cmt. (b) to RESTATEMENT (SECOND) OF AGENCY § 227. *See also* § 226 (Servant Acting for Two Masters).

---

cautioned against a **presumption** that individuals appointed by their employers to act as directors on the board of a second company had no fiduciary duties to the shareholders of that second company, and instead continued to act solely for their original employers. In other words, Defendants took a case that has no factual bearing on the issues here and pasted the phrase "legally unjustified" on top of a general assertion about agency principles to suit their purposes.

Similarly, in the Brief of the Hopkins Defendants, on page 5, Hopkins cite to *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 10-11 (2001) for the proposition that "a government consultant does not act in 'an interest of its own, or the interest of any other client, when it advises the agency that hires it.'" *Klamath* concerned whether a document prepared by a private government contractor qualified as an "intra-agency" memorandum under Exemption 5 of the Freedom of Information Act. It has absolutely no bearing on the issues presented here. And, while discussing two readings of the phrase "intra-agency memorandum" in a previous Supreme Court dissent, the Court stated that "the fact about the consultant that is constant **in the typical cases** is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* (emphasis added). In other words, Hopkins starts its quote in the middle of the sentence, omits the qualifier "in the typical cases" to make a definite statement, and changes the word "represent" to "act," thereby changing the meaning of the quote.

These are just two examples of the tortured quotations and citations that have continued to soil Defendants' briefs and motions throughout the litigation.

As it relates to this case, it is Plaintiffs' position that Dr. Soper was an employee of TRF – and no one else – during 1947, the key year in which the intentional exposure experiments were occurring in Guatemala. Dr. Soper was never a borrowed servant of anyone. He was paid a salary and benefits not by the PASB, but by TRF, who "assigned" him to work there. Under the agency principles outlined by Judge Garbis in *Alvarez III,* his principal clearly was TRF.

To the extent Dr. Soper had a relationship with the PASB, Dr. Parran was the PHS Surgeon General, and Drs. Moore, Turner, Eagle and Reed were members of the Syphilis Study Section, there is at least enough evidence to generate a colorable jury question on those individuals' dual agency with those respective government agencies. As outlined in detail above and not to be repeated here, these TRF and Hopkins employees acted for the benefit of their institutions. *See* above at pages 2 through 47. TRF and Hopkins did not give up control of these agents at any time, and neither did the PHS or the PASB seek exclusive control of them. TRF's policy and *modus operandi* was to act *through* governments and agencies, which is exactly what Drs. Parran and Soper did here. Dr. Soper admitted in his Memoirs that this was exactly the purpose his assignment to the PASB served. Likewise, Hopkins directly benefited from the work its physicians performed while serving on the SSS, and there was clearly an expectation and understanding that their roles on that section was done on behalf of the institution, to advance its standing and reputation and to gain more research grants for its physicians and public health researchers. A jury could easily find, therefore, that these men were dual agents and that TRF and Hopkins are liable for their conduct.

**B.      The doctrine of *respondeat superior* <u>does</u> apply to this case**

TRF and Hopkins ask this Court to abandon *respondeat superior*, stating that it does not apply in cases brought under the Alien Tort Statute. This is simply wrong. *Respondeat superior* is part of the body of international law, and this Court is required to apply it.

*Respondeat superior* is a basic legal principle that renders employers or principals legally responsible for the wrongful acts or omissions of their employees or agents, as long as the acts or omissions occur within the scope of their employment or agency. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 219; WILLIAM P. KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS 499 (5th ed. 1984). *Respondeat superior* is recognized by virtually every civilized nation, in both common law and civil law legal systems, and is thus properly considered part of customary international law. *See, e.g., B.C. Ferry Corp. v. Invicta Sec. Serv. Corp.*, No. CA023277, 84 A.C.W.S. (3d) 195 (B.C. Ct. App. 1998) (holding employer liable for arson committed by its security personnel) (Canada); *Lister v. Hesley Hall, Ltd.*, 1 A.C. 215 (H.L.) (2002) (holding school liable for sexual abuse by warden) (England and Wales); *Kimmy Sueng King-on v. Attorney Gen.*, H.K.L.R. 331 (C.A. 1987) (Hong Kong); *Chairman, Ry. Bd. v. Das,* 2 L.R.I. 273 (2000) (holding railway liable for rape by railway employees) (India); *Johnson & Johnson* (Ireland) Ltd. v. CP Sec. Ltd., I.R. 362 (H.Ct. 1986) (Ireland).

Indeed, as this Court noted in *Alvarez III, respondeat superior* principles have been applied by other courts in ATS cases. *See Doe VIII v. Exxon Mobile Corp.*, 654 F.3d 11, 47-48 (D.C. Cir. 2011), *vac. on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) (Mem.) ("[A]gency law determines whether a principal will pay damages for the battery committed by the principle's agent."); *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1241-42 (N.D. Cal. 2004) (applying agency principles to consider whether a parent corporation was liable for the acts of its subsidiary under the ATS). This Court also correctly explained that *respondeat superior* could "better fulfill federal common law objectives of uniformity." *Alvarez III*, 275 F. Supp. 3d at 692.

Application of *respondeat superior* in ATS cases makes sense because the ATS was enacted with the intention of providing aliens a broad civil remedy for international law violations, including violations carried out by corporations or other juridical entities. Abrogating *respondeat superior* in an ATS case, as Defendants suggest, would directly and improperly violate this intent. Before the ATS

was enacted in 1789, English and American courts, grappling with violations of the law of nations, applied agency principles, including *respondeat superior*, to hold corporations and other juridical entities responsible for the acts and omissions of their agents. English courts held the East India Company liable for the torts of its agents committed in violation of the law of nations. *See, e.g., The Case of Thomas Skinner, Merchant v. The East India Company*, 6 State Trials 710 (H.L.) 711 at 713-714, 724 (1666) (rejecting East India Company's argument that it could not be held liable for the torts of its agents, which constituted a violation of the law of nations on the high seas); *Shelling v. Farmer*, 93 Eng. Rep. 756; 1 Str. 646 (1725) (discussing settlement between East India Company and individual for "injuries by the Company's agents"); *Moodalay v. The East India Company*, 28 Eng. Rep. 1245 (Ch.) 1246, 1 Bro. C.C. 469, 470, (1785) (holding ship owners liable for the torts of their captains committed in violation of the law of nations).

