## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ESTATE OF ARTURO GIRON ALVAREZ, et al.**<br><br>    **Plaintiffs**<br><br>v.<br><br>**THE JOHNS HOPKINS UNIVERSITY, et al.**<br><br>    **Defendants** | **Civil Action No. 1:15-cv-0950 TDC** |

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
### PLAINTIFFS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT

PAUL D. BEKMAN (#00019)
E. DALE ADKINS III (#01425)
LAURENCE A. MARDER (#02443)
EMILY C. MALARKEY (#28197)
GREGORY G. HOPPER (#26150)
RYAN S. PERLIN (#20840)
ARYEH M. RABINOWITZ (#20225)
BEKMAN, MARDER HOPPER,
     MALARKEY & PERLIN, LLC
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21208
410-539-6633
*Attorneys for Plaintiffs*

F. R. JENKINS (*Admitted pro hac vice*)
MATTHEW R. CATON (*Admitted pro hac vice*)
MERIDIAN 361 INTERNATIONAL LAW
GROUP PLLC
97A Exchange Street, Suite 202
Portland, Maine 04101
866-338-7087
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

ARGUMENT…. ...................................................................................................... 1

I.   THIS CASE INVOLVES A PERMISSIBLE DOMESTIC APPLICATION OF THE ATS ............. 1

    A.   The conduct of Defendants' agents to conspire to commit and aid and abet the nonconsensual human experimentation all occurred in the United States ............................................................................................... 2

    B.   Defendants' tortious conduct far exceeds "general corporate activity" .... 4

II.   DEFENDANTS' AGENTS, ACTING IN THE SCOPE OF THEIR AGENCY, AIDED AND ABETTED AND CONSPIRED TO PERPETRATE THE GUATEMALA EXPERIMENTS......... 6

    A.   Drs. Moore, Turner, Eagle, and Reed were Hopkins' agents when they served on the Syphilis Study Section and aided and abetted the Guatemala Experiments ................................................................................... 6

        1.   *These doctors were agents of Hopkins while serving on the Syphilis Study Section* ......................................................................... 6

        2.   *Hopkins' agents aided and abetted the Guatemala Experiments*......... 9

    B.   Drs. Soper and Parran were TRF's agents when they aided and abetted the Guatemala Experiments.................................................................. 13

        1.   *Dr. Soper*.................................................................................. 14

        2.   *Dr. Parran* ............................................................................... 17

III.   DEFENDANTS ARE NOT ENTITLED TO THE PROTECTION OF ANY IMMUNITY ......... 19

    A.   Defendants cannot claim derivative sovereign or derivative absolute immunity ...................................................................................... 19

    B.   Defendants cannot claim charitable immunity ......................................... 21

IV.   THE SELECTED PLAINTIFFS EACH HAVE COMPETENT EVIDENCE TO AT LEAST GENERATE A JURY QUESTION ....................................................................... 24

    A.   Selected Plaintiffs *have* proffered evidence that they were involved in the Guatemala Experiments.............................................................. 24

    B.   Schoolchildren selected Plaintiffs have presented valid claims ................ 27

    1. *The basis for the claims of schoolchildren is the same as all other Plaintiffs* ............................................................................................ 27

    2. *The "paring down of claims" has been consistent with the Court's tiered discovery plan* .......................................................................... 29

  C. No Plaintiff's claim is time-barred as a matter of law .............................. 30

  D. **Defendants'** complaint about the process used to appoint heirs does not entitle them to summary judgment ........................................................... 31

**CONCLUSION** .................................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Aegis Defense Services, LLC v. Chenega-Patriot Group, LLC*, 141 F. Supp. 3d 479 (E.D. Va. 2015) ..........23

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019) ....................................................................................................................20-21

*Allstate Ins. Co. v. Kim*, 829 A.2d 611 (Md. 2003) .....................................................................................21

*Aziz v. Alcolac,* 658 F.3d 388 (4th Cir. 2011) ...............................................................................................1

*Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957) .................................................................................................23

*Boyle v. United Tech. Corp.*, 587 U.S. 500 (1988) .......................................................................................23

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ........................................................................... 19, 21

*Council for Periodical Distrib. Assoc. v. Evans*, 827 F.2d 1483 (11th Cir. 1987) .............................................8

*Courtney-Pope v. Board of Educ. of Carroll Cty.*, 304 F. Supp. 3d 480 (D. Md. 2018) .................................11

*Danner v. International Freight Sys. Of Wash.*, 855 F. Supp. 2d 433 (D. Md. 2012) ............................... 6, 16

*Doe v. Drummond Co., Inc.*, 782 F.3d 576 (11th Cir. 2015) ..........................................................................3

*Doe VIII v. Exxon Mobile Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vac. on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) (Mem.) .............................................................................................................................24

*Ecology Servs., Inc. v. GranTurk Equip., Inc.*, 443 F. Supp. 2d 756 (D. Md. 2006) .....................................27

*Estate of Alvarez v. Johns Hopkins Univ.*, 205 F. Supp. 3d 681 (D. Md. 2016) ("*Alvarez II*").............. 1, 30

*Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670 (D. Md. 2017) ("*Alvarez III*") .....................
.................................................................................................................................. 1, 2, 6, 9, 30, 31

*Estate of Alvarez v. Johns Hopkins Univ.*, 373 F. Supp. 3d 639 (D. Md. 2019) ("*Alvarez IV*") ..................1

*Filarsky v. Delia*, 566 U.S. 377 (2012) .......................................................................................................19

*Gagliardi v. Flint*, 564 F.2d 112 (3d Cir. 1977) ........................................................................................26

*Green v. H&R Block, Inc.*, 735 A.2d 1039 (Md. 1999) ......................................................................... 6, 16

*Green v. United States*, 709 F.2d 1158 (7th Cir. 1983) .................................................................................8

*Hall v. A.N.R. Freight Sys., Inc.*, 717 P.2d 434 (Ariz. 1986) (*in banc*)........................................................21

*Hood v. Montgomery Cnty.*, 2019 WL 3225749 (D. Md. Jul. 17, 2019) (unpublished opinion)................29

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014) ....................................................21

*Jara v. Nunez*, 878 F.3d 1268 (11th Cir. 2018) ..................................................................3

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ..............................................................23

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) .........................................................9, 14

*Leal Santos v. Gonzalez*, 495 F. Supp. 2d 180 (D. Mass. 2007) ....................................................26

*Lomando v. United States*, 667 F.3d 363 (3d Cir. 2011)................................................................23

*Mallik v. Sebelius*, 964 F. Supp. 2d 531 (D. Md. 2013) ....................................................25

*Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442 (4th Cir. 1996) ....................................24

*Nestle v. Doe*, 141 S. Ct. 1931 (2021)..........................................................................2, 4, 5

*Parker v. State*, 653 A.2d 436 (Md. 1995) ..............................................................20

*Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245 (4th Cir. 1967)....................................12

*Porter v. Quarantillo*, 722 F.3d 94 (2d Cir. 2013) ....................................................26

*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994) ..................................................24

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ............................24

*President & Directors of Georgetown Coll. v. Hughes*, 130 F.2d 810 (D.C. Cir. 1942) ....................................22

*Ramirez v. Clinton*, 2011 WL 2838173 *4 (D. Minn. Jul. 18, 2011) (unpublished opinion) ..................26

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) .......................................20

*Tome v. United States*, 513 U.S. 150 (1995)..............................................................26

*United States v. Carvalho*, 742 F.2d 146 (4th Cir. 1984) ....................................................26

*United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) ..........................................22-23

*United States v. Kubrick*, 444 U.S. 111 (1979).........................................................31

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) ..........................................................20

*Warfaa v. Ali*, 811 F.3d 653 (4th Cir. 2016) ....................................................................3

*Weidner v. Int'l Telecommunications Satellite Org.*, 392 A.2d 508 (D.C. 1978) ...............................................22

**Statutes**

22 U.S.C. §§ 288a, 288d.........................................................................................................................20

42 U.S.C. § 1983 ....................................................................................................................................19

Md. Code Ann., Cts. & Jud. Proc. § 5-632..........................................................................................23

Md. Code Ann., Health-Gen. § 19-354..............................................................................................23

Md. Code Ann., Ins. § 19-103 ...............................................................................................................23

**Federal Rules**

Fed. R. Civ. P. 17 ...................................................................................................................................32

Fed. R. Civ. P. 56 ...................................................................................................................................25

Fed. R. Evid. 803 ....................................................................................................................................25

Fed. R. Evid. 804 ...............................................................................................................................25-26

Fed. R. Evid. 807 ....................................................................................................................................25

**Other Authorities**

5 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 8:133 (3d ed. 2007) .........................................26

Restatement (First) of Agency §§ 226, 227, 229, 230 ....................................................................... 6, 14

Restatement (Second) of Agency § 217(b)(ii)......................................................................................19

Restatement (Second) of Torts § 895E................................................................................................22

WILLIAM L. PROSSER, LAW OF TORTS, § 133 (4th ed. 1971).................................................................22

## ARGUMENT

I.   **THIS CASE INVOLVES A PERMISSIBLE DOMESTIC APPLICATION OF THE ATS**

Attempting to characterize this case as "amorphous" and "nebulous," Defendants make one more last-ditch effort to persuade this Court that it would be impermissibly charting new territory if it were to reach the "novel" conclusion that aiding and abetting nonconsensual human is compensable under the ATS. This Court has specifically rejected Defendants' arguments in prior rulings. It has expressly scorned Defendants' position that a court may not recognize an ATS cause of action "unless the plaintiff has shown that Congress would undoubtedly want courts to create" that cause of action. *See Estate of Alvarez v. Johns Hopkins Univ.*, 373 F. Supp. 3d 639, 648 (D. Md. 2019) ("*Alvarez IV*"). It has explicitly concluded that "there is an international law norm barring nonconsensual medical experimentation on human subjects" that is compensable under the ATS. *Alvarez IV*, 373 F. Supp. 3d at 649 (citing *Estate of Alvarez v. Johns Hopkins Univ.*, 205 F. Supp. 3d 681, 689 (D. Md. 2016) ("*Alvarez II*"); *Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 683 (D. Md. 2017) ("*Alvarez III*")). And this Court has decidedly recognized that aiding and abetting violations of international norms is recognized under the ATS. *See Alvarez III*, 275 F. Supp. 3d at 698 (citing *Aziz v. Alcolac*, 658 F.3d 388, 401 (4th Cir. 2011)).

