# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

ESTATE OF ARTURO GIRON ALVAREZ,
*et al.*,

      Plaintiffs,

      v.

THE JOHNS HOPKINS UNIVERSITY,
THE JOHNS HOPKINS UNIVERSITY
SCHOOL OF MEDICINE,
THE JOHNS HOPKINS HOSPITAL,
THE JOHNS HOPKINS BLOOMBERG
SCHOOL OF PUBLIC HEALTH,
THE JOHNS HOPKINS HEALTH
SYSTEMS CORPORATION and
THE ROCKEFELLER FOUNDATION,

      Defendants.

Civil Action No. TDC-15-0950

## MEMORANDUM OPINION

Plaintiffs have filed this civil action against Defendants the Johns Hopkins University, the Johns Hopkins University School of Medicine, the Johns Hopkins Hospital, the Johns Hopkins Bloomberg School of Public Health, and the Johns Hopkins Health Systems Corporation (collectively, "Johns Hopkins"), as well as the Rockefeller Foundation ("Rockefeller"), alleging that Defendants aided and abetted or conspired to commit nonconsensual human medical experiments in Guatemala in the late 1940s and seeking to hold Defendants liable in tort pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 (2018). Pending before the Court are Defendants' Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment. On January 10, 2022, the Court held a hearing on the Motions. For the reasons set forth below,

Defendants' Motion for Summary Judgment will be GRANTED, and Plaintiffs' Cross Motion for Summary Judgment will be DENIED.

## BACKGROUND

This case arises from nonconsensual human medical experiments relating to sexually transmitted diseases ("STDs") that were primarily conducted in Guatemala from 1946 to 1948 ("the Guatemala Experiments" or "the Experiments"). The Guatemala Experiments were funded by grants from, and led by personnel of, the United States Public Health Service ("PHS"). This litigation has an extensive factual background and procedural history which is set forth in part in the following previous opinions of this Court, which are incorporated here by reference: *Estate of Alvarez v. Johns Hopkins Univ.*, 205 F. Supp. 3d 681 (D. Md. 2016) ("*Alvarez I*"); *Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670 (D. Md. 2017) ("*Alvarez II*"); *Estate of Alvarez v. Johns Hopkins Univ.*, 373 F. Supp. 3d 639 (D. Md. 2019) ("*Alvarez III*").

## I.   Origins of the Guatemala Experiments

In the 1940s, STDs such as gonorrhea and syphilis were of significant concern to the United States government, in large part because of outbreaks of STDs in the armed forces during World War II. In 1943 and 1944, at the suggestion of university-based researchers including Dr. Joseph Earle Moore of Johns Hopkins University, PHS researchers conducted experiments at the United States Penitentiary in Terre Haute, Indiana ("the Terre Haute Experiments") in which human volunteer subjects were intentionally infected with gonorrhea in order to study the effectiveness of two types of prophylaxis for gonorrhea. As the project was designed, the volunteers were federal prisoners who were paid and who provided written, informed consent. Within PHS, primary responsibility for conducting the Terre Haute Experiments was given to the Venereal Disease Research Laboratory ("VDRL") at the United States Marine Hospital in Staten Island,

New York. VDRL Director Dr. John F. Mahoney, an Assistant Surgeon in the PHS, oversaw the work on the Terre Haute Experiments from the VDRL, and Dr. John C. Cutler, a junior PHS officer, led the work at the prison. Although the PHS researchers attempted to artificially infect the prisoner volunteers by inoculating them with bacteria deposited into the end of the penis, and they used a variety of strains and methods, they were unable to reliably induce infection. As a result, the work was discontinued in July 1944, 10 months after it began. The difficulty of inducing infection left researchers unable to establish the effectiveness of a prophylaxis for gonorrhea.

Similar questions were outstanding as to syphilis. Though scientific developments had led the United States Army to adopt penicillin as a standard treatment for syphilis by 1944, much remained unknown, including whether penicillin prevented re-infection and whether the use of a prophylaxis after exposure to syphilis, such as an orvus-mapharsen solution, could prevent initial infection in the first place. Orvus-mapharsen was also considered a potential prophylaxis for gonorrhea.

In 1945, Dr. Juan Funes, a Guatemalan physician who worked with Dr. Mahoney and Dr. Cutler as a one-year fellow at the VDRL, proposed a research project in Guatemala relating to methods of prophylaxis for STDs. Dr. Funes was the Director of the Guatemalan Venereal Disease Control Department and also oversaw a major Guatemalan medical clinic at which commercial sex workers were required to undergo health inspections. Because commercial sex work was legal in Guatemala, the proposal was to identify inmate volunteers at the Penitenciaria Central ("the Penitentiary"), a Guatemalan prison, to expose them to STDs through sexual intercourse with infected sex workers, and then to test the effectiveness of the orvus-mapharsen prophylaxis on these volunteers. Prisoners were considered ideal subjects for the Experiments because they were a contained and restricted population whose progress could be readily followed over time.

3

## II.    Funding

In 1946, the Guatemala Experiments were formally funded through a PHS grant.  The Public Health Service Act of 1944 ("PHSA") had created a grant system led by the Surgeon General of the PHS, the agency head, in support of a mandate to "conduct" and "encourage . . . research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man[.]" Public Health Service Act § 301, Pub. L. No. 78-410, 58 Stat. 682, 691-92 (1944).  The PHSA authorized the Surgeon General to "[m]ake grants in aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are recommended by the National Advisory Health Council," *id.* § 301(d), an advisory committee consisting of both government officials and nongovernmental persons "skilled in the sciences related to health," *id.* § 217(a).  In turn, the National Advisory Health Council ("NAHC") received recommendations from "Special Study Groups" consisting of PHS scientists and outside consultants which were established to "review applications and prepare recommendations for [NAHC] consideration." 42 C.F.R. § 03.333 (1946 Supp.).  The ultimate funding approval came from the Director of the National Institute of Health ("NIH") "under authority delegated by the Surgeon General." 42 C.F.R. § 03.334 (1946 Supp.).  Under this structure, the Syphilis Study Section ("SSS") was the first such Special Study Group established.  Dr. Moore was the Chair of the SSS, and other SSS members included Dr. Mahoney and three individuals affiliated with Johns Hopkins University:  Dr. Thomas Turner, Dr. Harry Eagle, and Dr. Lowell Reed.  At its first meeting on February 7-8, 1946, the SSS reviewed 30 proposals for syphilis research, including the Guatemala Experiments.  The SSS approved the project and recommended it to the NAHC for funding.  At a March 8-9, 1946 meeting, the NAHC recommended funding the proposal, identified

4

as "Research Grant No. 65" and consisting of $110,450 to be provided to the Pan American Sanitary Bureau ("PASB"), an international health organization, for "investigation into venereal disease to be held in Guatemala." Joint Record ("J.R.") 44, ECF Nos. 405-425, 461. Surgeon General Dr. Thomas Parran approved the grant, and the funds were transferred to the PASB. Unlike other PHS grants, which were paid out of funds held by the NIH Research Grants Office, the funding for the Guatemala Experiments came directly from funds held by the VDRL.

### III.    The Experiments

The work of the Guatemala Experiments began in April 1946, including the construction of a Venereal Disease Research Laboratory in Guatemala. Dr. Joseph Spoto, Assistant Chief of the PHS Venereal Disease Division, who was on assignment to the PASB, was on the ground in Guatemala before Dr. Cutler arrived in August 1946. After Dr. Cutler arrived and met with officials from the Guatemalan Ministry of Public Health, the Guatemalan Army, and the Penitentiary, PASB officials entered into agreements with the relevant ministries to allow them to work with officials and institutions across the Guatemalan government. Dr. Cutler began by attempting to foster goodwill and cooperation among Guatemalan officials and populations by setting up diagnostic and treatment programs at which treatments such as penicillin were provided.

In November 1946, serology testing began at the Penitentiary. This procedure, conducted to facilitate reliable syphilis diagnoses, consisted of drawing blood from an inmate to test for the presence of syphilis antibodies, which would signify that the test subject had an active or previous syphilitic infection. In February 1947, the researchers began to conduct experiments in which they sought to have test subjects infected with STDs in order to study various issues, including but not limited to the effectiveness of prophylaxis options ("the intentional exposure experiments"). To cause infection, the researchers relied not only on arranging sexual intercourse between

5

commercial sex workers and prisoners—referred to as "normal exposure"—but also on injecting or otherwise directly applying an STD to human test subjects. J.R. 67. From 1947 to 1948, they conducted 32 such experiments using gonorrhea, 17 experiments using syphilis, and one using chancroid, involving a total of 1,308 people ranging from 10 to 72 years old.

Notably, the original plan to have prisoner volunteers exposed to commercial sex workers who had syphilis, and then serve as test subjects on the effectiveness of orvus-mapharsen as a prophylaxis for syphilis, did not occur as planned. One reason was that the serology tests showed an unexpectedly high rate of syphilis within the prison population, which appeared to limit the number of potential inmates without syphilis who could then serve as test subjects. Other reasons included that the researchers encountered difficulty in securing prisoner volunteers, as many prisoners objected to frequent blood withdrawals, and that the attempts to have prisoners contract STDs through sexual intercourse with commercial sex workers did not reliably induce infection. Instead, the researchers engaged in a wider variety of experimentation, including tests to identify effective artificial means to cause infection with STDs and additional, expanded serology testing, not necessarily following a logical progression. They also expanded the universe of test subjects beyond inmates at the Penitentiary to include service members in the Guatemalan Army, patients at a Guatemalan psychiatric hospital known as Asilo de Alienados ("the Psychiatric Hospital"), J.R. 48, and, with respect to serology testing, to children from a Guatemalan orphanage known as Hospicio Nacional de Guatemala ("the Orphanage") and several other locations, J.R. 51.

### A.    Syphilis Experiments

The intentional exposure experiments involving syphilis occurred from May 1947 through October 1948 and involved 688 test subjects. Researchers used several different strains of infectious material to conduct these experiments, most of which were sourced from rabbits.

6

Beginning in May 1947, Dr. Cutler began experiments on test subjects at the Penitentiary to explore a variety of questions relating to syphilis, but which did not include the original purpose of testing orvus-mapharsen as a prophylaxis. For 13 of 23 experiments, Dr. Cutler sought to expose test subjects to syphilis through sexual intercourse with commercial sex workers. In some instances, the researchers directly infected the sex workers through intra-cervical injection of rabbit syphilitic material before they had sexual contact with inmates. Though Dr. Cutler wrote that the sex workers were to be paid, there are no records of compensation. In one early experiment, directly infected commercial sex workers had sexual contact with 12 prisoners, none of whom developed clinical symptoms of infection. After this unsuccessful experiment with "normal exposure" through sexual contact, researchers began directly injecting syphilitic material into prisoner test subjects, in the foreskin of the penis or the right forearm. J.R. 69. There is no contemporaneous record of any Penitentiary inmates providing consent to their participation in the Guatemala Experiments or even understanding that an experiment was occurring. Indeed, a large portion of the prison population consisted of indigenous Guatemalans, and Dr. Cutler and Dr. Spoto did not believe that there was a need to explain the Experiments to them. In total, 219 prisoners were exposed to syphilis through sex workers or artificial inoculations between May 1947 and September 1948, with only 92 of them receiving some form of treatment.

In January 1947, even before syphilis experiments began at the Penitentiary, Dr. Cutler recommended to Dr. Mahoney that they supplement research at the Penitentiary with experiments on patients at the Psychiatric Hospital. The use of the Psychiatric Hospital was considered because of obstacles at the Penitentiary, which included prisoners objecting to blood draws. Dr. Richard Arnold, a PHS Senior Surgeon, the Director of Syphilis Research at VDRL, and a secondary supervisor for the Experiments, expressed concern about experiments on psychiatric patients who

could not give consent. Nevertheless, Dr. Cutler went forward with such experiments beginning in May 1947 to test the effectiveness of oral penicillin and orvus-mapharsen as means of prophylaxis and to test whether re-infection could take place following treatment. As part of these experiments, patients were intentionally exposed to syphilis either by injecting them with syphilitic material directly into the foreskin of the penis or the right forearm, or by applying it directly to the penis with cotton moistened with syphilitic material. In September 1947, in an effort to increase the syphilis transmission rate, Dr. Cutler began using the techniques of scarification and abrasion, which involved "abrading the membranes of psychiatric subjects' penises." J.R. 75. Although Dr. Mahoney considered these methods "drastic," Dr. Cutler went forward with them and deemed abrasion to be "the only practical method" for prophylaxis testing "approximating normal sexual exposure." J.R. 78. Other methods of intentionally infecting patients included oral ingestion of syphilitic material and cisternal punctures, consisting of injection of syphilis into patients' spinal fluid from the back of the skull. Rather than pay test subjects, Dr. Cutler gave them cigarettes and shifted funds intended to pay prison volunteers to the purchase of items for the benefit of the Psychiatric Hospital, including a refrigerator, a motion picture projector, and metal plates and cups. There is no evidence that the psychiatric patients gave consent to the experiments or even understood that they were involved in the experiments. Rather, Dr. Cutler referred to the first experiment at the Psychiatric Hospital as requiring him to engage in "double talk." J.R. 74. In some instances, patient test subjects actively objected to the experiments, including by fleeing the room to avoid scarification. The syphilis experiments at the Psychiatric Hospital continued through October 1948.

## B.     Gonorrhea Experiments

In the same time frame, Dr. Cutler and his team were conducting experiments relating to gonorrhea, such as testing the effectiveness of a method of providing penicillin developed by Dr. Arnold.   These experiments began in February 1947 and included exposing individuals in the Guatemalan Army to gonorrhea through sexual intercourse with commercial sex workers.   There is no evidence that these soldiers gave consent or were paid for these experiments.   Dr. Cutler found that it was "extremely difficult to obtain prostitutes willing to serve under experimental conditions" and did not find sufficient sex workers who already had gonorrhea, so the researchers directly infected some with gonorrhea by applying a cotton swab moistened with gonorrhea to the cervix.  J.R. 58.  There is no evidence that these commercial sex workers consented to be part of the Experiments or that they were aware that they were being infected with the STDs.

In April 1947, the researchers began to artificially infect human test subjects by directly injecting gonorrhea into the penis.   Having found low rates of infection arising from the normal exposure to gonorrhea from sexual contact, beginning in August 1947, the researchers transitioned to conducting most of their experiments with artificially inoculated test subjects.   From June to September 1948, Dr. Cutler also conducted gonorrhea experiments on human test subjects at the Psychiatric Hospital who were directly infected through inoculation in the rectum, urethra, or eyes.

## C.     Serology Testing

Before and throughout the intentional exposure experiments, Dr. Cutler and his team continued to engage in serology testing.  The testing focused primarily on the effectiveness of four different blood tests to determine whether human test subjects had active or previous syphilitic infections.  The testing sometimes included conducting lumbar punctures to look for infection in spinal fluid that may not appear on blood tests.  The serology testing occurred in the Penitentiary,

9

with the Guatemalan Army, and at the Psychiatric Hospital, but it also expanded to include serology testing on patients at the Venereal Disease and Sexual Prophylaxis Hospital, of which Dr. Funes was the Director; on leprosy patients at a leprosy facility outside of Guatemala City; and on children.

Serology testing on children began sometime before June 1947 and lasted through the summer of 1949, with researchers conducting physical examinations, blood draws, or lumbar punctures on 1,384 children between the ages of 1 and 18. Testing began with schoolchildren in Port of San Jose, followed by children residing in the Orphanage. According to Dr. Cutler, testing children below the age of sexual maturity provided researchers with a comparator group from which to understand whether diagnostic testing at the Penitentiary and other facilities was producing false positives, because the children would not have acquired the disease sexually. Researchers also engaged in serology testing on 441 indigenous children between the ages of 5 and 14 from the highlands of Guatemala and 277 indigenous children between the ages of 6 and 14 from Totonicapan, Guatemala. There is no record that any children knew that they were part of experiments or that any parents or guardians consented on their behalf.

**D.     Aftermath**

The funding for the Guatemala Experiments ran through June 1948, but the PASB was authorized by the NIH Research Grants office to continue working through the end of December 1948, at which point Dr. Cutler left Guatemala. PHS hired two Guatemalan physicians, including Dr. Funes, to continue to observe the patient groups subjected to the Guatemala Experiments and send blood specimens to the United States for study. Work relating to the Experiments continued into the 1950s, with serology testing continuing until at least 1949 and observation and study of human test subjects at the Psychiatric Hospital continuing until at least 1953.