Finally, it also makes sense to apply *respondeat superior* in ATS cases in order to incentivize corporate employers to exercise greater care in selecting and monitoring their employees, thereby preventing or reducing future injury. It assures victim compensation where individual employee tortfeasors are unavailable or unable to fund a remedy, and it assists to spread losses equitably and assign costs to the party in the best position to absorb them. International law seeks to discourage international human rights violations. Abandoning *respondeat superior*, and adopting a stricter standard, would make it harder to hold corporations responsible for human rights violations, and is antithetical to this goal.

For the reasons explained at length above, applying the principles of *respondeat superior* to this case compels a conclusion that there is a least a triable issue of fact regarding agency as it relates to the TRF and Hopkins individuals at issue in this case.

59

### C.      The *Monell*-like standard has no place under the ATS

Unsatisfied with the application of *respondeat superior* to this case, Defendants urge the Court to engage in judicial policymaking and do what no other federal court has done: refuse to apply established common law principles under *respondeat superior* and instead adopt a much narrower and more restrictive standard of corporate liability based on *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 679-80 (1978), as applied in a Seventh Circuit case, *Flomo v. Firestone Nat. Rubber Co.,* 643 F.3d 1013, 1020-21 (7th Cir. 2011). *See* Defs' Jt. Brief at 10-12. Under such standard, corporations that employ people who violate customary international law would only be liable if their actions were caused by and directly attributable to a corporate policy, decision, custom, or practice. *See id.*

As Plaintiffs argued when this issue was first raised in the motions to dismiss stage, *see Alvarez III*, Defendants misread and misinterpret *Flomo* and its analogy to *Monell.* Contrary to Defendants' argument, the Seventh Circuit in *Flomo* did not hold that *respondeat superior* is inapplicable in ATS cases, or that corporate civil liability in ATS cases is limited to situations when violations were "directed, condoned, or encouraged at the corporate defendant's decision-making level." During the appeal in *Flomo*, the plaintiffs conceded that corporate liability for international law violations is limited to cases in which a violation was "directed, encouraged, or condoned at the corporate defendant's decision-making level." *See* 643 F.3d at 1020-21. Although the court had concerns about the scope of corporate liability, the plaintiffs' concession meant that it could defer deciding where the line needed to be drawn. *See id.* at 1021 ("We needn't decide how far corporate vicarious liability for violations of customary international law extends; it is enough that we see no objection to corporate civil liability as circumscribed as the plaintiffs concede."). Thus, even though the "directed, condoned, or encouraged" language was used in *Flomo*, the court was not required to determine the appropriate standard.

Also, the Seventh Circuit did not hold that *Monell* provided a proper model for corporate liability in ATS cases, or apply a *Monell*-like standard. Instead, Judge Posner, writing for the court, merely indicated that the "directed, condoned, or encouraged at the corporate defendant's decision-making level" language conceded by the plaintiffs was roughly analogous to one of the court's recent 42 U.S.C. § 1983 decisions, in which it found that "a person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government – by the city council, for example, rather than by the police officer who made an illegal arrest." *Id.* at 1021 (citation omitted). Because of the plaintiffs' concession, Judge Posner did not write more than a single sentence on this issue. He did not discuss how close of an analogy existed, or even if the analogy was sufficiently apt to justify applying *Monell*-like standard under the ATS. No Circuit Court has since adopted the *Monell*-like standard in the nine years since *Flomo* was decided, and it remains an outlier.

For these reasons, this Court in *Alvarez III* was critical of Defendants' position. While recognizing that federal courts have applied the *Monell* standard in suits against corporations under § 1983, the Court noted that this approach has been called into doubt, such as in *Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 795 (2d Cir. 2014), in which the Second Circuit pointed out practical difficulties in applying *Monell* to private entities *See* 275 F. Supp. 3d at 690 (discussing *Shields*). This Court agreed that *Monell* was "cumbersome when applied to private entities," and supporting "the notion that [it] was not intended to, nor is it well-equipped to, apply to private corporations." *Id.* It also criticized Defendants' position because the *Monell* standard is a creature that exists only because of the unique statutory language found in 42 U.S.C. § 1983, which states that liability is imposed upon a person who subjects or "causes to be subjected" a person "to the deprivation of any rights." *Id.* This Court distinguished § 1983 and the ATS, stating that the ATS "contains no language regarding causation or who is subject to suit." *Id.*

This Court should finish what it started in *Alvarez III,* and hold that *Monell* has no application in ATS cases.

### D.    Even if a *Monell*-like standard applied, the evidence in this case is sufficient to meet that standard

Even if the Court issues the novel holding that a *Monell*-like standard applies in an ATS case, the evidence would still present a question of fact about whether the tortious conduct of high-rankings agents and employees of TRF and Hopkins were caused by, and directly attributable to, a corporate policy, decision, custom, or practice.