In light of this Court's prior rulings, Defendants are left to argue that this case involves an impermissible "extraterritorial" application of the Alien Tort Statute. Unfortunately, their argument is premised on an error of law and an error of fact. First, Defendants are legally incorrect that the only relevant conduct for purposes of the ATS is the actual experiments conducted on humans. Second, Defendants are factually incorrect that even if the conduct that occurred in the United States is relevant, it is insufficient to overcome the presumption against extraterritoriality.

1

**A.      The conduct of Defendants' agents to conspire to commit and aid and abet the nonconsensual human experimentation all occurred in the United States**

First, Defendants are not legally correct that the "relevant conduct" to be examined with respect to extraterritoriality is only "the nonconsensual human experimentation and the injuries arising therefrom." *See* Def. Renewed Jt. Reply at 3 (ECF No. 462-1). Given the Court's continued recognition of aiding and abetting as a viable ATS cause of action, the "relevant conduct" to be examined for purposes of the extraterritoriality analysis are the actions taken by Defendants in the United States in furtherance of the *aiding and abetting* – not the experimentation itself. Although Defendants now rely on *Nestle v. Doe*, 141 S. Ct. 1931 (2021), to argue otherwise, the *Nestle* Court simply did not say that the inquiry should be limited to the location in which the conduct that directly caused the injury occurred. In fact, the Court did not even decide this question.[1] *See Nestle*, 141 S. Ct. at 1936-37. Nor did the Court say that, in an aiding and abetting or conspiracy case, the location where the aiding and abetting or conspiracy transpired is irrelevant. To the contrary, the Court explicitly stated that "[i]f the conduct relevant to the statute's focus occurred" in the United States, then application of the ATS would be appropriate, "even if other conduct occurred abroad." 141 S. Ct. at 1936.

Given that this Court has held that a defendant may be liable under the ATS not just "directly," but also "indirectly" for aiding and abetting and/or conspiracy, *see Alvarez III*, 275 F. Supp. 3d at 698, it only makes sense that the "conduct relevant to the statute's focus" must be the conduct alleged to have been perpetrated by the defendant in a particular case that violated international law. In other words, this Court should not limit its analysis, as Defendants have urged, only to the location where a plaintiffs' injury occurred, or where the "principal" offense took place. Instead, the location where the

---

[1] Curiously, in Defendants' Renewed Joint Brief, Defendants agreed with Plaintiffs that "the Court has held that the statute's focus is on the **conduct that allegedly violates international law**." *See* Def. Renewed Jt. Brief at 12 (ECF No. 455-1) (emphasis added).

aiding and abetting or conspiracy is alleged to have occurred is also "conduct relevant to the statute's focus," and must be considered in determining whether Plaintiffs have overcome the presumption against extraterritoriality.

The cases cited by Defendants actually support Plaintiffs' argument that actions committed by domestic defendants that amount to aiding and abetting violations of international law is considered "conduct relevant to the statute's focus." *See Jara v. Nunez*, 878 F.3d 1268, 1273 (11th Cir. 2018) (emphasis added) (citations omitted) ("This 'relevant domestic conduct' <u>may include both primary tortious conduct and affirmative involvement in the torts of others</u>. For example, <u>actions from within the United States, such as aiding and abetting and conspiring with a foreign tortfeasor, may displace the presumption against extraterritoriality</u> if enough of the relevant conduct occurs domestically and if the allegations of domestic conduct are supported by a minimum factual predicate."); *Doe v. Drummond Co., Inc.*, 782 F.3d 576, 597-98 (11th Cir. 2015) (emphasis added) (citations omitted) ("[W]hen considering claims that the defendants aided and abetted or conspired with the perpetrators who committed the underlying violation, the domestic or extraterritorial location <u>of all conduct</u> in support of those claims is relevant to the jurisdictional inquiry."); *Warfaa v. Ali*, 811 F.3d 653, 660 (4th Cir. 2016) (emphasis added) (stating under *Kiobel* that "[a] plaintiff may rebut the presumption in certain, narrow circumstances: <u>when extensive United States contacts are present and the alleged conduct bears such a strong and direct connection to the United States</u> that it falls within *Kiobel's* limited 'touch and concern' language.").

As set forth at length in Plaintiffs' Opposition to Defendants' Renewed Motion for Summary Judgment, all of Defendants' conduct perpetrated in furtherance of its conspiracy and aiding and abetting the Guatemala Experiments occurred in the United States, and thus is sufficient to overcome the presumption against extraterritoriality.

**B.      Defendants' tortious conduct far exceeds "general corporate activity"**

Defendants are also factually incorrect that Plaintiffs have only alleged "a handful of peripheral actions" that have "at most, marginal connection with the tortious conduct in Guatemala." To support their argument, Defendants concocted a six-page chart attempting to pigeonhole the allegations of Plaintiffs' Third Amended Complaint into the allegations the Supreme Court found insufficient in *Nestle. See* Appendix to Def. Jt. Reply. Their attempt patently fails.

While the Supreme Court held that "allegations of *general* corporate activity… *alone*" in the United States was insufficient to overcome the presumption against extraterritoriality, *see Nestle*, 141 S. Ct. at 1937, it did not associate *all* domestic corporate activity with creating an extraterritoriality problem. In *Nestle*, the Nestle corporation was alleged to have approved ongoing technical and financial assistance to farms in the Ivory Coast that it knew or should have known were exploiting enslaved children so that it could maintain its exclusive right to purchase cocoa from those farms. *Id.* at 1935. Specifically, the plaintiffs alleged that Nestle "had economic leverage over the farms but failed to exercise it to eliminate child slavery." *Id.* The Court considered these decisions to be "general corporate activity" because plaintiffs did not allege that agents of Nestle formulated a plan to enslave children to produce cocoa, approved the plan to enslave children to produce cocoa, advanced the method or process of enslaving children to produce cocoa, or worked to cover up their role in the enslaving of children. In other words, while the plaintiffs there alleged that Nestle benefited from child slavery, Nestle's general corporate activity in the United States was a step removed from, and unconnected to, the violations of international law that it allegedly aided and abetted in the Ivory Coast.[2]

---

[2] Importantly, as Justice Alito pointed out at oral argument in *Nestle*, the plaintiffs there never even alleged that the defendants actually knew about the child slavery on the farms, only that they either "knew or should have known." *See Transcript of Oral Argument in* Nestle v. Doe, *No. 19-416*, pgs. 62-65,  https://www.supremecourt.gov/oral_arguments/argument_transcripts/2020/19-

On the other hand, as set forth in Plaintiffs' Renewed Cross Motion and Opposition, Plaintiffs have pled and proved a much closer domestic connection with the violations of international law than the "general corporate activity" found insufficient in *Nestle*. *See* Plaintiffs' Memo. in Support of Renewed Cross-Motion/Opp. at 69-70 (ECF No. 458-1). Defendants in this case did not just "fail to exercise" their leverage to stop the human experimentation. To the contrary, they acted affirmatively in the United States to generate the very idea for the Experiments as a way to further their own research that could not be accomplished in the United States. They ensured the approval and funding for the Experiments in the United States. They acted in the United States to ensure that their own research goals were advanced in the Experiments done in Guatemala. They sent material from the United States to Guatemala to use in the Experiments. They received biospecimens in the United States from the Experiments. And they covered up the Experiments in the United States once the Experiments were terminated.

It is not a part of any corporation's "general activity" to act to plan, approve, and advance nonconsensual human experimentation in direct violation of international law, benefit from those experiments, and work to cover them up. Rather, the facts of this case show that Defendants' domestic conduct was specifically related to the nonconsensual human experimentation that give rise to Plaintiffs' claims.

---

416_6k47.pdf. Similarly, Justice Sotomayor expressed doubt that the plaintiffs properly alleged any specific actions taken by the defendant domestic corporation. *See id.* at *66-69. Plaintiffs here, however, have pled and proved that Defendants' agents, in the United States, knew of, planned, approved, and advanced nonconsensual human experimentation in direct violation of international law, benefited from those experiments, and worked to cover them up.

## II.   DEFENDANTS' AGENTS, ACTING IN THE SCOPE OF THEIR AGENCY, AIDED AND ABETTED AND CONSPIRED TO PERPETRATE THE GUATEMALA EXPERIMENTS

There is at least a genuine dispute of material fact that agents of Johns Hopkins ("Hopkins") and The Rockefeller Foundation ("TRF") acted within the scope of their agency and for the benefit of their principals, to aid and abet, and conspire to carry out, the Guatemala Experiments.