10

Much of the information regarding the Guatemala Experiments did not come to light until decades later when, in June 2003, Dr. Susan M. Reverby, Professor Emerita in the History of Ideas and of Women's and Gender Studies at Wellesley College, discovered original records documenting the Guatemala Experiments, including a 1955 report on the Experiments by Dr. Cutler that was apparently never published or distributed. Dr. Cutler had donated his records to the University of Pittsburgh, at which he had served as a faculty member. Dr. Reverby contacted the United States Centers for Disease Control and Prevention to inform them of her discovery.

On October 1, 2010, President Barack Obama called President Álvaro Colom of Guatemala to extend an apology to the people of Guatemala, expressing deep regret for the research that occurred. The Secretary of State and the Secretary of Health and Human Services issued a joint apology for the "clearly unethical" Experiments. J.R. 15. On November 24, 2010, President Obama requested that a Presidential Commission for the Study of Bioethical Issues convene a panel to conduct a factfinding investigation into the Guatemala Experiments, which resulted in a report issued in September 2011 entitled *"Ethically Impossible": STD Research in Guatemala from 1946 to 1948* ("the Presidential Commission Report"). The Presidential Commission Report concluded that the Guatemala Experiments "involved gross violations of ethics as judged against both the standards of today and the researchers' own understanding of applicable contemporaneous practices," and that "many of the actions undertaken in Guatemala were especially egregious moral wrongs because many of the individuals involved held positions of public institutional responsibility." J.R. 8.

## IV.     Procedural History

On March 14, 2011, a class of victims of, or legal heirs to victims of, the Guatemala Experiments filed suit in the United States District Court for the District of Columbia against the

11

Secretary of Health and Human Services, the Surgeon General of the PHS, and other federal officials, as well as the Director of the Pan-American Health Organization, the successor organization to the PASB, seeking to hold them liable for the Guatemala Experiments under the Alien Tort Statute and the United States Constitution. *See Garcia v. Sebelius*, 867 F. Supp. 2d 125, 130-31 (D.D.C. 2012), *vacated in part*, 919 F. Supp. 2d 43 (D.D.C. 2013). On June 13, 2012, that case was dismissed because the district court held that (1) as to the federal officials, the United States had not waived sovereign immunity for the tort claims, and the plaintiffs failed to allege the requisite personal involvement necessary to maintain the constitutional claims; and (2) as to the Pan-American Health Organization and its director, they were entitled to immunity under the International Organizations Immunities Act of 1945, 22 U.S.C. § 288a(b) (2018). *Garcia*, 867 F. Supp. 2d at 137-38, 144.

The instant case was first filed on April 1, 2015. The presently operative complaint, the Third Amended Complaint ("the Complaint" or "the TAC"), was brought on behalf of 842 Plaintiffs divided into six categories: (1) those who were nonconsensually and unknowingly infected with syphilis, referred to as "Direct Plaintiffs"; (2) spouses or sexual partners of Direct Plaintiffs subjected to "secondary exposure" to syphilis; (3) children of Direct Plaintiffs subjected to "secondary exposure" to syphilis passed in utero or at birth; (4) grandchildren of Direct Plaintiffs subjected to "secondary exposure" across two generations; (5) "Wrongful Death Plaintiffs," consisting of parents, spouses, or children of individuals who died as a result of syphilis acquired from the Experiments; and (6) "Estate Plaintiffs," consisting of the estates and designated beneficiaries of those who died as a result of syphilis. TAC ¶¶ 40-46, ECF No. 127. At the present time, the claims have been narrowed to those of 107 Plaintiffs. In the Complaint, Plaintiffs asserted claims under the Alien Tort Statute and the Guatemalan Civil Code against Johns Hopkins,

12

Rockefeller, and Bristol-Myers Squibb Company, alleging that "physicians, researchers, and other employees and agents" of Defendants "designed, developed, approved, encouraged, directed, oversaw, and aided and abetted nonconsensual, nontherapeutic, human subject experiments in Guatemala." *Id.* ¶ 1. Bristol-Myers Squibb Company was subsequently dismissed as a defendant.

In 2017, the Court (Garbis, J.) granted in part and denied in part Defendants' Motion to Dismiss the Third Amended Complaint. *See Alvarez II*, 275 F. Supp. 3d at 711. Specifically, the Court dismissed all of Plaintiffs' claims under Guatemalan law. *Id.* Further, while Plaintiffs brought their ATS claims based on three theories of liability—direct liability, aiding and abetting liability, and conspiracy liability—the Court dismissed any claim based on direct liability with the exception of a limited claim against Rockefeller. *Id.* at 697. However, the Court declined to dismiss Plaintiffs' ATS claims against Defendants based on aiding and abetting and conspiracy liability. *Id.* at 698-702.

As relevant to the remaining claims, Plaintiffs have alleged that a "small group of powerful and highly influential men at Johns Hopkins and The Rockefeller Foundation" who had "spent their careers research and studying syphilis" "intentionally chose to conduct nontherapeutic, nonconsensual experiments because doing so allowed them to quickly identify a large pool of uninfected people, infect them with syphilis strains . . . and then use the newly infected men and women as a resource to be consumed as a means to their ends" of advancing their research interests. TAC ¶¶ 2-3. Plaintiffs have further alleged that Rockefeller "actively participated in, joined and participated in a conspiracy to further, and aided and abetted the Guatemala Experiments" through "key men" such as Dr. Thomas Parran and Dr. Frederick Soper. *Id.* ¶¶ 214, 216. Dr. Parran, who as Surgeon General of the PHS approved the funding for the Guatemala Experiments, was at the time simultaneously a member of Rockefeller's Board of Trustees and of the Board of Scientific

Directors of Rockefeller's International Health Division ("IHD"), a part of Rockefeller which focused on field operations, surveys, and research in public health, including providing aid to the development of official health organizations. Dr. Soper, a longtime Rockefeller employee, was an Associate Director of the IHD when he was appointed as the Director of the PASB in February 1947. As the PASB Director, he also served as the "Investigator" for the Guatemala Experiments, a role in which he approved personnel and funding decisions for staff in Guatemala and traveled to Guatemala in July 1947 to meet with Dr. Cutler and others about the Experiments.

As for Johns Hopkins, Plaintiffs alleged that "senior doctors" at Johns Hopkins "designed, developed, directed, oversaw, implemented, and aided and abetted the Guatemala Experiments," and "conspired with each other and third parties to encourage and otherwise ensure that the Experiments went forward." *Id.* ¶¶ 160-61. Specifically, Plaintiffs identified these doctors as Dr. John Earle Moore, Dr. Thomas Turner, Dr. Harry Eagle, and Dr. Lowell Reed, all of whom served on the SSS when it recommended approval of the funding for the Guatemala Experiments. During the time frame of the Guatemala Experiments, Dr. Moore, who was the Chair of the SSS, served as an Associate Professor of Medicine at Johns Hopkins Medical School, an Adjunct Professor of Public Health Administration at Johns Hopkins School of Hygiene and Public Health, and as the Physician in Charge of the Venereal Disease Division of the Medical Clinic at Johns Hopkins Hospital. Dr. Turner served as a Professor of Microbiology at Johns Hopkins University. Dr. Eagle was a Commissioned Officer of the PHS who was also serving as the Director of the Venereal Disease Research Laboratory and Laboratory of Experimental Therapeutics, and as an Adjunct Professor of Bacteriology, at the Johns Hopkins School of Hygiene and Public Health. Dr. Reed served as a Professor of Biostatistics and Director of the Johns Hopkins School of Hygiene and Public Health. In 1946, he became Vice President of Johns Hopkins University.

14

In 2019, this Court denied Defendants' Motion for Judgment on the Pleadings. *See Alvarez III*, 373 F. Supp. 3d at 649-50. After extensive discovery, Rockefeller and Johns Hopkins have each filed a Motion for Summary Judgment, for which they make certain arguments jointly, and Plaintiffs have filed a Cross Motion for Summary Judgment, all of which are now ripe for review. Additional facts specifically relevant to the resolution of the Motions are set forth below.

## DISCUSSION

In their Motions, Defendants argue that Plaintiffs have not established any basis for imposing liability because Plaintiffs have no cause of action under the Alien Tort Statute, and Plaintiffs seek an impermissible extraterritorial application of the ATS. Separately, Rockefeller and Johns Hopkins further argue that even if Plaintiffs could establish an ATS claim, (1) they are not liable because the individuals identified as responsible for the ATS violation were not acting as agents of Defendants when they took the allegedly tortious actions; and (2) even if those individuals were acting as agents of Defendants, the record evidence is insufficient to establish that Defendants aided and abetted or conspired to conduct nonconsensual human medical experiments. Defendants also offer multiple other arguments in support of their Motions, including that (3) Plaintiffs' claims are barred by sovereign, statutory, and charitable immunity; (4) there is insufficient evidence that Plaintiffs contracted syphilis as a result of the Guatemala Experiments; (5) the Estate Plaintiffs lack standing to sue; (6) Plaintiffs did not properly plead claims for battery against children subject to serology testing or for loss of consortium on behalf of spouses; and (7) Plaintiffs' claims are time-barred. In their Cross Motion, Plaintiffs argue that they are entitled to judgment as a matter of law because the record evidence conclusively establishes that Defendants' agents aided and abetted, or conspired to conduct, nonconsensual human medical experiments.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motions, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    Alien Tort Statute

Plaintiffs have brought this action pursuant to the ATS, which grants federal district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The ATS is a "strictly jurisdictional" statute. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004).  It "does not expressly provide any causes of action" but instead allows federal courts to recognize private claims for violations of international law under federal common law. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 114-15 (2013) (citing *Sosa*, 542 U.S. at 724).  Here, Plaintiffs claim that Defendants

have aided and abetted, or conspired to commit, nonconsensual human medical experiments in violation of the law of nations. As a threshold matter, Defendants argue that Plaintiffs' claims necessarily fail because (1) the alleged conduct underlying Plaintiffs' claim—nonconsensual human medical experiments—is not the type of conduct upon which an ATS cause of action may be based; and (2) Plaintiffs' claims constitute an impermissible extraterritorial application of the ATS.

### A.    Violation of the Law of Nations

As they did in earlier motions, Defendants argue that Plaintiffs have no cognizable ATS cause of action because the alleged misconduct at issue here—nonconsensual human medical experiments—is not a violation of an international law norm that can support an ATS claim. Under *Sosa*, whether an alleged violation of the laws of nations can support an ATS cause of action is determined (1) by whether the international law norm alleged to have been violated was "sufficiently definite to support a cause of action" which (2) involves "an element of judgment about the practical consequences of making that cause of action available to litigants in the federal courts." 542 U.S. at 732-33. The parties agree that the *Sosa* two-step test continues to govern.

The Court has, on three previous occasions in this litigation, held or affirmed that an ATS cause of action exists in this case. In *Alvarez I*, in denying in part Defendants' Motion to Dismiss the Second Amended Complaint, the Court (Garbis, J.) held that Plaintiffs had stated a "cause of action under the ATS for a violation of the norm of customary international law prohibiting medical experimentation on human subjects without their consent." *Alvarez I*, 205 F. Supp. 3d at 689 (quoting *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 187 (2d Cir. 2009)). Judge Garbis reaffirmed that holding in his memorandum opinion resolving Defendants' Motion to Dismiss the Third Amended Complaint. *Alvarez II*, 275 F. Supp. 3d at 683. Finally, in *Alvarez III*, this Court, after

considering Defendants' argument that the United States Supreme Court's decision in *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), had narrowed the applicability of the ATS to the point that Plaintiffs' claim was no longer viable, concluded that *Jesner* "provide[d] no basis to revisit this Court's prior ruling, consistent with the first prong of *Sosa*, that there is an international law norm barring nonconsensual medical experimentation on human subjects." *Alvarez III*, 373 F. Supp. 3d at 649.

Here, Defendants again argue that *Jesner* "tightened" *Sosa*'s second prong by barring courts from "crafting an ATS cause of action where there is even one 'sound reason to think Congress might doubt the efficacy or necessity of [the new] remedy.'" Defs.' Joint Mot. Summ. J. at 16, ECF No. 455-1 (quoting *Jesner*, 138 S. Ct. at 1402). This Court previously examined and rejected this argument in *Alvarez III* when it held that *Jesner* did not "establish[] a rule that a court may not establish an ATS cause of action . . . unless the plaintiff has shown 'that Congress would undoubtedly want courts to create a private cause of action.'" *Alvarez III*, 373 F. Supp. 3d at 648. All of the Court's prior rulings that a claim based on nonconsensual human medical experiments can support an ATS cause of action are the law of the case and will not be disturbed absent some intervening change in the law. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (noting that the law of the case doctrine recognizes that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))).

Defendants' sole new argument is that the Supreme Court's decision in *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), has narrowed the *Sosa* two-step test to the point that Plaintiffs' claim is no longer viable. In support of this argument, Defendants cite statements from Part III of Justice Thomas's opinion in *Nestlé* that "courts should defer to Congress" in creating ATS causes of action

18

beyond the "three historical violations of international law," "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Defs.' Joint Mot. Summ. J. at 15 (quoting *Nestlé*, 141 S. Ct. at 1937 (opinion of Thomas, J.)). Part III, however, was joined only by Justices Gorsuch and Kavanaugh and therefore does not represent the opinion of the Court. The only basis for rejecting the ATS claim in *Nestlé* that was supported by a majority of the Court was that it constituted an impermissible extraterritorial application of the ATS. *See Nestlé*, 141 S. Ct. at 1936-37. In her opinion, Justice Sotomayor, joined by Justices Breyer and Kagan, specifically rejected Justice Thomas's purported limitation on ATS claims as "contraven[ing] both [the] Court's express holding in *Sosa* and the text and history of the ATS." 141 S. Ct. at 1944 (Sotomayor, J., concurring in part). Notably, in his dissenting opinion, Justice Alito, specifically declined to reach this issue. *Nestlé*, 141 S. Ct. at 1951 (Alito, J., dissenting). Where Defendants' claim that *Nestlé* now bars an ATS cause of action based on nonconsensual human medical experiments is grounded in reasoning adopted by only three members of the Supreme Court, the Court declines to reevaluate its consistent and repeated holdings that such a cause of action is viable. *See Graves*, 930 F.3d at 318.

### B.    Extraterritoriality

Defendants also argue that Plaintiffs' claim in this case is an impermissible extraterritorial application of the ATS, relying primarily on *Nestlé*. In general, federal statutes are presumed to apply "only domestically," unless the statute "gives a clear, affirmative indication" that rebuts this presumption. *Nestlé*, 141 S. Ct. at 1936 (quoting *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016)). In *Kiobel*, the Supreme Court held that the ATS does not contain such a clear sign that it applies extraterritorially. *See Kiobel*, 569 U.S. at 124. As a result, "courts . . . cannot give 'extraterritorial reach' to any cause of action judicially created under the ATS."

*Nestlé*, 141 S. Ct. at 1936 (quoting *Kiobel*, 569 U.S. at 118).  Instead, to ensure a "permissible domestic application" of the ATS, plaintiffs must establish that "the conduct relevant to the statute's focus occurred in the United States," "even if other conduct occurred abroad." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337).

As a threshold issue, the parties first dispute what conduct is relevant to the statute's focus. Defendants argue that the conduct to be evaluated is the "conduct that allegedly violates international law" and limits this conduct to the "nonconsensual testing, or the injuries arising therefrom." Defs.' Joint Mot. Summ. J. at 12; Defs.' Joint Reply at 2, ECF No. 462-1.  Plaintiffs counter that for accessory liability claims such as aiding and abetting, the focus "is on the location of the conduct that is alleged to have aided and abetted the violation," rather than the location of the direct violation itself.  Pls.' Mot. Summ. J. at 69, ECF No. 458-1.  The distinction is significant because although the actual site of the nonconsensual human medical experimentation was Guatemala, Plaintiffs have pointed to various instances of domestic conduct that allegedly aided and abetted the torts against the victims of nonconsensual human medical experiments.