As stated above, in *Monell*, the Supreme Court held that a municipality is liable for the constitutional torts committed by its employee if the employee was implementing or executing a policy or decision made by a municipal officer or employee whose edicts or acts may fairly be said to represent official policy, or a practice so permanent and well-settled as to constitute a custom or usage, whether or not it had received formal approval through official decision-making channels. *See Monell*, 436 U.S. at 690-91. The Court provided more context in in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), explaining that an "official policy" is a course of action that can be attributed to the municipality itself. *Id.* at 479-80. One example is a "formal policy" – a policy "officially sanctioned or ordered" by a municipality or a municipal sub-unit's highest-level decision-makers, *see id.* – but there are many other examples of less formal, but still "official policies," such as policies created by the edicts or actions of people who have been given decision-making authority in a particular area. *See id.* at 480 n.8. *Monell*, the *Pembaur* Court noted, "expressly envisioned" that the "acts or edicts [of these distributed decision-makers] may fairly be said to represent official policy' and . . . give rise to municipal liability under § 1983." *Id.* at 480.

Further, a municipality can be held liable under § 1983 if a subset of its employees engaged in a sufficiently persistent course of misconduct that caused or allowed a constitutional violation to occur. In these situations, acquiescing to or condoning wrongful conduct over time takes the place of

"formal approval through the body's official decision-making channels." *Pembaur*, 475 U.S. at 482, n.10. *See also Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987) (allegations that officers "withheld information on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom"); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402-03 (4th Cir. 2014) (same).

Applying a *Monell*-like standard in this case therefore does not require Plaintiffs to prove that Hopkins or TRF had adopted institution-wide customs or practices to violate established rights; it is sufficient instead that they delegated decision-making authority to their employees. As explained above, the agents at issue in this case were key decision makers who were high up the ladders of their respective institutions. Dr. Parran was a Trustee of TRF, officer of the corporation and Scientific Director of its International Health Division. Dr. Soper was an Associate Director of the IHD, and an officer of the corporation. TRF assigned Dr. Soper to the PASB, where he became the Investigator for the Guatemala Experiments. Dr. Moore and his colleagues at Hopkins were all high-ranking, highly influential employees and researchers who were heads of their Departments, ran their own clinics and laboratories, and whose work brought Hopkins money, honor, and accolades.

When these men acted, they did so not on their personal behalves, but on behalf of and for the benefit of the official mission and purpose of their respective institutions. Dr. Soper's assignment to the PASB was in keeping with TRF's official policy of embedding its personnel in external agencies to direct non-traditional human experiments, seeking accelerated results. Additionally, TRF and Hopkins acquiesced to and condoned their agents' well known, formal involvement in the forerunners to the Guatemala Experiments, Tuskegee and Terre Haute, both of which have been condemned by ethicists. A jury could certainly conclude based on the evidence that TRF and Hopkins gave these men the authority and autonomy to authorize, participate in, and aid and abet the research that was the nonconsensual human experimentation in Guatemala.

63

III.   THIS CASE DOES NOT INVOLVE AN IMPERMISSIBLE "EXTRATERRITORIAL" APPLICATION
OF THE ATS

Defendants argue that Plaintiffs' claims are an impermissible "extraterritorial" application of the ATS because all of the tortious conduct occurred in Guatemala. This argument fails because the tortious conduct of Defendants in conspiring to formulate, plan, approve, fund, support participate in, and aid and abet the Guatemala Experiments all occurred in the United States.

There is a presumption that Congressional legislation (including the ATS) only applies "within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). The Supreme Court has stated, however, that the presumption is overcome when "the relevant conduct" asserted in the claims "touch[es] and concern[s] the territory of the United States … with sufficient force." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124-25 (2013). In *Al Shimari v. CACI Premier Tech., Inc.*, the Fourth Circuit held that determining whether the presumption is overcome requires "a fact-based analysis." 758 F.3d 516, 527 (4th Cir. 2014). The Fourth Circuit rejected the notion, advanced by Defendants here, that domestic conduct should be evaluated narrowly and in isolation. Instead, it concluded that domestic conduct should be evaluated more broadly and in light of the impact it had on the violations of customary international law committed elsewhere.

In *RJR Nabisco, Inc. v. European Community*, the Supreme Court stated that "*Morrison* and *Kiobel* reflect a two-step framework for analyzing extraterritoriality issues." 136 S. Ct. 2090, 2101 (2016). The second step of that framework concentrates on "conduct relevant to the statute's focus." *Id.* The Fourth Circuit has indicated that the relationship between *RJR Nabisco* and *Kiobel* is unclear: on the one hand, *RJR Nabisco* discussed the statute's "focus," rather than used *Kiobel*'s language of whether the relevant conduct touched and concerned the United States, but the other hand, "*RJR Nabisco* did not overturn *Kiobel* and … retain[ed] a similar emphasis on the relevant claim's connection to U.S. territory." *Roe v. Howard*, 917 F.3d 229, 240 n.6 (4th Cir. 2019).

The evidence in this case demonstrates that Drs. Parran, Soper, Moore, Turner, Eagle, and Reed took numerous actions in the United States to make the nonconsensual Guatemala Experiments happen, shape its direction to serve their research interests, aid and abet, and collaborate and conspire with each other and the perpetrators on the ground to insulate the Experiments from outside criticism and the second guessing that doomed the Terre Haute experiments. Regardless of the standard applied, this sufficient to overcome the presumption against extraterritoriality.

## IV.   DEFENDANTS ARE NOT ENTITLED TO ANY IMMUNITY

Defendants next claim that they are entitled to summary judgment based on certain immunity doctrines – specifically, derivative sovereign immunity and derivative absolute immunity, as well as charitable immunity. The party claiming a specific immunity has the burden of proof with respect to pleading and proving the applicability of that immunity. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982) (absolute immunity for executive officials); *Wilson v. Kittoe*, 337 F.3d 392, 397 n.1 (4th Cir. 2003) (*citing Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980) (qualified immunity in an action under 42 U.S.C. § 1983)). The claimed immunities do not apply to these Defendants or to this case.