### A.   Drs. Moore, Turner, Eagle, and Reed were Hopkins' agents when they served on the Syphilis Study Section and aided and abetted the Guatemala Experiments

#### 1.   *These doctors were agents of Hopkins while serving on the Syphilis Study Section*

Hopkins does not deny that it employed Drs. Moore, Turner, Eagle, and Reed from 1946 to 1950, that these individuals acted as its agents during this time, and that it permitted the doctors to serve on the Syphilis Study Section because that service benefited Hopkins. Instead, Hopkins asserts that its agency relationship automatically ended when its doctors did work incidental to the Study Section.

Hopkins advances a legal interpretation of a principal's "control" over his agent that is legally wrong. "[T]he control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions…. The level of control may be very attenuated with respect to the details." *Green v. H&R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999); *see also Danner v. International Freight Sys. Of Wash.*, 855 F. Supp. 2d 433, 454 (D. Md. 2012) (citation omitted) ("Often an agent is left free from direct supervisory control as he or she furthers the interest of the principal[.]"). Hopkins remained the master of the doctors *unless* the doctors' service on the Study Section required "abandonment" of their service to Hopkins, or went outside the "general nature" of what Hopkins authorized when it allowed them to serve on the Section – even if they acted in a way "specifically forbidden" by Hopkins, or used "forbidden means" to accomplish their work. *See Alvarez III*, 275 F. Supp. 3d at 693-94 (citing Restatement (First) of Agency §§ 226, 227, 229, & 230).

Hopkins' position is also factually wrong.  Its doctors' work on the Study Section was a boon to Hopkins: Hopkins enjoyed direct reputational benefits (prestige and status) and direct and indirect financial benefits from its physicians' work on Study Sections (*i.e.,* increasing Hopkins' access to and receipt of research money, collaboration with the government and other institutions on other research, and ability to recruit talented people). *See* Plaintiffs' Renewed Cross-Motion/Opp. at 14-15; J.R. 1158 (Ex. 34) (participation brought "honor and money to Hopkins" and allowed it "to continue to raise its profile in the world"); J.R. 5460-61 (Ex. 292) (the doctors' work made Hopkins one of the largest recipients of grant money). Hopkins even made its facilities available for Study Section meetings. J.R. 5826; (Ex. 318); 5829 (Ex. 319).

Hopkins responds that it did not receive a grant related to the Guatemala Experiments, and its doctors did not publish about them. This does not prove that Hopkins did not seek to benefit. Dr. Moore and his Hopkins colleagues had hit the limits of their laboratory research, and felt that testing their work on human subjects was the only way they could advance the research they had been pursuing for decades at Hopkins. Dr. Moore believed that human experiments had to be done. J.R. 34 (Ex. 1). Dr. Turner wanted to inject test subjects with rabbit syphilis to determine if he was on the path to a vaccine. J.R. 4769 (Ex. 214); 5253 (Ex. 262); 5254 (Ex. 263). Dr. Eagle too could not prove his thesis without a human experiment. J.R. 88 (Ex. 1). To these men, Guatemala was a "gold mine" – "a way to do the kind of research [they] ha[d] been aching to do for a really long time. They hadn't been able to finish the study and go further in Terre Haute. They couldn't find other human volunteers who were willing to have gonococcal stuff put in their eyeballs. So this was a great chance." J.R. 1159 (Ex. 34). The fact that their work was carried out in the Guatemala Experiments proves a benefit or at least pursuit of a benefit to Hopkins regardless of receipt of grant money.

Hopkins authorized its doctors to be on the Study Section knowing that they would be originating research, reviewing proposals, working with other scientists, building support for research

they considered worthwhile, recommending that grant money be spent on specific research projects, and overseeing the research periodically to decide whether it should continue. J.R. 42-43 (Ex. 1); 492 (Ex. 12); 4918 (Ex. 229). Nothing about their work on the Study Section required the doctors to "abandon" their service to Hopkins. If anything, it supported that service, and if Hopkins felt to the contrary, it could have withheld or withdrawn its permission.

Relatedly, the U.S. Government did not require Study Section members to "abandon" their service to Hopkins.[3] The doctors served "without compensation" from the government, other than a small *per diem* for travel expenses, and continued to be paid a salary by Hopkins. *See* Jt. Stmt. of Undisp. Facts at ¶ 22; J.R. 1097; 1159-60 (Ex. 34). Study Section members were "outstanding civilian scientists" brought together to direct the course of scientific investigations. J.R. 1854, 1856, 1859 (Ex. 77); 4918 (Ex. 229). The government did not question their recommendations.[4] J.R. 1099 (Ex. 34).

Hopkins' claim that Drs. Moore, Turner, and Eagle "did not hold high-ranking positions" at Hopkins, and that they lacked institutional power from 1946 to 1948, is disingenuous. Dr. Moore was an Adjunct Professor in the Hopkins School of Public Health, an Associate Professor of Medicine at Hopkins Medical School, and "Physician In-Charge" of Hopkins' Venereal Disease Division, a position he had held since 1929. J.R. 4789 (Ex. 218); 25 (Ex. 1); 5624 (Ex. 298). He was considered the "godfather of syphilis studies," and researchers from around the country came to him for advice.

---

[3] It is important to note that doctors and other professionals with special skills do not usually become borrowed servants, as urged by Defendants. Such individuals are usually not found to be under the control of a would-be "borrower," but rather, keep their relationship with their original master. *See, e.g., Green v. United States*, 709 F.2d 1158, 1164 n.6 (7th Cir. 1983). This principle has been applied to service on a task force, which is akin to the government study section at issue here. *See, e.g. Council for Periodical Distrib. Assoc. v. Evans*, 827 F.2d 1483, 1486 (11th Cir. 1987).

[4] Hopkins' argument that its doctors were required to obtain approval before they could request or receive grant money does not change this analysis. Its doctors were not soliciting funds or pledging departmental support. They were using their position – both at Hopkins and on the Study Section – to advance their research.

J.R. 1118 (Ex. 34). Similarly, Dr. Turner was a Professor of Microbiology and Dr. Eagle was an Adjunct Professor of Bacteriology and Director of the Venereal Disease Laboratory and Laboratory of Experimental Therapeutics at the Hopkins School of Public Health. Hopkins' argument is also inconsistent with the doctors being seen as having "unusual eminence" in their field. J.R. 728 (Ex. 14). And, the agency principles outlined in detail above do not require these doctors to have held "high-ranking positions:" the fact that they were agents who were given permission to be on the Study Section means that Hopkins remained responsible for their actions.

Finally, even if Hopkins' doctors acted in a way "specifically forbidden" by Hopkins or used "forbidden means" to accomplish their work on the Study Section, it does not mean that they were acting outside the scope of their authorization. *See Alvarez III*, 275 F. Supp. 3d at 694 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999)). A reasonable jury could conclude that Drs. Moore, Turner, Eagle, and Reed served as agents of Hopkins and the U.S. government simultaneously because their interests were not contradictory, and the doctors never abandoned their service to Hopkins.

### 2.   *Hopkins' agents aided and abetted the Guatemala Experiments*

There is ample evidence that Hopkins' doctors wanted to do research like the Guatemala Experiments for years. As explained in Plaintiff's Renewed Cross-Motion, Dr. Moore was a dominant force in bringing about the Terre Haute experiment, in which individuals were intentionally infected with gonorrhea and then treated with prophylaxis (the same design used in the Guatemala Experiments). J.R. 26 (Ex. 1). He enlisted support from the Surgeons General (including Dr. Parran) and the Committee on Medical Research (CMR), and he and his Hopkins colleagues drafted the research protocol, outlined its goals, and authored a waiver/consent form. J.R. 27-28 (Ex. 1). He overcame objections about the experiments' legality, the potential for liability, and the risk of bad publicity, and secured the support of the Federal Bureau of Prisons. J.R. 29, 31 (Ex. 1). He and his Hopkins colleagues remained involved, and developed relationships with the men who oversaw the

experiment and implemented it: Drs. Cutler and Mahoney of the U.S. PHS – the same men who were later at the center of the Guatemala Experiments. J.R. 32-33 (Ex. 1). When the experiments failed, Dr. Moore argued for them to continue and described their ending as a "blow." J.R. 35 (Ex. 1).

Hopkins asserts that because its agents drafted the consent form for Terre Haute, they were champions of informed consent who would have never knowingly participated in nonconsensual experiments. This ignores the fact that the head of the CMR, Dr. A.N. Richards, conditioned his support of Terre Haute on the people being "utilized as subjects . . . only after the risks have been fully explained and after signed statements have been obtained which shall prove that the volunteer offered his services with full knowledge and that claims for damages will be waived." J.R. 27 (Ex. 1). An alternative inference is that the doctors saw the need for consent in Terre Haute as a necessary evil to get what they wanted.

The evidence suggests that, frustrated by Terre Haute, the doctors never intended the Guatemala Experiments to be consensual. There is no evidence that the Syphilis Study Section ever considered obtaining informed consent in Guatemala. No consent forms were submitted with the grant application or during the renewal process. No documents using the phrase "informed consent" were submitted to the CMR or the National Advisory Health Council. No informed consent forms were found in Dr. Cutler's records. A reasonable jury could conclude that given the difficulties with Terre Haute, the doctors knew and agreed that the Experiments would be nonconsensual from the beginning. Guatemala was a far-away place, the people involved were poor and uneducated, and the potential "gold mine" made the ends justify the means.[5] J.R. 1159 (Ex. 34).

---

[5] Hopkins asserts that the connection between Terre Haute and Guatemala is a theory based on "wild speculation," but it ignores that the U.S. Presidential Commission concluded that the Guatemala Experiments, in part, grew out of the failures in Terre Haute. J.R. 36 (Ex. 1).