Prior to *Nestlé*, the extraterritoriality inquiry under the ATS was not limited only to conduct that directly violated an international norm or caused the injury.  In *Kiobel*, in which the Court held that to "displace the presumption against extraterritorial application," claims must "touch and concern the territory of the United States . . . with sufficient force," the Court did not explicitly reach the issue of what conduct should be considered in assessing the plaintiffs' aiding and abetting claim because "all the relevant conduct took place outside the United States" and the sole domestic nexus was the "mere corporate presence" of the foreign corporation defendants. 569 U.S. at 124-25; *see also id.* at 139-40 (Breyer, J., concurring in the judgment) (noting that the defendant corporations were listed on the New York Stock Exchange and their "only presence in the United

States consist[ed] of an office in New York City"). However, the United States Courts of Appeals

have considered conduct other than the direct tortious conduct resulting in injury. In *Al-Shimari*

*v. CACI Premier Technology, Inc.*, 758 F.3d 516 (4th Cir. 2014), the plaintiffs brought both direct

and accessory liability ATS claims arising out of the torture and mistreatment of foreign nationals

at the Abu Ghraib prison in Iraq by private interrogators working for CACI Premier Technology,

Inc. ("CACI"), an American corporation under contract to the United States government. *Id.* at

521-22. In its extraterritoriality analysis, which centered on the "touch and concern" test of *Kiobel*,

the United States Court of Appeals for the Fourth Circuit examined the domestic ties of both the

alleged direct tortious conduct and the alleged conduct constituting aiding and abetting. *Id.* at 528-

29. The Court specifically "consider[ed] a broader range of facts than the location where the

plaintiffs actually sustained their injuries," including that "managers located in the United States

were aware of reports of misconduct abroad, attempted to 'cover up' the misconduct, and

'implicitly, if not expressly, encouraged' it." *Id.* at 529.

Other circuits have likewise not limited their extraterritoriality inquiries to the situs of the

direct tortious conduct, instead considering the location of accessory liability conduct relevant in

evaluating whether an accessory liability claim constitutes an extraterritorial application of the

ATS. *See Doe v. Drummond*, 782 F.3d 576, 580, 598 (11th Cir. 2015) (in considering the

extraterritoriality of ATS claims of aiding and abetting and conspiracy arising from extrajudicial

killings in Colombia, recognizing that "the domestic or extraterritorial location of all conduct in

support of those claims is relevant to the jurisdictional inquiry"); *Mastafa v. Chevron Corp.*, 770

F.3d 170, 185, 191 (2d Cir. 2014) (in considering an ATS claim that the defendants were alleged

to have aided and abetted torture in Iraq under the Saddam Hussein regime, holding that the

relevant conduct in assessing extraterritoriality "is the conduct of the defendant which is alleged .

21

. . to be either a direct violation of the law of nations or . . . conduct that constitutes aiding and abetting another's violation of the law of nations" and including in the analysis domestic financial transactions and payments made in support of the Hussein regime).

Nothing in *Nestlé* changed this landscape. There, the Court adjusted the standard for assessing extraterritoriality from the "touch and concern" test of *Kiobel* to the question of whether "the conduct relevant to the statute's focus occurred in the United States." *Nestlé*, 141 S. Ct. at 1936 (quoting *RJR Nabisco*, 579 U.S. at 337)). It did not, however, define the universe of such relevant conduct or narrow it to only the direct tortious conduct causing injury. Rather, it concluded only that even upon consideration of the conduct alleged to have aided and abetted the forced labor—such as providing training, fertilizer, tools, and cash—"[n]early all" of that conduct still "occurred in Ivory Coast," so the claim involved an impermissible extraterritorial application of the ATS. *Nestlé*, 141 S. Ct. at 1936-37. Indeed, had a majority of the Court concluded that only direct tortious conduct may be considered, it would have defined the test in that manner, rather than choosing the more flexible "conduct relevant to the statute's focus" test that it adopted. *Id.* at 1936. Where courts have consistently considered all conduct constituting the aiding and abetting of, or a conspiracy to commit, a violation of the law of nations in analyzing the question of extraterritoriality, and *Nestlé* did not invalidate that approach, the Court will consider all of the alleged conduct in assessing extraterritoriality.

Defendants argue that even considering the aiding-and-abetting conduct, Plaintiffs' alleged domestic conduct "does not even begin to approach the ties . . . that were deemed insufficient" in *Nestlé*. Defs.' Joint Mot. Summ. J. at 13. In *Nestlé*, six plaintiffs alleged that they were trafficked from Mali into the Ivory Coast to work as child slaves on cocoa farms, and that defendants Nestlé USA and Cargill, Inc. aided and abetted the child slavery by buying cocoa from such farms and

providing the farms "with technical and financial resources—such as training, fertilizer, tools, and cash—in exchange for the exclusive right to purchase cocoa." 141 S. Ct. at 1935. Although nearly all of this conduct "occurred in Ivory Coast," the plaintiffs alleged that "all major operational decisions" occurred in the United States. *Id.* at 1935, 1937. Specifically, the plaintiffs alleged that the corporate defendants originated "financing arrangements" from the United States that included providing personal spending money to maintain Ivory Coast farmers' loyalty as their exclusive suppliers, and that the defendants had employees travel from the United States to the Ivory Coast to inspect the farming operations and report back to headquarters. *Doe v. Nestlé, S.A.*, 906 F.3d 1120, 1126 (9th Cir. 2018), *rev'd sub nom. Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021). On these facts, the Court held that "allegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of the ATS" because they "do not draw a sufficient connection between . . . aiding and abetting forced labor overseas . . . and domestic conduct" and thus dismissed the case as an improper extraterritorial application of the ATS. *Nestlé*, 141 S. Ct. at 1937.

Although Defendants argue that *Nestlé* mandates dismissal because the domestic conduct at issue here was plainly insufficient when compared to the facts of that case, the Court is unconvinced. Here, the domestic activity that allegedly aided and abetted the direct tortious conduct in Guatemala conduct is qualitatively distinct from the "general corporate activity" at issue in *Nestlé*. In *Nestlé*, the allegation was that the child slavery arrangements in the Ivory Coast were established and perpetuated by foreign farms, and that American corporations "knew or should have known" of such misconduct "yet continued to provide those farms with resources." *Id.* at 1935. The payments approved in the United States were made not specifically to support child slavery, but to retain the farms as exclusive suppliers. *Id.* In contrast, Plaintiffs' claim is not

that actions in the United States established knowledge of violations of the law of nations by foreign entities, or provided incidental support to such violations, but that the nonconsensual human medical experiments were conceived, designed, and approved in the United States, by United States citizens working for both the United States government and United States institutions such as Defendants. The Guatemala Experiments were reviewed by the SSS, one of the "Special Study Groups" established within a part of the PHS to review grant applications and prepare recommendations for consideration by the NAHC, which in turn provided a recommendation to the Surgeon General on whether to approve the grant. *See* PHSA §§ 217, 301; 42 C.F.R. § 03.333 (1946 Supp.).

The Chair of the SSS, and three other members, were affiliated with Johns Hopkins. After both the SSS and the NAHC recommended the funding of the Guatemala Experiments, the grant was approved in 1946 by Dr. Parran, the Surgeon General and a member of Rockefeller's Board of Trustees and a Scientific Director of the Rockefeller IHD. In 1947, Dr. Parran presided over an NAHC meeting at which the SSS recommendation for a continuation of federal funding was approved. Thus, the Guatemala Experiments were directly funded by a PHS grant, and no nonconsensual human medical experiments would have occurred in Guatemala in the absence of this domestic conduct creating and authorizing the Guatemala Experiments.

Moreover, American scientists and staff, including Dr. Soper, who was the Investigator for the Guatemala Experiments, were sent to Guatemala specifically to oversee, conduct, or observe results from the Experiments. Reports of the results of the Experiments were transmitted to scientists and officials in the United States, including Dr. Parran and Dr. Moore. Rabbits injected with syphilis strains were shipped from a Johns Hopkins laboratory to the PHS's VDRL in Staten Island, New York, and rabbits from that laboratory were then shipped to Guatemala so that

syphilitic strains could be used in the Experiments. J.R. 5278-80; J.R. 396. In at least one instance, a key step was taken jointly by an individual in the United States and an individual in Guatemala, specifically, when Dr. Mahoney, while in Staten Island, New York, corresponded with Dr. Cutler, who was in Guatemala, and confirmed the decision to alter the approach for securing volunteer test subjects. On multiple occasions, samples from the Experiments were shipped back to the United States for analysis in American laboratories.

This domestic conduct more closely aligns with what the Fourth Circuit previously held in *Al-Shimari* to be sufficiently domestic to warrant application of the ATS under a different but related standard. In *Al-Shimari*, the plaintiffs alleged that employees of CACI, a United States-based corporation, "instigated, directed, participated in, encouraged, and aided and abetted" torture and other abusive conduct in violation of the Geneva Conventions through its personnel at the Abu Ghraib prison in Iraq. 758 F.3d at 521-22. As was the case here, the tortious conduct was not a foreign-generated activity; rather it was conduct allegedly perpetrated pursuant to a partnership between the United States government and a private entity which provided "civilian contractors" who, as found by a subsequent U.S. Department of Defense investigation, had "directed or participated in some of the abuses." *Id.* at 521. Noting that "[w]hen a claim's substantial ties to United States territory include performance of a contract executed by a United States corporation with the United States government" the extraterritoriality inquiry requires "a more nuanced analysis," the court held that the fact that the "actual injuries were inflicted abroad" was "not sufficient" to bar application of the ATS. *Id.* at 528. Instead, the court relied on the following domestic ties to support extraterritoriality: "CACI's contract to perform interrogation services in Iraq was issued in the United States" by the United States government, CACI managers in the United States "gave tacit approval" to the acts of torture committed by CACI employees, and the

employees who committed the alleged abuses were United States citizens. *Id.* at 530-31. Although *Al-Shimari* applied a different standard than *Nestlé*, most if not all of these facts would properly be considered under *Nestlé*'s test of where "conduct relevant to the statute's focus" occurred. *Nestlé*, 141 S. Ct. at 1936. Where they demonstrate that, unlike in *Nestlé*, the tortious conduct was formulated by the United States government and its American private entity partner, and it was carried out by United States citizens working for the federal government and that entity, this Court concludes that the *Al-Shimari* claims would satisfy that test. In turn, where the domestic conduct here more closely aligns with that of *Al-Shimari* than *Nestlé*, the Court cannot readily conclude, as Defendants argue, that Plaintiffs' claims necessarily fail under *Nestlé* as an extraterritorial application of the ATS. The Court therefore will not grant summary judgment to Defendants on the grounds of extraterritoriality.

At the same time, the Court cannot readily find that Plaintiffs' claims pass muster as a domestic application of the ATS because there are significant questions about whether sufficient domestic conduct "relevant to the statute's focus" is properly attributed to Defendants or their agents. *Nestlé*, 141 S. Ct. at 1936. If some or all of the domestic conduct was attributable only to the United States government and not to Defendants, there may be an insufficient basis for Plaintiffs' claim to be deemed a domestic application of the ATS, as *Nestlé* appears to consider only conduct attributable the defendant. *See id.* at 1937; *cf. Al-Shimari*, 758 F.3d at 530-31 (in applying the "touch and concern" test, considering only factors applicable to the defendant company). The Court therefore cannot resolve this question without analysis of the broader question of whether Dr. Parran and Dr. Soper were acting as agents of Rockefeller, and Dr. Moore, Dr. Turner, Dr. Eagle, and Dr. Reed (collectively, "the Johns Hopkins Professors") were acting as agents of Johns Hopkins, in taking actions in support of the Guatemala Experiments. Because the

Court, as discussed below, will grant summary judgment to Defendants based on the lack of sufficient evidence that Rockefeller was responsible for the actions of Dr. Parran and Dr. Soper and the lack of sufficient evidence that the Johns Hopkins Professors aided and abetted or conspired to commit an ATS violation, the Court need not and will not fully resolve the issue of extraterritoriality.

## III.   Corporate Liability

Defendants also argue that their Motions should be granted because neither Rockefeller nor Johns Hopkins may be held liable for the actions of the individuals whose conduct is asserted to constitute aiding and abetting, or a conspiracy to commit, an ATS violation because (1) under the ATS, a defendant entity may not be held vicariously liable for the acts of its agents under the doctrine of *respondeat superior*; and (2) the individuals were not acting as agents of either Rockefeller or Johns Hopkins when they engaged in the conduct in question.

### A.   Legal Standards

Defendants assert that Rockefeller and Johns Hopkins cannot be held liable for the acts of their agents based on standard vicarious liability principles but instead may be held liable only if Plaintiffs establish that these entities were the "moving force" behind the alleged deprivation of rights under the standard set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defs.' Joint Mot. Summ. J. at 17. In *Monell*, the Supreme Court held that a municipal government may be held liable under 42 U.S.C. § 1983 for a constitutional violation committed by its employee only if the violation was pursuant to a custom or policy of the government. *Monell*, 436 U.S. at 694. Plaintiffs assert that the proper standard of liability is not *Monell* liability, but traditional *respondeat superior* liability, under which Defendants are liable for injuries caused by the tortious conduct of their agents within the scope of their employment. Restatement (First) of Agency §

27

219(1) (Am. Law Inst. 1933). In *Alvarez II*, the Court addressed this precise issue and determined that there is no case law holding that the *Monell* standard applies to an ATS claim, that the holding of *Monell* was based on the specific language of § 1983 and is therefore not logically applicable to the ATS context, and that case law supports the application of *respondeat superior* to ATS claims. *Alvarez II*, 275 F. Supp. 3d at 689-91. The Court also identified other factors supporting the application of *respondeat superior*, such as the fact that this doctrine "was a feature of the common law at the time the ATS was written," that its application is consistent with the ATS's "remedial intent" because a higher standard would reduce a corporation's incentives to control its employees' tortious conduct, and that its application could better fulfill federal common law objectives of uniformity. *Id.* at 691-92. Although *Alvarez II* found it unnecessary to resolve the question of the applicable legal standard to resolve the motion pending at the time, this Court now concludes, based on Judge Garbis's persuasive analysis in *Alvarez II*, that the *Monell* standard does not apply to an ATS claim and that corporate liability is instead governed by the doctrine of *respondeat superior. See id.* at 690-92.

Even applying *respondeat superior* as the standard for corporate liability, Plaintiffs must still demonstrate that the individuals affiliated with Defendants were acting as agents of Defendants when they engaged in the conduct alleged to violate the ATS. Defendants argue that they are not liable for any ATS violations because during the relevant events, (1) Dr. Thomas Parran and Dr. Frederick Soper were not acting as agents of Rockefeller; and (2) the Johns Hopkins Professors were not acting as agents of Johns Hopkins.

The Court previously outlined the relevant agency principles in *Alvarez II*, relying primarily on the First Restatement of Agency "because this was the version in effect at the time of the Experiments." 275 F. Supp. 3d at 693 & n.35, 694. Agency "is the relationship which results

28

from the manifestation of consent" by one person (the principal) to another (the agent) that the agent "shall act on [the principal's] behalf and subject to his control, and consent by [the agent] so to act." Restatement (First) of Agency § 1. Thus, an agent, in some circumstances a "servant" in a "master-servant relationship," *see id.* § 2 cmt. a, "is a person employed to perform service for another" and who, "in the performance of the service, is subject to the other's control or right to control." *Id.* § 220. If a principal-agent relationship exists, the principal will be liable for the agent's tortious acts only if they were acts performed within the scope of employment, which consist of "conduct . . . of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* §§ 219, 229.

As relevant here, a person employed by a principal may be "directed or permitted by [that principal] to perform services for another" and thus "may become the [agent] of such other in performing the services." *Id.* § 227. Under such circumstances, the agent lent by a principal may become an agent to the second principal "as to some acts and not as to others." *Id.* A person may be an agent to two different principals "at one time as to one act, provided that the service to one does not involve abandonment of the service to the other." *Id.* § 226.