### A.   Defendants are not entitled to the protection of either derivative sovereign or derivative absolute immunity

Derivative sovereign immunity protects a government contractor from suit when: "(1) the United States would be immune from suit if the claims had been brought against it, (2) the contractor performed services for the sovereign under a validly awarded contract, and (3) the contractor adhered to the terms of the contract." *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 970 (E.D. Va. 2019), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019) (*citing Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646-47 (4th Cir. 2018). Importantly, "the Supreme Court has held that derivative immunity is not guaranteed to government contractors and **is not awarded to government contractors who violate the law** or the contract." *Id.* (*citing Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-74 (2016)) (emphasis added). "The contractor must adhere to the government's instructions

to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the acts of the government." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (*citing Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 22 (1940)).

Derivative absolute immunity protects federal contractors from state tort liability arising from their exercise of discretion while acting within the scope of their employment. *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1446-47 (4th Cir. 1996). This immunity is afforded only when the benefits of immunity outweigh the substantial costs to individuals and to accountability. *Id.* at 1447.

These two immunities do not apply to this case for several reasons.[17]

*First*, the agents and employees of TRF and Hopkins whose conduct is at issue were not acting as government contractors but as independent scientists. The Study Sections established to direct and approve federally-funded research, including the Guatemala Experiments, were specifically responsible for directing the path of research at the time and were supposed to and did operate as "autonomous" bodies, free of government control, supervision and direction:

> **Support of research through the use of Research Grants funds does not imply in any way any degree of Federal control, supervision, or direction of the research project**.
> ….
> [T]he U.S. Public Health Service Research Grants program represents a sincere and continuing effort to supple Federal funds for the support of necessary additional research in the fields of medical and related

---

[17] In their separate brief, TRF also argues that it is entitled to derivative statutory immunity under the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288a. It argues that because the Pan American Health Organization ("PAHO"), formerly known as the Pan-American Sanitary Bureau ("PASB") is entitled to statutory immunity under the IOIA, *see Garcia v. Sebelius*, 867 F. Supp. 2d 125, 140 (D.D.C. 2013), Dr. Soper, in his capacity as Director of the PASB, is also immune from suit, as is TRF as his employer. For the same reasons explained above, however, even if Dr. Soper would have IOIA immunity, TRF would not get the benefit of any derivative immunity – the Restatement (Second) of Agency makes it clear that a principal cannot use an agent's immunity to protect itself from suit. RESTATEMENT (SECOND) OF AGENCY § 217(b)(ii). And TRF does not attempt to argue in the first instance that it meets the statutory definition of an "international organization" under 22 U.S.C. § 288. Therefore, TRF cannot obtain any derivative immunity under IOIA.

> science **without interposing any degree of government restriction, control, supervision, or regimentation.** The program is a scientific one, scientific guidance of **which lies wholly in the hands of scientists**.

J.R. 1858, 1859 (Ex. 77) (emphasis added); *see also* J.R. 4981 (Ex. 229) ("[f]or the first time in history, medicine's intellectual elite had the opportunity not only to set an example for the rest of the profession but **actually to direct the conduct of therapeutic research on a national scale**.") (emphasis added); J.R. 1159-60 (Ex. 34) (Reverby Dep.); J.R. 488-89 (Ex. 12) (Lombardo Dep.) ("everybody else who's part of the study section, I think, shares the same ethos of, you know, give them the money and turn them loose"); J.R. 5255-68 (Ex. 264) (Lombardo article).

The same is true for Dr. Soper, the Investigator of the Guatemala Studies. During 1947, when he was Investigator and when the majority of the intentional exposure experiments were occurring in Guatemala, he was not a government contractor, but instead, was "assigned" by TRF to the PASB, where he continued to be paid a salary, insurance, and retirement benefits, and was acting in furtherance of TRF's *modus operandi* of embedding its employees in outside organizations, including governmental ones, to further its public health initiatives. *See, inter alia,* J.R. 4968 (Ex. 236) ("I have been appointed to the Bureau by the R.F."); J.R. 4972 (Ex. 237) (Soper's assignment by TRF to the PASB "was designed to cover most of the purposes which [TRF's International Health Division] pursued in Latin America" and under his direction, "**IHD policies and philosophy have been adopted**. The PASB will eventually take over our functions"). *See also supra* pages 17-19, 35-36 regarding Exhibits supporting payment of salary and benefits.

*Second*, even if employees of TRF and Hopkins were acting as government contractors, their employers – TRF and Hopkins – cannot assert immunities that may apply to employees. The Restatement (Second) of Agency clarifies that a principal cannot use its agent's immunity to protect itself from suit:

> In an action against a principal based on the conduct of a servant in the course of employment … [t]he principal has no defense because of the fact that … the agent had an immunity from civil liability as to the act.

RESTATEMENT (SECOND) OF AGENCY § 217(b)(ii); *see also Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) ("[T]o determine the general common law of agency, the Court notes that it has traditionally looked to sources such as the *Restatement of Agency.*"). As stated above, derivative sovereign immunity only applies when a government contractor acts pursuant to a government contract. Here, TRF and Hopkins did not have any contract or agreement with the federal government. Thus, any derivative immunity that the agents and employees of TRF and Hopkins could potentially claim is personal to those individuals. TRF and Hopkins remain liable for the torts of their employees and agents, notwithstanding the theoretical possibility that those agents may be entitled to derivative immunity.