A jury could also conclude that Hopkins' agents were privy to the inner details about the Guatemala Experiments. All four men were involved with and approved the original proposal. They knew that informed consent had never been sought, obtained, or forms drafted. They had already worked and been on the "inside" of an unethical, arguably nonconsensual experiment with Drs. Mahoney and Cutler. Hopkins doctors were directly involved in re-approval and funding the Experiments the next year, and the designation of Dr. Soper as "Investigator," but again did not mention or discuss informed consent, who was being tested and where, or other questions that people with much less knowledge than they had would have known to ask. This suggests that they acted intentionally because they did not want to raise concerns, and they wanted to further the research they had been working on at Hopkins for years. J.R. 1116 (Ex. 34).

Hopkins asserts that its doctors did not provide substantial assistance to the Guatemala Experiments. In making this argument, it ignores conflicting evidence and resorts to arguing the credibility and weight of evidence, both of which are improper at this stage. *See, e.g., Courtney-Pope v. Board of Educ. of Carroll Cnty.*, 304 F. Supp. 3d 480, 489 (D. Md. 2018) (citations omitted) ("The judge's function in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial … [T]he court may not make credibility determinations."). There is no dispute that Hopkins' doctors approved the Experiments, acted to prevent controversies that would have caused them to be rejected, and acted to advance the research they had been conducting at Hopkins for years. J.R. 1155-56, 1159 (Ex. 34); *see also* J.R. 34, 43-44 (Ex. 1); 1914-16 (Ex. 88); 4783 (Ex. 215); 5259-64 (Ex. 264).

Additionally, when asked to decide whether to continue funding for the Experiments, the doctors consulted with each other and changed the language used in the renewal application to protect the Experiments and avoid criticism. J.R. 4955 (Ex. 231); 4956 (Ex. 232). These Hopkins doctors were considered among the best researchers in their field. Dr. Moore, in particular, was known to be

11

"demanding and strict." J.R. 4780 (Ex. 215). The Hopkins doctors had just spent two years, 1943 and 1944, fighting influential opponents in the research community about the importance of human studies. Nazi doctors were being tried in Nuremberg for international rights violations and war crimes, in part for conducting nonconsensual experiments. And the doctors knew from experience that Drs. Cutler and Mahoney had, at best, a questionable record on medical ethics. Moreover, if the doctors were on the "outside" of the conspiracy, as Hopkins suggests, they would not have been getting much, if any, information about what was happening in Guatemala, and they would likely have had questions about how Dr. Cutler was able to get so many people to give consent. Though Hopkins can claim that its doctors blindly "rubber stamped" Experiments, a reasonable jury could reject this notion and conclude that they were fully aware of what was going on. J.R. 1116 (Ex. 34) (Dr. Moore was "too thorough a scientist to ever have approved this without knowing exactly what was going on"); J.R. 1914-15 (Ex. 88) (referencing "extensive experimental study in human volunteers in Guatemala which results I am not at liberty to quote").

Hopkins suggests that Dr. Turner may have sent syphilitic rabbits to Guatemala, but that the rabbits may not have been used. Again, summary judgment is inappropriate where a reasonable jury could reach different conclusions based on the evidence. *See Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967) ("[S]ummary judgment should not be granted … if the evidence is such that conflicting inferences may be drawn therefrom[.]"). Moreover, Hopkins' argument misses the point: even if Dr. Turner did not supply rabbits used in Guatemala, he encouraged and promoted that test subjects be injected with rabbit syphilis, Dr. Mahoney agreed with the suggestion, and Dr. Cutler injected test subjects because of their urging. J.R. 5253 (Ex. 262); 5254 (Ex. 263); 65 (Ex. 1).

**B.    Drs. Soper and Parran were TRF's agents when they aided and abetted the Guatemala Experiments**

TRF does not deny that its policy in the 1940s was to work through governments and agencies, either by using its substantial resources or by embedding its staff in the government or agency to shape the outcome it wanted. Instead, like Hopkins, it asserts that its agency relationship with Drs. Soper and Parran automatically ended when Dr. Soper was "assigned" to the PASB, and while Dr. Parran was simultaneously working as the Surgeon General.

TRF's position is legally wrong.[6] As discussed above, TRF remained the master of Drs. Soper and Parran, and is legally responsible for their actions, *unless* their work required "abandonment" of their service to TRF, or went outside the "general nature" of what TRF authorized them to do.

TRF's position is also factually wrong. There is no dispute that TRF had a principal/agent relationship with Drs. Soper and Parran. TRF made Dr. Parran a Trustee of its Foundation and a Scientific Director of the International Health Division. J.R. 4823 (Ex. 224). TRF's Constitution, By-Laws, and Charter set-out the powers of both positions. Though Trustees worked primarily together, Scientific Directors had more autonomous decision-making power. It is true, as TRF points out, that Scientific Directors "ma[de] recommendations to the board." J.R. 2024 (Ex. 95). However, TRF failed to mention that Scientific Directors were given additional powers, including the "power … to make commitments in [sic] behalf of the corporation[.]" *Id.* Scientific Directors were tasked with the "immediate supervision of the work of [the IHD]." J.R. 2023-24 (Ex. 95). Similarly, TRF appointed Dr. Soper an Associate Director of the IHD (an officer of TRF), and he held that position throughout

---

[6] TRF again states that application of *respondeat superior* is not appropriate in an ATS case and that Plaintiffs must prove under *Monell* that it was the "moving force" behind the Experiments before it can be held responsible. This is not true. The Court has already held that a defendant can be held liable for indirectly violating the customary international law if it provided "substantial assistance" to a direct violator with the "purpose" of facilitating the violation (*i.e.,* aiding and abetting). Defendants' *respondeat superior* and *Monell* arguments were fully briefed in Plaintiffs' Renewed Cross-Motion/Opposition at pages 59-63.

the Guatemala Experiments. J.R. 4979 (Ex. 241). He was given the same power to act in a given field

as a director when his director was not in New York. J.R. 2024 (Ex. 95). There is no evidence that Dr.

Soper or Parran "abandoned" TRF's mission or acted outside of the "general nature" of their

authorizations.

        1.      *Dr. Soper*

       Dr. Soper did not leave or abandon his role at TRF for the PASB; rather, TRF "assigned" him

to the PASB. Dr. Strode, IHD Director, informed Dr. Soper in writing that "as of February 1, 1947,

you are *assigned* to the Pan American Sanitary Bureau." J.R. 4979 (Ex. 241) (emphasis added). Dr. Soper

used the same language when he accepted the assignment: "[m]any thanks for your letter . . . *assigning*

me, as of February 1, 1947, to the Pan American Sanitary Bureau."[7] J.R. 4965 (Ex. 234) (emphasis

added). Dr. Soper made it clear that he was not *abandoning* TRF, but was instead pursuing its interests:

> I became Director of the [Pan American Sanitary] Bureau on 1
> February 1947. My move to the official international health field was
> **not one of abandonment of The Rockefeller Foundation but
> rather of fulfilling its program**. It was **quite in keeping with
> Foundation policy** to make my service available to PASB **and I
> remained on its staff** during my first four years with the Bureau.

J.R. 2273; 2276 (Ex. 108) (emphasis added).

       Dr. Soper was not, as TRF asserts, "pursu[ing] a new path without the Foundation's oversight"

because he was "disappointed" with TRF.[8] In a letter to Dr. Strode, Dr. Soper recounted prior

---

[7] Dr. Soper stated under oath on an official government form that TRF was his employer from January 1920 until October 1950. J.R. 4985 (Ex. 243). Conflicting evidence merely establishes that there is a question of fact.

[8] TRF claims that nonconsensual experiments were inconsistent with its mission. It does not provide support for this assertion and there is no reason to suggest that Dr. Soper agreed. It is reasonable to believe that Dr. Soper thought he was advancing research TRF had funded in the past or otherwise was continuing research that had the support of Dr. Parran. Even if TRF is correct, an employee can act within the scope even when he engages in acts "specifically forbidden" by the employer and uses "forbidden means of accomplishing results." *Kolstad*, 527 U.S. at 543; RESTATEMENT (FIRST) OF AGENCY § 230.

conversations with him and Dr. Parran about *their* plans – not his – to expand the PASB's role. J.R. 4965-66 (Ex. 234). Dr. Soper was reluctant, stating that "it seems best for me to consider this as an assignment from the [IHD] with the hope that some one from the Latin American countries can be found and developed to take over this post within a few years." J.R. 4966 (Ex. 234).

TRF asserts that Dr. Soper was not assigned to the PASB for purposes of advancing the Guatemala Experiments. This argument requires too much; it is enough if the assignment furthered the mission of the TRF generally, and need not be specific to Guatemala. The law set out in *Alvarez III* focuses on whether the act at issue – here, assignment to a quasi-governmental agency and pursuing policies in the interests of both TRF and the agency – is an act "commonly done" by the principal. This is not in dispute: TRF commonly embedded its agents in senior positions inside governments and agencies to act as "directing personnel." J.R. 4719-22 (Ex. 209); 4749 (Ex. 210). It was to this end that Dr. Parran, in conjunction with Dr. Strode, and acting on behalf of TRF, assigned Dr. Soper, its 25-year employee, to the PASB. J.R. 2270, 2273, 2276 (Ex. 108); 4785 (Ex. 216). Dr. Parran was "keenly interested" in the work being done in Guatemala. J.R. 2633 (Ex. 138); 2636 (Ex. 139). Given the timing and circumstances of Dr. Soper's assignment, it is reasonable to infer that Dr. Parran and Dr. Strode, using their power at TRF, cleared the way for Dr. Soper to be the head of the PASB and serve as the "Investigator" for the Experiments.