## B. Rockefeller

Plaintiffs' argument that Rockefeller is liable for an ATS violation is premised on the claim that certain individuals affiliated with Rockefeller, specifically Dr. Parran and Dr. Soper, aided and abetted or conspired to commit the ATS violation. Defendants, however, argue that neither Dr. Parran nor Dr. Soper were agents of Rockefeller for purposes of their conduct relating to the Guatemala Experiments, so Rockefeller may not be held liable for any ATS violation based on their conduct. The Court therefore must assess whether these individuals were agents of Rockefeller as to the conduct relevant to Plaintiffs' claims. Although the Complaint also

references Dr. George Strode, the Director of Rockefeller's International Health Division, Plaintiffs are not presently arguing that Strode aided and abetted or conspired to commit ATS violations based on nonconsensual human medical experiments, so the Court need not and does not address Dr. Strode's conduct or his relationship with Rockefeller.

### 1.   Dr. Parran

Plaintiffs argue that Dr. Parran aided and abetted the Guatemala Experiments by approving their funding, and that he was aware of the nonconsensual nature of the Guatemala Experiments, based on a February 17, 1947 letter to Dr. Cutler from a PHS researcher who recounted a recent interaction he had with Dr. Parran. The PHS researcher wrote that Dr. Parran "was familiar with all the arrangements and wanted to be brought up to date on what progress had been made" on the Guatemala Experiments, and that he had "a merry twinkle . . . in[] his eye when he said, 'You know, we couldn't do such an experiment in this country.'" J.R. 2636. Rockefeller counters that this statement reflects only that Dr. Parran had knowledge that commercial sex workers were being used in the Guatemala Experiments and that it constitutes the only specific piece of evidence linking Dr. Parran to the details of the Experiments.

At the time of the approval and conduct of the Guatemala Experiments, Dr. Parran was serving as the Surgeon General of the PHS, a federal government position subject to appointment by the President of the United States and confirmation by the United States Senate. *See* PHSA § 204. Dr. Parran was appointed to this position by President Franklin D. Roosevelt in April 1936 and reappointed in 1940 and 1944. As Surgeon General, Dr. Parran was a senior executive with leadership responsibility over the PHS, *see* PHSA §§ 201-02, which provided the funding for, and conducted, the Guatemala Experiments. It was in this capacity that he approved the funding for the Guatemala Experiments. Indeed, the regulations in effect at the time provided that approval

30

of a PHS grant required, at a minimum, "final action" by the Director of the NIH "under authority delegated by the Surgeon General." 42 C.F.R. § 03.334 (1946 Supp.).

The record evidence establishes that all of Dr. Parran's actions relating to the Guatemala Experiments were taken in his capacity as Surgeon General. For example, in a December 23, 1946 letter to Dr. Cutler, Dr. Mahoney's statement that Dr. Parran was "keenly interested in the Guatemala project" referred to him as the Surgeon General, J.R. 2633, and Dr. Mahoney's reference in a February 19, 1948 letter to having "lost a very good friend" was about "the change which has taken place in the Surgeon General's office" upon Dr. Parran's departure from that position. J.R. 5249. Plaintiffs have identified no records relating to the Guatemala Experiments in which there was any mention of Dr. Parran's affiliations with Rockefeller or any evidence that Dr. Parran took actions related to the Guatemala Experiments to advance the interests of Rockefeller. Nor are there any records showing that Rockefeller had the ability to, or actually did, exercise any control over Dr. Parran's actions as the presidentially-appointed Surgeon General. Thus, Dr. Parran was plainly acting as an agent of the federal government when acting in relating to the Guatemala Experiments.

Plaintiffs nevertheless argue that Dr. Parran was simultaneously acting as an agent of Rockefeller in relation to the Guatemala Experiments because he maintained two affiliations with Rockefeller during the relevant time period:  (1) as a member of Rockefeller's Board of Trustees; and (2) as a member of the Board of Scientific Directors of the Rockefeller IHD.

Dr. Parran served as a member of the Rockefeller Board of Trustees starting in 1938. Plaintiffs argue that Dr. Parran's role as a Trustee made him an agent of Rockefeller because Rockefeller "conducted its business and affairs by and through its Trustees." Pls.' Mot. Summ. J. at 35. However, common law principles establish that "[n]either the board of directors nor an

31

individual director of a business is, as such, an agent of the corporation or of its members."
Restatement (Second) of Agency § 14C (Am. L. Inst. 1958); *see also* 2 Fletcher Cyclopedia of the
Law of Corporations § 392 (2021) (stating that "the overwhelming weight of authority" provides
that "when a corporation's power is vested in the directors or trustees to do particular acts or
generally manage its affairs, it is vested in them not individually but as a board"); *Aries Ventures
Ltd. v. Axa Finance S.A.*, 729 F. Supp. 289, 295 (S.D.N.Y. 1990) (holding that an individual
member of a corporate board "has no power to act on behalf of the corporation, absent board
authorization to do so").

These principles properly apply to Dr. Parran's service on Rockefeller's Board of Trustees.
Rockefeller's Constitution and By-Laws provided for a 21-member Board of Trustees "by whom
the business and affairs of the corporation shall be managed" and granted to the Board the authority
to "elect by ballot" the "officers . . . of the corporation," which included the Chairman of the Board,
the President, up to three Vice Presidents, the Secretary, the Treasurer, the Comptroller, and
several Directors. J.R. 2016. The Board could also appoint certain other Rockefeller officials,
such as Associate Directors and Assistant Directors. Members of the Board of Trustees also
constituted the membership of Rockefeller's Executive Committee, Finance Committee, and
Nominating Committee. A summary of the minutes of the April 1947 meeting of the Board of
Trustees did not list Dr. Parran as the Chair of the Board or a member of any of these Committees,
and there is no evidence that Dr. Parran was an officer of Rockefeller or served on any of these
Committees. Dr. Parran's role as a member of the Board of Trustees was therefore the equivalent
of that of a member of the Board of Directors of a corporation, and nothing in Rockefeller's
Constitution and By-Laws authorized an individual member of the Board, as opposed to the Board
itself, to make decisions for, or act on behalf of, Rockefeller. *See* J.R. 2016; J.R. 2021-23 (referring

32

to the work of the Board of Trustees and the Committees as work done by a group, not by individual members). Like many members of corporate Boards of Directors, Dr. Parran was actually a full-time employee of another entity—in his case, as Surgeon General of the PHS. Most of the other members of the Rockefeller Board of Trustees, which included individuals such as New York Times Publisher Arthur Hays Sulzberger and Dartmouth College President John S. Dickey, were prominent leaders of other organizations rather than full- or part-time employees of Rockefeller. Indeed, the Constitution and By-Laws required only that the Board meet once a year, while allowing for additional meetings to be called from time to time. Thus, Dr. Parran's service on the Rockefeller Board of Trustees while he was employed as the Surgeon General did not establish that he had an individual principal-agent relationship with Rockefeller that rendered him an agent of Rockefeller for purposes of his actions relating to the Guatemala Experiments.

As for his role as a member of the Board of Scientific Directors of the IHD, as relevant here, Dr. Parran served in that role during a three-year term from 1944 until the end of 1946 and then was reappointed again effective January 1949. Thus, for the years of 1947 and 1948, when the majority of the Guatemala Experiments occurred, Dr. Parran was not even a member of the Board of Scientific Directors. On the question of whether that role rendered Dr. Parran an agent of Rockefeller during 1946 and 1949, the evidence shows that Dr. Parran's service as a Scientific Director, like his service on the Board of Trustees, was the equivalent of service on a corporate Board of Directors and did not establish an individual agency relationship. Although the Director of the IHD was an officer of Rockefeller, the Scientific Directors were not permanent employees of Rockefeller; rather, they were selected by the Board of Trustees "in classes for terms of three years each," J.R. 2024, with "two Directors leaving each year and two new Directors being appointed each year," J.R. 4819. The Scientific Directors included outside experts who, like Dr.

33

Parran, had full-time employment outside of Rockefeller. For example, Dr. Reed served as a member of the Board of Scientific Directors from 1940 to 1942 and again from 1945 to 1947, a period of time during which he also served as the Dean of the Johns Hopkins School of Hygiene and Vice President of Johns Hopkins University. The Constitution and By-Laws provided that the Board of Scientific Directors' role was to be "in charge of" the "immediate supervision" of the IHD's work, to advise the Director of the IHD on the administration of the IHD, and to make recommendations to the Board of Trustees about the IHD's work "from time to time." J.R. 2024. This Board had the power to "determine and designate the use of funds" of Rockefeller and to "make commitments in behalf of" Rockefeller subject to conditions, limits, and budgets imposed by the Board of Trustees. *Id.* The work of the Scientific Directors, however, was to be performed as a group, as "the business of the Scientific Directors" and their meetings were to be "carried on" pursuant to "rules and regulations . . . not inconsistent with" Rockefeller's Constitution and By-Laws. *See* J.R. 2023-24.

There is no evidence that an individual Scientific Director acting alone had the authority to act on behalf of Rockefeller. To the contrary, Dr. Strode, the Director of the IHD, stated in January 1946 that the "relations between the officers of the Division and the Board of Scientific Directors [were] almost identical with those obtaining between the officers and the [Board of] Trustees in the other divisions." J.R. 2219. The role of the Board of Scientific Directors was to "approve program and policy and make designations within the budget" passed by the Board of Trustees, actions which took place at meetings of the Board. J.R. 2217. The Scientific Directors "in practice [did] not initiate the program of work" and had "no administrative or executive functions." J.R. 2218. Though Scientific Directors could make field visits to learn more about the work of Rockefeller, any suggestions or recommendations they made as a result were not binding.

Indeed, the Scientific Directors were sometimes referred to as the "Board of Scientific Consultants." J.R. 4721. The evidence thus establishes that the Board of Scientific Directors operated in a manner comparable to a Board of Directors and took any actions binding Rockefeller as a group, such that no individual Scientific Director alone acted as an agent of Rockefeller.

Where all of the record evidence reflects that Dr. Parran was serving and acting as the Surgeon General during his involvement in the Guatemala Experiments, and that his side roles as an outside member of Rockefeller's Board of Trustees and of the IHD Board of Scientific Directors did not transform him into an agent of Rockefeller, Plaintiffs are left with the argument that Dr. Parran's work on the Guatemala Experiments as Surgeon General was a "textbook example" of the Foundation's strategy of "embedding 'directing personnel' inside the government so that it could influence and shape government policy, use the government's resources, and hide its actions from view and criticism." Pls.' Mot. Summ. J. at 36. The evidence offered in support of this argument, however, consists primarily of statements in a 1964 book, *Toward the Well-Being of Mankind: Fifty Years of the Rockefeller Foundation*, which stated that the philosophy of Dr. Wickliffe Rose, a Director of the Rockefeller IHD who retired in 1928, was that Rockefeller was a "partner, but not a patron" and that it followed the principle of "working through governments." J.R. 4749. Plaintiffs also reference an appendix to a 1951 report by Rockefeller's Commission on Review of the International Health Division entitled "Structure, Policy, Staff, Methods of Operation, Program, and Expenditures of the International Health Division of The Rockefeller Foundation," J.R. 4718, which stated that the general policy of the IHD was "to work through official governmental agencies," J.R. 4720, and that one method of its operation was the "cooperative method," which "consisted of joint operations between the [IHD] and governments,

35

both agencies contributing funds as well as personnel," with the IHD providing "the directing personnel, usually one individual, all other personnel being recruited locally." J.R. 4722.

These generic statements of Rockefeller's broad philosophy do not provide a basis to conclude that Dr. Parran was an agent of Rockefeller during his work as Surgeon General relating to the Guatemala Experiments. As discussed above, although Dr. Parran had some affiliations with Rockefeller while he served as the Surgeon General, there is no evidence that his specific appointment to that government position, which occurred in 1936, was an example of this general policy, or that Rockefeller had any role in that appointment. There is no evidence, documentary or otherwise, establishing that Rockefeller exerted any influence, much less control, over Dr. Parran's work as Surgeon General broadly or on the Guatemala Experiments specifically. There is no evidence of any communications between Dr. Parran and Rockefeller leadership about the Guatemala Experiments. Indeed, the Guatemala Experiments do not fit the description of the IHD's "cooperative method" because there is no evidence that Rockefeller provided any grant funding to the Guatemala Experiments, and the personnel working on them largely consisted of PHS personnel. J.R. 4722. Under these circumstances, Plaintiffs' reference to broad statements about Rockefeller's operational philosophy do not constitute evidence that Dr. Parran was an agent of Rockefeller for purposes of the Guatemala Experiments.

In summary, the record reflects that Dr. Parran was acting in his capacity as the Surgeon General in his actions relating to the Guatemala Experiments, and that his affiliations with Rockefeller were as an outside board member and consultant who was therefore not an agent of Rockefeller for purposes of such actions. There is no evidence to support Plaintiffs' conjecture that Rockefeller deliberately placed Dr. Parran into the role of Surgeon General in 1936 in order to carry out its interests and that, ten years later, he was subject to its control on matters relating to

the Guatemala Experiments. The Court therefore finds that there is insufficient evidence to establish that Dr. Parran was acting as an agent of Rockefeller as he carried out his duties as a United States government official. As a result, Dr. Parran's actions cannot provide a basis to establish liability by Rockefeller for any ATS violations.

### 2. Dr. Soper

Plaintiffs also argue that Dr. Frederick Soper, an Associate Director of the IHD, was an agent of Rockefeller while he served as the Investigator for the Guatemala Experiments, and that Rockefeller is therefore liable for his actions relating to the Guatemala Experiments. Correspondence between Dr. Cutler and Dr. Mahoney confirm that Dr. Soper traveled to Guatemala in this role in July 1947. At the time, neither was personally acquainted with him, but Dr. Mahoney advised Dr. Cutler that Dr. Soper was "the responsible official of the study and as such is entitled to complete confidence." J.R. 395. In diary entries, Dr. Soper referenced information he received during the visit relating to artificial inoculation with STDs and serology tests on children. Rockefeller, however, argues that at the time of his work as the Investigator, Dr. Soper was serving as the Director of the Pan American Sanitary Bureau, an international health organization, and that "[n]othing in the record establishes that [Rockefeller] controlled Dr. Soper's actions involving the Experiments." Rockefeller Mot. Summ. J. at 14, ECF No. 455-3. Plaintiffs counter that Rockefeller is liable for Dr. Soper's actions because Dr. Soper remained a Rockefeller employee even after he became the PASB Director and was thus an agent of both Rockefeller and the PASB for the duration of the Guatemala Experiments.

In approximately 1920, Dr. Soper began to work for Rockefeller in the IHD and served in various roles. As of 1946, he was an Associate Director of the IHD, but there is no evidence that Soper played any role in the Guatemala Experiments during 1946. In September 1946, Dr. Soper

37

attended a meeting with several PHS officials, including Dr. Parran, at which he learned that the then-Director of the PASB, Hugh S. Cumming, intended to retire in January 1947 and that Dr. Soper was both Dr. Parran's and Cumming's choice to take over as Director. The PASB was an "official international health agenc[y]" serving the nations of the western hemisphere and was expected to become the regional office of the planned World Health Organization, which had yet to be established. J.R. 2270. Although Dr. Soper's primary assignment at that time was exploring the establishment of a regional office for Rockefeller's activities in Africa and the Middle East, he tentatively agreed to take the position subject to the approval of Dr. Strode, the Director of the IHD and Dr. Soper's Rockefeller supervisor. According to Dr. Soper, Dr. Strode at one point told him that he had been "working on the idea of putting [Dr. Soper] in the PASB" because there was "no other person with the same background and possibilities." J.R. 2482. After Dr. Strode provided his assent, Dr. Soper became the official candidate supported by the United States government to become the PASB Director, and the U.S. Department of State formally announced its support of Dr. Soper to the other governments in the Americas. In January 1947, Dr. Soper attended the Pan American Sanitary Conference as part of the United States delegation and was elected as PASB Director at the conference. He entered on duty on February 1, 1947. Dr. Soper remained as PASB Director until 1959. The PASB was the formal recipient of the PHS grant funding the Guatemala Experiments when it was initially approved by the NAHC in March 1946 and when the funding was reapproved in March 1947. At some point after he became the PASB Director, Dr. Soper replaced Dr. Mahoney as the Investigator for the Guatemala Experiments. In July 1947, Dr. Soper visited Guatemala to carry out that function.