*Third*, even if the Court were to give TRF and Hopkins the benefit of any immunity that their agents would be entitled to receive (in violation of Restatement (Second) of Agency § 217), derivative sovereign immunity still does not apply. The grant of any authority by the U.S. government to Defendants and their agents to research sexually transmitted diseases did not include entering a contract, or instructing government contractors, to perform non-consensual human experimentation in violation of customary international law. Because the agents and employees of TRF and Hopkins either directly violated customary international law or aided and abetted that violation during the non-consensual experiments (see discussion above), they cannot avail themselves of the immunity of the sovereign. *See Campbell-Ewald*, 136 S. Ct. at 672-74. Merely staying within the government's "thematic umbrella" of STD research is not enough to acquire immunity. *See In re KBR, Inc.*, 744 F.3d at 345. Additionally, the public policy of holding Defendants responsible for performing non-consensual human experimentation in Guatemala against customary international law outweighs any benefits of

providing immunity to the orchestrators of the experiments, who went well-beyond any alleged contract with and instructions of the government.[18]

*Fourth*, even if the Court views the agents and employees of TRF and Hopkins as government contractors and includes TRF and Hopkins in any immunities that their agents and employees were entitled to, derivative absolute immunity still does not apply. That doctrine only provides immunity to suits under **state law**. *See Mangold*, 77 F.3d at 1446-47. This is an action under the (federal) Alien Tort Statute only. Furthermore, derivative absolute immunity does not apply because the actions of the Defendants' agents in directing or aiding and abetting the non-consensual human experimentation in Guatemala against customary international law was outside the scope of their alleged employment with the United States government. *See id.* Lastly, derivative absolute immunity does not apply because the benefits of providing immunity to Defendants' agents for their actions in designing, planning, aiding and abetting, and orchestrating the Guatemala experiments do not outweigh the costs of depriving the victims of the Guatemala Experiments the right to recover for their injuries. *See id.* at 1447.

### B. Defendants are not entitled to the protection of charitable immunity

Charitable immunity also has no place in this case. Defendants claim – without citing any international law, federal common law, Restatement provision, or any other source that would be

---

[18] Defendants cite *Filarsky v. Delia*, 566 U.S. 377, 391 (2012), for the proposition that derivative immunity should apply to the alleged "government contractors" in the Guatemala Experiments. Defendants' reliance on *Filarsky*, however, is unavailing. That case considered whether a private attorney retained temporarily as an investigator by a municipality was entitled to a defense of **qualified immunity** under 42 U.S.C. § 1983 for performing the same discretionary function as a government prosecutor. *Id.* at 380-82. Defendants, however, do not ask for qualified immunity, but rather, derivative sovereign immunity. The doctrine of qualified immunity "is bounded in a way that … derivative immunity is not." *Campbell-Ewald*, 136 S. Ct. at 673. Additionally, an entity is not entitled to qualified immunity for violations of law that are "clearly established." *Id.* The prohibition against non-consensual human experimentation recognized by customary international law is "clearly established," so *Filarsky*'s qualified immunity would not apply. *Filarsky* simply does not support Defendants' request for derivative immunity.

applicable in a case arising under the ATS – that charitable immunity arising under *Maryland common law* is an absolute defense in this case. Their reliance on Maryland common law is sorely misplaced.

International law and federal common law apply to this case. *See, e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) ("We agree that *Sosa* and our precedents send us to international law to find the standard for [ATS] liability."); *Exxon Mobil Corp.*, 654 F.3d at 35 ("To the extent that the federal common law and the customary international law standards do not differ, a court may, for purposes of applying [requirements], turn to the federal common law… standard in addressing claims under the ATS.").

The reason why Defendants conveniently skip reliance on international law and federal common law to support their charitable immunity defense is because there is no such law to rely upon. The doctrine of charitable immunity does not exist under customary international law and, even if it did exist, there is no indication that customary international law would recognize it as a defense to claims for violations of the law of nations. Federal common law expressly does not recognize the defense of charitable immunity. The Restatement (Second) of Torts is a "common reference point for courts considering cases arising under federal law." *Michigan v. U.S. Army Corp. of Engineers*, 667 F.3d 765, 780 (7th Cir. 2011); *see also Field v. Mans*, 516 U.S. 59, 70 (1995) (characterizing the Restatement (Second) of Torts as "the most widely accepted distillation of the common law of torts"). Section 895E of the Restatement (Second) of Torts is directly on point:

> One engaged in a charitable, educational, religious or benevolent enterprise or activity **is not for that reason immune from tort liability**.

RESTATEMENT (SECOND) OF TORTS § 895E (emphasis added). Comment d of Section 895E explains that "[t]he great majority of jurisdictions have come to recognize that none of these justifications [for charitable immunity] has validity, and **have forthrightly abolished the immunity**." *Id.* (Emphasis added.) In sum, international law and federal common law do not recognize charitable immunity as a

defense, and for that reason, Defendants are not immune from tort liability arising under the Alien Tort Statute.

Finally, public policy dictates that immunities are only recognized when the benefits of the immunity outweigh the costs. *See Mangold*, 77 F.3d at 1447. As explained above, the benefits of allowing a state common law charitable immunity doctrine to insulate Defendants from liability for their roles in designing, planning, aiding and abetting, and orchestrating the Guatemala Experiments against customary international law do not outweigh the costs of depriving the victims of those Experiments the right to recover for their injuries in this action brought pursuant to the Alien Tort Statute.

## IV.   DEFENDANTS' PLAINTIFF-SPECIFIC DEFENSES LACK MERIT

Defendants finally mount a number of defenses specific to the Selected Plaintiffs on whom discovery has been conducted. None of them have merit.

### A.   Evidence of identity raises a jury question

Defendants first make the sweeping allegation that they are entitled to summary judgment as to *all* claims because there is "no evidence" "linking" *two* of the Selected Plaintiffs to the Guatemala Experiments.[19] Defendants are wrong about the evidence regarding those two Plaintiffs, but even if they were correct, they still would not be entitled to judgment on the claims of the other Plaintiffs. And, in general, questions regarding a particular Plaintiff's "link" to the Experiments raise fact questions that require a determination by a jury, rather than by the Court as a matter of law.