Similarly, TRF claims that it had no power to control Dr. Soper's actions while he was at the PASB, but Dr. Soper himself could not have been clearer that it did. Writing an "official statement" to Dr. Strode, his boss, corporate officer, and high-ranking decisionmaker at TRF, Dr. Soper said that when he was assigned to the PASB he felt like he "was no longer a free agent to decide, on the basis of personal preference or of my own financial interest, where I would work."[9] J.R. 4965 (Ex. 234).

_____

[9] TRF claims that the PASB constitution prevented Dr. Soper from acting on outside influences, but PASB's Constitution did not become effective until October 1947, after he was named

Although TRF twists these words to make it seem as if Dr. Soper felt he was hamstrung by the *Government's* wishes, that is simply not true. Dr. Soper wrote that he agreed to accept the position because he considered it to be in keeping with his earlier conversations with Dr. Strode about TRF's interest in developing the PASB, subject to Dr. Strode's approval. *See id.* Dr. Soper ended the letter by stating that he would consider his work on the PASB "an assignment from the [TRF] International Health Division," and hoped that TRF would find a replacement for him quickly. J.R. 4966 (Ex. 234). Because TRF was working through the PASB, it agreed to pay Dr. Soper's salary. J.R. 5049 (Ex. 257); J.R. 4967 (Ex. 235). Additionally, and in direct contradiction to TRF's argument that his assignment to the PASB caused abandonment of his agency with TRF, Dr. Soper continued to attend to TRF business unrelated to the PASB. In July 1948, for example, he went to Sardinia, Italy, to inspect and approve a TRF project with other TRF personnel, after which he reported back to Dr. Strode at TRF. J.R. 5818-21 (Ex. 314); 5823 (Ex. 315). Also, having Dr. Soper in place prevented another, less controllable person, from being in that seat. J.R. 395 (Ex. 8). As explained above, the requisite "control" need not be "direct supervisory control," but rather, can be "very attenuated" and need not regard all of the "minutia of the agent's actions." *Green,* 735 A.2d at 1051; *Danner,* 855 F. Supp. 2d at 454.

Lastly, TRF claims that Dr. Soper did not provide substantial assistance for the purpose of promoting the nonconsensual experiments. Dr. Soper arrived in Guatemala and met with Dr. Cutler as the Investigator responsible for ensuring the safety and well-being of the test subjects. J.R. 5345 (Ex. 283); 5043 (Ex. 257). He was a conduit and in the middle of correspondence between Drs. Mahoney and Cutler, including conversations lessons learned in Terre Haute and their application to Guatemala. J.R. 5816 (Ex. 313); 5824 (Ex. 316); 5825 (Ex. 317). He controlled the purse-strings,

---

Director. While this may have been the PASB's policy on paper after that date, it does not mean that Dr. Soper followed it or saw his actions as conflicting.

including the hiring and payment of local researchers, and the authorization of gifts to ensured access to the asylum. J.R. 4994 (Ex. 250); 5003 (Ex. 253); 5825 (Ex. 317). He gave the Experiments cover: he was the person to whom Drs. Cutler and Mahoney reported in "complete confidence," ensuring that another, less controllable person, would not have access to or stumble across information that could jeopardize or expose the Experiments. J.R. 395 (Ex. 8). He was also involved in wrapping-up the Experiments in a way that avoided disclosure. J.R. 5816 (Ex. 313).

TRF complains about a lack of direct evidence that Dr. Soper saw the nonconsensual experiments when he traveled to Guatemala, or confirmation that he and Dr. Cutler discussed them while he was at Dr. Cutler's home. Circumstantial evidence is sufficient and often all that is available in a conspiracy case, but here there is *direct* evidence that Dr. Soper knew Dr. Cutler was performing intentional exposure experiments, "serological tests" on children in an orphanage, and testing in an asylum where consent could not be freely given. J.R. 2658-59 (Ex. 142); 5002 (Ex. 252); 4994 (Ex. 250). He knew that patients were being infected with the "rabbit strain" of syphilis. J.R. 2658 (Ex. 142); J.R. 5051 (Ex. 257). And, before Dr. Soper met Dr. Cutler and had dinner in his home, Dr. Cutler indicated that they would talk about operational security: "We shall tell him as soon as he arrives . . . that the less he talks the better." J.R. 400 (Ex. 10). In reply, Dr. Mahoney stated that Dr. Soper is "the responsible official of the study and as such entitled to complete confidence." J.R. 395 (Ex. 8).

### 2.    *Dr. Parran*

Dr. Parran served as both a Scientific Director at TRF and the Surgeon General from 1936 until 1948. In both capacities, he made the eradication of syphilis the hallmark of his career. J.R. 23-24 (Ex. 1). He promoted and worked closely with Dr. Moore of Hopkins in both roles. J.R. 4788 (Ex. 217); 4779 (Ex. 215). This relationship made Drs. Parran and Moore "key" players in the effort to understand and treat syphilis. J.R. 4779 (Ex. 215). His ability to get Dr. Soper "assigned" to the PASB by TRF shows that he used his powers in both roles.

TRF knew that Dr. Parran bent and broke ethical guidelines well before 1946, and it either authorized the behavior or acquiesced to it. Dr. Parran, collaborating with Dr. Moore, presided over the Tuskegee Study of Untreated Syphilis in the Negro Male, a study that infamously involved the intentional failure to treat hundreds of African-American sharecroppers suffering from syphilis in Alabama. J.R. 4773, 4780 (Ex. 215). And, collaborating with Dr. Moore, he approved and supported the Terre Haute Experiment. J.R. 26-27; 32 (Ex. 1). A reasonable jury could conclude that Dr. Parran's actions concerning the Guatemala Experiments were in keeping with his course of conduct both at TRF and as Surgeon General.

Dr. Parran provided "substantial assistance" to the Guatemala Experiments. He approved its funding and renewal of funding. J.R. 44-45 (Ex. 1). He had the power to stop the Experiments, but not only let them continue, he fully supported them. J.R. 534 (Ex. 12). He kept updated on the progress of the Experiments, was "keenly interested," almost preoccupied, with the work that was going on, and signaled that he was not concerned about any potential ethical issues. J.R. 2633 (Ex. 138); 2636 (Ex. 139). And, as stated earlier, he arranged for Dr. Soper to be assigned as "Investigator" and "responsible official" for the Experiments.  J.R. 4265 (Ex. 185); 395 (Ex. 8).

Dr. Parran acted for the purpose of supporting the nonconsensual experiments. He knew that the Experiments were grossly unethical, giddily acknowledging to a PHS researcher who had returned from Guatemala that the Experiments could not be performed in the United States. J.R. 2636 (Ex. 139). It is reasonable to infer from this comment that Dr. Parran knew of the nonconsensual nature of the Experiments. Professor Lombardo, an ethicist who served as a senior advisor to the U.S. Presidential Commission, has opined that the evidence "suggests that Parran not only knew the details of Cutler's work but also endorsed it with full awareness of its ethical toxicity." J.R. 5252 (Ex. 261); 5261 (Ex. 264). And Dr. Reverby has opined that Dr. Parran supported the Experiments knowing that they were nonconsensual. J.R. 4783-84 (Ex. 215).

There is at least a question of fact regarding whether agents of TRF are liable to Plaintiffs under the ATS for their roles in aiding and abetting or conspiring to perpetrate international human rights violations.

III.   **DEFENDANTS ARE NOT ENTITLED TO THE PROTECTION OF ANY IMMUNITY**

Defendants have failed to meet their burden to prove that they may avail themselves of any type of immunity for their role in the Guatemala Experiments.

### A.   Defendants cannot claim derivative sovereign or derivative absolute immunity

In support of their argument that they should not be "left holding the bag" for the actions of government employees, and should be entitled to the same sovereign immunities available to those employees, Defendants continue to rely on *Filarsky v. Delia*, 566 U.S. 377, 391 (2012), which gives them no shelter. The *Filarsky* Court considered whether a private attorney hired by a municipality was entitled to qualified immunity under 42 U.S.C. § 1983 for performing the same discretionary function as a government prosecutor. The issue in that case was qualified immunity, not the absolute immunity that Defendants seek here. Even if it was the same, however, there is no qualified immunity for violations of law that are "clearly established," as is the prohibition against nonconsensual human experimentation. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016). Finally, Defendants are a step removed from the qualified immunity permitted in *Filarsky*: unlike the prosecutor there, Defendants were not hired by, and had no agreement with, the U.S. Government, and therefore cannot avail themselves of the government's immunity.

Defendants in their reply brief ignore the bright-line rule established by the Restatement (Second) of Agency § 217(b)(ii) – namely, that a principal cannot use its agent's immunity to protect itself from suit. They instead cobble together a homespun version of "federal common law" to support their argument, but none of the authority they cite either establishes what the federal common law is, or that they – private entities who had no contract with the U.S. Government – should be entitled to

immunity. Specifically, the one federal case cited by Defendants, *Van de Kamp v. Goldstein*, extended prosecutorial immunity to supervising prosecutors because the same concerns for immunizing individual prosecutors apply to the administrative obligations of their supervisors. 555 U.S. 335, 344-48 (2009). *Van de Kamp* did not apply derivative immunity in the way Defendants suggest; rather, it simply extended the grant of prosecutorial immunity.[10] Defendants also rely on state law, but state law is not germane in this case brought under the ATS.[11] *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (in "international disputes implicating … our relations with foreign nations … our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the … international nature of the controversy makes it inappropriate for state law to control").