The evidence demonstrates that Dr. Soper's role as the Investigator for the Guatemala Experiments was based on his position at the PASB. The PHS grant that funded the Guatemala

Experiments was made to the PASB, not to Rockefeller, and the documents listing Dr. Soper as the Investigator referenced his institutional affiliation as the PASB, not Rockefeller. To the extent that the records of the Experiments and the correspondence among Dr. Cutler, Dr. Mahoney, and others relating to the Experiments reference Dr. Soper's affiliations, they make no mention of Rockefeller. Likewise, correspondence from Dr. Cutler and Dr. Mahoney to Dr. Soper discussing expenses and personnel relating to the Experiments was addressed to Dr. Soper as the PASB Director, without any mention of his affiliation with Rockefeller.

Plaintiffs' argument that Dr. Soper was an agent of Rockefeller for purposes of his work in the Guatemala Experiments is thus primarily based on the fact that Dr. Soper did not resign from his position as Associate Director of the IHD when he became the PASB Director. Instead, he was reappointed as Associate Director in April 1947 and in every year up to and including 1950. In support of the view that Dr. Soper remained an agent of Rockefeller, Plaintiffs reference a January 31, 1947 letter, in which Dr. Strode "inform[ed]" Dr. Soper that in light of his election as PASB Director, he was being "assigned" to the PASB, and that that this "assignment" would be renewed by the Board of Trustees at its April 1947 meeting. J.R. 4979. Dr. Strode also informed Dr. Soper that while the PASB would pay Dr. Soper's travel and miscellaneous expenses, Rockefeller would continue to pay his salary and make its regular payments to an annuity policy held by Dr. Soper. This salary payment lasted for one year of Dr. Soper's tenure as PASB Director. In a December 12, 1947 letter from Dr. Strode, Dr. Soper was informed that effective January 1, 1948, the PASB would begin to pay his salary instead of Rockefeller, and that as a result, "all payments from the International Health Division . . . will be interrupted as of that date." J.R. 4993. In the same letter, Dr. Soper was granted "a leave of absence without pay" from the staff of the Rockefeller IHD, effective January 1, 1948. *Id.*

Unrefuted statements by Dr. Soper, including in his PASB Director's Report covering 1947 through 1950, establish that the reason for the temporary arrangement under which Rockefeller paid Dr. Soper's salary as PASB Director was that at the time that Dr. Soper became the Director, the PASB lacked a funding source to pay the salaries of the Director and other professional staff. At that time, most PASB staff were PHS officers on loan to PASB, and the PASB "had no professional public health staff whose entire salary was paid by the Bureau." J.R. 2541. Dr. Soper characterized his salary payment as an "offer of the International Health Division" that "it seem[ed] best for the Pan American Sanitary Bureau to accept" because the PASB had made "no provision" in "previous budgets" to pay its Director. J.R. 4966. The previous Director, Cumming, had received no salary. It was only after extensive fundraising from member countries in 1947 that the PASB was able to develop and pay its own professional staff.

The fact that Dr. Soper continued to be employed and paid by Rockefeller during at least part of his service as PASB Director does not establish that Dr. Soper remained an agent of Rockefeller for purposes of his work in the Guatemala Experiments. Consistent with the principles of agency set forth in the Restatement, *see supra* part III.A, the Supreme Court has recognized that in determining tort liability, "[o]ne may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation." *Standard Oil Co. v. Anderson*, 212 U.S. 215, 220 (1908). In such a scenario, "the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." *Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 308 (1932). Whether such a transfer of the agency relationship from an original employer to a second employer occurred is determined by "whose is the work being performed, a question which is usually

answered by ascertaining who has the power to control and direct the servants in the performance of their work." *Standard Oil Co.*, 212 U.S. at 221-22. The relevant question is not whether the individual remains the agent "of the general employer as to matters generally, but whether or not, as to the act in question, [the agent] is acting in the business of and under the direction of one or the other." Restatement (First) of Agency § 227 cmt. a. Factors that would show that the general employment continued during the work for another entity are "that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist." *Id.* § 227 cmt. c. As for whether the general employer remains liable along with the second employer for actions taken in service to the second employer, "[i]n the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." *Id.* § 227 cmt. b.

Thus, the fact that Rockefeller paid Dr. Soper's PASB salary for approximately one year does not alone make Dr. Soper an agent of Rockefeller for purposes of the Guatemala Experiments. *See Standard Oil Co.*, 212 U.S. at 225 (noting that "the payment of wages" is one of several factors that bear upon the agency relationship but is not one of "the ultimate facts" and is instead only "more or less useful in determining" which employer's work is being done and which employer exercised "the power of control"). In *Denton*, the Supreme Court held that a railroad company that "hired and paid" a railroad porter was not liable for the porter's negligence while loading United States mail into a mail car under the direction of a United States postal clerk because the porter was not "under the direction or control of" the railroad company. *Denton*, 284 U.S. at 307, 311; *see also Sharpe v. Bradley Lumber Co.*, 446 F.2d 152, 155 (4th Cir. 1971) (holding, under

North Carolina law, that "inclusion of [an employee] on the payroll of [an employer] would not, standing alone, suffice to establish an agency relationship").

The same is true here where the record is clear that the reason that Rockefeller paid Dr. Soper's salary during his first year as PASB Director was PASB's lack of funding, and Plaintiffs have identified no persuasive evidence that Rockefeller had "the power to control and direct" Dr. Soper "in the performance of [his] work" as PASB Director generally or as to the Guatemala Experiments specifically. *Standard Oil Co.*, 212 U.S. at 222. Rather, the evidence demonstrates that both Dr. Soper and Dr. Strode considered the work of the PASB as distinct from Rockefeller's work and not subject to controlling input from Rockefeller. For example, on January 31, 1947, Dr. Strode wrote to another researcher that the fact that Dr. Soper had recently "assumed his new duties as Director of the PASB . . . mean[t] that we lose, at least temporarily, one of our outstanding staff members." J.R. 2485. Significantly, the evidence establishes that even before his "leave of absence without pay" effective January 1, 1948, J.R. 4993, Dr. Soper was on a leave of absence from the IHD as of the beginning of his service as PASB Director. In Dr. Soper's "Provisional Draft Report of the Director of the Pan American Sanitary Bureau" to PASB member nations, he stated that in February 1947, Rockefeller had granted him "a leave of absence" from the IHD to serve as PASB Director. J.R. 2539. Moreover, in listing Dr. Soper's employment history with the IHD in a 1950 memorandum regarding Dr. Soper's upcoming retirement from Rockefeller, Dr. Strode stated that from 1947 onward, Dr. Soper was "[o]n leave of absence from the IHD, serving as Director of the Pan American Sanitary Bureau." J.R. 5753. Thus, even though Dr. Soper was nominally still listed as an Associate Director of the IHD during 1947, his leave of absence demonstrates that during that period he was effectively working only as the PASB Director.

Further, there is no documentary evidence showing that Dr. Soper ever sought direction or guidance from Rockefeller relating to the Guatemala Experiments, or that any Rockefeller officer or employee offered any input or even comment on the Guatemala Experiments. To the extent that Dr. Soper sent reports and correspondence to Rockefeller during his tenure at PASB, he made no mention of his specific actions relating to the Guatemala Experiments. In April 1947, his "activity report for February 1947" submitted to IHD stated only that he had "assumed office as Director of the Pan American Sanitary Bureau" and that he was "[o]n duty with PASB." J.R. 2494. His only listed activity for March and April 1947 was "[o]n duty with PASB." *Id.* Similarly, in an August 7, 1947 letter to Dr. Strode, Dr. Soper described his challenges in fundraising for the PASB, but he made no mention of the Guatemala Experiments. Tellingly, in that letter, Dr. Soper named as his "organizations to serve" the WHO, the PASB, and the Pan American Union—he did not include Rockefeller. J.R. 2496.

As to other factors, even if Dr. Strode may have recommended or agreed to Dr. Soper's selection as PASB Director, where Dr. Soper was selected at the 1947 Conference by representatives of the member nations, there is no evidence that Rockefeller could have substituted a different Rockefeller official in place of Dr. Soper to take over as PASB Director. Rather, as Dr. Soper noted in his February 11, 1947 letter to Strode, the hope and expectation was that "someone from the Latin American countries," as opposed to another Rockefeller employee, would "be found and developed to take over this post within a few years." J.R. 4966. Notably, when a successor from another country was not immediately found, Dr. Soper served not for a short period of time, but for a period of 12 years as PASB Director.

In the absence of specific evidence showing that Dr. Soper was subject to direction from Rockefeller relating to the Guatemala Experiments, Plaintiffs instead argue that Dr. Soper

43

remained an agent of Rockefeller for those purposes based on the general principle that "[i]n the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." Restatement (First) of Agency § 227 cmt. b. "There is no inference that because the general employer has permitted a division of control, he has surrendered it." *Id.* Here, however, in addition to the fact that Dr. Soper was on a leave of absence from the IHD during his service as PASB Director, there is other affirmative evidence that Rockefeller surrendered control over Dr. Soper for purposes of his work as the PASB Director. Specifically, Article 19 of the PASB Constitution provided that "[i]n the performance of their duties, the Director and all personnel of the Pan American Sanitary Bureau shall not seek nor receive instructions from any government or from any authority external to the Pan American Sanitary Organization." J.R. 4288. Though the PASB Constitution was not formally approved until October 1, 1947, the "general terms" of the Constitution were approved at the January 1947 Pan American Sanitary Conference at which Dr. Soper was elected PASB Director. J.R. 2274. It was also understood at the Conference that the PASB would serve as the regional office of the World Health Organization, which had a similar clause in Article 37 of its Constitution. Indeed, where the PASB was an international organization and Dr. Soper had been selected as Director at an international conference by official representatives of the United States government and multiple foreign governments, it would be untenable for the PASB to permit Dr. Soper to take direction from any outside entity such as Rockefeller.

Finally, as with Dr. Parran, Plaintiffs assert generally that Dr. Soper remained an agent of Rockefeller even while serving as the PASB Director because his placement in that role was another example of Rockefeller's philosophy of embedding "directing personnel" into

44

governmental bodies in order to "influence and shape agency policy" while "us[ing] the agency's resources as a force multiplier." Pls.' Mot. Summ. J. at 38. In his memoir, Dr. Soper reflected that his "move to the official international health field was not one of abandonment of The Rockefeller Foundation but rather of fulfilling its program" because "[i]t was quite in keeping with Foundation policy to make [his] services available to PASB." J.R. 2273. Notably, however, Dr. Soper's work with the PASB generally and on the Guatemala Experiments specifically was not an example of Rockefeller's "cooperative method," *see supra* part III.B.1, in that Rockefeller did not provide grant funding to support that work. Dr. Soper's same memoir recounted how, in fundraising for the PASB, he explained to the Brazilian president that he had "previously, as Representative of The Rockefeller Foundation in Rio" been able to spend Rockefeller money on health programs, but that he "was no longer with the Foundation" and instead "with the Pan American Health Organization" which had "almost empty" accounts. J.R. 2277. Further, there is no evidence that Dr. Soper's affiliation with Rockefeller was relevant to his work on the Guatemala Experiments. There is no evidence that either Dr. Strode or Dr. Soper had been involved in syphilis research, or that they had played any role in the Terre Haute Experiments relating to STDs. Although the IHD Appendix lists syphilis as one of many topics that "ha[s] at one time or another been a part of the program of the Division," J.R. 4725, Plaintiffs have not identified evidence that at the time of Dr. Soper's work as the Investigator for the Guatemala Experiments, Rockefeller was prioritizing syphilis projects in any meaningful way.

Thus, Dr. Soper's subjective, after-the-fact assessment that his work at PASB was generally consistent with the mission of Rockefeller, or provided it with some intangible benefits, does not establish that he remained an agent of Rockefeller for purposes of the Guatemala Experiments. *See McLamb v. E.I. Du Pont de Nemours & Co.*, 79 F.2d 966, 967-68 (4th Cir. 1935)

(finding that the Du Pont Company did not become liable for an explosion even though it had provided experts to advise the Government engineer on the blasting work because the Government had remained in control of the project, and the fact that Du Pont provided the experts "doubtless with the hope and expectation of selling its products to the United States" did not render it "responsible for [the] results"). His assessment cannot substitute for actual evidence that, particularly in light of Dr. Soper's leave of absence from the Rockefeller IHD, the restrictions of the PASB Constitution, and the lack of any evidence of control over Dr. Soper's work as PASB Director, Rockefeller actually could or did retain any control over Dr. Soper's actions as Investigator for the Guatemala Experiments.

### 3.    Rockefeller Liability

The lack of evidence to support Plaintiffs' theory that Dr. Parran and Dr. Soper were agents of Rockefeller for purposes of the Guatemala Experiments is fatal to their claims against Rockefeller. Significantly, while in *Alvarez II*, the Court denied Defendants' Motion to Dismiss based on the allegations that Dr. Parran "worked for the PHS and Rockefeller simultaneously" and that Dr. Soper was "acting to fulfill Rockefeller's mission and goals, and was under the direction of, and reporting to, the Rockefeller Board of Directors," 275 F. Supp. 3d at 696, it did so based on multiple other allegations in the Complaint that have proven to be unsupported by the record evidence relating to the Guatemala Experiments. These include the allegations that:

- "Rockefeller established an outpost in Guatemala and sent employees to staff it."

- Dr. Parran had "independent policymaking authority within Rockefeller."

- Dr. Parran "used his staff from . . . Rockefeller to provide logistical support" for the Experiments.

- Rockefeller had "institutional control over the PASB and periodically used it to implement its policies."

46

- Dr. Strode received reports from Dr. Soper on what was happening in Guatemala, and he informed Rockefeller's Executive Committee.

- Dr. Soper "wrote reports to ·The Rockefeller Foundation's Executive Committee detailing the work performed."

- Dr. Soper "leaked details of PASB policies" to Dr. Strode "before they became public so [Rockefeller] could adapt its policies" and "worked behind the scenes with Rockefeller to coordinate their policies with the PASB's policies."

*Id.* at 693, 695-96. Where the theory of liability against Rockefeller is premised on the actions of Dr. Parran and Dr. Soper, and the post-discovery record lacks sufficient evidence to show that they were acting as agents of Rockefeller in their activities relating to the Guatemala Experiments, the Court will grant Rockefeller's Motion.

### C.    Johns Hopkins

As for Johns Hopkins, Plaintiffs argue that it is liable for the acts of the Johns Hopkins Professors because these doctors were agents of Johns Hopkins during the Guatemala Experiments and were actively serving the interests of Johns Hopkins, including while serving on the SSS. Defendants assert that liability cannot be established because in serving on the SSS, these individuals were agents of the federal government, not Johns Hopkins, and even if they were agents of both simultaneously, any of their actions relating to the Guatemala Experiments were outside the scope of their Johns Hopkins employment.

At the time of the Guatemala Experiments, the Johns Hopkins Professors were all employees of Johns Hopkins in some capacity. The primary role that the Johns Hopkins Professors undertook relating to the Guatemala Experiments was to recommend approval of their funding as members of the Syphilis Study Section. Dr. Moore was the chair of the SSS. As discussed above, the SSS was one of several governmental advisory committees known as a "Special Study Groups," consisting of "Public Health Service scientists and outside consultants," established to

47

review applications for PHS grants and to "prepare recommendations for consideration" by the

NAHC for funding. 42 C.F.R. § 03.333 (1946 Supp.). The SSS held its first meeting on February

7-8, 1946 and recommended initial funding of the Guatemala Experiments. Prior to March 1947,

the SSS reconvened and recommended renewed federal funding for the Guatemala Experiments.

Defendants' argument that private individuals serving as outside consultants on a

governmental advisory body such as the SSS should not be deemed to be agents of their regular

employers for purposes of such governmental activities has some force. However, at the hearing

on the Motions, the parties acknowledged that they were aware of no statutory, regulatory, or case

law authority that addresses the specific question here of whether such individuals are agents of

the federal government, their regular employer, or both. Even if the Court were to agree with

Defendants that in serving on the SSS, these individuals were acting only as agents of the federal

government, such a determination would not resolve the issue of agency as to Johns Hopkins

because Plaintiffs' allegations also relate to certain other conduct by these individuals that was

arguably outside their role as SSS members.

Under these circumstances, the Court finds that it need not resolve the issue of agency

because, as discussed below, even assuming that the Johns Hopkins Professors were acting as

agents of Johns Hopkins, the evidence is insufficient to support the conclusion that any of these

four individuals aided and abetted, or conspired to commit, an ATS violation based on

nonconsensual human medical experiments.