As to the first of Defendants' examples, Francisco Garcia Alvarez, Defendants ignore that prior to his death, Mr. Alvarez signed a Sworn Declaration in which he stated that he was jailed in the Central Penitentiary in Guatemala City, offered cigarettes by foreign doctors in exchange for being stripped naked, examined, and given shots, including in his genitals. J.R. 1844-45 (Ex. 74). He stated

---

[19] Defendants mention a third plaintiff, Clara Luz Fernandez de Valiente, but Ms. Fernandez is a "spouse" plaintiff whose claim counsel plans to dismiss. *See* note 5 supra.

that he began to ooze pus from his genitals three days after receiving shots, and that the foreign

doctors continued to see him for approximately nine months thereafter. *Id.* His family will testify at

trial that he made similar statements to them prior to his death. (Indeed, Plaintiffs' counsel offered

Defendants the opportunity to depose Mr. Alvarez's son, but they declined on the basis that he had

not yet been appointed Representative for his father's Estate at the time defense counsel traveled to

Guatemala to take depositions). This evidence sufficiently "links" Mr. Alvarez to the Experiments,

and is sufficient for a jury to conclude that he was a victim.

Similarly, Manuel Chun Mucu has given a video-taped deposition under oath in which he

testified that he remembers receiving "shots" that made him sick while in a mental asylum. J.R. 790-

91 (Ex. 19). Contemporaneous documentation from the Experiments confirms that a "Manuel Chun"

was purposefully infected in the mental asylum with "a 20-gauge needle [] used to scarify (his) foreskin

before applying a pledget soaked with the [syphilitic] emulsion" on "two or three" occasions. J.R.

4542-4560 (Ex. 200); J.R. 4712-13 (Ex. 208); J.R. 1276-77, 1280 (Ex. 35). To the extent Mr. Mucu's

memory differs from contemporaneous documentation, that does not prove as a matter of law that

he is not a victim. Mr. Mucu is alive and will testify at trial: if there are discrepancies between his

testimony and documents, those are quintessential jury questions.

Finally, even if Defendants were correct regarding these two plaintiffs, they still would not be

entitled to judgment as to the other Selected Plaintiffs.[20] Defendants bear the burden of proving that

---

[20] With regard to Defendants' arguments that some of the Plaintiffs' names vary from names identified on the documents produced by the National Archives, those "discrepancies" also do not entitle Defendants to summary judgment. It is well-known that Latin Americans have a first name (sometimes two), followed by their father's last name, followed by their mother's last name (for example, Arturo Girón Alvarez). Dr. Cutler, the Public Health Service doctor who was the primary person performing the experiments in Guatemala, was an American doctor who spoke English. Instead of writing down the typical three- or four-name moniker for many of his "subjects," Dr. Cutler often wrote only two names; indeed, most, if not all, of his records for Asylum subjects list only two. *See, e.g.* J.R. 5352-56 (Ex. 285). Other times, Dr. Cutler or his colleagues wrote more names, but in the

they are entitled to summary judgment. They have no such proof, and as stated, to the extent there

are any discrepancies in the testimonial or documentary evidence, those are issues for the jury.

### B.     Evidence regarding infection with an STD is not required to show that a plaintiff was a victim of a nonconsensual experiment

Defendants argue that no plaintiff can prove that he or she acquired syphilis in the Guatemala

Experiments.[21] Setting aside that the actual acquiring of a sexually transmitted disease is not the critical

inquiry as it relates to Defendants' liability, their assertion is simply false. For example, the

documentation produced by the National Archives supports that two of the five Representative

Plaintiffs regarding whom discovery was conducted acquired syphilis during the Experiments:[22]

---

wrong order. These "discrepancies" and the limitations inherent in the documentation were acknowledged by the U.S. Commission in its Report:

> Limitations inevitably attach to trying to interpret and analyze incomplete and decades-old data sources. The documents contained a mix of English and Spanish written by multiple individuals with varying levels of fluency, proficiency with spelling, and penmanship. **They reflect inconsistency in the spelling of individuals' names** and assigning the subject numbers, further complicating this investigation; **for example, on one page, an individual's name would be recorded as "Gomez," but the next entry referencing the same person might be noted as "Gomes," likewise for "J.O. Hernandez" and "Jorge Oscar Hernandez**."

J.R. 166 (Ex. 1) (emphasis added).

[21] Defendants point out that there is no evidence that syphilis experiments were conducted on people in the Guatemalan Army. But there is undisputed evidence that there were intentional *gonorrhea* exposure experiments performed on Army soldiers. J.R. 132 (Ex. 1).

[22] Defendants incredulously argue that Plaintiffs should not be entitled to rely on the National Archives records because they are "unreliable" hearsay. Defendants are guilty of doubletalk, inasmuch as they rely on those same documents in support of their own arguments (such as the argument that Plaintiffs lack evidence that they are the same people as those identified in Archive records).

In addition, the records are official United States Government records that were produced by the Government in response to a subpoena issued in this lawsuit. They were relied upon by the U.S. Government when the Presidential Commission authored its report. They are the only evidence that exists regarding the specific experiments perpetrated in Guatemala, and as such, qualify under both

- Arturo Girón Alvarez (Plaintiff No. 1) was re-infected in the Guatemala Experiments with syphilis obtained from the testicles of a syphilitic rabbit. He developed swelling at the site of injection and in his lymph nodes, followed by red painful lesions. Despite treatment with penicillin, he was not cured of his re-infection with syphilis. J.R. 4342-58 (Ex. 188); J.R. 4706 (Ex. 208).