Defendants are not sovereign entities. They bear no public responsibility, and are not accountable to any chain of command or electoral constituency that could otherwise remediate wrongdoing outside of the judicial process. Any authority that the U.S. Government gave to the perpetrators obviously did not include an instruction to conduct, conspire, or aid and abet nonconsensual human experimentation in violation of customary international law and federal law. *See Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 970 (E.D. Va. 2019), *appeal dismissed*, 775

---

[10] In TRF's separate initial brief, it argued that it was entitled to derivative statutory immunity under the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288a *et seq*. In their reply, Defendants have retreated from that assertion and now just draw an analogy to IOIA immunity. Although the IOIA specifically immunizes international organizations, and representatives, officers and employees of these international organizations, *see* 22 U.S.C. §§ 288a(b) & 288d(a), it grants no other immunity. The IOIA has no application to this case, and Defendants' claim that failing to grant it an equivalent immunity would "eviscerate" the IOIA is utter hyperbole.

[11] As one example of a state law case, Defendants cite *Parker v. State*, 653 A.2d 436, 443 (Md. 1995), for the proposition that the absolute immunity of a judge extends to his employer. *Parker* held merely that Maryland cannot be liable for the actions of its judges because the Maryland Tort Claims Act does not waive immunity for such suits. *See id.* ("[A] suit that is barred by judicial immunity cannot form the basis of a recovery against the State under the Tort Claims Act."). *Parker* has nothing to do with this case and does not draw an appropriate analogy.

F. App'x 758 (4th Cir. 2019) (*citing Campbell-Ewald Co.*, 136 S. Ct. at 672-74) ("[T]he Supreme Court has held that derivative immunity is not guaranteed to government contractors and is not awarded to government contractors who violate the law or the contract."); *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (citations omitted) ("The contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the acts of the government."). Plaintiffs seek to hold Defendants responsible for *their* conduct relating to the Experiments. The public policy of holding Defendants responsible for their own actions in designing, planning, aiding and abetting, and orchestrating the non-consensual human experimentation in Guatemala against customary international law far outweighs any benefits of providing immunity.

>    **B.     Defendants cannot claim charitable immunity**

In support of their contention that they are entitled to charitable immunity, Defendants make three arguments: (1) this Court should look beyond international law to the "federal common law" *at the time of the Guatemala Experiments*, which they claim recognized charitable immunity; (2) in the absence of federal common law, this Court should "fill in the gap" and look to Maryland charitable immunity law; and (3) other federal statutes have permitted charitable immunity. Each of these are unavailing.

As to the first, the torts and defenses in an ATS case are controlled by customary international law, which does not recognize charitable immunity. The absence of this defense is not an interstitial "gap" to be filled, rather, it marks the limit of state practice and legal opinion on the subject. And, even assuming that there is a gap, it must be filled by federal common law *as it existed at the time this lawsuit was filed,* and not, as Defendants suggest, as the time of the Guatemala Experiments. *See Hall v. A.N.R. Freight Sys., Inc.*, 717 P.2d 434, 444 (Ariz. 1986) (*in banc*) (*cited by Allstate Ins. Co. v. Kim*, 829 A.2d 611, 623-24 (Md. 2003)) ("[A] right vests only when it is actually assertable as a legal cause of action or defense," and until a lawsuit is filed, the assertion of a defense "is contingent upon an event or

condition which may not happen and thus cannot be characterized as a vested right."); *see also Weidner v. Int'l Telecommunications Satellite Org.*, 392 A.2d 508, 510 (D.C. 1978) (emphasis added) ("The date upon which the cause of action arose is not material to the question of immunity. *The crucial date is that on which the complaint is filed*."). The Restatement (Second) of Torts § 895E is the clearest enunciation of federal common law on the subject, and explicitly holds that charitable immunity does not apply.[12] This Restatement was published in 1979, and was well-established when this suit was filed.[13]

Regarding Defendants' second argument, because international and federal common law does not recognize charitable immunity, there is no "gap" to be filled by state law. In arguing to the contrary, Defendants continue their habitual practice of cherry-picking quotations from cases, partially quoting *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728 (1979), to support their proposition that federal courts at times look to state law "to decide ancillary liability matters in claims arising under federal statutes." The entire quote from *Kimbell*, however, does not support Defendants' position:

> Undoubtedly, **federal programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules**. Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. **Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the**

---

[12] To make the point that the federal common law expressed in the Restatement rejecting charitable immunity applied prospectively only, Defendants cite South Carolina and Missouri cases that applied the abrogation of charitable immunity prospectively. These cases, however, discussed whether individual state Legislatures intended the legislative abrogation of charitable immunity statutes to operate retroactively or prospectively. The intentions of state Legislatures have nothing to do with federal common law about charitable immunity at the time of the Experiments, nor do they shed any light on how the Restatement provision should be applied.

[13] Further, the seminal case cited by § 895E was the landmark **1942** case from the D.C. Circuit, also written prior to the Guatemala Experiments. *See President & Directors of Georgetown Coll. v. Hughes*, 130 F.2d 810 (D.C. Cir. 1942); *see also* WILLIAM L. PROSSER, LAW OF TORTS, § 133, pg. 96 (4th ed. 1971) ("[T]hat year a devastating opinion of Judge Rutledge in the Court of Appeals of the District of Columbia reviewed all of the arguments in favor of the immunity, and demolished them so completely as to change the whole course of the law.").

**federal programs. If so, we must fashion special rules solicitous
of those federal interests.**

*Id.* (citations omitted) (emphasis added). Considering whether charitable immunity would "frustrate" the goals of the ATS requires weighing the nature, gravity, and uniformity of ATS actions, and necessitates the application of federal common law rather than a specific state's law.[14] It would simply not make sense for an entity to be held liable under the ATS for nonconsensual human experimentation in one state, but be immune for the same terrible conduct in another.[15] Additionally, applying charitable immunity under Maryland common law would frustrate the specific objective of the ATS, namely, "to provide a federal forum for adjudicating that narrow set of violations of the law of nations that, if left unaddressed, threatened serious consequences for the United States." *Jesner*, 138 S. Ct. at 1410 (Thomas, J., concurring) (citation omitted).

Defendants' third argument, that federal statutes accept state charitable immunity, is also unpersuasive. The first of two cases cited in support of this argument merely held that charitable immunity can be a defense in cases brought under the Federal Tort Claims Act, because "the applicable state law defines the scope of the United States' liability under the FTCA." *Lomando v. United States*, 667 F.3d 363, 376 (3d Cir. 2011) (citation omitted). The second case does not even deal with charitable immunity, but rather, with a statutory cap on non-economic damages in cases brought under the

---

[14] Federal common law can also preempt state law under the rules of implied conflict preemption when the state law stands as obstacle to "an identifiable federal policy or interest" in an area that is of "unique federal concern." *Boyle v. United Tech. Corp.*, 587 U.S. 500, 504-12 (1988); *see also Aegis Defense Services, LLC v. Chenega-Patriot Group, LLC*, 141 F. Supp. 3d 479, 487 (E.D. Va. 2015) ("[T]here are a few areas involving uniquely federal interests in which federal common law preempts state law due to a significant conflict between the federal interest and the state law."). The ATS certainly fits that bill. *See Jesner v Arab Bank, PLC*, 138 S. Ct. 1386, 1406 (2018) ("The ATS was intended to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations ….").

[15] Maryland law also limits charitable immunity to the extent there is liability insurance. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-632; Ins. § 19-103; Health-Gen. § 19-354. New York, where TRF is headquartered, abrogated the immunity in 1957. *See Bing v. Thunig*, 143 N.E.2d 3, 9 (N.Y. 1957).

Emergency Medical Treatment and Labor Act (EMTALA). *See Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 865 (4th Cir. 1994) ("EMTALA explicitly incorporates state law on the issue of damages."). Unlike the statutes at issue in those cases, the ATS is not defined by, and does not explicitly incorporate, state law, but rather, is a statute that requires federal courts to consider international law and federal common law. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (international law); *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 35 (D.C. Cir. 2011), *vac. on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013 (Mem.) (federal common law).

Finally, as previously stated, public policy dictates that immunities are only recognized when the benefits of the immunity outweigh the costs. *See Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447 (4th Cir. 1996). The benefits of allowing a state common law charitable immunity doctrine to insulate Defendants from liability for their roles in designing, planning, aiding and abetting, and orchestrating the Guatemala Experiments do not outweigh the costs of depriving the victims of those Experiments the right to recover for their injuries in this action brought pursuant to the ATS.

## IV. THE SELECTED PLAINTIFFS EACH HAVE COMPETENT EVIDENCE TO AT LEAST GENERATE A JURY QUESTION

Defendants continue to maintain that the proof amassed in discovery supporting the claims of the Selected Plaintiffs is not legally sufficient to generate a jury question. Each of their complaints lacks merit on the facts and/or the law.