## IV.    Accessory Liability

In *Alvarez II*, the Court dismissed all claims of direct liability against Defendants except

the claim that Rockefeller, "via its employee Dr. Soper, who was acting under the direction of

Rockefeller executives, can be liable as a perpetrator of crimes against humanity." 275 F. Supp.

3d at 697. In their reply brief, Plaintiffs have pulled back from any direct liability claim against Dr. Soper and instead rely solely on a theory of accessory liability—aiding and abetting an ATS violation or conspiracy to commit an ATS violation. In any event, because the Court has determined that Rockefeller is not liable for the actions of Dr. Soper, it need not consider any issues related to direct liability.

### A.    Aiding and Abetting Liability

To prove liability as an aider and abettor of an ATS violation of international law, a plaintiff must demonstrate that a defendant (1) "provide[d] substantial assistance" to that violation; and (2) did so "with the purpose of facilitating the alleged violation." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011). This "purpose" standard requires a defendant to act with more than just "knowledge" of a violation. *See id.*

As a threshold matter, the Court reaffirms that the violation of international law at issue in this case is a violation of "the norm of customary international law prohibiting medical experimentation on human subjects without their consent." *Alvarez II*, 275 F. Supp. 3d at 683. At the hearing on the Motions, Plaintiffs attempted to shift to a claim that the violation of the law of nations at issue is any experimentation on human subjects involving the intentional injection of syphilis. The Third Amended Complaint, however, specifically described the violation of "customary norms of international law" as the prohibition on "nonconsensual human experimentation." *See, e.g.*, TAC ¶ 502. Plaintiffs cannot effectively amend their Complaint through their briefing on the Motion. *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 573 (D. Md. 2019). Particularly at this late stage of the case, and after the Court has issued multiple rulings in this case premised on the understanding that the alleged violation of the law of nations was the conduct of nonconsensual human medical experiments, it

49

would be improper to allow such a change at this time. *See Alvarez II*, 275 F. Supp. 3d at 683; *Alvarez III*, 373 F. Supp. 3d at 649.

Moreover, while the Court has readily concluded that nonconsensual human medical experiments violate the law of nations, *see Alvarez II*, 275 F. Supp. 3d at 683, Plaintiffs have not provided any authority establishing that the consensual infection of a human volunteer with an STD such as syphilis was a violation of the law of nations at the time of the Guatemala Experiments. Rather, the Presidential Commission found that in 1943 or 1944, around the time of the Guatemala Experiments, "[t]he issue of the ethical and legal permissibility of intentionally exposing humans to STDs remained unsettled." J.R. 29. According to the Presidential Commission, the Terre Haute Experiments, which took place in 1943 and 1944, were designed to include the intentional infection of federal prisoners with STDs after they had provided informed consent. In advance of the Terre Haute Experiments, the Attorney General was consulted and took the position that any problem with the experiments was "not a legal one, but political in nature." J.R. 31. Thus, regardless of whether the Terre Haute Experiments were ethical and legal by today's standards, the issue of whether consensual infection of human volunteers with STDs violated the law of nations in the 1940s is a different question from whether nonconsensual human medical experimentation is such a violation. Where this issue was not part of Plaintiffs' case up to now, and Plaintiffs have not provided evidence establishing that the repackaged alleged violation was, in fact, a violation of the law of nations at the time of the Guatemala Experiments, the Court will address only the issue of whether the evidence is sufficient to support a claim that the Johns Hopkins Professors aided and abetted nonconsensual human medical experiments.

## 1.   SSS Funding Recommendation

Plaintiffs' primary argument as to Johns Hopkins' liability is that all four Johns Hopkins Professors aided and abetted nonconsensual human medical experiments in their capacity as members of the SSS by reviewing and recommending the approval of the proposed PHS grant to fund the Guatemala Experiments.  They argue that by making such a recommendation, the Johns Hopkins Professors provided substantial assistance to this violation of the law of nations and acted with the purpose of facilitating it.  Johns Hopkins, however, argues that there is no evidence that the proposal reviewed and supported by the SSS called for nonconsensual human medical experiments, as opposed to syphilis experiments on volunteer subjects who provided informed consent.  In the absence of such evidence, they argue, the Johns Hopkins Professors did not act with the purpose of facilitating an ATS violation.

Defendants are correct that there is no evidence that the proposal supported by the SSS called for experimentation on human subjects without their consent.  With the passage of time, the actual written grant application and experimental protocol for the Guatemala Experiments submitted to the SSS are not available.  Joint Statement of Undisputed Facts ("JSUF") ¶ 23, ECF No. 379-1.  The record also lacks any minutes, notes, or other evidence of the specific proposal, or the discussion within the SSS about it, that would establish that the proposal itself contemplated nonconsensual human medical experiments.

Plaintiffs argue that Defendants' theory that the original SSS proposal did not disclose that the Guatemala Experiments would include nonconsensual human medical experiments is speculative, and that where there is evidence that the Guatemala Experiments did in fact include nonconsensual human medical experiments, it is reasonable to infer, in the absence of evidence to the contrary, that the SSS proposal accurately described what actually occurred.  Here, however,

the record actually includes affirmative evidence that the original proposal did not call for nonconsensual human medical experiments.

In his 1955 report on the Guatemala Experiments, Dr. Cutler described the history of, and changes to, the protocols of the Guatemala Experiments.   He stated that the Guatemala Experiments began with the suggestion from Dr. Funes, the Chief of the Venereal Disease Control Division of the Guatemala Public Health Service and a scientist who had worked with Dr. Cutler and the PHS on syphilis research, that controlled studies on syphilis could occur in Guatemala. The concept was that with Guatemalan prisoners legally permitted to engage commercial sex workers, and with sex workers likely to be infected with syphilis, such prisoners could be recruited as volunteers for experiments on the effectiveness of various prophylaxis techniques.   Thus, the "original plan" was to conduct experiments in cooperation with "the penitentiary where exposure of volunteers to infected prostitutes would provide the testing opportunities." J.R. 2152.

However, after preliminary serology testing to screen for syphilis, Dr. Cutler stated that he encountered "a real problem" because the tests suggested "a very high rate of infection among the inmates," which could impact whether an adequate number of volunteers could be secured.   J.R. 2155.   To determine whether the results were accurate or included a significant number of false positives, Dr. Cutler and his team chose to pursue "several courses of action at this stage," including engaging in serology testing of children at the Orphanage to assess whether the tests were generating false positives and repeatedly engaging in "blood and spinal fluid serology in an adult population" consisting of patients at the Psychiatric Hospital, whose director agreed to permit the studies. J.R. 2157-58. According to Dr. Cutler, while those serology studies were underway, "it became evident that plans as originally conceived at the prison could not be carried out" due to inmates' resistance to continued blood withdrawals and "certain factors in the custodial

52

management." J.R. 2161. These issues "made it impracticable to continue the work which was begun in connection with the visit of prostitutes to serve the prison volunteers" such that it appeared that "it might be necessary to terminate the entire project or else abandon investigation of prophylaxis altogether." *Id.* It was then "decided to undertake studies involving inoculation with syphilis at the insane asylum." J.R. 2164. Dr. Cutler's report acknowledged the changes to the original plan as follows:

> When it was decided to change the direction of the study from the use of volunteers exposing themselves to prostitutes . . . to a study involving the use of individuals experimentally inoculated . . ., certain other adjustments were made. Funds had been allocated in the budget for payment of volunteers. With the shift to inoculation instead of sexual exposure and with the shift of primary emphasis to the asylum rather than the prison it was decided to use those funds for the benefit of the institution rather than for the individual.

J.R. 2166. Funds were redirected to providing anticonvulsant drugs to epileptic patients and to purchasing other amenities for the institution including a motion picture projector, a refrigerator, and metal cups, plates, and forks.

Contemporaneous correspondence between Dr. Cutler and Dr. Mahoney confirms that a departure from the original protocols of the Experiments occurred. In a January 7, 1947 letter to Dr. Mahoney, after discussing plans to bring in "sources of infection" for the experiments in the Penitentiary, likely a reference to the commercial sex workers, Dr. Cutler wrote that he was "making some arrangement which may enable us to carry out some further studies such as inoculation in the insane asylum," reflecting a plan to supplement the initially contemplated research with experiments at the Psychiatric Hospital, which later began in May 1947. J.R. 2614. More specifically, in a June 22, 1947 letter to Dr. Mahoney, Dr. Cutler wrote that "[w]hen the program was originally set up it was the plan to get the volunteers at the prison and to pay them," that Dr. Mahoney was "well acquainted with the reasons why it was not thus carried out," and that

there should now be a targeted appeal to the colonel running the prison to secure volunteers. J.R. 400. In a June 30, 1947 response, Dr. Mahoney wrote that the "use of volunteer groups rather than the type which is being employed would be more than satisfactory," and that the "budget will stand for almost any fee for volunteers which you consider to be advisable." J.R. 396. This exchange establishes that the original "set up" of the Guatemala Experiments contemplated the use of paid volunteers from the Penitentiary, as reflected by the existence of a substantial budget for paying volunteers. J.R. 400.

At that time, the researchers were still studying prisoners exposed to STDs through sex workers as part of the Experiments. In response to Dr. Cutler's description of a gonorrhea experiment "using natural exposure" and "contacts" between men and women, Dr. Mahoney appeared to urge Dr. Cutler to continue attempting such experiments, stating that he was "anxiously awaiting [Dr. Cutler's] report of the transmission experiments utilizing contact only" because it was "of vital importance if we are to carry out the studies outlined." J.R. 395. In his June 22, 1947 letter, however, Dr. Cutler also referenced the shift to studies based on inoculation rather than exposure through sexual contact by stating that "[n]ow that we have the opportunity in the asylum it would seem well for us to try the virulence" of a particular syphilis strain "if you so desire." J.R. 401. In a September 8, 1947 letter to Dr. Cutler, Dr. Mahoney expressed concern over the field trials of prophylactic agents for gonorrhea and syphilis and stated that as to syphilis "unless we can transmit the infection readily and without recourse to scarification or direct implantation, the possibilities of studying the subject are not bright." J.R. 2675. Dr. Mahoney described scarification as a "drastic" measure "beyond the range of natural transmission." *Id.* These exchanges confirm the shift that occurred within the Guatemala Experiments to the more invasive experimental methods.

When compared to this uncontroverted evidence that the original plan for the Guatemala Experiments was to conduct research with human volunteers who contracted syphilis through sexual transmission, there is no evidence that prior to its vote to recommend the funding of the Guatemala Experiments in February 1946, the full membership of the SSS was informed that the Guatemala Experiments would include nonconsensual human medical experimentation. Nor is there evidence that it was informed that the subjects would include children in orphanages, or individuals housed in psychiatric facilities, who may not have been able to provide informed consent. Although Plaintiffs argue that the fact that Dr. Moore, Dr. Mahoney, and Dr. Cutler were involved in the Terre Haute Experiments supports an inference that they intended to pursue nonconsensual human medical experiments in Guatemala, the Terre Haute Experiments had formal protocols relating to securing informed consent. To the extent that Plaintiffs have argued that the Johns Hopkins Professors must have been frustrated by that requirement and desired to pursue nonconsensual human medical experiments in Guatemala, there is no evidence that any of them ever stated, in writing or otherwise, that they wanted to move to nonconsensual experimentation rather than another effort with volunteer subjects. According to the Presidential Commission, the Terre Haute Experiments were discontinued because of the difficulty of reliably inducing infection in humans, not because they were unable to secure volunteers to participate. Furthermore, while the Presidential Commission stated that research in Guatemala provided an opportunity to work "with reduced concern" for "fear of adverse legal consequences and bad publicity," J.R. 36, it also concluded that the impetus to engage in experimentation there was the "legality of commercial sex work and the requirement for sex workers to undergo health inspection," which presented "the possibility of carrying out carefully controlled studies." J.R. 41. Thus, the record lacks evidence showing that the Johns Hopkins Professors were aware of the

nonconsensual nature of the Guatemala Experiments at the time of the SSS's initial funding recommendation.

### 2.    SSS Funding Renewal

On March 14-15, 1947, Surgeon General Parran presided over a meeting of the National Advisory Health Council which approved renewed funding for the Guatemala Experiments in the amount of $105,800 for "Investigation of Venereal Diseases in Guatemala, Central America" for the fiscal year 1948, beginning on July 1, 1947. J.R. 4265. The SSS thus had recommended the renewed funding at some point before March 1947. Again, there is no evidence that the Johns Hopkins Professors on the SSS were aware of the nonconsensual nature of the Guatemala Experiments at the time of that action.

Plaintiffs argue that such knowledge can be inferred from a series of letters exchanged after that renewal recommendation between Dr. Moore and the other members of the SSS regarding a draft letter from Dr. Moore as Chair of the SSS to Dr. Cassius Van Slyke, the Chief of the Research Grants Division of NIH, which Plaintiffs claim to be evidence of a cover up the nonconsensual nature of the experiments. On May 26, 1947, Dr. Moore wrote to "Members of the Syphilis Study Section," including Dr. Turner and Dr. Eagle, that "it is necessary within the next few days for each Study Section to name a sum desired for the prosecution of investigation in its particular field during the fiscal year 1949 (Beginning July 1, 1948)," which would be "used by the Research Grants Office in requesting an appropriation from the Bureau of the Budget." J.R. 224. Dr. Moore attached a draft letter to Dr. Van Slyke stating that the SSS "believes that an over-all budget of $900,000 is desirable," broke this figure down into six subcategories of research with a description of each subcategory, and provided a table listing the amounts requested and recommended in the past for fiscal year 1948 and the amount tentatively recommended for fiscal year 1949. *Id.* Dr.

Moore requested feedback on whether SSS members thought the $900,000 sum "seem[ed] . . . suitable" and whether they approved of the subcategory divisions and the explanatory comments. J.R. 225.  Dr. Van Slyke was carbon copied on this letter to the SSS members.

Dr. Moore's draft letter to Dr. Van Slyke referenced as one of the six subcategories "Applied Clinical Studies in Syphilis" and included in the description of that subcategory that the SSS "was presented for fiscal 1948 with only three applications in this field," listing as one of the three "the Guatemala study dealing with the experimental transmission of syphilis to human volunteers and improved methods of prophylaxis." J.R. 231.  The draft table accompanying the draft letter stated that for Applied Clinical Studies in Syphilis in fiscal year 1948, the SSS had requested $144,923.84 for the three studies and included an explanatory footnote stating "Mahoney $105,000 (Guatemala)." J.R. 227.

In response to Dr. Moore's request for feedback, Dr. Turner suggested "that the word 'epide[]miological' be added" to the subcategory that included the Guatemala Experiments so that it was entitled "Applied Clinical and Epidemiological Studies in Syphilis." J.R. 4956.  Another member of the SSS, George Mast, wrote to Dr. Moore that because he "assume[d] that this letter might be given to the Bureau of the Budget," he suggested that the discussion of the Applied Clinical Studies in Syphilis subcategory "be rewritten to leave [out] reference to the Guatemala experiment." J.R. 4955.  On June 28, 1947, Dr. Moore sent his final budget letter to Dr. Van Slyke, which reflected these edits.  He re-titled the subcategory "Applied Clinical and Epidemiological Studies in Syphilis" and removed the specific reference to the Guatemala Experiments. J.R. 4960. In the table, he removed the footnote referencing the Guatemala Experiments and reduced the fiscal year 1948 requested amount by the $105,000 allocated to the Guatemala Experiments,

resulting in a lowered total of $39,923.84. *Id.*; J.R. 4964; *see also* J.R. 231; J.R. 235 (showing the handwritten edits).

Plaintiffs argue that this correspondence "evidences a concerted effort to conceal the nature of the experiments by removing the phrase 'experimental transmission' 'to human volunteers' from the title" and that the suggested edits from members of the SSS demonstrated that they "knew the true nature of these Experiments was to be kept from unnecessary scrutiny." Pls.' Mot. Summ. J. at 18. Defendants counter that this series of letters is not nefarious, but rather reflects the mundane reality that the funds for the Guatemala Experiments came from a separate budget within the PHS. The record evidence supports Defendants' account. The minutes of the March 1946 NAHC meeting at which the funding for the Guatemala Experiments, Research Grant 65-C, was initially approved includes a notation that "this project application was different from others in that funds were provided by the Venereal Disease Division with mechanics of processing to be handled by the Research Grants Office," reflecting that the funding did not derive from the Research Grants Office. J.R. 5349. Similarly, a June 11, 1947 schedule listing continuation projects and their funding amounts approved by the NAHC prior to June 1947 included a line item for the renewed funding for the Guatemala Experiments for fiscal year 1948 but instead of providing a funding amount, contained the notation "[t]o be paid by VD." J.R. 2643.