- Manuel Chun Mucu (Plaintiff No. 649) was purposefully exposed to both syphilis and gonorrhea during the Experiments. His penis was scarified and syphilis was applied with a pledget. He was also inoculated with gonorrhea by applying a solution of pus from a gonorrhea-infected inmate into his urethra at the tip of his penis. Syphilis tests conducted through 1949 were positive, despite receiving penicillin. J.R. 4542-4560 (Ex. 200); J.R. 4712-13 (Ex. 208). Although a 2019 test was negative, that fact is immaterial given that it was conducted over 70 years later, at a time when antibodies would be expected to dissipate. J.R. 4713 (Ex. 208).

Even if there was no evidence that any Plaintiff actually acquired a sexually transmitted infection, however, Defendants' argument misses the critical inquiry at issue in this case: whether the Plaintiffs were victims of a violation of a norm of international law as a result of nonconsensual human experimentation. *Alvarez II,* 205 F. Supp. 3d at 689 ("Plaintiffs have pled sufficient facts to state a cause of action under the ATS for a violation of the norm of customary international law prohibiting medical experimentation on human subjects without their consent."); *Alvarez III,* 275 F. Supp. 3d at 683 (same).

Although it certainly may go to the issue of damages, whether a plaintiff actually acquired a disease as a result of the nonconsensual experiments is immaterial to the issue of Defendants' liability. There is an abundance of evidence that the Plaintiffs were victims of nonconsensual human experiments, whether or not they were infected: the documents from the National Archives confirm that, even in patients for whom infection is not confirmed, they were nevertheless subject to blood draws, lumbar punctures, genital scarification, injections in their eyes, forced intercourse, and other

the "ancient documents" exception to the hearsay rule, *see* Fed. R. Evid. 803(16), and the "residual exception" of Fed. R. Evid. 807, which permits admission of hearsay where the evidence is supported by other guarantees of trustworthiness, and is more probative than any other evidence obtainable by other means.

painful experiments. J.R. 4342-4704 (Ex. 188-207); 4705-4717 (Ex. 208). As such, they are entitled to recover as victims of nonconsensual human experimentation in violation of an international norm under the Alien Tort Statute.

### C.   The Estate Plaintiffs have "standing"

Defendants are also wrong that the Estate Plaintiffs lack "standing" to sue because they had not completed ministerial procedures required under Guatemalan law to bring a lawsuit at the time this suit was filed. To start, Defendants ignore that, of the three remaining Representative Estate Plaintiffs, **two of the three were alive at the time this case was filed** on April 1, 2015.[23] J.R. 1547 (Ex. 40) (death certificate for Hector Arriaza showing date of death "diez de enero de dos mil quince" (October 1, 2015)); J.R. 1568 (Ex. 43) (death certificate for Francisco Garcia Alvarez showing date of death "veintidós de junio de dos mil diecisiete" (June 22, 2017)). As such, they properly brought claims in their own names, and, having died during the pendency of this action, Representatives were appointed in due course according to deadlines set by Judge Gesner during discovery. J.R. 1652 (Ex. 54); 1617-19 (Ex. 51); 1642-47 (Ex. 52).

Even for Arturo Girón Alvarez and/or any other plaintiff who was deceased at the time the case was filed, that fact is not fatal. Federal Rule of Civil Procedure 17(a)(3) prohibits the court from dismissing a party for failure to prosecute in the name of the real party in interest until that party has the opportunity to be joined into the case:

> (3) *Joinder of the Real Party in Interest.* The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

---

[23] Again, Defendants also mention Clara Luz Fernandez de Valiente, a spouse whose claim Plaintiffs' counsel plans to dismiss. *See note* 5 *supra.*

That procedure has been followed here. The Court specifically declined to dismiss the claims of Estate Plaintiffs when Defendants raised this issue in the motion to dismiss stage, instead determining that "the ability of each Estate Plaintiff to sue shall be resolved in the course of the litigation." *Alvarez III,* 275 F. Supp. 3d at 710. Judge Gesner thereafter set deadlines for Plaintiffs to complete the procedures required under Guatemalan law to name Representatives for the Estate Selected Plaintiffs. Plaintiffs did so in the time required by the Court, and so their claims cannot be dismissed. *See Akbar v. Calumet City,* 632 F. App'x 868, 871 (7th Cir. 2015) ("[T]he original flaw does not doom the litigation: it is subject to cure[.] Although [the non-administrator plaintiff] had no right to pursue this case as the real party in interest, that problem was solved when [the administrator] was substituted[.]").

Perhaps acknowledging that Rule 17 clearly allows for the representative to be substituted during the litigation, Defendants now seek to challenge the method Plaintiffs' local Guatemalan counsel employed to have those Representatives appointed, asserting that such a process needs to be done in court before a judge. Their response lacks merit. As explained by Plaintiffs' expert, a Guatemalan lawyer and advisor to the Ministry of Culture of Guatemala, he fully complied with the extrajudicial "notary" process for appointing estate representatives in cases in which no family member objects. Because no family member objected in this case, the extrajudicial process he followed was valid, and the representatives are the appropriate people to bring this case. J.R. 5432-34 (Ex. 289).

### D.   "Battery" claims are not novel

Defendants next argue that the claims of the 63 child victims should be dismissed because they are allegedly based on the "new legal theory" of nonconsensual battery. There is no new legal theory. This case is, and has always been, based on a violation of norms of international law as a result of nonconsensual human experimentation under the Alien Tort Statute, as held by Judge Garbis. *Alvarez II,* 205 F. Supp. 3d at 689 ("Plaintiffs have pled sufficient facts to state a cause of action under

the ATS for a violation of the norm of customary international law prohibiting medical experimentation on human subjects without their consent.); *Alvarez III,* 275 F. Supp. 3d at 683 (same).