### A. Selected Plaintiffs *have* proffered evidence that they were involved in the Guatemala Experiments

Every single challenge Defendants launch to support their argument that the Selected Plaintiffs were not actually victims of the Guatemala Experiments raises, at the very least, a quintessential question of fact that must be evaluated and determined by a jury at trial:

1.   **Arturo Girón Alvarez:** Defendants' contention that "the only purported evidence connecting Mr. Girón Alvarez to the Guatemala Experiments" is a sworn statement from his daughter is categorically false. Official records produced by the U.S. Government's National Archives and Records Administration (NARA) – which

have been relied upon as the primary contemporaneous source of evidence by the U.S. and Guatemalan Government Commissions that have investigated the Guatemala Experiments – establish that Arturo Girón Alvarez was infected with syphilis while in prison as part of the Guatemala Experiments. J.R. 4342-58 (Ex. 188); 4706 (Ex. 208); 1270-75 (Ex. 35). These records alone are sufficient to either entitle him to summary judgment, or at least take his case to the jury.[16]

Additionally, Mr. Alvarez's daughter has authored a sworn affidavit in which she states that she recalls her father telling the family that he was subjected to medical practices while imprisoned. J.R. 1850-51 (Ex. 76 (Spanish)); 4198-99 (Ex. 181 (English translation)). Defendants say that this is hearsay, but that is a self-serving objection given that they declined to depose Mr. Alvarez's daughter during discovery, even though Plaintiffs offered to make her available. Defendants should not be permitted to use their refusal to engage in discovery to argue that proof is lacking. Under this Court's rules governing summary judgment, Mr. Alvarez's daughter's sworn statement need not be admissible at trial if it is being presented to the Court in order to establish what admissible evidence Plaintiffs *can* present at trial – *i.e.,* her live testimony.[17] And, what Mr. Alvarez told his daughter during his lifetime about his memories of being imprisoned constitutes statements about "facts of family or personal history," which are admissible under the hearsay exception of Fed. R. Evid. 804(b)(4).[18]

---

[16] Defendants state that they plan to object to the NARA records as being inadmissible hearsay. There are multiple hearsay exceptions that apply to these records. First and foremost, they are public records of the U.S. Government excepted under Fed. R. Evid. 803(8). The Government itself described these records as being "federal records" when it took control of them. *See* Mar. 28, 2011 Press Release, "National Archives Releases John Cutler Papers Online," https://www.archives.gov/press/press-releases/2011/nr11-94.html ("This collection … of approximately 12,000 pages of correspondence, reports, photographs, and patient records was donated in September of 1990 to the University of Pittsburgh by Dr. Cutler. In September 2010, the University contacted the Centers for Disease Control and Prevention to request the transfer of the material to the Federal government. After examining the material, it was determined that they were Federal records and they were transferred to the National Archives at Atlanta in October, 2010.").

The records are also ancient documents created prior to 1998. Fed. R. Evid. 803(16). Finally, they are excepted by the "residual exception" of Fed. R. Evid. 807, which permits admission of hearsay where the evidence is supported by other guarantees of trustworthiness, and is more probative than any other evidence obtainable by other means. There is no greater proof of the inherent reliability of these documents than the fact that the U.S. Government and Guatemalan Government relied upon them in generating their official reports.

[17] *See* ECF No. 180 at p. 5 ("Under Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not be in admissible form; the requirement is that the party identify facts that could be put in admissible form." *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546 (D. Md. 2013)).

[18] Fed. R. Evid. 804(b)(4) provides an exception to the hearsay rule, if the declarant is unavailable as a witness, to statements made about "facts of personal or family history." "Rule

2.     **Manuel Chun Mucu**: The official records of the U.S. Government produced by NARA establish that "Manuel Chun" was purposefully infected in an asylum with both gonorrhea and syphilis as part of the Guatemala Experiments. J.R. 4542-4560 (Ex. 200); 4712-13 (Ex. 208); 1276-77, 1280 (Ex. 35). Plaintiff Manuel Chun Mucu has given a sworn deposition in which he testified that he was a prisoner in an asylum when he was approximately 15 years old, and that he remembered receiving injections. J.R. 790-91 (Ex. 19). Mr. Mucu is still alive and can testify at trial. Although Defendants point out factual discrepancies, such as the age Mr. Mucu estimated he was at the time of his imprisonment in the asylum decades ago, those are matters for cross-examination, and do not entitle Defendants to judgment.

3.     **Francisco Garcia Alvarez**: Defendants state that the "only purported evidence" connecting Francisco Garcia Alvarez to the Guatemala Experiments is inadmissible hearsay: namely, the written declaration of Mr. Alvarez, signed under oath when he was still alive during the pendency of this case, in which he attested to the fact that he was offered cigarettes by foreign doctors while imprisoned in exchange for being stripped naked, examined, and given shots, including in his genitals (which began to ooze pus), and that the foreign doctors continued to see him for approximately nine months thereafter. J.R. 1844-85 (Ex. 74). Although Mr. Alvarez is now deceased, the Court should consider this sworn statement as evidence as a statement of personal history under Fed. R. Evid. 804(b)(4). *See* note 18 *supra*. The

---

804(b)(4) assumes that statements of family history are likely to be informed by knowledge shared in common among family members on the basis of customs and understandings that are likely to be true." *Porter v. Quarantillo*, 722 F.3d 94, 98 (2d Cir. 2013) (*citing* 5 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 8:133, p. 224 (3d ed. 2007)). A court should ask whether "the circumstances named in the statement [were] such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge[.]" *Id.* (citation omitted). The setting that an 804(b)(4) statement was made, including whether it was made during litigation, does not factor into whether it is admissible. *See Tome v. United States*, 513 U.S. 150, 161 (1995). For cases regarding the application of this exception, *see Gagliardi v. Flint*, 564 F.2d 112, 116 (3d Cir. 1977) (permitting statement of mother that the decedent worked as a painter); *Leal Santos v. Gonzalez*, 495 F. Supp. 2d 180, 185-86 (D. Mass. 2007) (nephew permitted to testify that his grandmother had told him that she had come to the United States twice as a young girl); *Ramirez v. Clinton*, 2011 WL 2838173 *4 (D. Minn. Jul. 18, 2011) (unpublished opinion) (permitting testimony that a person's parents "always told her that she was born in the United States").

The cases Defendants cite to argue that the exception does not apply are unavailing. Def. Renewed Jt. Reply at 13 n.10. *United States v. Carvalho* only held that "evidence as to <u>motive or purpose</u>, highly debatable or controversial matters, is simply not within the scope of Rule 804(b)(4)." 742 F.2d 146, 151 (4th Cir. 1984) (emphasis added). Additionally, the statement in *Porter* failed to fulfill the requirements of Rule 804(b)(4) because there was no explanation as to "how the precise date of relocation was sufficiently significant or interesting or unusual such that it became … a subject of presumptively accurate family lore." 722 F.3d at 98. The statements at issue in this case, however, (about the horrible events that occurred to the declarant while in prison) were "such a marked item in the ordinary family history," and were not related to motive or purpose.

Court should also consider the expected testimony of Mr. Alvarez's family members that will be given at trial regarding their recollection of similar statements he made before his death. (Defendants also declined to depose a representative of Mr. Alvarez's family although Plaintiffs made one available for deposition.)

4.    **Ramiro Galvez Villalobos**. Absent from Defendants' Reply is any argument that there is no evidence connecting Selected Plaintiff Ramiro Galvez Villalobos to the Guatemala Experiments. Perhaps that is because there is ample evidence, including his own deposition in which he testified to his memory of being injected with what he believed to be vaccinations while attending school as a child at the very school where testing is known to have occurred. In addition, the deposition and Sworn Declaration of the former Director of the School states that it is well-known in the community that Mr. Villalobos attended the school as a child during the relevant time period. *See* Cross-Motion/Opp. at 49; J.R. 1743-45, 1754-64 (Ex. 71); 5357-58 (Ex. 286(a) (Spanish)); 5359-60 (Ex. 286(b) (English translation)).

The Selected Plaintiffs have put forth sufficient evidence to take their cases to a jury. *See, e.g. Ecology Servs., Inc. v. GranTurk Equip., Inc.*, 443 F. Supp. 2d 756, 771 (D. Md. 2006) ("[D]eterminations concerning witnesses' memories of events, and the judging of the credibility of witnesses are impermissible functions for the Court on summary judgment.").

## B.    Schoolchildren Selected Plaintiffs have presented valid claims

### 1.    The basis for the claims of schoolchildren is the same as all other Plaintiffs

Defendants urge the court not to recognize the claims of schoolchildren Selected Plaintiffs, who were subject to blood draws and other non-therapeutic procedures without their consent. They argue that this Court has not held "that battery without exposure to disease is at ATS violation," so that permitting these claims would be recognizing an "entirely new cause of action" that "is not properly before the Court." They further claim that there is no "ATS jurisdiction" over (admittedly) "nonconsensual" blood draws, because they are "benign" and do not violate the laws of nations.

Defendants hyperbolize the legal issue before the Court, while at the same time trying to narrowly construe the facts relating to the claims of schoolchildren as being merely related to "benign" blood draws. As to the legal issue, there is no new theory of liability here. The theory of liability has always been that Plaintiffs are entitled to recover under the ATS because Defendants directly

perpetrated the Guatemala Experiments, or else aided and abetted and conspired to perpetrate them, in violation of international norms against nonconsensual human experimentation. For three versions of the Complaint, Plaintiffs have consistently argued that they were victims of nonconsensual medical experimentation that violated then-existing international norms. Plaintiffs have consistently alleged that those human experiments involved children in the Puerto de San Jose community.

There is, in fact, no dispute that those children were the subjects of medical experimentation. The purpose of the experiments on children was to find a patient population that had not previously been exposed to sexually-transmitted disease in order to develop an accurate blood test for detecting syphilis. The experimentation on schoolchildren was discussed in the U.S. Presidential Report, which stated that the Experiments:

- Involved at least 1,384 Guatemalan children between the age of 1 and 18 years who were subject to non-consensual medical experiments between 1947 and 1949;
- Involved physical examinations of the schoolchildren's mouths, skin, lymph nodes, and, in boys, genitals;
- Subjected children to multiple blood draws, and in some cases, lumbar punctures; and
- Concluded that "[t]here is also no record that the children knew that they were part of an experiment or had an individual parent or guardian consent on their behalf." J.R. 49-53 (Ex. 1).