In contrast, Plaintiffs have identified no evidence refuting the clear inference that the removal of the reference to the Guatemala Experiments from Dr. Moore's letter to Dr. Van Slyke was based on the fact that its funding came from a different budget source, not a concerted effort to conceal the nonconsensual human medical experiments. Plaintiffs' interpretation of this exchange is unpersuasive for several other reasons. First, the fact that Dr. Moore referenced the Guatemala Experiments in his original draft shows a lack of intent by Dr. Moore to conceal them.

58

Notably, the suggestion to remove references to the Guatemala Experiments came from an SSS member unaffiliated with Johns Hopkins. Second, Dr. Turner's suggested edit to the title of the subcategory in no way conceals the Guatemala Experiments. Third, where the existence of the Guatemala Experiments in general was not a secret, the removal of references to them does not evidence a cover up when the original language specifically described the Guatemala Experiments as involving the experimental transmission to "human volunteers." J.R. 231. If anything, the letters provide evidence that Dr. Moore was still under the assumption that the Experiments were being conducted with volunteers.

Finally, there is no evidence that between the original funding recommendation in February 1946 and the renewed funding recommendation prior to March 1947, the Johns Hopkins Professors on the SSS received information that the Guatemala Experiments included nonconsensual human medical experiments. To the extent that an inference of such knowledge arguably could flow from the fact that Dr. Mahoney and other PHS personnel were members of the SSS, the evidence affirmatively shows that information about the conduct of the Guatemala Experiments, and the shift to nonconsensual human medical experiments, was tightly controlled within a group of individuals significantly smaller than the SSS. In a May 17, 1947 letter to Dr. Mahoney, shortly after Dr. Cutler began experiments at the Psychiatric Hospital, Dr. Cutler referenced a New York Times article questioning whether certain human experiments relating to syphilis could be conducted ethically and stated that "[i]t is becoming just as clear to us as it appears to be to you that it would not be advisable to have too many people concerned with this work in order to keep down talk and premature writing. I hope that it would be possible to keep the work strictly in your hands without necessity for outside advisors or workers other than those who fit into your program and who can be trusted not to talk." J.R. 309. Subsequently, in his June 22, 1947 letter, Dr. Cutler

again advised Dr. Mahoney that they should strictly limit knowledge of the details of their work. Specifically, he stated that "it is imperative that the least possible be known and said about this project, for a few words to the wrong person here, or even at home, might wreck it or parts of it." J.R. 400.  He further stated that the "four of us in our project have carefully discussed the matter and all feel that we should do all possible to keep knowledge of our project restricted," *id.*, a group which Dr. Paul Lombardo, Senior Advisor to the Presidential Commission, believed to include Dr. Cutler; Dr. Mahoney; Dr. John Heller, the Chief of the PHS Venereal Disease Division, who had visited Guatemala; and possibly Dr. Spoto, but not the Johns Hopkins Professors. Accordingly, Dr. Cutler advised that he would send his "detailed reports and discussions of our work directly to you and not through any other person," and that in complying with the PASB's requirement for monthly reports, his team would "continue to send the barest summaries of our progress." J.R. 400. Dr. Cutler also noted that "[i]it is unfortunate that we have to work in such a guarded, even subterranean way, but it seems to be very necessary." *Id.*  In reply to Dr. Cutler's proposal to send his detailed reports solely to Dr. Mahoney, Dr. Mahoney stated that he was working to "restrict our own conversations and those of others bearing upon the matter" and stated that he had begun "forwarding all of [Cutler's] reports to Doctor Heller in a way which we hope will prevent their being read by unauthorized persons." J.R. 395. Dr. Mahoney further stated that he hoped Dr. Cutler "will not hesitate to stop the experimental work in the event of there being an undue amount of interest in that phase of the study" as it "would be preferable to delay the work than to risk the development of an antagonistic atmosphere." *Id.*

The secrecy appeared to extend throughout the Guatemala Experiments.  On April 19, 1948, Dr. Arnold wrote to Dr. Cutler that he was "more than a bit . . . leary [sic] of the experiment with the insane people" because "[t]hey can not give consent, do not know what is going on, and

if some goody organization got wind of the work, they would raise a lot of smoke," further reflecting that Dr. Cutler's decision to work with the Psychiatric Hospital was not sanctioned from the beginning and was kept under wraps. J.R. 2667-68. On September 3, 1948, as the Experiments were nearing their end, Dr. Mahoney wrote to Dr. Cutler that funding could last for another year, but that at that point it could "become necessary to curtail the work or to request an additional grant." J.R. 5816. Dr. Mahoney stated that "[r]equesting a new grant has some drawback in that it will require a progress report dealing with the work which has been accomplished," which "we might not care to do at the present time." *Id.* As Dr. Cutler summarized in his draft 1955 report, it "was deemed advisable, from the point of view of public and personal relations, to work so that as few people as possible knew the experimental procedure," which "necessitated certain compromises in experimental design and patient management." J.R. 2164.

Where the evidence establishes that knowledge of the details of the Guatemala Experiments, including the changes to the original plan, was limited to a small group of people, and there is no evidence that the Johns Hopkins Professors on the SSS were included within that group, the Court concludes that the evidence is insufficient to establish that based on their service on the SSS and participation in the funding recommendations in 1946 and 1947 relating to the Guatemala Experiments, the Johns Hopkins Professors were aware of the nonconsensual nature of the Guatemala Experiments. Thus, the evidence is insufficient to establish a genuine dispute of material fact as to whether they acted with the purpose of facilitating a violation of the law of nations when they voted to approve the funding recommendations.

### 3.    Dr. Moore

In arguing that Dr. Moore, the Chair of the SSS, knew of and substantially assisted nonconsensual human medical experiments with the requisite purpose, Plaintiffs assert that he

"encouraged, supported, directed and participated in the Guatemala Experiments . . . knowing that the human test subjects were not giving consent." Pls.' Mot. Summ. J. at 45, 47. As examples of such support, Plaintiffs have asserted that Moore "appointed three of his Hopkins colleagues to fill" positions on the SSS and that Dr. Moore, along with the other Johns Hopkins Professors, "gathered support, made recommendations, and obtained Dr. Parran's approval" for the Guatemala Experiments. *Id.* at 46-47. Beyond the fact that nothing in the record provides evidence that Dr. Moore was the decisionmaker on the appointment of the other Johns Hopkins Professors to the SSS, as discussed above, the record relating to the SSS recommendations reveals no evidence that Dr. Moore knew that the Guatemala Experiments would include nonconsensual human experiments at the time of the SSS's funding recommendation in February 1946 or renewal recommendation prior to March 1947. Accordingly, the fact of his participation in the work of the SSS, even as its Chair, does not demonstrate that he acted with the requisite "purpose of facilitating" nonconsensual medical experimentation on human subjects. *Aziz*, 658 F.3d at 401.

Other than his role in the SSS's funding recommendations, Plaintiffs have identified only a few threads of evidence in support of their assertion that Dr. Moore knew that the Guatemala Experiments were nonconsensual and provided substantial assistance to them with the purpose of facilitating them. Plaintiffs point to a January 2, 1948 letter from Dr. Moore to Colonel Donald Longfellow of the Office of the Surgeon General ("the Longfellow Letter") requesting permission for a University of Chicago professor to travel to Guatemala to learn about the Guatemala Experiments. In explaining the request, Dr. Moore described the history of experiments that demonstrated that researchers had not yet been able to identify a reliable means of experimental transmission of syphilis, referenced the Terre Haute Experiments as part of that history, and stated that "Mahoney and his group, under the auspices of the U.S. Public Health Service, have

undertaken an extensive experimental study in human volunteers in Guatemala with results which I am not at liberty to quote but which indicate that even under normal conditions of exposure, there is striking variability in the attack rate." J.R. 1914. Dr. Moore stated that he was seeking "to enlist the interest of competent investigators" to continue to research this issue, and that he had identified Dr. C. Phillip Miller, a Professor of Medicine at the University of Chicago, as someone interested in such work for whom "it would be desirable . . . to have as much first-hand information as possible concerning previous studies" on this issue such as the Guatemala Experiments. J.R. 1915. He therefore requested that Dr. Miller be appointed as a consultant to the Surgeon General in order to allow him to travel to Guatemala for up to two weeks to "familiarize himself with the U.S. Public Health Service Project." J.R. 1915. While Plaintiffs correctly note that this statement may support the conclusion that certain non-public results of the Guatemala Experiments had been shared with Dr. Moore, the conclusion that it also reflects that Dr. Moore was aware of the nonconsensual nature of the experiments does not follow, particularly where Dr. Moore specifically described the Guatemala Experiments as using "human volunteers" and referenced only results that related to "normal conditions of exposure," a term that was elsewhere used to refer to transmission through sexual contact. J.R. 1914. Even if this letter could be construed as evidence of Dr. Moore's knowledge that the Experiments included nonconsensual human medical experiments, it post-dates both the SSS's initial 1946 recommendation of funding and 1947 recommendation of renewed funding and thus cannot support a finding that those actions were taken with the requisite purpose of facilitating nonconsensual human medical experimentation.

Although Plaintiffs have characterized this letter as showing that Dr. Moore was "push[ing] support for the Experiments," Pls.' Mot. Summ. J. at 48, it cannot be fairly characterized as substantial assistance to the Guatemala Experiments. In the letter, Dr. Moore's request that Dr.

Miller, who had "certain ideas which deserve experimental trial," be permitted to travel to Guatemala to learn about the experiments there was explicitly for the purpose of facilitating "the prosecution of further studies of his own at the University of Chicago," not to gather support for or to otherwise assist the Guatemala Experiments themselves, which had already been approved and reapproved for funding and been in progress for at least a year at that point. J.R. 1915. Indeed, Dr. Moore stated that Dr. Miller was "considering the desirability of submitting a proposal to . . . the U.S. Army for a grant in aid to the University of Chicago for this purpose." *Id.* Thus, the Longfellow Letter does not provide evidence that Dr. Moore took any action to provide "substantial assistance" to the Guatemala Experiments for the purpose of facilitating nonconsensual human medical experiments. *Aziz*, 658 F.3d at 401.

The only other evidence offered of Dr. Moore's knowledge of the nonconsensual nature of the Guatemala Experiments is a June 10, 1948 letter to Dr. Mahoney from Hans Neurath, a Professor of Physical Biochemistry, on which Dr. Moore is listed as carbon copied, commenting on a memorandum "dealing with the results of the Guatemala Study on the Euglobulin-Inhibition Test." J.R. 5270. In the letter, Neurath referenced the fact that "only about 11 per cent of the syphilitic patients in the Asylum Group gave the biologic type of reaction and that approximately 18 per cent gave the same type of reaction in those individuals with no evidence of syphilis." *Id.* He also stated that he was surprised at the "apparently higher incidence of syphilitic reactions in the group of patients with no evidence for syphilis in the San Jose and in the Orphanage groups." J.R. 5271. References to an "asylum" group and an "orphanage" group suggest the existence of data collected from residents of the Psychiatric Hospital and from children in the Orphanage, both groups from whom informed consent may not have been obtainable. The letter does not establish, nor does the broader record reflect, that children were deliberately infected with syphilis; rather,

as noted by Dr. Cutler, at some point after serology testing among prisoners revealed unusually high numbers of test subjects with syphilis, the researchers decided to take blood draws from children to determine whether the serology testing methods for the presence of syphilis was accurate.

To the extent that this single document could be construed as showing that at some point Dr. Moore became aware that the Guatemala Experiments included testing on residents of such facilities, this letter was sent in June 1948, over a year after the SSS had recommended approval of renewed funding for the Guatemala Experiments prior to March 1947. Thus, Plaintiffs would still need to identify some act by Dr. Moore after that point that would constitute "substantial assistance" to the Guatemala Experiments that could, based on such knowledge, be deemed to have been committed "with the purpose of facilitating" nonconsensual human medical experiments. *Aziz*, 658 F.3d at 401. There is, however, no evidence of any specific acts taken by Dr. Moore, other than his role in the SSS's earlier funding recommendations, that could be deemed substantial assistance.

Finally, Plaintiffs assert generally that "biospecimens collected from test subjects in Guatemala . . . were sent back to the U.S., where they continued to be used for years after in research projects" conducted by SSS members, including Dr. Moore and the other Johns Hopkins Professors. Pls.' Mot. Summ. J. at 29. However, an examination of Plaintiffs' citations to the record reveals that they support only the proposition that these samples were shipped back to the United States, not that they were shipped to any laboratories at Johns Hopkins, let alone that they were then used by the Johns Hopkins Professors named in this litigation. *See* J.R. 54 (stating solely that samples were shipped back to the United States without reference to a specific location); J.R. 96 (same); J.R. 191 (same); J.R. 193 (referencing "Serologic Follow-up . . . Done at CDC"); J.R.

194 (noting records of tissue samples sent to a VDRL laboratory associated with the University of North Carolina, Chapel Hill); J.R. 208 (noting observation samples were sent to a VDRL laboratory in Georgia); J.R. 209 (same); J.R. 5934-36 (noting that the material was sent from an NIH doctor to a VDRL laboratory at the University of North Carolina, Chapel Hill).

Plaintiffs are therefore left with only the opinion of their historical expert, Dr. Reverby, the historian who uncovered the Guatemala Experiments. Dr. Reverby expressed the opinion that "Moore and others on the Syphilis Section knew what they were doing edged over an ethical boundary" and that Dr. Cutler "had the support of the NIH Syphilis section" and others, including Dr. Moore, "to do what they thought was crucial." J.R. 4783. In support of this opinion, however, Dr. Reverby did not cite to any historical documents or records she reviewed but instead relied on the more general opinion that Dr. Moore was "too thorough a scientist to ever have approved this without knowing exactly what was going on" and "would have to have seen the details" to approve it. J.R. 1116. When asked if there is any evidence of what these "details" were, Dr. Reverby agreed that there is no record of them. *Id.*

Likewise, although Dr. Lombardo has stated that Dr. Moore "knew a great deal," J.R. 498, his only evidentiary basis for this opinion was the Longfellow Letter. When asked in his deposition if he was aware of any evidence that the Johns Hopkins Professors knew about the nonconsensual nature of the experiments, Dr. Lombardo stated, "I don't know what they knew." J.R. 516. Dr. Lombardo also testified he had found no evidence that Dr. Cutler or Dr. Mahoney had sent any detailed reports to Dr. Moore or the SSS. Rather, Dr. Lombardo acknowledged that as to Dr. Cutler's statement in his June 22, 1947 letter to Dr. Mahoney referencing a group of four individuals who had agreed to control information about the Guatemala Experiments, he had found no evidence, and did not believe, that Dr. Cutler's reference to the "four of us" included Dr. Moore

J.R. 499. Finally, no expert or other witness has identified any evidence of an action by Dr. Moore, other than participation in the funding recommendations, that could be characterized as substantial assistance to the Guatemala Experiments. Where the opinions on Dr. Moore's role offered by historical experts are not sufficiently supported by actual evidence, the Court concludes that they are not sufficient to generate a genuine dispute of material fact on whether Dr. Moore provided substantial assistance with the purpose of furthering nonconsensual human medical experiments.

More broadly, because the evidence in the record is insufficient to show that Dr. Moore knew that the Guatemala Experiments were nonconsensual when he participated in the SSS's funding recommendations, or that he took any other actions that constituted substantial assistance to such nonconsensual human medical experiments, the Court concludes that there is insufficient evidence to support a conclusion that Dr. Moore aided and abetted a violation of the law of nations.

### 4. Dr. Turner

As evidence that Dr. Turner aided and abetted the Guatemala Experiments, Plaintiffs cite to his service on the SSS when it recommended funding the Experiments and documentation that on at least one occasion, he shipped syphilitic rabbits to a PHS lab, which then shipped the same or similar rabbits to Guatemala. Plaintiffs argue that the shipping of rabbits was intended to "test his theory" that rabbit syphilis could be used to develop a vaccine for humans. Pls.' Mot. Summ. J. at 27.