The schoolchildren victims were absolutely the subjects of medical experimentation without their consent. This fact is not disputed and was discussed in both the U.S. Presidential Report and Guatemalan Presidential Report. J.R. 49-53; 191 (Ex. 1); J.R. 3207, 3253-54 (Ex. 177). Whether those plaintiffs were infected with disease on purpose, or "simply" subjected to blood draws or lumbar punctures without their consent, is immaterial.

### E.      Limitations have not yet run

Defendants next urge the Court to "reconsider" its holding that limitations begins to run when a plaintiff is aware of his/her injuries **and** their "factual cause." *See Alvarez III,* 275 F. Supp. 3d at 685-686. There is no reason for the Court to do so. Its ruling was legally correct.

Moreover, Defendants have failed to present evidence that any plaintiff knew about the cause of his/her injury prior to 2010, when President Obama made a public apology to the President of Guatemala. Although they claim that such evidence exists as to two Plaintiffs, who assert that they became ill after being injected (Manuel Chun Mucu and Francisco Garcia Alvarez), knowing that an act caused *illness* is not enough to put those Plaintiffs – who were imprisoned in an asylum and jail, respectively – on notice that their illness was caused by a medical experiment in which they were purposefully infected with disease. As such, their claims, filed in 2015, were timely under the 10-year limitations period applicable to ATS claims. *See Alvarez II,* 205 F. Supp. 3d at 689-90. At the very least, the nature and extent of their knowledge must be submitted to the fact-finder at trial, not decided as a matter of law.

Defendants also assert as to the claims of the 63 schoolchildren victims that a victim of battery "by definition" knows of the battery when it occurs, citing a case in which the court held that children who were abducted from their families must have known they were abducted at the time. *See Ellul v.*

*Congregation of Christian Bros.,* 774 F.3d 791 (2d Cir. 2014). Unlike being taken forcefully from one's family, however, the plaintiffs here did not know that the injections they received as schoolchildren were harmful. In fact, one has testified that he thought he was receiving a vaccine. J.R. 1743-45, 1754-64 (Ex. 77). And again, what the children knew, and when they knew it, are questions of fact that should be submitted to a jury.

**F.     Summary**

At pages 32-34 of their Joint Motion, Defendants summarize why they believe the Selected Plaintiffs' claims must be dismissed, precluding any further discovery on the claims of the remaining 100+ Plaintiffs to this lawsuit. Below is a summary of why they are wrong (*see also* pages 47-52 *supra* summarizing these individuals' claims as part of Plaintiffs' Cross-Motion for Summary Judgment):

### *Galvez Villalobos*

- Was a victim of nonconsensual blood draws while a student at the Puerto de San Jose School, and therefore a victim of human experimentation entitled to recover under the ATS, regardless of whether he acquired a disease.

- Claim is timely because it was brought within 10 years from when he learned of the cause of his injury.

### *Manuel Chun Mucu*

- Has testified at deposition that he was in psychiatric facility. Contemporaneous records from the Guatemala Experiments confirm that "Manuel Chun" was a victim. Inconsistencies between testimony given in 2019 and documents from the 1940s are fact questions for a jury to decide.

- A negative 2019 syphilis test has no bearing on whether someone was infected in the mid-1940s.

- Claim is timely because it was brought within 10 years from when he learned of the cause of his injury.

### *Francisco Garcia Alvarez*

- Has signed a Sworn Declaration recounting his memory of being a victim in the Experiments while in the Army.

- Was alive at the time the lawsuit was filed, and therefore no "Estate" needed to be established for him until his death. This was timely and properly done during the course of discovery.

- Claim is timely because it was brought within 10 years from when he learned of the cause of his injury.

### Hector Arriaza Alvarez

- Was a victim of nonconsensual blood draws while a student at the Puerto de San Jose School, and therefore a victim of human experimentation entitled to recover under the ATS, regardless of whether he acquired a disease.

- Was alive at the time the lawsuit was filed, and therefore no "Estate" needed to be established for him until his death. This was timely and properly done during the course of discovery.

### Arturo Girón Alvarez

- Contemporaneous records from the Guatemala Experiments confirm that "Arturo Giron Alvarez" was a victim in the Experiments.

- Estate properly and timely set up in the course of discovery such that dismissal is not appropriate under Fed. R. Civ. Pro. 17.

## <u>CONCLUSION</u>

Defendants misstate and misapply applicable legal principles in this case, including issues of agency, the appropriate standard for liability under the Alien Tort Statute, and immunity doctrines. Their legal arguments should be rejected. When the proper law is applied, there is ample evidence in this case to generate a jury question of whether agents and employees of The Rockefeller Foundation and Johns Hopkins directed, approved, funded, supervised, participated in, and aided and abetted nonconsensual human experimentation in violation of customary international norms. There is ample evidence to generate a jury question on whether the Plaintiffs were victims of that experimentation and suffered injury as a result. This Court should not grant judgment in favor of Defendant, precluding any further discovery on the remaining 100+ claims left in this case.  Defendants' Motion for Summary Judgment on All Claims should be denied.

___/s/_____
PAUL D. BEKMAN (#00019)
E. DALE ADKINS III (#01425)
LAURENCE A. MARDER (#02443)
EMILY C. MALARKEY (#28197)
GREGORY G. HOPPER (#26150)
RYAN S. PERLIN (#20840)
ARYEH M. RABINOWITZ (#20225)
BEKMAN, MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
410-539-6633
*Attorneys for Plaintiffs*

___/s/_____
F. R. JENKINS (*Admitted pro hac vice*)
MATTHEW R. CATON (*Admitted pro hac vice*)
MERIDIAN 361 INTERNATIONAL LAW
GROUP PLLC
97A Exchange Street, Suite 202
Portland, Maine 04101
866-338-7087
*Attorneys for Plaintiffs*