Although Defendants attempt to narrowly interpret the schoolchildren's claims as relating only to "benign" "diagnostic testing," it is not possible to separate the multiple blood draws and other testing performed on schoolchildren from the rest of the Guatemala Experiments. Nor do the schoolchildren's claims involve, as Defendants say, "simple negligence" or the failure to obtain informed consent for one patient on one occasion. Instead, the researchers sought out children because they could not achieve satisfactory results by using the blood of subjects in the asylum, prison, or jail. The testing was not "benign," but rather, was invasive and violated the bodily integrity of the children in a degrading and inhumane manner. Nor was it "diagnostic": the serological experiments

performed on children were not separate, concomitant, unrelated, and therapeutic experiments; they were all part of the same nonconsensual, purposeful, and unethical research as the experiments perpetrated on victims in the asylum, jail, and prison. All actions perpetrated as part of those Experiments – including those involving children, and whether or not they involve purposeful infection with a sexually-transmitted disease – violate customary international law.

This is the theory of liability that Plaintiffs have pursued throughout this case. The Court need not recognize a "new" ATS cause of action to allow the claims of schoolchildren to proceed.[19]

2.    The "paring down of claims" has been consistent with the Court's tiered discovery plan

Although it is true that Plaintiffs have withdrawn one factual allegation relating to the schoolchildren – namely, Plaintiffs longer plan to contend that any schoolchild acquired a sexually-transmitted disease as part of the Guatemala Experiments – Plaintiffs are absolutely entitled to withdraw factual allegations based on evidence adduced during discovery. This happens routinely in civil litigation, and is not grounds for granting summary judgment.

Moreover, Plaintiffs did not, as Defendants contend, withdraw this factual allegation because of "the uncovering of massive fraud."[20] At the outset of this case, the Court specifically held that Plaintiffs' counsel were not expected, and it did not wish for them, to prove either in the Third Amended Complaint, or even in the initial discovery phase, that all of the Plaintiffs contracted a sexually-transmitted disease that was "directly" caused by the Experiments. The Court stated that it

---

[19] The one case Defendants cite in support of their "new legal theory" argument is an employment law decision of this Court in which it refused to consider a hostile work environment claim that was not pled in the plaintiff's complaint, which instead alleged only racial discrimination and retaliation. *See Hood v. Montgomery Cnty.,* 2019 WL 3225749 (D. Md. Jul. 17, 2019) (unpublished opinion). For reasons stated above, this case is distinguishable because Plaintiffs have not alleged any new legal theory of recovery.

[20] The Court has already denied Defendants' motion for sanctions related to their inflammatory accusations of "fraud." ECF No. 351.

would <u>not</u> require Plaintiffs' counsel to "scurry around" Guatemala gathering up detailed support for 842 individuals. *See Alvarez II*, 205 F. Supp. 3d at 688 ("The Court will not—at the present stage—require the Plaintiffs to provide adequate foundational allegations for all of the 842 Plaintiffs"); *see also* ECF No. 300 (Opp. To Mot. For Sanctions) at pp. 12-14 (citing hearing transcripts). Instead, the Court repeatedly stated issues of causation and medical linkage to the Experiments would instead be fleshed out in the course of discovery, and decided later via summary judgment – *i.e.* now. *See Alvarez III,* 275 F. Supp. 3d. at 704.

The Court's vision for this case has worked. Plaintiffs' counsel has, in good faith, pared down the claims as further evidence has been amassed. Decisions to dismiss the claims of certain classes of Plaintiffs, or to modify the factual allegations of the schoolchildren's claims, were **not** made because "massive fraud" was "uncovered," but because Plaintiffs followed the Court's discovery procedures.[21] The withdrawal of one factual allegation relating to the schoolchildren Plaintiffs does not entitle Defendants to judgment on all of their claims.

### C.    No Plaintiff's claim is time-barred as a matter of law

This Court previously held that "an ATS claim does not accrue and the limitations period does not commence when a plaintiff, through no fault of his or her own, is unaware of an injury's existence **or** factual cause." *Alvarez III*, 275 F. Supp. 3d at 685. Focusing on the "injury's existence" part of this duo, Defendants continue to insist that what starts limitations running is when a particular plaintiff is

---

[21] Plaintiffs withdrew the factual allegation that schoolchildren were infected with sexually-transmitted disease because they lost proof supporting that allegation when they were forced to withdraw an expert witness, Dr. Abdiel Orozco, after he committed perjury at his deposition regarding photographs that he said were taken of his laboratory. This perjury had nothing to do with the laboratory testing Dr. Orozco performed or his substantive opinions about which Plaintiffs were infected, but because Plaintiffs no longer had an expert, they had to withdraw assertions that they expected to be based on his opinion testimony. In continuing to push their "massive fraud" theory of the case, Defendants make the unsupported analytical leap that because Dr. Orozco falsely testified about photos of his lab, it must mean that all of his testing was a lie. To this day, Defendants have no proof that the testing done by Dr. Orozco was "fraudulent."

learns that he or she was injected, had their blood drawn, or fell ill. The problem with this argument is that none of these events is sufficient to give a plaintiff notice of the "factual cause" of that injury. That component requires knowledge that the person was injected, had blood drawn, or fell ill ***because they were a subject in human medical experimentation, or for a harmful purpose,*** and not for an innocuous reason. If the plaintiff is unaware that the injection he received purposefully gave him a sexually-transmitted disease, or his blood was drawn as part of a human experiment, or if his illness was in fact a sexually-transmitted disease, then the plaintiff does not have knowledge of his injury's "factual cause," and limitations has not begun to run.

The Supreme Court case cited in this Court's earlier decision, *United States v. Kubrick*, 444 U.S. 111, 122 (1979), illustrates this: although the *Kubrick* Court dismissed that plaintiff's case as untimely, it did so because the plaintiff knew "that he was injured, that the injury came from the drug, and who had given him that drug." *See Alvarez III*, 275 F. Supp. 3d at 685. The same cannot be said here. It is undisputed that none of the Plaintiffs – like the rest of the world – became aware that they were purposefully being infected with disease, who perpetrated it on them, or that they were human experiment subjects until, at earliest, 2010, when President Obama made a public apology to the President of Guatemala.

At the very least, a jury should consider the nature and extent of each Plaintiff's knowledge at trial in order to determine whether limitations on his claim has expired, rendering judgment as a matter of law in Defendants' favor inappropriate.

### D.  Defendants' complaint about the process used to appoint heirs does not entitle them to summary judgment

In support of their argument that the Selected Estate Plaintiffs lack "standing," Defendants urge the Court to undertake judicial fact-finding and weigh competing affidavits filed by Guatemalan lawyers regarding the procedure to appoint legal representatives under Guatemalan law. Their objection to the process undertaken by Plaintiffs' local Guatemalan counsel is supported by

voluminous affidavits of a Guatemalan lawyer that have not been the subject of discovery, and that were provided to Plaintiffs' counsel for the first time in these summary judgment proceedings.

Defendants' "standing" objection should be denied for several reasons. First, Plaintiffs dispute that the process undertaken by their local counsel in Guatemala was inadequate to properly appoint personal representatives for the Selected Plaintiffs. As stated by their local counsel, a professor on the subject of inheritance law, the cases cited by Defendants are not precedential in Guatemala, and in any event, are distinguishable from this case. J.R. 5814-15 (Ex. 312).

Second, it would be premature for the Court to grant summary judgment without first allowing Plaintiffs to conduct discovery on the opinions offered by Defendants' new expert identified for the first time in their motion for summary judgment. Plaintiffs should be afforded the opportunity to cross-examine this witness prior to any ruling from this Court regarding the state of Guatemalan law.

Third, it bears repeating that, of the three remaining Selected Estate Plaintiffs, **two of the three were alive at the time this case was filed** on April 1, 2015, and therefore had standing. *See* Plaintiffs' Renewed Cross-Motion/Opp. at p. 81 (ECF No. 461-1). To the extent Defendants now complain that Plaintiffs have not formally moved to substitute those individuals' Estates as parties given their death during the pendency of the case, that is a ministerial act that can be accomplished at any time. It is expressly allowed under Federal Rule of Civil Procedure 17, and Plaintiffs can accomplish the substitution at any time. This Court should not elevate form over substance and grant judgment simply because that has not occurred yet.

## CONCLUSION

For all these reasons, those stated in Plaintiffs' Renewed Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment on All Claims, and those to be stated at a hearing on these motions, Defendants' Renewed Motion for Summary Judgment should be denied.

PAUL D. BEKMAN (#00019)
E. DALE ADKINS III (#01425)
LAURENCE A. MARDER (#02443)
EMILY C. MALARKEY (#28197)
GREGORY G. HOPPER (#26150)
RYAN S. PERLIN (#20840)
ARYEH M. RABINOWITZ (#20225)
BEKMAN, MARDER HOPPER,
        MALARKEY & PERLIN, LLC
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21208
410-539-6633
*Attorneys for Plaintiffs*

F. R. JENKINS (*Admitted pro hac vice*)
MATTHEW R. CATON (*Admitted pro hac vice*)
MERIDIAN 361 INTERNATIONAL LAW
GROUP PLLC
97A Exchange Street, Suite 202
Portland, Maine 04101
866-338-7087
*Attorneys for Plaintiffs*