As with Dr. Moore, there is no evidence in the record that Dr. Turner was aware of the nonconsensual nature of the Guatemala Experiments at the time of the funding recommendations. The documentary evidence offered by Plaintiffs to show Dr. Turner's involvement in the Guatemala Experiments primarily consists of two letters from Dr. Mahoney to Dr. Cutler. In a September 20, 1946 letter to Dr. Cutler, Dr. Mahoney wrote that "[m]any people appear to be

aware" of the existence of the Guatemala Experiments and were "interested in the studies to be undertaken." J.R. 5253. Specifically, Dr. Mahoney wrote that Dr. Turner "approached me with a suggestion that we endeavour to determine the pathogenicity of the spirochete cuniculi in the human," which Dr. Mahoney considered to "not be a difficult task." *Id.* Dr. Mahoney reported that "utilizing a freshly isolated strain in order to avoid any possibility of contamination" would be advisable and that "Turner would gladly carry this out at any time we indicate our willingness to go ahead with the work." *Id.* A month later, in an October 15, 1946 letter to Dr. Cutler, Dr. Mahoney wrote that he was "frequently asked as to the progress of the work" and stated that Dr. Turner "wants us to check on the pathogenicity in man of the rabbit spirochete." J.R. 5254. Dr. Mahoney stated, however, that he had informed Dr. Turner and others who had inquired "that the laboratory is not completed as yet but when in operation we would more than welcome visitors and inspection." *Id.* There is no evidence that Dr. Turner ever traveled to Guatemala or that he participated in carrying out the Experiments. Plaintiffs have also pointed to correspondence showing that on July 15, 1946, two months before his discussions with Dr. Mahoney, Dr. Turner arranged to have two rabbits infected with the spirochete cuniculi form of syphilis shipped to a PHS laboratory in Staten Island, New York to be used for research, and that on January 27, 1947, that laboratory planned to ship certain unspecified rabbits to Dr. Cutler in Guatemala.

These letters show only that Dr. Turner was aware that the Guatemala Experiments were occurring and that he wanted to participate in them or at least have them address a research question in which he had an interest. Nothing in these letters or any other record evidence suggests that Dr. Turner was aware that the Guatemala Experiments used human test subjects without their consent, or that his proposed research would be conducted on such individuals. Because this evidence does not support a finding that Dr. Turner had the requisite state of mind, the Court need

not resolve the disputed question of whether the syphilitic rabbits shipped by Dr. Turner to the PHS laboratory in New York were the same rabbits later shipped from that facility to Guatemala, and whether the shipping constituted substantial assistance. *See* J.R. 5278-80.

Plaintiffs also point to the minutes of a 1952 meeting of a National Research Council, Committee on Medicine, Subcommittee on Venereal Diseases attended by Drs. Moore, Eagle, Turner, and Cutler. In particular, they focus on Dr. Turner's reference to "studies by Mahoney in which many substances were effective against syphilis if used during the first two hours" as evidence that Dr. Turner and others were aware of the results of the Guatemala Experiments. J.R. 5310. The minutes, however, do not provide information showing that Dr. Turner, Dr. Moore, or Dr. Eagle knew the particular circumstances under which the Guatemala Experiments were conducted, whether in 1952 or, as would be probative here, prior to any actions they took that arguably constituted substantial assistance to the Guatemala Experiments.

In the absence of other evidence, Plaintiffs again cite to the general opinion of Dr. Lombardo that Dr. Turner "knew what was going on," based primarily on the 1946 letters. J.R. 504. Dr. Lombardo, however, later qualified that opinion by acknowledging that he did not know that Dr. Turner was aware of the nonconsensual nature of the Guatemala Experiments. Thus, all Dr. Lombardo's opinion establishes is that Dr. Turner knew that experiments were being conducted in Guatemala related to the transmission of syphilis, a fact not disputed by Defendants. Particularly in light of evidence that the original plan for the Guatemala Experiments was to use only volunteers as test subjects, and that Dr. Cutler and Dr. Mahoney were tightly controlling information about the Guatemala Experiments, *see, e.g.,* J.R. 400, the letters and Dr. Lombardo's opinion are insufficient evidence to create a genuine dispute of material fact on whether Dr. Turner

had the requisite purpose of facilitating nonconsensual human medical experiments as necessary to establish an aiding and abetting claim.

### 5. Dr. Eagle

As for Dr. Eagle, beyond his participation in the funding recommendations by the SSS, Plaintiffs identify as evidence that he aided and abetted an ATS violation the fact that he advocated for his research to be integrated into the Guatemala Experiments, and the fact that he provided life-saving medication to the wife of a key Guatemalan figure who helped ensure that Dr. Cutler had access to military personnel for the Guatemala Experiments.

As with Dr. Moore and Dr. Turner, there is no evidence that Dr. Eagle knew of the nonconsensual nature of the experiments. If anything, letters between Dr. Mahoney and Dr. Cutler suggest the opposite, that Dr. Eagle was kept out of the Guatemala Experiments. Specifically, on May 5, 1947, Dr. Mahoney warned Dr. Cutler that "Harry Eagle is about to complain to the Surgeon General" that Dr. Mahoney had "not been extremely enthusiastic about allowing him to enter the Guatemala study." J.R. 5284. Dr. Mahoney noted that Dr. Eagle had conducted animal studies on the use of penicillin as a prophylaxis for syphilis and could "only prove the thesis by a human experiment." *Id.* Dr. Mahoney stated that although Dr. Eagle had discussed his interest with him, he "could not see wherein a study of that kind would have other than an academic value" and that he did "not care much about having anyone join the study who could not share in the responsibility for the entire program." *Id.* As acknowledged by Dr. Lombardo, there is no evidence that Dr. Eagle was ever permitted to participate in the Guatemala Experiments. There is also no evidence that Dr. Eagle ever visited Guatemala.

Plaintiffs also reference an incident in 1946 in which Dr. Eagle provided a chemical treatment for mercury poisoning to Dr. Mahoney, who forwarded it on to General Tejada of the

Guatemalan Army for use by his wife. On September 12, 1946, after Dr. Cutler wrote to Dr. Mahoney informing him that General Tejada's wife had been subjected to mercury poisoning, Dr. Mahoney responded that he "fe[lt] sure that Doctor Eagle will have a supply" of the commercially unavailable chemical needed to treat such poisoning. J.R. 1910. The chemical was later obtained from Dr. Eagle and forwarded to Dr. Cutler. On November 5, 1946, Dr. Cutler reported to Dr. Mahoney that the chemical had been used to treat General Tejada's wife and that her condition had improved. He further reported that General Tejada "thoroughly enjoyed his visit with [Dr. Mahoney] at Staten Island" and "is very much interested in our study and consequently we are counting on real cooperation from the Army." J.R. 5307. From this exchange, Plaintiffs assert that the provision of the chemical had facilitated cooperation from the Guatemalan Army that in turn facilitated the performance of nonconsensual human medical experiments. Even if this were true, the chain of inferences is far too attenuated for this episode to constitute evidence that Dr. Eagle provided substantial assistance to the Guatemala Experiments for the purpose of facilitating nonconsensual human experiments. There is no evidence that as of September 1946, Dr. Eagle was aware that the Guatemala Experiments involved nonconsensual human medical experiments. There is also no evidence that Dr. Eagle was aware of why Dr. Mahoney needed the chemical, its intended use, or that such use was for the purpose of facilitating cooperation from the Guatemalan Army in nonconsensual human medical experiments.

For these reasons, the evidence is insufficient to establish a genuine dispute of material fact as to whether Dr. Eagle aided and abetted nonconsensual human medical experiments.

### 6. Dr. Reed

As for Dr. Reed, Plaintiffs have not identified any evidence showing any participation in the Guatemala Experiments other than his service on the SSS at the time of the funding

71

recommendations. Thus, for the reasons stated above, the evidence is insufficient to support the conclusion that he aided and abetted a violation of the law of nations based on nonconsensual human medical experiments.

### 7.   Johns Hopkins Liability

As discussed above, the Court finds that there is insufficient evidence to support the conclusion that any of the Johns Hopkins Professors aided and abetted the violation of the law of nations in the Guatemala Experiments. In reaching this conclusion, the Court notes that the discovery in this case has not provided evidence to support many of the compelling allegations that caused the Court to deny the Motion to Dismiss the Third Amended Complaint in *Alvarez II.*

The Complaint alleges that "high level decision makers and policymakers from Johns Hopkins [and] The Rockefeller Foundation . . . entered into a conspiracy with each other and with a small handful of like-minded doctors . . . to design, develop, approve, direct, and oversee the nonconsensual experiments to serve their ends and the ends of their institutions." TAC ¶ 5. This "control group" designed the Experiments to be nonconsensual by instructing researchers to deceive Guatemalans by telling them that they were "receiving routine medical tests" or that they were receiving medication "for their own good." *Id.* ¶¶ 6, 8. However, there is no evidence that any such "control group" involving the Johns Hopkins Professors actually existed or worked together on the Guatemala Experiments. For example, the record is devoid of correspondence between the Johns Hopkins Professors and Dr. Cutler or Dr. Mahoney, the two PHS researchers most intimately involved with the implementation of the Experiments. The only evidence of a small group directing the Experiments is Dr. Cutler's reference in his June 22, 1947 letter to a group of four, consisting of himself, Dr. Mahoney, Dr. Heller, and possibly Dr. Spoto, all of whom were PHS or PASB personnel.

Other compelling allegations included that:

- Dr. Moore "designed the research protocols and tests to be used in the Guatemala Experiments and specifically targeted the vulnerable population groups used as subjects."

- Dr. Moore "helped select Dr. Cutler and Dr. Soper to be in positions of authority in the Experiments."

- Dr. Turner "sent at least 32 sets of infected rabbits" from his John Hopkins laboratory to Guatemala "to be used to infect subjects with syphilis" and "instructed Cutler to inject subjects with T. cuniculi to test its pathogenicity and to send him data from the Experiments."

- Dr. Eagle used staff and resources from a Johns Hopkins laboratory "to assist the researchers in the Experiments" and "shipped arsenic and bismuth, and the appropriate dosing schedules, to Guatemala to be used in the tests."

- Dr. Reed "was involved with defining, transmitting, and analyzing the data received from the Experiments" and worked with Dr. Cutler "to ensure the careful reporting of data and to provide support."

*Alvarez II*, 275 F. Supp. 3d at 699. Based on such allegations, the Court concluded in *Alvarez II* that these "acts of direct material and logistical support and guidance, including sending the rabbits—the source of the harm—are clearly substantial acts of assisting in the nonconsensual human experimentation." *Id.* As it turns out, however, with the exception of the letters establishing that Dr. Turner sent two syphilitic rabbits to a New York laboratory from which they may have been shipped to Guatemala, there is simply no evidence supporting these allegations.

The Court also relied on the Complaint's allegations that Dr. Moore "identified the children, mentally ill patients, and others used as subjects, and knew they did not give informed consent" and "deliberately decided not to seek consent from the Guatemalan subjects" despite knowing how to as he did in the Terre Haute Experiments. *Id.* These allegations also have not been borne out in the record before the Court. Further, while the Complaint alleges that Dr. Turner and Dr. Reed "received data that included the location and ages of test subjects" such that "they

knew that at least some of them were incapable of consent," *id.*, Plaintiffs have not pointed to any evidence of their receipt of such data.  Because the allegations that stated a plausible claim of aiding and abetting nonconsensual human medical experiments are not supported by evidence compiled in discovery, the Court cannot conclude that there is a genuine issue of material fact as to whether the Johns Hopkins Professors aided and abetted an ATS violation.  The Court will therefore grant summary judgment to Johns Hopkins on the aiding and abetting claim.

### B.   Conspiracy Liability

Where the Court finds insufficient evidence to support the conclusion that any of the Johns Hopkins Professors acted with the purpose to facilitate a violation of the law of nations, specifically, nonconsensual human medical experiments, the Court necessarily finds insufficient evidence to support the conspiracy claim.  To prove liability for a conspiracy, Plaintiffs must prove that (1) two or more persons agreed to commit a wrongful act; (2) the defendant "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it"; and (3) "one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005); *accord Al Shimari v. CACI Premier Tech., Inc.*, 300 F. Supp. 3d 758, 783 (E.D. Va. 2018).  Thus, the state of mind required to establish liability for a conspiracy to commit an ATS violation is the same as for aiding and abetting an ATS violation. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009); *Alvarez II*, 275 F. Supp. 3d at 701.  The *mens rea* required is the purpose of facilitating a violation of the law of nations. *Alvarez II*, 275 F. Supp. 3d at 698.  Having found insufficient evidence of that state of mind, *see supra* part IV.A, the Court will grant summary judgment to Johns Hopkins on the conspiracy claim as well.

## CONCLUSION

Based on these rulings, the Court must grant summary judgment to Defendants and need not address Defendants' remaining arguments. Necessarily, the Court must also deny Plaintiffs' Cross Motion for Summary Judgment.

In so ruling, the Court does not find that Dr. Parran and Dr. Soper did not participate in or provide substantial assistance to the Guatemala Experiments with knowledge of the nonconsensual human medical experiments, only that the evidence does not support the conclusion that they were acting on behalf of the Rockefeller Foundation when they supported those Experiments. Nor does the Court the necessarily conclude that the Johns Hopkins Professors had no knowledge that the Guatemala Experiments included such nonconsensual experiments or that they used certain human test subjects who were incapable of consent. The Court finds only that in light of the passage of over 70 years since the Guatemala Experiments, any evidence that may have demonstrated that Dr. Parran or Dr. Soper were acting on behalf of Rockefeller in their work relating to the Guatemala Experiments, or that the Johns Hopkins Professors engaged in acts of substantial assistance to the Guatemala Experiments with the purpose of furthering nonconsensual human medical experiments, has been lost to the sands of time. Where rulings in a court of law, as opposed to the reasoned judgments of historians, must be grounded in admissible evidence, the Court finds insufficient evidence to support the conclusions that Plaintiffs need a factfinder to reach in order to prevail. Under these circumstances, the Court must grant Defendants' Motions.

The Court's ruling also does not reflect any conclusion that, even beyond the issue of consent, the Guatemala Experiments were conducted in an ethical manner. Rather, the Court credits the findings of the Presidential Commission that they were "morally wrong and the individual researchers and institutional officials were morally blameworthy," J.R. 21, and that they

"involved unconscionable violations of ethics," J.R. 105, the direct result of which was that "profoundly vulnerable persons, some in the saddest and most despairing states, had their bodies systematically and repeatedly violated." J.R. 121.   However, because the evidence establishes that the Guatemala Experiments were primarily if not exclusively conceived of, directed by, and conducted by officials of the United States and Guatemalan governments, and in the absence of proof that Defendants were legally responsible, the Court cannot grant relief to Plaintiffs.

The Court recognizes that its ruling will frustrate the efforts of the victims of the Guatemala Experiments to achieve justice.   In the end, the Court's ruling, in combination with another federal court's ruling that the United States government and the successor organization to the PASB are immune from suit for their roles in the Guatemala Experiments, *see Garcia*, 867 F. Supp. 2d at 130-31, 144, illustrates the limits of the court system to provide justice for every injustice.   At other times in our history when the United States government has engaged in egregious conduct against blameless victims, it has not only taken responsibility, as it has in this instance through an apology by the President of the United States to the people of Guatemala, but it has also found other means by which to compensate victims. *See* Civil Liberties Act §§ 2, 105, Pub. L. No. 100-383, 102 Stat. 903, 903-06 (1988) (apologizing for the "grave injustice" of, and providing monetary restitution to the victims of, the internment of Japanese Americans during World War II).   Such actions demonstrate not weakness but the greatness of a nation that strives always to right its wrongs and to advance the cause of justice.   Whether any such remedy will be provided in this instance, however, is beyond the power of this Court to grant.

For the foregoing reasons, Defendants' Motions for Summary Judgment will be GRANTED, and Plaintiffs' Cross Motion for Summary Judgment will be DENIED.  A separate Order shall issue.

Date:   April 18, 2022

THEODORE D. CHUANG
United States District Judge